<u>EXHIBIT 1</u>

DISTRICT OF COLUMBIA SUPERIOR COURT DOCKET SHEET AND
DOCUMENTS

Civil Actions

# Case Summary

### Case No. 2023-CAB-000246

| | | |
|---|---|---|
| **Michael R. Newman v. Howard University School of Law et. al.** | § § § | Location: **Civil Actions** <br> Judicial Officer: **Matini, Shana Frost** <br> Filed on: **01/16/2023** |

---

## Case Information

Case Type: Contract
Subtype: Breach of Contract
Case Status: **01/16/2023   Open**

---

## Assignment Information

**Current Case Assignment**
Case Number     2023-CAB-000246
Court           Civil Actions
Date Assigned   01/16/2023
Judicial Officer   Matini, Shana Frost

---

## Party Information

*Lead Attorneys*

| | | |
|---|---|---|
| **Plaintiff** | **Newman, Michael R.** <br> 1935B Lamont Street NW <br> Washington, DC 20010 | |
| **Defendant** | **Bright, Debra** <br> Assoc. VP Student Aff., Howard University <br> 2400 Sixth Street NW <br> Washington, DC 20059-0001 | **Shafer, Amanda E** <br> *Retained* <br> 202-628-5116(F) <br> 202-688-3451(W) <br> CROWELL & MORING LLP <br> 1001 Pennsylvania Ave., N.W. <br> Washington, DC 20004 <br> aberman@crowell.com |
| | **Evers, Cynthia** <br> Vice President for Student Affairs, Howard University <br> 2400 Sixth Street NW <br> Washington, DC 20059-0001 | **Shafer, Amanda E** <br> *Retained* <br> 202-628-5116(F) <br> 202-688-3451(W) <br> CROWELL & MORING LLP <br> 1001 Pennsylvania Ave., N.W. <br> Washington, DC 20004 <br> aberman@crowell.com |
| | **Frederick, Wayne A.I.** <br> c/o Howard University Office of the President <br> 2400 Sixth Street NW <br> Washington, DC 20059-0001 | **Shafer, Amanda E** <br> *Retained* <br> 202-628-5116(F) <br> 202-688-3451(W) <br> CROWELL & MORING LLP <br> 1001 Pennsylvania Ave., N.W. <br> Washington, DC 20004 <br> aberman@crowell.com |
| | **Holley, Danielle** <br> c/o Howard University School of Law <br> 2900 Van Ness Street NW <br> Washington, DC 20008-1154 | **Shafer, Amanda E** <br> *Retained* <br> 202-628-5116(F) <br> 202-688-3451(W) <br> CROWELL & MORING LLP |

Civil Actions

## Case Summary

### Case No. 2023-CAB-000246

1001 Pennsylvania Ave., N.W.
Washington, DC 20004
aberman@crowell.com

**Howard University**
2400 Sixth Street NW
Washington, DC 20059-0001

**Shafer, Amanda E**
*Retained*
202-628-5116(F)
202-688-3451(W)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
aberman@crowell.com

**Howard University School of Law**
2900 Van Ness Street NW
Washington, DC 20008-1154

**Shafer, Amanda E**
*Retained*
202-628-5116(F)
202-688-3451(W)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
aberman@crowell.com

**Identities Unknown, THIRD PARTIES**
Office of the Dean, Howard Law
2900 Van Ness Street NW
Washington, DC 20008-1154

**Lanier-Smith, Lawan**
Office of Student Conduct, Howard University
2400 Sixth Street NW
Washington, DC 20059-0001

**Shafer, Amanda E**
*Retained*
202-628-5116(F)
202-688-3451(W)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
aberman@crowell.com

---

## Events and Orders of the Court

01/16/2023
Complaint Filed
*Claim Amount: $8,407,000.00 No Summons submitted*
Docketed on:   01/17/2023
Filed by:   Plaintiff Newman, Michael R.

01/24/2023
Summons Issued
Party:   Plaintiff Newman, Michael R.

01/24/2023
Initial Order [Remote]      (Judicial Officer: Matini, Shana Frost)

02/10/2023
Notice to Court (Praecipe) to Enter Appearance Filed
Date 2:   02/14/2023
Filed by:   Defendant Bright, Debra;
Defendant Evers, Cynthia;
Defendant Frederick, Wayne A.I.;
Defendant Holley, Danielle ;
Defendant Howard University;
Defendant Howard University School of Law;
Defendant Lanier-Smith, Lawan

04/21/2023
**Remote Initial Scheduling Conference**   (9:30 AM)   (Judicial Officer: Matini, Shana Frost)

---

**Civil Actions**

## Case Summary

**Case No. 2023-CAB-000246**
Financial Information

---

**Plaintiff**    Newman, Michael R.

| | |
|---|---:|
| Total Financial Assessment | 120.00 |
| Total Payments and Credits | 120.00 |
| **Balance Due as of 02/16/2023** | **0.00** |

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

)
)
MICHAEL R. NEWMAN                                  )
1935B Lamont Street NW                             )
Washington, D.C.  20010-2624                       )
(808) 796-4708                                     )
                                                   )
                   Plaintiff                       )
                                                   )
           v.                                      )
                                                   )
HOWARD UNIVERSITY SCHOOL OF LAW     )
2900 Van Ness Street NW                            )
Washington, D.C.  20008-1154                       )
(202) 806-8000                                     )
                                                   )
        and                                        )
                                                   )
HOWARD UNIVERSITY                                  )
2400 Sixth Street NW                               )
Washington, D.C.  20059-0001                       )
(202) 806-6100                                     )
                                                   )
        and                                        )
                                                   )
DANIELLE HOLLEY, DEAN                              )
Howard University School of Law                    )
2900 Van Ness Street NW                            )
Washington, D.C.  20008-1154                       )
(202) 806-8000                                     )
                                                   )
        and                                        )
                                                   )
WAYNE A.I. FREDERICK, PRESIDENT         )
2400 Sixth Street NW                               )
Washington, D.C.  20059-0001                       )
(202) 806-2500                                     )
                                                   )
        and                                        )

1

CYNTHIA EVERS                                      )
Vice President for Student Affairs                 )
2400 Sixth Street NW                               )
Washington, D.C.  20059-0001                       )
(202) 806-6100                                     )
                                                   )
        and                                        )
                                                   )
DEBRA BRIGHT                                       )
Associate VP of Student Affairs                    )
2400 Sixth Street NW                               )
Washington, D.C.  20059-0001                       )
(202) 806-6100                                     )
                                                   )
        and                                        )
                                                   )
LAWAN LANIER-SMITH                                 )
Office of Student Conduct                          )
2400 Sixth Street NW                               )
Washington, D.C.  20059-0001                       )
(202) 806-6100                                     )
                                                   )
        and                                        )
                                                   )
THIRD PARTIES                                      )
Identities to Be Sought through Discovery          )
                                                   )
                Defendants                         )
                                                   )


COMPLAINT FOR BREACH OF CONTRACT,
BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING,
DEFAMATION, TORTIOUS INTERFERENCE WITH CONTRACT,
AND VIOLATION OF § 1981, § 1985(3), D.C. H.R.A., AND
TITLE VI OF CIVIL RIGHTS ACT OF 1964

Jury Trial Demanded.

**COMPLAINT**

-----
PARTIES

1.    Plaintiff Michael Ray Newman, residing at 1935B Lamont Street NW, Washington D.C., 20010-

      2624, was a student of Howard University School of Law at all times relevant to this complaint.

2

2.      Defendant Howard University School of Law ("Howard Law" or "School") is a private college with

principal place of business at 2900 Van Ness Street NW, Washington, D.C., 20008-1154.

3.      Howard University ("University") is a private university headquartered at 2400 Sixth Street NW,

Washington, D.C., 20059-0002, and operates Howard Law.

4.      At all relevant times, Defendant Danielle Holley, formerly Holley-Walker ("Holley"), was Dean of

Howard Law; Wayne Frederick ("Frederick") was President of the University; Cynthia Evers

("Evers") was University Vice President for Student Affairs; Debra Bright ("Bright") was Associate

Vice President for Student Affairs; and Lawan Lanier-Smith ("Lanier-Smith") was the University's

Director for the Office of Student Conduct and Community Standards.

5.      Defendant third parties, identities to be sought through discovery, include students and other

parties who induced University officials to breach the School's contract with Newman, who

prompted Holley to initiate an action of expulsion, and as specified below.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper pursuant to D.C. Code § 11–921 and § 13–423.

7.      Plaintiff is a United States citizen and resident of the District of Columbia.

8.      Defendants University and School are headquartered in the District of Columbia. Events

underlying this Complaint occurred in the District of Columbia and/or by, on, or through the

agency of University administrators.

## SUMMARY OF FACTS

9.      On December 12, 2019, Howard University School of Law offered Plaintiff Michael Newman

("Newman") a placement in its three-year Juris Doctor ("J.D.") program for the study of law. As

incentive, Howard presented Newman with a scholarship offer of $26,250.00 per year for three

years based on Newman's competitive score on the Law School Admission Test ("LSAT") and undergraduate grade point average ("GPA"). Newman accepted the scholarship and matriculated with the incoming class in the fall semester of 2020. He continued as a student in good standing until expelled by the University on September 19, 2022.

10.     In the summer of 2020, students of Newman's class set up web-based chat rooms using the mobile phone application "GroupMe." Newman joined two such chat groups, one exclusive to "Section 2" (one of three sections of the 2023 class) and a second inclusive of the entire class. In the same manner as other students, Newman used this chat group for purposes which included sharing school-related information, discussing issues of politics and society, and socializing. Privately, Newman posted to a Twitter account but neither interacted with classmates through Twitter nor to his recollection ever informed anyone at Howard Law of his Twitter identity.

11.     Fears surrounding Covid prompted Howard Law officials to announce online-only study from fall 2020 through spring 2021. Students attended classes via "Zoom" or "Teams" software and were introduced to Westlaw's online courseware West Education Network ("TWEN"), where they obtained schedules and course work and submitted assignments to professors. Most professors' TWEN sites included a "Forum" page that allowed any student access to post and respond to topics at will. Most instruction conducted over Zoom or Teams featured a chat function in which students freely posted comments responding to the professor and to one another. Howard Law regularly used an email listserv hosted by Google Gmail to communicate with the 2023 class, the student body as a whole, or all students, faculty, staff, and alumni ("Howard community").

12.     In October 2020, students attended a symposium during which an African-American speaker claimed that if Biden and Harris won the White House they would usher in a "golden age of environmental justice." In response, Newman typed a comment to his Section 2 classmates on

4

GroupMe: "Where I part with the black community is where they believe government solves problems, I only see it causing problems." Newman asked if further dialogue could be had on whether: (1) black voters didn't question turning to government for solutions, and (2) reliably voting for the same party every election disincentivized both parties from responding to the needs of black communities. Some classmates voiced willingness to engage in dialogue with Newman, but upon the request of another student, Newman agreed to move the debate off GroupMe and announced to those who had engaged with him that he would respond to them on a professor's Forum page, which he then did, redacting names of students who had asked to be omitted. The same professor had, at the beginning of the semester, welcomed all students to post topics freely to her Forum and to consider it "their page" to use as they liked.

13. Some students reacted with acrimony to Newman's Forum entry and contacted School administrators. One wrote to Newman individually stating, "You are way outta pocket and I hope [the professor] drags you for filth. pull up your urban dictionary if u want but your groupme privileges are revoked[.]" Newman was removed from the Section 2 GroupMe chat.

14. During the same time, Newman made a comment in the Zoom chat of his Legal Reading, Research, and Writing ("LRRW") class comparing himself as a Caucasian student at Howard Law to an African-American student at a primarily-white university. Newman expressed feeling "utterly disenfranchised." Classmates responded with rancorous opposition and called his remarks "offensive." Newman responded, "I'm here to learn, not just law, but to learn the thoughts and experiences of people of color. Learning is by definition being corrected, so from what I can tell I have to be permitted to make mistakes. Everyone is invited to correct me." One classmate called on him to apologize, and he replied, "[F]rom the bottom of my heart, I would never offend any student or faculty at Howard deliberately. Please accept my apology."

15.     Classmates became more overtly hostile, and some conspired to seek his expulsion. A class
        officer interrupted a professor at close of class to announce a gathering at which Section 2
        students would discuss "next steps"; when the professor asked in response to what, the officer
        spoke abstractly without naming Newman, but classmates understood she was talking about
        him. The professor replied jokingly, "Whoever it is, I'll kill him!" Newman felt humiliated.

16.     In a phone conversation McGahee told Newman he had become the most hated student
        McGahee had seen in his tenure at Howard Law. McGahee attempted to persuade Newman of
        the insensitivity if not outright offensiveness of his comments but could not explain in clear
        terms what he found offensive about them. Newman expressed a willingness to comprehend
        where his error lay before apologizing, and McGahee endorsed this approach. The two
        discussed whether Newman might write a letter to his classmates attempting to better explain
        his positions and reconcile lingering disagreement or animus.

17.     A legal research and writing professor spent almost an entire class session discussing Newman
        and his purported racial insensitivities. Newman had no prior knowledge of the professor's
        planned discussion and was as surprised as his classmates. Nevertheless, some complained that
        controversies for which they deemed Newman responsible were causing them severe stress
        that distracted them from their studies. In deference to this reported anxiety Newman fell silent
        for the remainder of the fall 2020 semester and voiced no further opinions. Throughout that
        time classmates remained hostile toward Newman and refused his participation in study groups.
        A combination of public ostracism, vilification, and humiliation caused Newman to suffer
        depression, anxiety, and suicidal thoughts. He attempted to seek mental health counseling
        through the University, but University counseling services informed him they could not obtain
        the licensing exemption required to provide service in Hawaii, where he resided. Depression and
        anxiety severely hampered Newman's ability to focus on law study.

                                                6

18.     In January 2021 Newman distributed a letter to his classmates in four parts. In his first

        installment, he explained the purpose of his letter, to share "reflections and observations as

        honestly and critically as I can in hopes that some of you will receive wisdom from them and

        reopen your hearts to the friendship that I have long wished to share with you." In his second,

        he recapitulated comments that had stirred controversy, affirmed the diversity of "the 'black'

        community," and called into question some classmates' claims of past race-based harassment at

        other universities. In his third, he related past experiences crossing cultures, which he believed

        "should ideally result in a true merger that forever changes both the newcomer and the host

        environment for the better." His third and fourth installments increasingly incriminated Howard

        Law as a haven for racial bigotry: "Howard Law should establish educational programs to

        promote understanding among its majority-black student body and facilitate dialogue to better

        enhance mutual understanding among its multiracial and multi-ethnic student body. What HUSL

        needs now is more, not less, open and constructive dialogue." Near the conclusion to these

        communications, January 26, 2021, he shared a link to view *Uncle Tom*, a documentary film by

        commentator Larry Elder, the rights to which he had purchased for $300, with his class.

19.     In mid-January 2021 Newman became aware a classmate had discovered his private Twitter

        account and unearthed a "tweet" he had posted July 30, 2020, that reproduced a well-known

        image of emancipated slave "Gordon" baring his very badly scarred back. Newman captioned

        the image, "But we don't know what he did before the picture was taken!" The classmate

        "retweeted" (disseminated a screenshot of) Newman's post to other classmates, who in turn

        reposted and shared it with others within and outside the Howard community. Newman

        immediately responded to several retweets, including the original classmate's, remarking, e.g.,

        "Hello [student's name]. As you retweet this post to vilify me, be aware my point was ironic, in

        response to Americans who attempt to explain away videos of police brutality by claiming that

                                                        7

the victim must have committed wrongdoing before the video started that justified the violence." He added, "This shouldn't need mention, but like you, I view what happened to this man as unconscionable. That you think I would condone physical abuse or slavery shows you know less about me than you could learn by one phone call. You know how to reach me." Neither the original retweeter nor any other responded to attempts at dialogue. Newman tracked down every retweet he could and noted widespread references to his race, gender, sexual preference, age, and personal appearance by members of the Howard community.

20.     Overwhelmingly, student reception to Newman's letter and his offer of the documentary film was negative. Several students derisively labeled his letter a "manifesto." One accused him of "objectively racist, sexist, and overall problematic behavior," another of "manipulating [classmates'] emotions … as a social experiment." Subsequent to the third installment of Newman's letter, he was removed from the 2023 class-wide GroupMe.

21.     In an email dated January 26, 2021, Newman wrote to Howard University President Wayne Frederick, with cc to Holley, "request[ing] assistance from Howard administration to address racial discrimination" and seeking "reassurance that my status as a Caucasian student is equal to that of my African-American colleagues." Newman attached to his email an exchange Newman had engaged in with a classmate on GroupMe. The classmate had ridiculed him, dubbed him "Mayo king," and posted an image of a jar of mayonnaise (a pejorative epithet for Caucasians). Students observing the exchange had said nothing in admonishment to the classmate but rebuked Newman, then excluded him from the chat. President Frederick never responded, but minutes after Newman's email Holley replied asking him to meet with her.

22.     Later the same day, January 26, 2021, Newman distributed the fourth and final part of his letter. Because he had been removed from all group chats, he shared the fourth installment, as well as

his offer of a documentary film, over a School listserv. Following this, McGahee emailed the class of 2023 stating: "[U]se of law school listservs … are restricted to official approved law school business and organizational use. Mass email exchanges are violations. *The policy regarding mass emailing was suspended and is under review to allow students to communicate without layers of approval.* We are prepared to reinstate the formal listserv use policy if the need is apparent. Please consult the office of Student Affairs prior to sending mass emails if you are unsure whether your message meets the stated criteria." [Emphasis added.] McGahee did not elucidate where Howard Law's "formal listserv use policy" was to be found, did not reproduce its precise language, and at no time subsequent to his email ever indicated the "formal listserv use policy" had been reinstated.

23.     Less than one hour after McGahee's email, Holley emailed Newman individually stating, "It has come to my attention that you are sending email messages to the Class of 2023 listserv. You are not authorized to send these emails. I request that you no longer send any emails to the Class of 2023 email list or any other law school email list. The class emails lists are intended to be used by law school faculty, staff, and administrators for official law school business and official announcements from student organizations."

24.     In response to Newman's documentary offer, several students replied over the School listserv. One called him a fool. One wrote, over the listserv, "Stop clogging the listserv." Another speculated he had a "savior complex." In response to the fourth part of his letter, a classmate wrote over the listserv, "According to a cishet white man (1L), Howard University School of Law is among *the most RACIST universities in the COUNTRY.*" Administrators did not reprimand or place consequences on classmates for emailing over the listserv. Newman sent a total of two emails over School listservs in 2021 and none after he was asked to stop.

9

25.  Holley, McGahee, and Newman met two days later, January 28, 2021, over a Zoom conference call. Holley secretly recorded the meeting, she would later admit. Holley complained that Newman's race discrimination concerns were wasting university resources and demonstrated to her Howard Law was a poor choice for him. She suggested he transfer elsewhere. She listed numerous complaints she considered ill conduct on Newman's part, including a video he had shared in the 2023 class GroupMe, the image of Gordon he had tweeted from his private account, and observations and opinions he had expressed on public matters. She accused Newman of racially harassing classmates. She emphasized that as a private university Howard Law owed Newman no First Amendment rights. She asked that from then on Newman confine his activities to classroom study and refrain from discourse outside the classroom. She denied mayonnaise was an epithet or that Newman was a victim of racial discrimination. She said she had asked students to avoid interacting with him and to remove him from GroupMe.

26.  Newman explained to Holley the intent of his tweet of "Gordon" was to support protecting present-day racial minorities from police brutality. Holley expressed understanding and relief.

27.  The next day, Howard Law told Newman his fall 2020 academic performance placed him in the bottom half of his class and jeopardized continued award of his academic merit scholarship.

28.  January 31, 2021, three days after her private Zoom conference with McGahee and Newman, Holley hosted a regularly scheduled "Town Hall" meeting. Normally the weekly venue hosted up to ten participants, however, in the days leading up to the Town Hall large numbers of students signaled their determination to attend, discuss Newman, and probe administrators as to their planned response. One student tweeted: "Me waiting patiently for my classmates to gather mayo king and admin in this community meeting." A group of students formed a separate chat group for live discussion during the Town Hall, at one point naming their group "King Mayo."

10

Newman wrote twice to Holley and McGahee predicting "a tremendous amount of vitriol" at the Town Hall, requesting "a trained professional [be] present to mediate the discussion," and recommending Denise Robinson, a professional counselor who had hosted inclusivity seminars for Howard Law in the past. Administrators ignored both requests but emphasized the purpose of the Sunday Town Hall was "not to discuss you or any other student." Holley did not provide Newman with a link to attend the Town Hall. He requested and obtained one from McGahee.

29.     Addressing a crowd of 300 participants, Holley opened by saying, "[I]t was very clear what the topic this week needed to be." The entire two hour, ten minute meeting was spent discussing controversies surrounding Newman, venting hostility and anger toward him and statements and views attributed to him. Holley indicated she had met or would meet separately with Howard Law alumni to discuss the same topic. (Newman was never invited to join any alumni meeting.) After introductory remarks Holley invited all participants who had comments or questions to press the Zoom application's "raised hand" function. Newman repeatedly did so.

30.     Addressing the crowd, Holley averred that FERPA prevented her from discussing any particular student, thus she avoided calling Newman by name, but all participants understood her discussion pertained to him. Holley acknowledged a "petition I received this morning," adding, "we take that very seriously." Holley characterized Newman's writings as "hurtful," "wrong," "lies," "untruthful," "not based in history," and "disturbing in every sense of the word." She cast Newman as someone who was "in our community who [doesn't] share our values." She repeatedly urged students to file formal complaints against Newman for disruption, instructed them how to do so, and offered additional assistance as needed.

31.     (No student ever filed a formal complaint against Newman under the Code.)

32.     During the Town Hall, students referred to Howard Law as "a black space" six times and called

the School "our space" or "our own space" four times. Holley endorsed and repeated this use of

the word saying, "One of the questions that I have for this group is, what does it mean for us to

protect our own spaces?" A student wished to determine "what it means to be a black space,"

and added, "We do have a role in defining what our space is and how our space looks and the

standards of engaging in it." One student called Newman's comments "racist, homophobic,

sexist, transphobic," however, at no point in the Town Hall were his past comments examined,

quoted, or their content discussed on its merits. Rather, all discussion focused solely on the fact

that a Caucasian student at Howard Law had broken tabus by voicing unpopular views and

opinions and refusing to defer to African-American classmates.

33.     One student said Newman had "infiltrat[ed] the community" and "[didn't] fully understand the

community standards." She and others suggested interviewing future applicants to weed out

others like Newman. Newman was accused of "terrorizing the students," of "derailing entire

classes because of [his] entitlement," and "repeated incidents of harassment." One student

connected Newman to what he called a "white supremacist insurrection" at the Capitol three

weeks prior (January 6). References to Newman's race were made continuously throughout the

town hall. He was chastised for using a brown-toned "raised hand" icon instead of a fair one,

which one student called "virtual blackface." One student went so far as to compare Newman to

Caucasians of prior generations who had "hung [African-Americans] from trees." In fact, he

initially accused Newman of directly participating in such crimes but quickly corrected himself:

"[A]s we were hung from trees, you said, 'Get that'—uh, uh, the people, white people, said, 'Get

that boy!'" Many expressed dissatisfaction Holley had not already taken corrective action.

34.     In the chat, Newman asked, "How do we reconcile calling Howard a multiracial community that

embraces diverstiy [sic] and inclusion while continuing to use terms like 'our own space' and 'a

black space'?" To this students replied: "Example #1000 from Mr. Newman"; "this is what we are talking about"; "we reconcile it by acknowledging you're at a HBCU"; "[d]o you even know what an HBCU is my guy." Two students accused Newman of "hate speech." Six references were made to his race. A student typed, "Imagine a white man believing that they have radical ideas to bring to an HBCU campus."

35.     During the course of the Town Hall, Newman requested to speak by raising his electronic "hand" three times. Holley disengaged his "raised hand" each time. Soon after Newman commented in the chat, the chat function was turned off. He was unable to unmute himself in order to speak, though all discussion revolved around him, and a number of participants called on him to speak apparently believing he was refusing when in fact he was unable. When discussion turned to Newman's tweet of former slave Gordon and students expressed their dismay that a Howard Law student (they thought) endorsed physical abuse of slaves, Newman held up a handwritten sign to his webcam that read: "DEAN HOLLEY-WALKER: Please correct the record as regards the photograph of a beaten slave." Immediately, Holley turned off Newman's camera. After a time the chat was reopened, and Newman typed: "I would like to explain the photograph. Dean Holley-Walker, you already know the explanation. Allow me to explain if you won't." Other participants also pressed Holley to grant Newman an opportunity to speak. In response Holley announced she would unmute Newman and allow him to speak. Then, without explanation, she invited two other participants to speak and afterward announced she was closing the meeting. Many comments poured into the Zoom chat insisting Newman be given a chance to speak. Holley finally extended the meeting to invite Newman to speak, which he did for eight minutes before Holley interrupted.

36.     Newman invited anyone who was interested to speak with him over the phone. He offered to answer any questions anyone had. He explained that his tweet of Gordon was intended to voice

13

support for racial minorities who suffered police violence. He denied ever supporting slavery,

violence, or subjugation of racial minorities and affirmed a desire to see "people of color lifted

up educationally and economically" as well as a commitment to "free speech and open

dialogue." He "extend[ed] [his] love and friendship to everyone in the class" and professed a

"genuine feeling of devotion, wanting to serve people of color in the United States."

37.     Newman's words did little to quell criticisms from other participants. Derisive comments

continued to appear in the Zoom chat and included frequent references to Newman's race. One

called him "the White Panther." Another typed, "white man Savior complex maybe?" Holley

demonstrated throughout the Town Hall she was watching the chat attentively but said nothing

in response to antagonistic comments highlighting Newman's race.

38.     In the days leading up to the Town Hall and during it students and alumni posted comments

about Newman to one another over Twitter, calling him "keebler cookie" (pejorative for

Caucasian), "the white man," "this racist white man," "cis-het white man," "wild ass white boy,"

and "snow possum," and reproduced his photograph for public ridicule. One tweeted, "how are

you gonna say h*ward is racist???? it was created because of racism homie." One tweeted,

"NOT THIS WHITE MAN WITH A BROWN HAND" (referring to his brown-toned raised hand) and

"Does this man have to call us [N-words] for them to actually do something???" Another

tweeted, "why is this racist white man STILL at HUSL[?]"

39.     Two days following the Town Hall meeting, Holley sent an email to the 2023 class, but omitting

Newman from among recipients, which stated, "I made a request several weeks ago to your

class leadership to have any student who uses GroupMe in a way that is disruptive to the

educational environment removed from the GroupMe. Please monitor your GroupMe chats and

report to me any posts that are disruptive to the academic environment."

40.    Although Newman's final grades in fall 2020 had averaged among the lowest in his class at 70.4, his spring 2021 average rose to 90.7. Newman believed his spring grades brought his cumulative average up to the top half of his class.

41.    In August 2021, now required to attend class in person, Newman moved with his son from Hawaii to northwest Washington, D.C., and enrolled his son into a local elementary school; his wife and daughter remained in Hawaii. Newman attended class regularly. On August 25, 2021, Newman visited McGahee's office to inquire about an administrative hold on his account and apparent delay with his scholarship. McGahee informed Newman later that day that he had fallen within the lower half of his class and that as a consequence his scholarship had been revoked. On October 6, 2021, Newman met with Holley and McGahee to ask them to consider reinstating his scholarship on one or another of two bases: One, he asserted that his poor performance in the fall of 2020 resulted directly from mental anguish caused by a hostile educational environment arising from racial discrimination which administrators knowingly allowed and even fomented. Newman recounted how, during fall 2020, ostracism and public humiliation had caused him to suffer depression, anxiety, and intrusive thoughts of suicide. Two, he was never informed before moving to Washington that his scholarship had been revoked.

42.    Holley denied Caucasian students at Howard Law, and Newman in particular, faced racial discrimination to any degree. McGahee claimed all Newman's difficulties with classmates sprang from the fact that Newman said offensive things.

43.    In September 2021, a Howard Law administrator called a gathering of second-year students to discuss academic performance and offer guidance to improve their grades. She opened the floor for questions or comments, reassuring them that "whenever you are sharing space with me that it is a safe space"; and "You can share with each other in this room even though you may not

15

feel comfortable doing that in other spaces"; and "We're all in this thing together." Newman raised his hand and when called on said, "I love my classmates. I love being here. I wouldn't [rather] be at any other school…. I say this with love. I don't mean to bring up animosity, but it's an unquestionable fact for me that my fall grades were a flop as a direct result of discrimination that I had to face in the one-L year." As Newman was speaking, every classmate in the room, as many as two dozen, stood up and walked out, with the administrator following behind.

44.     On October 21, 2021, Newman was permitted to join a new GroupMe chat populated by the entire student body as well as alumni. Newman expressed a desire "for open dialogue about Howard's lack of inclusivity." Subsequently, he asked, "Has HUSL achieved an inclusive environment? Or is it failing in this regard?" Newman commented, "Double kudos to anyone struggling with a psychiatric condition who chose to study law. Either burden by itself would hobble most people. But as a practicing attorney you'll be uniquely disposed to meet the needs of mentally ill clients caught up in a legal system that stacks the deck against them. Rare is the lawyer with the patience and insight to look past the illness and see the person within and guide them past institutional obstacles and societal prejudice. Thanks for persevering." A classmate reacted by accusing Newman of "passive-aggressively attempting to insult yet another Black person in this GroupMe." Newman was permanently removed from the chat group.

45.     Newman filed a formal complaint of racial discrimination with the University alleging that his exclusion from GroupMe was motivated by racial animus. Newman met with an attorney to whom the University had outsourced its investigation. Newman told the attorney-investigator that racial discrimination at Howard Law was pervasive and oppressive. A conclusion to the investigation read: "Howard University reaffirms its commitment to provide an environment for its community members that is free from discrimination, harassment and retaliation…. Based on

an investigation that was completed, a finding of racial discrimination in violation of federal or
local laws, or University policy, could not be substantiated."

46.     On January 24, 2022, a student sent an email over the School listservs, attaching an open letter
to Holley signed by 26 classmates voicing their disagreement with the School's decision to
return to in-person study in the face of what he considered unacceptable health risk presented
by "the serious and worsening state of the pandemic." The classmate purported to write "[o]n
behalf of the student body." Holley replied, also using the listservs: "Good morning, I will review
your letter carefully. I am happy to continue to address the concerns in this letter. … I will hold
open office hours tomorrow. … I welcome all concerned students to join those sessions."

47.     The following day, January 25, 2022, Newman emailed  a response to the open letter, also using
School listservs, stating that "every member of the student body should be at liberty to share his
views as these signers have and respond to one another as I'm doing, whether via the listserv or
elsewhere." Newman praised the classmates "for their willingness … to voice their views openly
and attempt to wrest control for themselves over decisions directly affecting them" and
admonished administrators for their "aloofness" and "often opaque and autocratic policies."
Newman, however, disagreed with the premise of the open letter and contended "the perceived
risk of Covid to healthy young people [was] [] highly overblown," while a lack of in-person
human contact was jeopardizing people's mental health.

48.     Twenty minutes after sending his email, Newman received a reply from Holley stating,
"Mr. Newman, This is an unauthorized use of the law school's email system and the class
listservs. Please refrain from using these mediums of communication." Newman replied, asking,
"Why was my email unauthorized but the open letter others sent wasn't? Why would you want
to prevent me from responding to an open letter that purported to represent me? What

17

medium of communication is available to me in absence of the listserv?" Holley did not respond. Newman set an appointment to meet with Holley the same day.

49.     It was well known at the time a 28-year-old Howard Law student had died suddenly and unexpectedly. Administrators had revealed no cause of death. Newman contacted Howard Law Director of Student Affairs Adrienne J. Packard on January 24, 2022, but she had no information. Some speculated the student may have committed suicide. In a private Zoom call of January 25, 2022, Newman asked Holley the cause of the student's death. Holley replied that she was "baffled" by what she considered a "highly inappropriate question." She nevertheless denied the student's death was related to suicide, Covid, or the Covid vaccine.

50.     On the topic of Newman's email earlier that day, Holley clarified that a year earlier, January 28, 2021, she had permanently banned Newman from any use of School listservs. She said she had assigned to Newman a special status unlike that of other students who also had used School listservs at the time. She called Newman a chronic offender of the School's "listserv policy." She again did not supply any printed text or identify any location or precise language of such a policy. Conversely, she conceded Newman may email classmates using cc or bcc email functions.

51.     In attempted compliance with Holley's instruction, on January 29, 2022, Newman sent an open letter from his private email account, using the bcc function, to a number of students with an open letter calling on Holley to delay a pending vaccine booster deadline and encouraging students to investigate more fully before undergoing repeat vaccinations. He shared a link to a news report in the deceased classmate's hometown reporting she had died from pulmonary embolism (PE), a condition scientifically linked to mRNA vaccines.

52.     Minutes after Newman's email he received a reply from Dean Holley stating, "I warned you on Wednesday not to send any more unauthorized emails to the law school student body or using

law school resources. You are now using the Outlook address book to individually email students with a message that has been characterized by your fellow students as 'disgusting' and 'disturbing'. You have continued to violate the University's email policy. Please be on notice that I am having your Howard email address suspended and your gmail blocked from the law school system. I will bring student code of conduct charges against you on Monday morning."

53.   On January 31, 2022, Holley filed a formal complaint against Newman alleging "continual harassment of member [sic] of the Howard Law community, and disturbance of the learning environment at the School of Law." The same day, Newman filed a formal complaint against Holley alleging "threats," "discrimination," and "hostile academic environment." Newman contended, "[Holley's] verbal and written threats of disciplinary action are misuses of university procedure and abuses of the power imbalance that inheres in her position as Dean aimed to intimidate me from expressing information and views she disfavors and to control what information or opinions are shared among classmates." He asked for formal investigation and disciplinary action against Holley.

54.   That evening, January 31, 2022, Newman arrived to a class on campus and was met at the door by six students who told him that talking about the classmate's death was "unacceptable." They rejected Newman's attempt to engage them in dialogue, telling him they only wished to communicate to him their displeasure and warn him never to do it again. The students told Newman Holley owed him no duty to share facts pertinent to the deceased classmate's death.

55.   Holley's complaint was adjudicated by the Director of Howard University's Office of Student Conduct & Community Standards Lawan Lanier-Smith. Lanier-Smith was also the official to whom Newman had submitted his complaint against Holley. In an introductory meeting of February 25, 2022, Lanier-Smith refused to reveal the status or whereabouts of his complaint

against Holley, saying only that it had been referred to "appropriate" University administrators. Lanier-Smith spoke of Holley's accusations against Newman as established facts rather than as unsubstantiated claims. She asked him to submit a written explanation for his "continuous" use of listservs over the protests of School administrators and his insistence on "disrupting" School operations. Newman emailed Lanier-Smith asking her to recuse herself. She never responded.

56.     To his knowledge and belief, Newman's complaint against Holley was never adjudicated.

57.     Lanier-Smith informed Newman both at their initial meeting and at his first hearing that the Code denied him an opportunity to cross-examination Holley. In fact, the Code guarantees students the right "[t]o face accuser(s) and have the opportunity to cross-examine them."

58.     At Newman's first hearing of April 21, 2022, Lanier-Smith opened by emphasizing the importance of succinctness and "not taking up too much of everyone's time."

59.     Much of Holley's testimony at Newman's first hearing relied on material misquotes of his past written comments which Holley seemed to recall offhand rather than to read from original texts. She made numerous false claims, some having no clear relevance to her complaint. Her evidence included emails from students and other third parties, but she presented no witnesses. She spoke ramblingly with little indication as to which of Newman's alleged actions constituted offenses under the Code or which of these warranted disciplinary action. She accused Newman of having subjected classmates to "racial harassment," described Newman as argumentative and obstinate, accused him of harassing her administrative assistant, described a law school environment of mayhem for which she deemed Newman solely responsible, and declared she had never witnessed such a force for destruction in her entire career.

60.     After her conclusion, despite ample opportunity to question Holley, the only question posed, and one without relevance to the complaint, was, "What was the name of that symposium?"

Holley was never asked to show evidence Newman "continually emailed over the listserv" in 2021 in defiance of administrators' instructions or for any other of her claims.

61.   Lanier-Smith informed Newman he may have no more than 15 minutes to present his defense. Newman produced electronic time stamps from emails of January 2021 that refuted Holley's claim he had defied her or McGahee's instructions. He pointed to the fact Holley's complaint largely accused Newman of disruption but that Holley had never shown how emails constituted disruptions. He took issue with her conclusory accusations and explained to the panelists the meaning of the word "conclusory" and why such evidence should be held unpersuasive. He denied making the statements Holley had attributed to him.

62.   Newman informed the panel that he had spent a total of some $1000 on classmates and had come to Howard Law with love and the hope for lifelong friendships.

63.   Panelists asked Newman why he had continued to use the listserv after being asked to stop despite Newman having just shown email timestamps refuting this claim. A panelist expressed incredulity that Newman had continued inquiry into the cause of a classmate's death after his Dean had denied him this information. They expressed disinterest in the news report the classmate died of pulmonary embolism or scientific evidence of a link between mRNA vaccines and PE. They discounted Newman's claim of unequal treatment, saying it was irrelevant that other classmates had engaged in substantially-same conduct as Newman.

64.   The University's Notice of Findings, delivered May 10, 2022, declared Newman "Responsible" but supplied no rationale for its decision. The Notice consisted solely of boilerplate with Newman's name and the word "Responsible" pasted in. Newman appealed.

65.   Newman contended procedural error, substantive error, and disproportionate sanction. As procedural error, citing relevant portions of the Code, Newman contended that most of Holley's

factual allegations pertained to the distant past, far beyond the five-day limitation of actions prescribed in the Code. He took issue with Holley's citations to "vague swaths of the Code … without showing how any alleged act on my part constituted violations." He protested the denial of an opportunity to cross-examine Holley. He alleged "numerous examples of bias," including Lanier-Smith's refusal to recuse herself. He called into question the propriety of allowing the complainant (Holley) license to interpret the Code and contended that an impartial observer would have found "no textual support in the Code" to support Holley's claims; or, to whatever extent the panelists or Lanier-Smith interpreted the Code independently, they failed to include their reasoning in their Notice of Findings. Newman cited the panelists' apparent disregard for seemingly unassailable evidence of email timestamps refuting several of Holley's contentions. Newman took issue with the limitation of 15 minutes for his defense. In conclusion, he alluded to "numerous other ways" in which he believed a fair process had been denied him.

66.   As substantial errors, Newman contended that Holley's claims included numerous falsifications and distortions of evidence. He called Holley's "inconsistent responses" to his conduct and his classmates' substantially-same conduct "unlawfully discriminatory." Newman insisted that not only had he complied with Holley's January 2021 request to cease use of the listserv, as well as her January 2022 similar request, but additionally, his email about a classmate's death, which became part of the basis for Holley's complaint, was sent in precise compliance with Holley's instructions. Finally, he called Holley's claim of harassment spurious.

67.   As a third basis for appeal, Newman declared expulsion a disproportionate sanction, writing, "One classmate finally convinced me [the deceased student] must have taken her own life. This caused me such severe anguish that I wept uncontrollably. When I regained composure, I looked online to see if any news outlet had shed light on her cause of death. That was when I learned for the first time that [the student] had died of PE. She was 28 or 29 years old. I personally had

never known of anyone [the student's] age in good health to die so suddenly and unexpectedly of a natural cause. It took only one simple internet search to discover a potential link between the Covid vaccine and PE. With the deadline approaching the very next day, I undertook to warn my classmates to conduct their own research before undergoing additional vaccination. The fear of another death even woke me in the middle of the night to work on composing my thoughts for publication. The Dean herself had already granted her approval for emails sent from one's personal email account. But even if she hadn't, I would have felt obligated as a matter of moral stewardship to alert students to the potential risk of undergoing vaccination."

68.     Newman added, "Similarly, every other writing I have publicized to my classmates I have intended to be for their benefit. I came to Howard with the expectation that some students would be bigoted toward me on account of my race, my age, my sex, and other like factors. I never anticipated such bigotry would so dominate the milieu. I never envisioned that administrators would not only condone that bigotry but stoke it yet greater. And despite discrimination on a scale none of my classmates likely ever experienced, I never stopped caring for their wellbeing. I want them to see the logical fallacies built into the world view that's been foisted on them, the wealth of evidence that undermines their assumptions about their own status and station in American society, and the improvements they could foster by believing not only in themselves but in those they deem their enemies. Perhaps above all, I believe it is my right and responsibility to fight without ceasing for the right to freedom of expression and dissent. And the record will show that I have made every attempt to exercise this right through proper venue and decorum."

69.     On June 6, 2022, Associate Vice President Bright informed Newman she would consider an appeal on two grounds: procedural error, "but only with respect to the opportunity for cross-examination," and disproportionate sanction. Bright confirmed the Code guaranteed an accused

student the right to cross-examine his accuser. She admitted she had heard a recording of the hearing and heard Lanier-Smith deny Newman an opportunity to cross-examine Holley. But she refused to answer whether this alone were not enough to support Newman's appeal and refused to state whether the hearing had been biased against him. When Newman invited Bright to ask him questions, she expressed interest primarily in knowing what questions he would have asked Holley if he had been granted the opportunity. Newman voiced his suspicion Bright was chiefly interested in gathering information from him she could pass on to Holley so the latter could prepare for cross-examination in advance of a rehearing. Bright denied that friendly relations between Holley and Lanier-Smith could have affected the disciplinary process.

70.     The Foundation for Individual Rights and Expression ("FIRE") wrote to President Frederick and Holley in support of Newman. FIRE recapitulated the factual history of Newman's disciplinary charges as well as their procedural history and, with Newman's consent, invited Frederick to supply any additional facts deemed relevant. FIRE reminded Frederick of Howard University's promises of free expression with citations to the Student Handbook: "With appreciation for the tradition of freedom of expression on campus, the University reasserts its commitment to fostering and tolerating different viewpoints"; and "As members of the University Community, all students are guaranteed freedom of expression, inquiry and assembly." FIRE contended that: "(A) Newman's Emails Constituted Core Speech; (B) Newman's Emails [Did] Not Constitute Disruptive Conduct; (C) Howard Enforced its Listserv Policy in a Viewpoint-Discriminatory Manner; and, (D) Newman's Emails [Did] Not Amount to Harassment." Neither Frederick nor Holley responded.

71.     Over Newman's protests, the University assembled the same three panelists for his rehearing. Holley's testimony of July 26, 2022, repeated the same false and conclusory assertions she had made at the prior hearing, again referring to Newman's four-part letter as a "manifesto." She

acknowledged the deceased student had died of PE. She claimed Newman had alleged the student died from a Covid vaccine. (Newman had asserted only a *potential* link.) She called Newman's email about the deceased student "defamatory." She again claimed Newman had continually defied University policy and administrators' instructions.

72.   Lanier-Smith limited Newman's cross-examination to 20 minutes. Holley refused to answer a number of questions and, when she did answer, added up to one minute of additional comment. Newman was not permitted to limit Holley's answers, but Lanier-Smith told him he may have more time for cross-examination. Newman attempted to cut Holley's answers short several times, Lanier-Smith reprimanding him and threatening further sanctions each time. Lanier-Smith never checked Holley for evasiveness and sometimes interrupted to prevent her from answering. Holley claimed she had not read FIRE's letter.

73.   Holley admitted under cross-examination she had supplied the hearing panel evidence against Newman that he was never shown. She denied this constituted "secret evidence."

74.   Holley's complaint had accused Newman of harassment without naming any victims, and under cross-examination, Holley informed Newman for the first time that she herself was his victim. Holley claimed that, by inquiring into his classmate's cause of death during their Zoom meeting of January 25, 2022, and by publishing the classmate's reported cause of death, Newman had committed harassment against Holley. Holley also claimed to bring the action for harassment against Newman on behalf of a group of the deceased classmate's "friends," unnamed, including the authors of emails included in her complaint.

75.   Lanier-Smith prevented Holley from answering when Newman asked about an uprising in which Howard University students seized Blackburn Community Center on the main campus and held it for more than 30 days but were not expelled. Newman nevertheless asked Holley, "If the

25

university sanctioned a Caucasian student but not a black student for substantially the same conduct, would the university be in violation of Title VI of the Civil Rights Act?" Holley warned Newman that filing a Title VI cause of action against the University "would be very negative for you in terms of your own career."

76.    Finally, Newman presented a black-and-white photograph of Howard University students participating in a sit-in protest at an area pharmacy in the 1960s. Newman posed the question, "Do you think that the manager of this establishment could have made a plausible claim that these students' behavior was disruptive?" Holley seemed to regard this question as the most offensive remark she had yet heard from Newman and spoke for several minutes about the outright offensiveness of Newman comparing himself to past Howard student protesters demonstrating for equal treatment. Holley declared to the panelists she was glad Newman had put his offensiveness on full display, exclaiming, "This is Michael Newman 101!" then described how her mother had suffered under Jim Crow segregation and how Newman must have known this and wanted to provoke her in a deliberately hurtful manner. Panelists denounced what they considered a demeaning spectacle.

77.    The hearing panel's second Notice of Findings was identical to the first. In Newman's second appeal, he objected to the use of secret evidence, apparent disregard for evidence exonerating him, and facial absurdity of the charge "harassment." He added the previously-unmentioned fact McGahee had discussed with Newman writing a letter to classmates back in October 2000 and said use of the same letter in an act of expulsion "border[ed] on contemptuousness."

78.    Evers denied Newman's second appeal, finalizing the University's decision to expel Newman. Evers denied secret evidence had been used against Newman, contrary to Holley's open

admission it had. She asserted the Code included no requirement "that a specific or individual 'victim' … be identified in a complaint" of harassment.

79.   Evers asserted that Holley's oft-repeated claims Newman had used the listserv in violation of School policy and against her express commands were, in fact, tangential and "did not 'materially affect the decision or finding of the Hearing Panel.'" In fact, Holley had consistently emphasized this claim as central to her complaint, a hearing panelist indicated she was much affected by this particular point, Lanier-Smith focused on it primarily in her first meeting with Newman, and at Newman's appeal hearing Bright asserted that his purported misuse of the listserv was the very cause of the alleged disruptions. (Moreover, Evers could not have deduced, in the absence of any supportive rationale in the panel's Notice of Findings, what information panelists had deemed central or peripheral to their findings.) Finally, Evers asserted that expulsion was a proportionate sanction in part because Newman "had not shown contrition throughout [his] student conduct process."

CAUSES OF ACTION

### Count I: Violation of Title VI of the Civil Rights Act of 1964.
***As against University and School.***

80.   Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

81.   Newman bases a prima facie case for discrimination on disparate treatment, hostile educational environment, and retaliation. The University and Law School are recipients of significant federal funds. Newman belonged to a racial minority as a Caucasian student at Howard Law.

### A. *Disparate Treatment.*

82.   In January 2021, other students who had used University listservs were not sanctioned. For two emails sent over the listserv Holley "permanently banned" Newman from listservs, restricted his

email access, called him a "chronic offender" of a purported "listserv policy," assigned him subordinate status with diminished privileges, and insisted he abstain from interaction with classmates outside the classroom. A year later, in January 2022, African-American students who signed an open letter and disseminated it via listserv were not reprimanded (in fact, Holley responded favorably to them), but when Newman responded to their open letter over the listserv Holley severely reprimanded him, threatened him with disciplinary action, filed a complaint against him, and prosecuted him with disregard for abundant evidence he had attempted to comply with her ambiguous and unclear policy.

83. No clear "listserv policy" existed anywhere in the Code, but if any did, McGahee's email of January 2021 attested that the policy was in suspension at the time Newman sent emails over the listserv. His third and last listserv use in 2022 came after Holley responded congenially to African-Americans' listserv use, leading him to understand she allowed use in that instance. Holley's allegations of Code violations were pretexts for discriminatory treatment.

84. Beginning in fall 2020, Holley and classmates scrutinized Newman's commentaries on public issues, which were not objectively offensive, while condoning inflammatory racial rhetoric by African-Americans, including racial epithets in and outside the classroom. She rebuked Newman for a video he posted to GroupMe describing observations on race and racial politics, but when asked to comment on a classmate's video which derided Howard University for promoting an Asian-American journalist, and which featured a co-host who said she attended an HBCU "just to get away from white people," Holley emphasized she had no control over GroupMe. She asked students to "monitor your GroupMe chats and report to me any posts that are disruptive to the academic environment," which she meant regarding Newman. To fulfill her request a classmate defamed Newman with a knowingly false representation of his tweet of Gordon.

85.   Defendants prosecuted Holley's formal complaint against Newman alleging "disruption" and
      "harassment" with willful disregard for the speciousness of the claims. Defendants expelled
      Newman for "disruption" over emails he had sent, but did not prosecute or reprimand
      classmates for emails and other communications of exaggerated alarm. "Disruptions," if any,
      resulted only from classmates' reactions and not from Newman's commentaries on public
      issues, advocacies of sociopolitical changes, or warnings of potential dangers to their health and
      reflected the view of students and administrators that Caucasian students of Howard Law may
      not express themselves with the same freedom as African-American students. Administrators'
      and students' uses of the phrases "a black space," "our space," and "our own spaces" reflected
      the view African-American students enjoy a status of privilege above that of Caucasians.

86.   Holley subjected Newman to more than two hours of scorn and criticism while attempting to
      prevent him from speaking in his own defense. No African-American Howard Law student has
      been forced to endure such public condemnation and humiliation.

87.   The University's persecution of Newman for disruptions his emails allegedly caused contrasted
      starkly with its treatment of students who seized control of the Blackburn Community Center on
      the main campus and held it for over a month. The students involved crippled a major campus
      service and drew national media attention but were not expelled. The president of Howard Law
      Student Bar Association sent an email over a School listserv calling on Howard Law students to
      show support for the Blackburn takeover and was neither reprimanded nor punished for
      unauthorized use of the listserv and support for a major campus disruption.

88.   In fall 2020, some Howard Law students posted an announcement to GroupMe which, in
      Holley's words, "contained incredibly offensive and dehumanizing language, including ethnic
      slurs, gender stereotyping, and categorizing some students as 'real' men and others as

'questionable.'" No student was punished. In response, Howard Law employed the services of Denise Robinson, a professional diversity and inclusion advocate, to counsel students on sex and gender inclusivity. By contrast, no plausible showing has been made that Newman's writings were ever hurtful, inflammatory, defamatory, offensive, or dehumanizing, yet he was persecuted by students and administrators and expelled. Administrators rejected his calls to enlist Robinson's services, or install any program of any kind, to promote race inclusivity.

89.     Newman was denied participation in GroupMe chat groups for discriminatory reasons. Exclusion from GroupMe affected him adversely by cutting off a key source of information material to academic success as well as reminders of deadlines, offers of employment and study opportunities, access to academic resources, and shared insights available to other students.

90.     Howard Law thus denied Newman benefits normally provided under its Juris Doctor program, provided him an education different in manner from his peers, and subjected him to separate treatment in matters related to services and benefits in violation of Title VI.

91.     Newman was denied entry to the law library three times while African-Americans were allowed to enter freely; denied access to counseling services on July 21, 2022; and denied participation in the School mentorship program his second year, all for racially discriminatory reasons.

**B. *Hostile educational environment.***

92.     Faculty and administrators fomented racial animosities toward Newman by endorsing some classmates' views that his comments on matters of public concern or advocacy for political and social changes were insensitive, offensive, or racist, and by endorsing the view that classmates' derogatory comments regarding Caucasians and derogatory epithets were acceptable. Holley instructed students to ban Newman from GroupMe and before 300 members of the community called his writings "hurtful," "wrong," "lies," and "disturbing." She called Newman "people who

are in our community who don't share our values" and insinuated he had said "racist and …

terrible things." She understood Newman's tweet of Gordon was intended to support African-

Americans but withheld this fact as students one after another expressed disgust in a mistaken

belief Newman supported physical abuse of slaves and took deliberate steps to prevent him

from explaining the truth until after irreparable damage had been done to his reputation.

93. Howard Law professors induced students to read anti-Caucasian texts and taught them to

believe Caucasians were solely or chiefly to blame for the world's problems.

94. Holley purported to host a second Town Hall for alumni. Further damage caused Newman's

reputation and standing in the community would have spilled over into the student population,

negatively impacting him, as students and alumni are in frequent communication.

### C. *Retaliation.*

95. Holley immediately retaliated against Newman for his email asking Frederick to address race

discrimination, telling him Howard was a poor choice for him, requesting he transfer elsewhere,

assigning him an official subordinate status, insisting he confine his activities to classroom study

only, and attempting to prevent his participation in a Town Hall devoted to discussing him.

96. Newman's email to Frederick was protected activity, and Holley's threats, intimidation,

disciplinary charges, misrepresentations in her testimony, and finally, expulsion, were acts of

retaliation that violated Title VI. Lanier-Smith, Evers, and Bright prejudiced his disciplinary

proceedings by circumventing Code-prescribed processes in retaliation for his complaints of

discrimination. The four administrators acted in concert to deny Newman fairness and

impartiality in his disciplinary proceedings for reasons motivated by racial animus.

97. Evers' complicity is further evidenced by her declaration at the end of disciplinary proceedings

that allegations central to Holley's complaint were tangential and irrelevant. Holley's claims of

continuous and defiant use of listservs were central from the beginning, both Lanier-Smith and

hearing panelists expressed pressing concern regarding this issue, and during his appeal hearing

Bright asserted Newman's purported misuse of the listserv was the cause of alleged disruptions.

Evers' note that Newman failed to show contrition, in the absence of wrongdoing, exemplified

the University's insistence that Caucasian students exhibit deference.

98.     Holley's warning to Newman under cross-examination that a Title VI lawsuit would be "very

negative" for his career was a threat of further retaliation.

99.     As a direct, proximate, and foreseeable result of Defendants' race discrimination, hostile

environment, and retaliation, Newman has suffered and will continue to suffer economic losses

in lost salary, employment benefits and opportunities, and career path; and compensatory

damages for pain, suffering, emotional anguish, and damage to his reputation; justifying an

award of $2,000,000 in monetary damages. Newman also seeks reimbursement of attorney's

fees, interest, and costs associated with pursuing this matter, pursuant to the federal statute.

### Count II: Violation of 42 U.S.C.A. § 1981.
### *As against all defendants.*

100.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

101.    Existence of contract and breach are discussed under Count V. Third-party Defendant culpability

is discussed under Count III.

102.    Newman's conduct while a student at the School was exemplary. Though his commentaries

were poorly received by classmates, he carefully crafted all of them for their benefit. The fact

that in all the criticisms leveled by students, faculty, and administrators, almost no attention

was ever paid to the content of his writings, but rather, all attention focused on Newman

personally and his status as a Caucasian student at Howard, demonstrates that the content itself

was not offensive, and only the sheer fact a Caucasian student at Howard Law had the audacity to be so outspoken in dissent offended those who wished to see Caucasians subjugated.

103.    African-American students routinely commented on their perceptions of moral failures of Caucasian-Americans as a class. One professor organized a week of discussion on the topic, assigning *The Racial Contract*, a book which holds as its premise the claim that all Western society is built around the oppression and exploitation by Caucasians of non-whites. African-American students routinely made caustic, inflammatory remarks against Caucasians with the awareness of faculty and administrators but were never reprimanded. By contrast, Newman's commentaries, while critical of the African-American community in some respects, took aim at certain specific conduct, e.g., voting habits, he considered detrimental to the same African-American community. He also voiced his belief that racial discrimination was equally harmful when practiced by any race against any other, a view widely opposed at Howard Law, where many perceive only Caucasians can be racist. Thus an African-American could not have been expelled from Howard Law for writing commentaries about racial politics even if they contained inflammatory rhetoric. No African-American student was admonished for voicing a desire to "get away from white people" or declaring Howard "a black space." Newman merely shared thoughts on issues of public importance, party politics, and national domestic and foreign policy, and called attention to anti-Caucasian bigotry and discrimination at Howard Law. None of his writings denigrated any racial or other demographic, and he never used racial epithets, while African-American students commonly blamed Caucasians for most or all of the world's problems, using epithets with tacit approval of peers, faculty, and administrators.

104.    Calls for action from students and alumni peaked after Newman declared racial discrimination a problem at Howard Law. Rather than address the widespread anti-Caucasian animus, administrators pandered to the anti-Caucasian sentiments with retaliatory actions against him.

105.    Suspicions Newman was a nefarious actor who had "infiltrated" the Howard community with an

        evil "agenda" could not have arisen in the absence of racial animus. Holley stated she spent 25%

        of her time addressing outrage over Newman's writings, and McGahee said Newman was the

        most hated student he had ever seen at Howard Law. The deep-seated animosity students

        exhibited toward Newman's comments could not have occurred absent racial animus.

106.    Newman's protected activity was in close temporal proximity to adverse actions that were taken

        against him and that were a result of the protected activity.

107.    As a direct, proximate, and foreseeable result of Defendants' race discrimination, hostile

        environment, and retaliation in violation of 42 U.S.C. § 1981, Newman has suffered and will

        continue to suffer economic losses in lost salary, employment benefits and opportunities, and

        career path; and compensatory damages for pain, suffering, emotional anguish, and damage to

        his reputation; justifying an award of $2,000,000 in monetary damages. Newman also seeks

        reimbursement of attorney's fees, interest, and costs associated with pursuing this matter,

        pursuant to the federal statute.

        **Count III: 42 U.S.C. § 1985(3).**

108.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

        **A. *As against Holley and certain third parties to be identified through discovery.***

109.    Holley, students, alumni, and/or other third parties conspired to sift through Newman's

        communications in search of a pretext for an action for expulsion. One student found what she

        thought could serve as a basis in his tweet of Gordon. Holley withheld the meaning of that tweet

        from participants of the Town Hall in an attempt to increase hostility toward him and encourage

        students to bring formal charges against him for disruption. Expulsion was obtained through

        breach of the University's contractual obligations in violation of 42 U.S.C. § 1981 and 42 U.S.C.

34

§ 2000d et seq. As a result of Defendants' conspiratorial acts, Newman suffered economic damages in lost salary, employment benefits and opportunities, and career path; and compensatory damages for pain, suffering, emotional anguish, and damage to his reputation; justifying an award of monetary damages. He also seeks reimbursement of attorney fees, interest, and costs associated with pursuing this matter, pursuant to the federal statute.

**B. *As against six students whose identities are to be obtained through discovery.***

110.   Six students conspired to present a show of force with intent to intimidate Newman and deprive him of equal protections, privileges, and immunities guaranteed him by 42 U.S.C. § 1981 and 42 U.S.C. § 2000d et seq. because of his race. They caused him stigma in front of peers and rein-forced his inferior status as a Caucasian student, justifying an award of monetary damages.

**C. *As against Holley, Lanier-Smith, Evers, Bright, and Frederick.***

111.   Holley, Lanier-Smith, Evers, and Bright conspired (1) to contravene procedural safeguards in the Code and (2) to abuse discretion granted them by the Code for the purpose and intent to deprive Newman of equal protections guaranteed by 42 U.S.C. § 1981 and 42 U.S.C. § 2000d et seq.; obfuscated the nature of charges against Newman; disregarded meaningful evidence in his favor; declared after conclusion of the disciplinary process that claims central to the complaint were only peripheral; and misused the process as a pretext for discriminatory treatment. As a result of Defendants' conspiratorial acts, Newman suffered economic damages in lost salary, employment benefits and opportunities, and career path; and compensatory damages for pain, suffering, emotional anguish, and damage to his reputation; justifying an award of monetary damages. He also seeks reimbursement of attorney's fees, interest, and costs associated with pursuing this matter, pursuant to the federal statute.

112.    For collective losses stemming from violations of 42 U.S.C. § 1985(3) Newman seeks $2,000,000 plus attorney's fees, interest, and costs.

### Count IV: Violation of District of Columbia Human Rights Act.
*As against all defendants.*

113.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

114.    Defendants Howard University and Howard University School of Law are "Educational institutions" within the meaning of D.C. Code § 2-1401.02(8).

115.    Newman is a member of protected classes based on race, sex, age, sexual orientation, gender identity, and political affiliation.

116.    Newman suffered adverse administrative actions including but not limited to hostile environment, retaliation, disparate treatment, pretextual disciplinary action, and expulsion.

117.    His protected class status was a substantial factor in Defendants' decisions to pursue expulsion charges against him, and these decisions were not attributable to a legitimate reason.

118.    Defendants' actions constituted willful misconduct, were in bad faith, were wanton, were outrageous, were done without just cause or excuse, and were done with malice and/or with conscious or reckless disregard for Newman's protected rights under the D.C. H.R.A.

119.    During one conversation a professor pressed Newman ten times to agree to her proposition that "women of color suffer disproportionately from laws restricting access to abortion." Responding to his refusals to do so, ten times she accused him of failing to read the assigned text. She finally hinted she may reduce his "participation" grade accordingly. Other professors used participation grades, midterms, and/or other assignments, combined with opaque grading systems, to circumvent the School's purportedly-anonymous grading policy. Course grades based on

research papers typically were not anonymous. Newman voiced concern his grade could, in such circumstances, be affected. McGahee denied professors were ever swayed by an ulterior motive and called Newman's concern "a very heavy allegation." Newman traces positive correlations between anonymity and grades, particularly when voicing opinions opposed by his professors.

120.     Contingency of grades on willingness to espouse the School's favored opinions and narratives, or constrain opposition to them; pressure exerted on Newman to endorse the Democratic Party, liberal ideologies, or factual premises he opposed; and/or retaliation for Newman's opposition to such party, candidates, ideologies, and/or factual premises constituted discrimination based on political affiliation in violation of the D.C. H.R.A.

121.     As a direct, proximate, and foreseeable result of Defendants' conduct in violation of D.C. H.R.A., Newman has suffered and will continue to suffer economic losses in lost salary, employment benefits and opportunities, and career path; and compensatory damages for pain, suffering, emotional anguish, and damage to his reputation; justifying an award of $2,000,000 in monetary damages. Newman also seeks reimbursement of attorney's fees, interest, and costs associated with pursuing this matter, pursuant to the D.C. statute.

### Count V: Breach of Contract.
### *As against University and School.*

122.     Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

123.     In 2019 Newman applied for admission to Howard Law. A December 12, 2019, letter signed by Dean of Admissions Reginald McGahee attests to the School and University's offer of placement in its Juris Doctor program and scholarship of $26,250 per year. Newman's initials and signature attest to his assent to matriculation and the terms of his scholarship July 13, 2020. Newman provided consideration in the form of tuition and fees supplied by federal loans.

124.    To comply with a School mandate, Newman performed additional consideration in May 2021 by

        undergoing Covid vaccination. He soon began suffering breathing difficulties that linger in part

        to the present. Additionally, he subsequently relocated his family to Washington, D.C., at

        considerable expense, departing employment, school, and friendships to pursue his J.D. degree.

125.    Howard University's Non-Discrimination Policy commits it to "strive[] to maintain an

        environment in which all members of the University community are: (a) judged and rewarded

        solely on the basis of ability, experience, effort, and performance; and (b) provided conditions

        for educational … pursuits that are free from all forms of unlawful discrimination, harassment,

        and retaliation"; and "not [to] tolerate discrimination or harassment against any person … in the

        provision of its education programs or activities, based on race, color, religion, sex, national

        origin, gender identity or expression, sexual orientation, disability, marital status, [and] age…."

        Defendants breached these obligations by censoring or silencing him, vilifying him for legitimate

        public speech, making an odious spectacle of him, willfully fostering a climate of hostility and

        intimidation, predicating academic success in part on willingness to espouse the School's

        favored views, narratives, and political agenda, and wrongfully expelling him.

126.    The Student Code of Conduct guarantees students' rights and freedoms of "expression, inquiry

        and assembly," "the right to peacefully protest," "an environment that is safe and free from

        invidious harassment, discrimination or intimidation," "the right and responsibility to report, in

        good faith and without fear of retaliation, violations of [applicable University codes] to

        appropriate academic or administrative officers," and freedom from discrimination. The Code

        also binds students "[t]o read, become familiar with and adhere to the [applicable University

        codes], the relevant academic Bulletin of the school or college in which the student is enrolled

        and any and all other relevant and pertinent University policies"; and "[t]o protect and foster

        the intellectual, academic, cultural, social, and other missions of the University." Accused

                                                    38

students are guaranteed "a fair and impartial hearing before an appropriately appointed hearing

board, appeal board, or Administrative Hearing Officer."

127.   The University breached its guarantee of free expression by restricting Newman's ability to

express observations and opinions on matters of public interest and by retaliating for his rightful

exercise of such expression; of free inquiry by persecuting him for inquiring into and warning

classmates of the cause of his classmate's death; and of free assembly by denying him digital

platforms for exchange of ideas permitted other students. The University denied him the right

to peacefully protest and persecuted him for speaking out against racial bigotry or criticizing Law

School administration. Administrators denied him an environment free of invidious harassment,

engaging in invidious harassment themselves and condoning it in their student population. The

University employed subterfuges in prosecuting Holley's complaint in defiance of basic,

commonly-recognized principles of due process, denied him the fairness and impartiality

guaranteed by the Code, and violated its own intellectual, academic, cultural, and social

missions, its "tradition of freedom of expression on campus," and its "commitment to fostering

and tolerating different viewpoints."

128.   Through willful misuse of the University's disciplinary process, administrators denied Newman

his rights under the Code, including the right (i) to cross-examine Holley, initially, and other

accusers throughout; (ii) timely to examine evidence used against him; (iii) to avail himself of the

Code's five-day limitation of actions; (iv) to receive adequate notice of hearing; (v) to enjoy a

presumption of innocence; and (vi) to place the burden of proof on the complainant.

129.   The Code states, "The consequences are serious for students who are charged and/or found

guilty of misconduct under this Code. Therefore, any member of the University Community who

knowingly and/or willfully misuses the procedures of the Code to harm another member of the

University Community shall be subject to disciplinary action." The University breached its

contract by ignoring or nullifying Newman's complaint against Holley for threats, intimidation,

and misuses of disciplinary procedures to stifle freedoms expressly guaranteed under the Code.

130.    Holley purported to bring a disciplinary complaint on behalf of unnamed students. She herself

had acknowledged the Code did not allow for this. Bright treated Holley's complaint against

Newman as one brought on behalf of the entire School of Law ("The School of Law community

found your actions to be disruptive and harassing"). Treating a complaint as if the complainant

had authority or power to speak on behalf of other parties breached the School's contract

and/or its contractual implied warranty of good faith and fair dealing.

131.    As a direct, proximate, and foreseeable result of Defendants' breach, Newman has suffered and

will continue to suffer economic losses in lost salary, employment benefits and opportunities,

and career path; and compensatory damages for pain, suffering, emotional anguish, and

damage to his reputation; justifying an award of $4,000,000 in monetary damages, to be

adjusted by an amount determined at trial if Newman can complete a J.D. degree. Newman also

seeks reimbursement of attorney's fees, interest, and associated costs as permitted by law.

### Count VI: Breach of Implied Warranty of Good Faith and Fair Dealing.
*As against University and School.*

132.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

133.    By cultivating a hostile environment that interfered with Newman's ability to perform well in his

studies, disregarding or trivializing his reports of racial discrimination, persecuting him for his

outspokenness, and predicating his grades in part on his acceptance of a marginalized status or

political ideologies favored by the School, Defendants failed to provide a level playing field for

academic excellence in breach of the implied warranty of good faith and fair dealing.

40

134.    Administrators abused their power to dictate terms of the contract by restricting Newman's
        ability to express observations and opinions on matters of public interest, by attempting to
        confine his activities to classroom study only, and by prosecuting a complaint against him for the
        simple exercise of rights guaranteed him under the Code, for example, the right to criticize
        administrators and the right to inquire into the cause of his classmate's death and share
        information that could impact other students' health. (Or, alternatively, any such rights not
        expressly guaranteed were also never limited by any contractual language.) With Evers'
        approval, Holley stretched the language of the Code beyond its reasonable meaning so as to
        rationalize its application to Newman's alleged conduct, and Evers, Bright, Lanier-Smith, and
        hearing panelists accepted her unreasonable interpretations without question.

135.    Lanier-Smith's bias was evident from her introductory meeting, for example, in her response to
        Newman's query as to where his complaint against Holley had been forwarded: "This is not a
        time for you to grill me about where your stuff is, right? So I told you that it was given to the
        appropriate individuals, and that's really all the conversation that I'm going to have about that."
        Bias throughout Newman's disciplinary process violated the spirit of the Code and Defendants'
        implied warranty of good faith and fair dealing.

136.    Defendants prosecuted Holley's formal complaint with malicious disregard for principals of
        fairness and/or in retaliation for Newman's complaints of race discrimination and formal
        complaint against Holley. Specific acts that violated the University's guarantee of a "fair and
        impartial hearing before an appropriately-appointed hearing board" and breached an implied
        warranty of good faith and fair dealing included but were not limited to the following: Lanier-
        Smith (i) withheld from Newman Holley's complaint until less than three days before his first
        scheduled hearing; (ii) scheduled his first hearing days before his final exams; (iii) allowed
        insufficient time for cross-examination and defense; (iv) used secret evidence against him at

both hearings; (iv) employed the same three panelists at his second hearing who had developed prejudice against him at his first; (v) failed to question any evidence submitted by Holley; (vi) entertained emails from students as evidence without presenting their authors as witnesses whom Newman could cross-examine; (vii) exhibited favoritism toward Holley; and (viii) hand-picked panelists on whose complaisance she knew she could rely.

137.    Hearing panelists failed to make proper and sound determinations of fact, identify relevant sections of the Code, properly interpret the relevant language in those sections, and apply them to established facts. Instead, they relied on Holley, a party to the proceedings, to dictate to them her own conclusions as to Newman's conduct and any applicability of the Code and adjudicated her claims against him based on her conclusions, not their own. Lanier-Smith treated Newman disdainfully before hearing panelists and conducted herself as a prosecutorial party rather than as a neutral arbiter. Lanier-Smith's refusal to permit certain questions during cross-examination prejudiced the proceeding further, and at times Lanier-Smith and panelists joined in Holley's open hostility toward Newman, e.g., when he displayed a photograph depicting Howard University students engaged in a sit-in protest at a local drugstore. These and other failures of proper adjudication violated the spirit of the Code and the implied warranty.

138.    Defendants disregarded persuasive evidence including: lack of any clear language in the Code applicable to Newman's conduct, Holley's failure to supply Newman with a clear and comprehensible policy or point him to precise language in the Code she deemed relevant, McGahee's email announcing the listserv "policy" had been "suspended," and Newman's efforts to comply with administrators. They disregarded the fact Holley purported to bring a case on behalf of other parties who were never named, which Holley herself acknowledged was not permitted under the Code. Much of the basis for Holley's complaint relied on a letter Newman

42

had shared with classmates in four parts, some fashion of which McGahee had preapproved. These failures violated the spirit of the Code and the implied warranty.

139.    Newman's biased appeal processes, including, e.g., Bright's use of a private meeting as a ploy to solicit information deemed useful to Holley, unexplained disregard for legitimate grounds for appeal, and acceptance of Holley's implausible harassment charge attest to complicity to pretext and breach of implied warranty of good faith and fair dealing.

140.    The School's contract imposed no allegiance to a party or political ideology, thus, contingency of Newman's grades on willingness to espouse favored opinions and narratives, or constrain his opposition to them; pressure on Newman to endorse the Democratic Party, liberal ideologies, or factual premises he opposed; and/or retaliation for Newman's opposition to such party, candidates, ideologies, and/or factual premises violated the implied warranty.

141.    Some Howard Law instructors openly profess to award all students A+. Only through word of mouth could classmates share such information pertinent to grades as which courses award A+ to all students. Newman's ostracism, motivated by discrimination, reduced his access to such information. By exacerbating, condoning, or allowing discrimination, Defendants breached a good faith duty to provide a level playing field for the pursuit of competitive grades.

142.    Evers' assertion the Code required no specific victims be identified in a complaint of harassment offended any acceptable standard of jurisprudence, constituted bad faith, and implicated the highest level of University leadership in the fraudulent miscarriage of disciplinary procedure.

143.    As a direct, proximate, and foreseeable result of Defendants' breach of good faith and fair dealing, Newman has suffered and will continue to suffer lost salary, employment benefits, opportunities, and career path; and compensatory damages for pain, suffering, emotional

43

anguish, and damage to his reputation; justifying monetary damages, combined with Count V, of $4,000,000, adjustable as described, with reimbursement of attorney's fees, interest, and costs.

### Count VII: Defamation.

*As against Holley, School, University, and third parties to be determined through discovery.*

144.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

145.    Holley used the entirety of a two-hour Town Hall both to defame Newman and to encourage classmates to do so, resulting in damage to Newman's standing among his peers. Statements included, but were not limited to, false allegations of racism.

146.    Holley's formal complaint and oral testimony contained false and defamatory statements, some of which were republications of reports by third parties, that permanently injured Newman in his profession and community standing, lowered him in the estimation of classmates, professors, and/or alumni, and resulted in expulsion. Expulsion will make difficult or impossible admission to alternate J.D. or other academic study and restrict future employment possibilities. Defendants acted out of malice, ill will, and conscious indifference or reckless disregard as to their effects on Newman's rights or feelings, misquoted or quoted him out of context, and/or characterized him or his words as "racist" or "racially offensive" without just cause or excuse.

147.    Holley's testimony that Newman was argumentative with her and McGahee mischaracterized those interactions—which McGahee has conceded were entirely cordial—prejudiced him to the hearing panelists, and contributed to his expulsion.

148.    Holley falsely asserted to hearing panelists Newman continued using the listserv in 2021 after being asked multiple times to cease, and Lanier-Smith, panelists, and Bright acknowledged the persuasive effect this claim had on their determination to find against Newman.

149.    Holley called Newman's email regarding a deceased classmate "defamatory" and claimed
        Newman had written that she died from the Covid-19 vaccine. Newman only reproduced a news
        report from the classmate's hometown attributing her death to PE and cited scientific reports of
        a potential link between the vaccine and PE.

150.    Holley claimed Newman said the difference between black Americans and other Americans was
        that black Americans wanted the government to solve their problems for them. Newman only
        said he parted with the black community on the question of whether government solves
        problems or only creates them, made no assertions regarding other demographic groups, and
        did not compare African-Americans to other races.

151.    Holley accused Newman of saying African-Americans suffer from hive mind. He told a specific
        group of classmates only that they, not African-Americans generally, suffered from hive mind.

152.    The foregoing false and defamatory claims prejudiced administrators and hearing panelists and
        contributed to Newman's expulsion. Under D.C. law, republications of defamatory statements
        give rise to liability in both the original source and the party responsible for republication.

153.    Defendants' false and defamatory statements were intentionally harmful, reckless, or negligent;
        were not protected by privilege to a third party or public interest; were actionable as a matter of
        law irrespective of special harm; and their publication caused Newman special harm.

154.    Additional false and defamatory statements made by Holley during her Town Hall for alumni will
        be requested through discovery and included in an amended complaint.

155.    As a direct, proximate, and foreseeable result of Defendants' false and defamatory statements,
        Newman has suffered and will continue to suffer lost salary, employment benefits and
        opportunities, and career path; and compensatory damages for pain, suffering, emotional

anguish, and damage to his reputation; justifying an award of $400,000. Newman also seeks

reimbursement of attorney's fees, interest, and associated costs as permitted by law.

**Count VIII: Intentional Infliction of Emotional Distress.**

*As against Holley, School, and University.*

156.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

157.    Holley's pattern of extreme and outrageous conduct was intentional, extreme, outrageous, and

in deliberate disregard for the high degree of probability Newman would suffer injury including

emotional distress.

158.    Beginning in fall 2020 and culminating with expulsion, Holley conspired with Newman's

classmates to seek grounds for his dismissal from school; subjected him to more than two hours

of public condemnation and ridicule at a Town Hall meeting; at which time she defamed him in

front of peers even as she disabled his microphone, lowered his digital "hand," turned off the

chat, and disabled his camera all with the intent of preventing him from speaking in his defense;

suppressed information she knew had the potential to exonerate him regarding his tweet of

Gordon; fabricated or substantially altered evidence to present in his prosecution; fostered a

hostile educational environment; and engaged in such a general pattern of harassment and

intimidation as to be intolerable in a civilized community.

159.    Holley used an administrative charge as a pretext for unlawful discrimination and colluded with

other University officials to circumvent the letter and spirit of the Code, poisoned the

disciplinary process, and deliberately prejudiced the hearing panelists.

160.    As a direct, proximate, and foreseeable result of Defendants' intentional infliction of emotional

distress, Newman has suffered severe emotional distress, at times resulting in psychological

pain, anger, resentment, depression, anxiety, suicidality, family strife, and public and private

embarrassment, justifying an award of $200,000 in monetary damages. Newman also seeks reimbursement of attorney's fees, interest, and associated costs as permitted by law.

### Count IX: Tortious interference with contractual relations.
#### *As against third party defendants.*

161.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

162.    Defendants knew of the School's contractual relationship with Newman and petitioned the School to breach its contract. The cumulative pressure of their demands raised the specter of a potential loss of revenue in the form of tuition dollars if students transferred elsewhere or passed on negative reviews to potential applicants if their demands for action were not met.

163.    Defendants employed predatory methods to force the School to meet demands which led to his expulsion and caused him to suffer emotional, mental, academic, and economic harm. Newman has suffered and will continue to suffer lost salary, employment benefits, opportunities, and career path; and compensatory damages for pain, suffering, emotional anguish, and damage to his reputation; justifying monetary damages, combined with Counts V and VI, of $4,000,000, adjustable as described. He also seeks reimbursement of attorney's fees, interest, and costs.

### Count X: Prevention Doctrine.
#### *As against University and School.*

164.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

165.    Defendants prevented Newman from performing in the top half of his class by embarrassing him publicly, stoking or tolerating anti-white sentiment, causing him to suffer ostracism, depression, anxiety, and intrusive thoughts of suicide, and precluded his ability to perform adequately on exams. Some grades were reduced because of bias, and ostracism and discrimination created an unlevel playing field. Newman seeks restoration of his scholarship in full, $52,750, with attorneys' fees and costs, plus interest, of this action, added to other remedies awarded.

**Count XI: Promissory Estoppel.**

*As against University and School.*

166.    Prior paragraphs are realleged and incorporated by reference as if fully set forth herein.

167.    Defendants promised Newman full availability of his academic merit scholarship renewable for

three years. In anticipation of his continued scholarship Newman relocated himself and his son

to Washington, D.C., in August 2021 and began study, relying to his detriment on Defendants'

promise. Defendants failed to notify him of his loss of scholarship until after he had relocated

and begun studies. Absent an award under Count X, Newman seeks damages under promissory

estoppel of $52,750, attorneys' fees and costs, plus interest, added to other remedies awarded.

## PRAYER FOR RELIEF

168.    WHEREFORE, Newman respectfully requests that this Court:

A.  Declare Defendants' conduct of committing race discrimination, hostile environment,
    and/or retaliation against Newman to be in violation of 42 U.S. Code § 2000d et. seq.;

B.  Declare Defendants' conduct of committing race discrimination, hostile environment,
    and/or retaliation against Newman to be in violation of 42 U.S.C. § 1981;

C.  Declare Defendants' conspiracy to deprive Newman of federally-protected rights to be in
    violation of 42 U.S.C. § 1985(3);

D.  Declare Defendants' conduct of committing discrimination, hostile environment, and/or
    retaliation against Newman to be in violation of the D.C. Human Rights Act;

E.  Enjoin Defendants to comply with the aforementioned federal and state laws;

F.  Declare Defendants School and University to be in unlawful breach of contract;

G. Declare Defendants School and University to be in violation of contractual implied warranty of good faith and fair dealing;

H. Enjoin the School to continue Newman's education and, upon adequate completion of requisite courses and credit hours, graduate him with a Juris Doctor degree;

I. Declare Defendants Holley, School, University, and third parties liable for defamation against Newman;

J. Declare Defendants Holley, School, and University liable for intentional infliction of emotional distress against Newman;

K. Declare that a private university owes its students a tort duty not to abuse its power imbalance to interfere with students' freedom of expression;

L. Declare the University denied Newman a duty not so to abuse its power in interference with his freedom of expression, and award Newman additional money damages as the Court deems proper;

M. Declare that a private university owes its students a tort duty not to abuse its power imbalance to deny them good faith efforts to assure fairness and impartiality in adjudication of disciplinary actions;

N. Declare the University denied Newman a duty to fulfill such good faith efforts, and award Newman additional money damages as the Court deems proper;

O. Award Newman damages for emotional distress, pain, anguish, suffering, and damage to his reputation;

P.  Award Newman damages to compensate lost income, employment benefits and
    opportunities, and career path;

Q.  Award Newman exemplary damages totaling $8,407,000 against Defendants School and
    University;

R.  Award Newman exemplary damages in as permitted by law and/or the Court's discretion
    against all other Defendants;

S.  Award Newman his costs and reasonable attorney's fees incurred for each count in this
    action as permitted by law;

T.  Award Newman prejudgment and post-judgment interest for each count in this action as
    permitted by law; and

U.  Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

TRIAL BY JURY IS DEMANDED ON ALL ISSUES TRIABLE BY A JURY.

Respectfully submitted this 16th day of January, 2023.

/s/ Michael Ray Newman
Representing Himself
1935 Lamont Street NW
Washington, D.C.  20010-2624
Telephone: (808) 796-4708
E-mail: thayray@gmail.com



**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Michael R. Newman
_____
Plaintiff

vs.

Cynthia Evers
_____
Defendant

Case Number 2023-CAB-000246

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Newman (pro se)
_____
Name of Plaintiff's Attorney

1935 B Lamont Street NW
_____
Address

Washington, D.C. 20010-2624
_____

(808) 796-4708
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date 1/24/2023

如需翻译, 请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오     የአማርኛ ትርጉም ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
Civil Actions Branch
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Michael R. Newman
_____
Plaintiff

vs.

Case Number 2023-CAB-000246

Danielle Holley
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Newman
_____
Name of Plaintiff's Attorney

1935 B Lamont Street NW
_____
Address

Washington, D.C. 20010-2624

(808) 796-4708
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date ___1/24/2023___

如需翻译，请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요.      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                   Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Michael R. Newman
_____
                    Plaintiff

vs.

                                        Case Number  2023-CAB-000246

Wayne A.I. Frederick
_____
                    Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Newman
_____
Name of Plaintiff's Attorney

1935 B Lamont Street NW                    By _____
_____                              Deputy Clerk
Address
Washington, D.C. 20010-2624
(808) 796-4708                             Date  1/24/2023
_____
Telephone

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

_Clerk of the Court_

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

_Michael Newman_
_____
                                    Plaintiff
            vs.

_Howard University_                          Case Number _2023-CAB-000246_
_____
                                    Defendant

### SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

_Michael R. Newman (pro se)_
Name of Plaintiff's Attorney                      _Clerk of the Court_

_1935B Lamont Street NW_
Address                              By _____
_Washington, D.C. 20010-2624_                Deputy Clerk

_(808) 796-4708_
Telephone                            Date _1/24/2023_

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828   ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                    Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000** Washington, D.C. 20001
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Michael R. Newman
_____
                                            Plaintiff

vs.

Howard Univ. School of Law
_____          Case Number 2023-CAB-000246
                                            Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Newman (pro se)
_____
Name of Plaintiff's Attorney

1935 B Lamont Street NW
_____          By _____
Address                                            Deputy Clerk
Washington, D.C. 20010-2624
_____
(808) 796-4708
_____          Date 1/24/2023
Telephone

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요.     (amharic text) (202) 879-4828 (amharic text)

Clerk of the Court

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                            Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Michael R. Newman
_____
                              Plaintiff

vs.

                                        Case Number 2023-CAB-000246
Lawan Lanier-Smith
_____
                              Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Newman (pro se)
_____
Name of Plaintiff's Attorney

1925 B Lamont Street NW
_____
Address

Washington, D.C. 20010-2624
_____

(808) 296-4708
_____
Telephone

_Clerk of the Court_

By _____
          Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.    ?ኦማርኮማ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
Civil Actions Branch
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Michael R. Newman
_____
                                        Plaintiff

vs.

Debra Bright
_____          Case Number 2023-CAB-000246
                                        Defendant

**SUMMONS**

To the above named Defendant:

   You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

   You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Newman
_____
Name of Plaintiff's Attorney

1935 B Lamont Street NW
_____
Address

Washington, D.C. 20010-2024
_____

(808) 796-4708
_____
Telephone

                                        Clerk of the Court

By _____
                                        P.D.C
                                        Deputy Clerk

Date _____
                                        11/24/2023

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.    የአማርኛ ትርጉም አስፈላጊ ከሆነ (202) 879-4828 ይደውሉ

   IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

   If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                        Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**Civil Division - Civil Actions Branch**
**500 Indiana Ave NW, Room 5000, Washington DC 20001**
**202-879-1133 | www.dccourts.gov**

**Case Number: 2023-CAB-000246**

**Case Caption: Michael R. Newman v. Howard University School of Law et. al.**

**INITIAL ORDER**

| Initial Hearing Date: | Initial Hearing Time: | Courtroom Location: |
|---|---|---|
| Friday, 04/21/2023 | 9:30 AM | Remote Courtroom 517 |
| **Please see attached instructions for remote participation.** | | |
| Your case is assigned to Associate Judge Shana Frost Matini. | | |

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

1)  This case is assigned to the judge and calendar designated above. All future filings in this case shall bear the calendar number and judge's name along with the case number in the caption.

2)  Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of the summons, the complaint, and this Initial Order. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4.

3)  Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

4)  At the time stated below, all counsel and unrepresented parties shall participate in a hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients before the hearing whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this hearing.

5)  If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference once, with the consent of all parties, to either of the two succeeding days when the calendar is called. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date. No other continuance will be granted except upon motion for good cause shown.

6)  Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

*Chief Judge Anita M. Josey-Herring*

**To Join by Computer, Tablet, or Smartphone:**

1)   Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

Link: dccourts.webex.com/meet/ctb517

Meeting ID: 129 911 6415

2)   When you are ready, click "Join Meeting".

3)   You will be placed in the lobby until the courtroom clerk gives you access to the hearing.

**Or to Join by Phone:**

1)   Call 202-860-2110 (local) or 844-992-4726 (toll-free)

2)   Enter the Webex Meeting ID listed above followed by "##"

**Resources and Contact Information:**

1)   For best practices on how to participate in Webex Meetings, click here https://www.webex.com/learn/best-practices.html.

2)   For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.

3)   For case questions, call the Civil Actions Branch Clerk's Office at 202-879-1133.

## ACCESSIBILITY AND LANGUAGE ACCESS

**Persons with Disabilities:**

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call 202-879-1700 or email ADACoordinator@dcsc.gov . The D.C. Courts does not provide transportation service.

**Interpreting and Translation Services**:

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office listed for your case. For more information, visit https://www.dccourts.gov/language-access.

**Servicios de interpretación y traducción:**

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría de su caso.

Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች፥**

የዲ.ሲ ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። የቃል ወይም የጽሑፍ ትርጓሜ ለመጠየቅ እባክዎን በመዝገብዎ የተዘረዘሩትን የጸሀፊ ቢሮ (ክለርክ'ስ ኦፊስ) ያናግሩ። ለተጨማሪ መረጃ https://www.dccourts.gov/language-access ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያየትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።

# Tips for Attending Remote Hearings - Civil Division

*Your court hearing may be held remotely. This means that you will participate by phone or by video conference instead of coming to the courthouse. Here are some tips on how to prepare.*

## How do I know if I have a remote hearing?

The Court will contact you to tell you that your hearing is remote. They may contact you by sending you an email, letter in the mail, or by calling you.



## How do I take part in a remote hearing?

The Court will give you step-by-step instructions on how to take part in the remote hearing.

If you lose your written notice, call the Civil Actions Clerk's Office for instructions at:

202-879-1133

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

   Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.

- You can also find the list of legal services providers at dccourts.gov/coronavirus by clicking on the link that says, "List of Legal Service Providers for Those Without an Attorney."

- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.

- Witnesses: tell the judge if you want a witness to testify at your hearing.

- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

## Tips for the Hearing



- Join the hearing a few minutes early!

- Charge your computer or phone and make sure you have enough minutes to join the call. Find a private and quiet space. If possible, be alone in a room during the hearing. Try to limit distractions as much as possible. If others are in the room with you, ask if they can be quiet during the hearing.

- Mute your microphone when you are not talking. Mute all sounds on your phone or computer.

- Say your name before you speak so the record is clear. Be prepared to identify your role in the hearing (e.g., observer, plaintiff, defendant, witness, etc.).

- Speak slowly and clearly so everyone hears what you are saying.

- Pause before speaking in case there is a lag. Use a headset or headphones if you can. This will free up your hands and sound better.

- Try not to talk over anyone else. Only one person can speak at a time. If you talk while someone else is talking, the judge will not be able to hear you.

- Have all your documents for the hearing in front of you. Have a pen and paper to take notes.

- If you are not ready for your hearing or want to speak with an attorney, you can ask the judge to postpone your hearing for another date.

- If your sound or video freezes during the hearing, use the chat feature or call the Clerk's Office to let them know that you are having technical issues.

## Special Tips for Video Hearings
### (Click here for more information)



- Download the court's hearing software, WebEx, in advance and do a test run! The Court will provide you with a WebEx link in advance of the hearing.

- Set up the camera at eye level. If you are using your phone, prop it up so you can look at it without holding it.

- Look at the camera when you speak and avoid moving around on the video.

- Wear what you would normally wear to court.

- Sit in a well-lit room with no bright lights behind you.

- If possible, find a blank wall to sit in front of. Remember the judge will be able to see everything on your screen, so pick a location that is not distracting.




# District of Columbia Courts

# Tips for Using DC Courts Remote

The DC Courts have **remote hearing sites** available in various locations in the community to help persons who may not have computer devices or internet service at home to participate in scheduled remote hearings.  The Courts are committed to enhancing access to justice for all.

There are six remote access sites throughout the community which will operate: **Monday – Friday, 8:30 am – 4:00 pm.**

### The remote site locations are:



| **Remote Site - 1** | **Remote Site - 4** |
|---|---|
| Balance and Restorative Justice Center<br>1215 South Capitol Street, S<br>Washington, DC 20003 | Balance and Restorative Justice Center<br>hode Island Avenue, NE<br>ington, DC 20018 |
| **Remote Site - 2**<br>Balance and Restorative Jus<br>Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Remote Site - 5**<br>es Center<br>14th Street, NW, 2nd Floor<br>munity Room<br>ington, DC 20009 |
| **Remote Site - 3**<br>Balance and Restorative Jus<br>Center<br>118 Q Street, NE<br>Washington, DC 20002 | **Remote Site - 6**<br>es Center<br>2000 14th Street, NW, Suite 300N<br>Office of the Tenant Advocate<br>Washington, DC 20009<br>*** No walk-ins at this location*** |

If you want to use a remote site location for your hearing, call **202-879-1900** or email DCCourtsRemoteSites@dcsc.gov **at least 24 hours before your hearing to reserve a remote access computer station**.  If you require special accommodations such as an interpreter for your hearing, please call **202-879-1900 at least 24 hours in advance of your hearing so the Courts can make arrangements**.

**\*You should bring the following items when you come to your scheduled site location\***

1. Your **case number** and any **hyperlinks** provided by the Courts for your scheduled hearing.
2. Any documents you need for the hearing (evidence), including exhibits, receipts, photos, contracts, etc.
3. Materials for notetaking, including pen and paper.
4. A facial covering will be required for entry into the remote hearing location; if you do not have a facial covering one will be provided.

 **\*Safety and security measures are in place at the remote sites.**

**Contact information to schedule your remote access computer station:**
Call:  **202-879-1900**
Email:  DCCourtsRemoteSites@dcsc.gov




## Consejos para usar los sitios de audiencia remota de los Tribunales de DC

Los Tribunales de DC disponen de **sitios de audiencia remota** en distintos centros de la comunidad para ayudar a que las personas que no tienen dispositivos informáticos o servicio de Internet en su casa puedan participar en audiencias remotas programadas. Los Tribunales honran el compromiso de mejorar el acceso de toda la población a la justicia.

En toda la comunidad hay seis sitios de acceso remoto que funcionarán de l**unes a viernes, de 8:30 am a 4:00 pm**.

### Los centros de acceso remoto son:



| | |
|---|---|
| **Sitio Remoto - 1**<br>Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 | **Sitio Remoto - 4**<br>Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |
| **Sitio Remoto - 2**<br>Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Sitio Remoto - 5**<br>Reeves Center<br>2000 14th Street, NW, 2nd Floor<br>Community Room<br>Washington, DC 20009 |
| **Sitio Remoto - 3**<br>Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 | **Sitio Remoto - 6**<br>Reeves Center<br>2000 14th Street, NW, Suite 300N<br>Office of the Tenant Advocate<br>Washington, DC 20009<br>*No se puede entrar sin cita previa* |

Si desea usar un sitio remoto para su audiencia, llame al **202-879-1900** o envíe un mensaje de correo electrónico a DCCourtsRemoteSites@dcsc.gov **al menos 24 horas antes de la audiencia, para reservar una estación de computadora de acceso remoto. Si** necesita adaptaciones especiales, como un intérprete para la audiencia, llame **al 202-879-1900 al menos 24 horas antes de la audiencia para que los Tribunales puedan hacer los arreglos necesarios.**

**\*Cuando concurra al sitio programado debe llevar los siguientes artículos\***

1. Su **número de caso** y todos los **hipervínculos** que le hayan proporcionado los Tribunales para la audiencia programada.

2. Cualquier documento que necesite para la audiencia (prueba), incluidos documentos probatorios, recibos, fotos, contratos, etc.

3. Materiales para tomar nota, como papel y lápiz.

4. Para ingresar al sitio de la audiencia remota deberá llevar una mascarilla facial; si no tiene mascarilla facial, se le proporcionará una.

**\*Los sitios de acceso remoto cuentan con medidas de seguridad y protección.**

**Información de contacto para programar su estación de computadora de acceso remoto:**
Teléfono: **202-879-1900**
Correo electrónico: DCCourtsRemoteSites@dcsc.gov

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION

| | |
|---|---|
| MICHAEL R. NEWMAN, )<br><br>                                        Plaintiff, )<br>v.                                             )<br>                                               )<br>HOWARD UNIVERSITY SCHOOL )<br>OF LAW, *et al*.                          )<br>                                  Defendants. )<br> ) | Case No.: 2023 CAB 000246<br><br>The Honorable Shana Frost Matini<br><br>Next Event: Initial Hearing, April 21, 2023<br>at 9:30am |

## PRAECIPE OF APPEARANCE OF AMANDA SHAFER BERMAN AS COUNSEL FOR DEFENDANTS

Pursuant to D.C. Superior Court R. Civ. P. 101(b)(1), the undersigned notifies this Court of her appearance as counsel for Defendants Howard University School of Law, Howard University, Danielle Holley, Wayne A.I. Frederick, Cynthia Evers, Debra Bright, and Lawan Lanier-Smith in this matter.

DATED: February 10, 2023                    Respectfully submitted,

                                                             /s/ Amanda Shafer Berman
                                                             Amanda Shafer Berman (#497860)
                                                             CROWELL & MORING LLP
                                                             1001 Pennsylvania Ave., N.W.
                                                             Washington, D.C. 20004
                                                             Tel: (202) 688-3451
                                                             Fax: (202) 628-5116
                                                             aberman@crowell.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2023, I caused to be served a true copy of the

foregoing Notice of Appearance via first class mail postage prepaid on:


Michael R. Newman
1935B Lamont Street NW
Washington, DC 20010-2624

/s/ Amanda Shafer Berman
Amanda Shafer Berman