**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL R. NEWMAN,                      )
                                        )
                    Plaintiff,          )        Civil Action No. 1:23-cv-00436
v.                                      )
                                        )
HOWARD UNIVERSITY SCHOOL                )        **MEMORANDUM OF POINTS AND**
OF LAW, *et al*.                        )        **AUTHORITIES IN SUPPORT OF**
                    Defendants.         )        **MOTION TO DISMISS COMPLAINT**
                                        )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS COMPLAINT AS TO THE HOWARD**
**DEFENDANTS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................3

LEGAL STANDARD.............................................................................................8

ARGUMENT ..........................................................................................................9

I.   PLAINTIFF'S CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS
     SHOULD BE DISMISSED. ........................................................................9

II.  PLAINTIFF'S DISCRIMINATION CLAIMS FAIL AS TO ALL
     HOWARD DEFENDANTS. ......................................................................10

     A.   Plaintiff's disparate treatment claim fails. ........................................12

          1.   The only adverse action Plaintiff alleges is his expulsion. ....................13

          2.   Plaintiff does not allege facts to support that similarly
               situated non-White students were not expelled. .....................................14

     B.   Plaintiff's hostile environment claim fails.........................................16

     C.   Plaintiff's retaliation claim fails........................................................18

III. PLAINTIFF'S § 1985(3) CLAIM FAILS. ................................................22

IV.  PLAINTIFF'S DEFAMATION CLAIM FAILS.........................................24

     A.   Plaintiff's defamation claim fails because he has not alleged any
          defendant made false or defamatory statements about him. .............24

     B.   Plaintiff's defamation claim based on Dean Holley's speech at his
          disciplinary hearing fails because her speech at the hearing was
          privileged. ........................................................................................31

V.   PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL
     DISTRESS CLAIM FAILS. ......................................................................33

VI.  PLAINTIFF'S CONTRACT CLAIMS FAIL. ............................................36

     A.   Howard did not breach any contractual obligations under the
          University's Non-Discrimination Policy or the Student Code of
          Conduct.............................................................................................36

          1.   Howard's Code of Conduct and Policy do not set forth
               contractual obligations owed by the University or School of
               Law to Plaintiff. ......................................................................37

i

2.     Plaintiff does not allege facts that, if true, show that Howard violated specific duties in the Code of Conduct or Non-Discrimination Policy. ...........................................................39

B.     Plaintiff's claim for violation of implied warranty of good faith and fair dealing fails because Defendants did not act "arbitrarily or capriciously." ................................................................41

C.     Plaintiff's prevention doctrine claim fails...........................................43

D.     Plaintiff's promissory estoppel claim fails. .......................................44

CONCLUSION...............................................................................................45

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agora, Inc. v. Axxess, Inc.*,
  90 F. Supp. 2d 697 (D. Md. 2000) ........................................................................28

*Allworth v. Howard Univ.*,
  890 A.2d 194 (D.C. 2006) .....................................................................................41

*Armstrong v. Thompson*,
  80 A.3d 177 (D.C. 2013) ..........................................................................24, 26, 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................8, 9

*Bain v. Howard Univ.*,
  968 F. Supp. 2d 294 (D.D.C. 2013).......................................................................42

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015).............................................................................9

*Basch v. George Washington Univ.*,
  370 A.2d 1364 (D.C. 1977) ...................................................................................37

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................9

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993)...............................................................................................23

*Brimelow v. N.Y. Times Co.*,
  2020 WL 7405261 (S.D.N.Y. Dec. 16, 2020) .......................................................28

*Brown v. Philip Morris Inc.*,
  250 F.3d 789 (3d Cir. 2001)...................................................................................23

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006).................................................................................................19

*Carpenter v. King*,
  792 F. Supp. 2d 29 (D.D.C. 2011) .........................................................................29

*Carter-Frost v. D.C.*,
  305 F. Supp. 3d 60 (D.D.C. 2018) .........................................................................21

*Caudle v. Thomason*,
    942 F. Supp. 635 (D.D.C. 1996) ...................................................................25

*Chandamuri v. Georgetown Univ.*,
    274 F. Supp. 2d 71 (D.D.C. 2003) ...........................................................19, 20

*Collins v. Pension Benefit Guar. Corp.*,
    881 F.3d 69 (D.C. Cir. 2018) ...............................................................43, 44

*Comcast Corp. v. National Association of African American-Owned Media*,
    140 S. Ct. 1009 (2020) ........................................................................21

*Corbin v. Wash. Fire & Marine Ins. Co.*,
    278 F. Supp. 393 (D.S.C.), *aff'd*, 398 F.2d 543 (4th Cir. 1968) ...........................31

*Dantzler v. U.S. Dep't of Just.*,
    2021 WL 2809125 (D.D.C. July 6, 2021) .......................................................24

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ............................................................14, 16, 17, 34

*Doe v. Trs. of Univ. of Penn.*,
    270 F. Supp. 3d 799 (E.D. Pa. 2017) ........................................................16

*Doe v. Univ. of Dayton*,
    2018 WL 1393894 (S.D. Ohio Mar. 20, 2018) ...............................................32

*In re Est. of Drake*,
    4 A.3d 450 (D.C. 2010) ......................................................................43

*Fennell v. Marion Indep. Sch. Dist.*,
    804 F.3d 398 (5th Cir. 2015) .............................................................16, 17

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) ..............................................................45

*Florio v. Gallaudet Univ.*,
    --- F. Supp. 3d ---, 2022 WL 2785972 (D.D.C. July 15, 2022) ...........................26, 28

*Forkkio v. Powell*,
    306 F.3d 1127 (D.C. Cir. 2002) .............................................................14

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny*,
    442 U.S. 366 (1979) .........................................................................23

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971) ..........................................................................22

*Guilford Transp. Indus., Inc. v. Wilner*,
   760 A.2d 580 (D.C. 2000) ................................................................26, 28

*\*Hajjar-Nejad v. George Washington Univ.*,
   37 F. Supp. 3d 90 (D.D.C. 2014) ......................................11, 13, 14, 23

*Harris v. Mayorkas*,
   2022 WL 3452316 (D.D.C. Aug. 18, 2022) ....................................12, 16

*Jimenez v. Wellstar Health Sys.*,
   596 F.3d 1304 (11th Cir. 2010) ...............................................................23

*Jones v. WMATA*,
   205 F.3d 428 (D.C. Cir. 2000) ...............................................................19

*Joseph v. Boise State Univ.*,
   998 F. Supp. 2d 928 (D. Idaho 2014) ...............................................12, 14

*Katz v. Odin, Feldman & Pittleman, P.C.*,
   332 F. Supp. 2d 909 (E.D. Va. 2004) ....................................................31

*Ke v. Drexel Univ.*,
   2015 WL 5316492 (E.D. Pa. Sept. 4, 2015) ........................................11

*Khan v. Yale Univ.*,
   27 F.4th 805 (2d Cir. 2022) ............................................................31, 32

*Klayman v. Segal*,
   783 A.2d 607 (D.C. 2001) ......................................................................26

*Knelman v. Middlebury Coll.*,
   898 F. Supp. 2d 697 (D. Vt. 2012), *aff'd* 570 F. App'x 66 (2d Cir. 2014)............................39

*Kotsch v. D.C.*,
   924 A.2d 1040 (D.C. 2007) ..............................................................35, 36

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ..................................................................9

*Kurd v. Republic of Turkey*,
   374 F. Supp. 3d 37 (D.D.C. 2019) .........................................................23

*Manago v. D.C.*,
   934 A.2d 925 (D.C. 2007) .......................................................................37

*Mandawala v. Ne. Baptist Hosp., Counts 1, 2, & 11*,
   16 F.4th 1144 (5th Cir. 2021) .................................................................14

*Mandel v. Board of Trustees of California State University*,
2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) .................................................................17, 18

*Mazanderan v. McGranery*,
490 A.2d 180 (D.C. 1984) ...........................................................................................31

*Middlebrooks v. Godwin Corp.*,
722 F. Supp. 2d 82 (D.D.C. 2010) .............................................................................9, 10

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) ........................................................................................................26

*Moldea v. N.Y. Times Co.*,
22 F.3d 310 (D.C. Cir. 1994) .....................................................................................29

*Morgan v. D.C.*,
550 F. Supp. 465 (D.D.C. 1982) ...............................................................................22

*Mosby-Nickens v. Howard Univ.*,
864 F. Supp. 2d 93 (D.D.C. 2012) .............................................................................37, 38

*Myers v. Alutiiq Int'l Sols., LLC*,
811 F. Supp. 2d 261 (D.D.C. 2011) ...........................................................................44

*Nugent v. Unum Life Ins. Co. of Am.*,
752 F. Supp. 2d 46 (D.D.C. 2010) .............................................................................41

*Ortberg v. Goldman Sachs Grp.*,
64 A.3d 158 (D.C. 2013) .............................................................................................33, 34, 35

*Park v. Brahmbhatt*,
234 A.3d 1212 (D.C. 2020) .........................................................................................31

*Prasad v. George Washington Univ.*,
390 F. Supp. 3d 1 (D.D.C. 2019) ...............................................................................17

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
288 F.3d 548 (3d Cir. 2002) .......................................................................................11

*Richter v. Cath. Univ. of Am.*,
2019 WL 481643 (D.D.C. Feb. 7, 2019) ....................................................... *passim*

*Robertson v. Cartinhour*,
867 F. Supp. 2d 37 (D.D.C. 2012) .............................................................................30

*Robertson v. D.C.*,
269 A.3d 1022 (D.C. 2022) .........................................................................................33

*Rochon v. Gonzales*,
   438 F.3d 1211 (D.C. Cir. 2006) ..........................................................20

*Shinabargar v. Bd. of Trs. of Univ. of D.C.*,
   164 F. Supp. 3d 1 (D.D.C. 2016) ........................................................38

*Sibley v. St. Albans Sch.*,
   134 A.3d 789 (D.C. 2016) ...................................................................44

*Sigal Constr. Corp. v. Stanbury*,
   586 A.2d 1204 (D.C. 1991) .................................................................26

*Skidmore v. Gilbert*,
   2022 WL 464177 (N.D. Cal. Feb. 15, 2022) .......................................28

*Smith v. Sch. Dist. of Phila.*,
   112 F. Supp. 2d 417 (E.D. Pa. 2000) ..................................................28

*Sparrow v. United Air Lines, Inc.*,
   216 F.3d 1111 (D.C. Cir. 2000) ..........................................................20

*\*Stafford v. George Washington Univ.*,
   2019 WL 2373332 (D.D.C. June 6, 2019) ................................... *passim*

*Stafford v. George Washington Univ.*,
   578 F. Supp. 3d 25 (D.D.C.), *overruled on other grounds by* 56 F.4th 50 (D.C.
   Cir. 2022), *petition for cert. filed* (Mar. 27, 2023) ...............................16

*Stith v. Chadbourne & Parke, LLP*,
   160 F. Supp. 2d 1 (D.D.C. 2001) ........................................................25

*Stovell v. James*,
   810 F. Supp. 2d 237 (D.D.C. 2011) ...............................................25, 26

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017)...........................................................29, 30

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022), *appeal filed* ..............................33, 36

*Tressler v. Nat'l R.R. Passenger Corp.*,
   819 F. Supp. 2d 1 (D.D.C. 2011) ........................................................25

*Tsintolas Realty Co. v. Mendez*,
   984 A.2d 181 (D.C. 2009) ...................................................................37

*Ullmo ex rel. Ullmo v. Gilmour Acad.*,
   273 F.3d 671 (6th Cir. 2001) .........................................................39, 40

*United States v. Bailey*,
    444 U.S. 394 (1980)..................................................................................22

*Waldon v. Covington*,
    415 A.2d 1070 (D.C. 1980) .....................................................................35

*Ward v. Zelikovsky*,
    643 A.2d 972 (N.J. 1994).........................................................................28

*Wiley v. Glassman*,
    511 F.3d 151 (D.C. Cir. 2007).................................................................19

*Wilson v. DNC Servs. Corp.*,
    417 F. Supp. 3d 86 (D.D.C. 2019)....................................................22, 24

*Wood v. AFGE*,
    316 F. Supp. 3d 475 (D.D.C. 2018)........................................................30

*Wright v. Howard Univ.*,
    60 A.3d 749 (D.C. 2013) .........................................................................41

**Statutes**

*42 U.S.C. § 1981 ........................................................................... *passim*

42 U.S.C. § 1981(b) ......................................................................................11

*42 U.S.C. § 1985(3) ....................................................................... *passim*

*42 U.S.C. §§ 2000d, *et seq.* ........................................................ *passim*

D.C. Code § 2-1402.41 ............................................................................2, 11

D.C. Code § 2-1403.16 ............................................................................2, 11

**Rules**

Fed. R. Civ. P. 12 ...........................................................................14, 41, 43

Fed. R. Civ. P. 12(b)(6)..................................................................................1

Defendants Howard University School of Law, Howard University, Danielle Holley, Wayne A.I. Frederick, Cynthia Evers, Debra Bright, and Lawan Lanier-Smith (collectively, "Howard Defendants") respectfully submit this Memorandum in Support of their Motion to Dismiss Plaintiff's Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

Howard University is a private historically Black college or university ("HBCU") located in Washington DC. Plaintiff Michael Newman, formerly a student at Howard University School of Law ("HUSL" or "Howard Law"), was expelled on September 19, 2022, after a finding by the University's Office of Student Conduct & Community Standards that he had violated the Student Code of Conduct. Newman was found, after an extensive fact-finding process—including two hearings and two appeals—to have engaged in Disruptive Conduct and Harassment, in violation of the Code, after sending a series of unwanted and unauthorized electronic mass messages to the Howard Law community using the HUSL listserv and email systems. Newman's mass emails reportedly were experienced by students who received them as harassing and disruptive. And Newman repeatedly had been instructed by Howard Law leadership to cease the mass emailing of other students and his use of the School's listserv and email systems for personal messages.

Following a January 2022 email in which Newman linked a classmate's recent death to the Covid-19 vaccine and advocated for his personal campaign against the vaccine, Newman was charged with violating sections VI.6 and VI.12 of the University's Student Code of Conduct, and ultimately found Responsible. During the extensive proceedings, Newman admitted to the conduct at issue and explicitly stated he lacked contrition. Newman now complains that he was expelled because of his race, in violation of Title VI, 42 U.S.C. §§ 2000d *et seq*., 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and the D.C. Human Rights Act (DCHRA), D.C. Code § 2-1402.41. In addition, Newman asserts claims for breach of contract, breach of the implied warranty of good faith and

fair dealing, prevention, tortious interference with contractual relations, promissory estoppel, defamation, and intentional infliction of emotional distress.[1] The facts alleged in Newman's complaint, however, do not support any of these claims.

Newman's discrimination claims all fail because he does *not* allege specific facts showing that: (1) he was subjected to expulsion or other adverse actions on account of his race or another protected category; (2) Howard was deliberately indifferent to severe and pervasive race-based harassment of him; or (3) he was disciplined in retaliation for participating in a protected activity. Moreover, to the extent Plaintiff points to any action that occurred prior to January 16, 2022, claims based on those acts are barred by the DCHRA's one-year statute of limitations. D.C. Code § 2-1403.16. Newman's § 1985(3) "conspiracy" claim, likewise, fails because he has not alleged specific facts that show that certain Defendants conspired to act to deprive him of his civil rights. Newman's defamation claim fails because he has not alleged specific facts showing that any defendant made a non-privileged, false, and defamatory statement about him. Rather, his allegations demonstrate that the statements in question were plainly opinion, and many were made in a privileged context: the disciplinary hearing. Newman's intentional infliction of emotional distress claim similarly fails because he has not alleged facts showing that any defendant engaged in conduct that was "extreme" or "outrageous" in regards to him. And Newman's contract-based claims fail because he has not alleged facts that, if true, would show that Howard breached contractual obligations to him as a student, either explicit or implicit.

---

[1] Newman also alleges "[t]ortious interference with contractual relations" against "third party defendants." Compl. ¶¶ 161-6. As this claim is asserted solely against unidentified "third party defendants"—*not* the Howard Defendants—Howard Defendants do not address it in this Motion.

## FACTUAL BACKGROUND

Newman enrolled at Howard Law in the Fall of 2020, after receiving a scholarship of $26,250 per year. Compl. ¶ 9. His scholarship required that Newman maintain an academic standing in the top half of his class. *Id*. ¶ 41. Due to the Covid-19 pandemic, Newman attended classes his first year virtually, while residing in Hawai'i. *Id*. ¶¶ 11, 17. Prior to the start of the school year, Newman joined GroupMe chat platforms that had been set up, and were administered, by his classmates—not the University. *Id*. ¶ 10.

Following a symposium in October 2020, Newman posted on his section's GroupMe that, "Where I part with the black community is where they believe government solves problems, I only see it causing problems." *Id*. ¶ 12. Some of Newman's classmates "reacted with acrimony" to this statement and "removed [him] from the Section 2 GroupMe chat." *Id*. ¶ 13.

Several months later, Newman distributed, first via GroupMe and then via the HUSL listserv, a four-part letter to his classmates, which some referred to as a "Manifesto." *Id*. ¶¶ 18, 20; Ex. 1.[2] In that letter, Newman described his experience at Howard Law and claimed he "was shunned more completely … than any student at any law school in the country." Ex. 1 at 1. He asserted that "no U.S. law student in 2020 suffered greater persecution by classmates [than me]." *Id*. Newman further stated that he had been contacted by the University's Title IX office offering to discuss his claims of harassment, but he responded that he "had no interest in pursuing claims against anyone." *Id.* at 3, 6. Newman asserted, however, that "[r]acial bigotry" "stands front and

---

[2] Newman repeatedly refers to and quotes from this "Manifesto." *E.g.*, Compl. ¶¶ 18-20, 22, 71, 138. It is thus integral to, and incorporated into, the Complaint, and may be considered by the Court in deciding Defendants' Motion. *See Richter v. Cath. Univ. of Am.*, 2019 WL 481643, at *2 (D.D.C. Feb. 7, 2019) ("[T]he Court may consider 'documents attached to or incorporated in the complaint … and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim.'") (citation omitted).

center" in the Howard community, and that, because he had "not allowed [him]self to be marginalized," he, as "a 'white man,'" could "teach 'black' Americans about combating racial discrimination." *Id.* at 8, 10. Newman concluded by stating that "Howard's position among the country's most racist law schools could be reasonably predicted" by the fact that Howard is attractive to "aspiring young people who identify strongly with their minority race." *Id.* at 11. He compared the desire of Black Americans to attend an HBCU to the desire of a White student to attend a school because of "the prevalence of Caucasian students." *Id.* Along with his four-part letter, Plaintiff "shared a link to … *Uncle Tom*, a documentary film by commentator Larry Elder." Compl. ¶ 18.

Newman's Complaint describes students' reactions to his missive as "[o]verwhelmingly … negative." *Id.* ¶ 20. He alleges that he was removed from the class-wide GroupMe platform following the third installment of his letter. *Id.* As a result, he distributed the fourth installment through the HUSL official email listserv. *Id.* ¶ 22. Associate Dean of Student Affairs McGahee then emailed the entire class stating that "[u]se of law school listservs … [is] restricted to official approved law school business and organizational use [and that m]ass email exchanges are violations." *Id.* The Dean of Howard Law, Danielle Holley, emailed Plaintiff directly and "request[ed] that [he] no longer send any emails to the Class of 2023 email list or any other law school email list. The class emails lists are intended to be used by law school faculty, staff, and administrators for official law school business and official announcements from student organizations." *Id.* ¶ 23.

On January 26, 2021, Plaintiff sent an email to Howard University President Dr. Wayne A.I. Frederick, copying Dean Holley, requesting "assistance from Howard administration to address racial discrimination." *Id.* ¶ 21. Plaintiff attached to his email an exchange where a fellow

4

student had called Plaintiff "Mayo king." *Id*. Dean Holley responded immediately, requesting Newman to meet with her and Dean McGahee. The meeting was held two days later, at which Plaintiff alleges that Dean Holley "listed numerous complaints" of purported "ill conduct" by Plaintiff, including "racially harassing classmates." *Id*. ¶¶ 21, 25.

On January 31, 2021, Dean Holley hosted (virtually) a regularly scheduled Town Hall. *Id*. ¶ 28. The Town Hall addressed controversies at the Law School and Newman asserts that, although Dean Holley never mentioned him by name, "all participants understood" the discussion was about him. *Id*. ¶ 30. While not specifically identified, Newman alleges that Dean Holley "characterized [his] writings as 'hurtful,' 'wrong,' 'lies,' 'untruthful,' 'not based in history,' and 'disturbing.'" *Id*. ¶ 30. Newman asserts that other students accused him of "terrorizing the students," "derailing entire classes," and "repeated incidents of harassment." *Id*. ¶ 33. Although Newman alleges that Dean Holley refused his requests to speak, *id*. ¶ 35, he concedes, in fact, that he *was* permitted to speak at the end of the town hall "for eight minutes," to address the issues raised by his classmates. *Id*. Newman does not allege any further relevant events during academic year 2020-21.

The following year, HUSL classes were in person, and Newman moved to Washington, D.C. before the start of his second year. *Id*. ¶ 41. On August 25, 2021, Newman was informed by Dean McGahee that "he had fallen within the lower half of his class and that as a consequence his scholarship had been revoked." *Id*. In September, Newman joined other second-year students and an administrator to discuss academic performance and how to improve their grades. *Id*. ¶ 43.

At the beginning of the next semester, on January 24, 2022, a student sent an "open letter to [Dean] Holley signed by 26 classmates" over the HUSL listserv, questioning Howard's "decision to return to in-person study" despite the ongoing Covid-19 pandemic. *Id*. ¶ 46. Newman responded over the listserv the following day, noting his opposition to the open letter. *Id*. ¶ 48.

Dean Holley promptly responded to Newman, informing him that his email was another "unauthorized use of the law school's email system," noting that he was a "chronic offender," and asking that he "refrain from using these mediums of communication." *Id*. ¶¶ 48, 50.

Around this time, Newman became aware that a Howard Law student had died unexpectedly. *Id*. ¶ 49. Newman met with Dean Holley on January 25 and asked her "the cause of the student's death." *Id*. Newman asserts Dean Holley responded that she was "'baffled' by what she considered a 'highly inappropriate question,'" but "denied the student's death was related to suicide, Covid, or the Covid vaccine." *Id*. Newman nonetheless emailed "a number of students" suggesting that the student had died as a result of the Covid-19 vaccine and "calling on [Dean] Holley to delay a pending vaccine booster deadline." *Id*. ¶ 51; *see also* Holley Complaint, Ex. 2 at 9-10.[3]

Shortly thereafter, Dean Holley contacted Newman and reminded him that he had been "warned [] not to send any more unauthorized emails to the [] student body or [to] us[e] law school resources," noting that his most recent email "ha[d] been characterized by [his] fellow students as 'disgusting' and 'disturbing.'" Compl. ¶ 52. She then advised him of her intent to file a formal complaint regarding his conduct with the Office of Student Conduct & Community Standards— which she did on January 31, 2022. *See* Ex. 2.

Dean Holley's complaint alleged violations by Newman of Section VI of the Student Code

---

[3] Newman repeatedly references and characterizes this email, *e.g.*, *id.* ¶¶ 51, 54, 66-68, 71, and it is both integral to and incorporated into his Complaint. Similarly, Dean Holley's complaint (which contains Newman's email) against Newman is repeatedly cited in the Complaint, *see id.* ¶¶ 53, 55, 59, 61, 66, and was the basis for his expulsion. It is both integral to and incorporated into his Complaint. *See supra* n.2.

of Conduct ("the Code"),[4] citing his "unauthorized and abusive use of the University's email system and [] continual harassment of member[s] of the Howard Law community, and disturbance of the learning environment at the School of Law." Ex. 2 at 1. Pursuant to Section IV.2.A of the Code, the complaint proceeded to a hearing before an Administrative Hearing Panel, which found Newman "Responsible" for violating the subsections of the Code prohibiting "Disruptive Conduct" and "Harassment," and recommended expulsion as the sanction. Compl. ¶ 64; Ex. 3 (May 9, 2022 Notice of Findings).[5]

Plaintiff appealed this decision, citing "procedural error, substantive error, and disproportionate sanction." Compl. ¶ 65; May 17, 2022 Appeal Letter (Ex. 4).[6] His appeal was granted one month later, citing procedural error in denying Plaintiff's request to cross examine Dean Holley. The appeal also undertook to review the expulsion sanction—which was vacated pending a new hearing. *See* June 17, 2022 Appeal Memo (Ex. 5.).[7] A new hearing was held *de novo* on July 26, 2022, in which Plaintiff was permitted to cross-examine Dean Holley. Compl. ¶ 72. The Panel again found Plaintiff responsible for disruptive conduct and harassment, and recommended expulsion as the sanction. *Id*. ¶ 77; Ex. 6 (August 16, 2022 Notice of Findings). Plaintiff again appealed, but his second appeal was denied because "the Administrative Appeals

---

[4] The 2021-22 Code of Conduct is publicly available (as part of the Student Handbook) at https://studentaffairs.howard.edu/sites/studentaffairs.howard.edu/files/2022-04/2021%20-%202022%20Student%20Handbook_0.pdf. For this reason, as well as the fact that Plaintiff repeatedly cites and quotes it, the Court may consider the Code. *See* n.2, *supra*.

[5] Like Plaintiff's email "Manifesto," this Notice of Finding is cited and characterized in his Complaint, Compl. ¶ 64, and thus incorporated into his allegations. *See* n.2, *supra*.

[6] Newman's appeal of the Hearing Panel's finding is extensively discussed and quoted in the Complaint (¶¶ 65-68) and thus this letter is integral to and incorporated therein. *See* n.2, *supra*.

[7] Plaintiff references and quotes this document, Compl. ¶¶ 69, 71 and it is both integral to and incorporated into his Complaint. *See* n.2, *supra*.

Officer determined that [his] appeal could not reasonably be expected to meet at least one of the four stated criteria for an appeal to be granted." Ex. 7 (September 18, 2022 letter from Dr. C. Evers);[8] *see also* Compl. ¶ 78.

The same day conduct proceedings were initiated against him, Newman filed a formal complaint with the University alleging that Dean Holley failed to take steps to mitigate the discrimination he endured as a Caucasian student at HUSL, and that she refused to share pertinent Covid-19 vaccine-related information regarding a student's death. Compl. ¶ 52. In response, the University engaged external investigators to review Newman's allegations. Compl. ¶ 45. Following a nearly six-month investigation, the investigators concluded that Newman's claims "could not be substantiated." Compl. ¶ 45; Ex. 8 (July 11, 2022 Complaint Closure memorandum).[9]

Newman was expelled on September 18, 2022 and proceeded to file this Complaint against Howard University, HUSL, the President of the University, Dr. Wayne A.I. Frederick, Howard Law Dean Danielle Holley, and three Student Affairs administrators.

## **LEGAL STANDARD**

A complaint must be dismissed unless it states "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotation omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[8] The Complaint relies on and discusses both the second disciplinary decision and appeal denial (*e.g.*, ¶¶ 77, 78, 79). These documents are thus integral to and incorporated into the Complaint. *See* n.2 *supra*.

[9] This concluding memo of the third-party investigation into Newman's complaint is repeatedly cited and characterized in the Complaint (¶¶ 45, 53, 55-56) and thus incorporated into the allegations. *See* n.2 *supra*.

alleged." *Id.* The Court "accept[s] all the well-pleaded factual allegations of the complaint as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor"; however, the Court does not "assume the truth of legal conclusions." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). Further, "the [C]ourt need not accept inferences … unsupported by the facts set out in the complaint." *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 86 (D.D.C. 2010) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). The Court is also "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted).

## ARGUMENT

### I.    Plaintiff's Claims Against the Individual Defendants Should Be Dismissed.

In addition to claims against Howard University and HUSL, Newman asserts claims against the following individuals: Dean Danielle Holley (HUSL Dean), Dr. Wayne A.I. Frederick (President of Howard University), Dr. Cynthia Evers (Vice President of Student Affairs), Dr. Debra Bright (Associate Vice President of Student Affairs), and Lawan Lanier-Smith (Director, Office of Student Conduct & Community Standards). These claims against individual officers and administrators all fail for the reasons discussed in I-V, *infra*, with respect to the Howard institutional defendants, Howard University and Howard Law.

The claims asserted against the individual defendants are: unlawful discrimination under 42 U.S.C. § 1981 (Count II) and the DCHRA (Count IV), and conspiracy to deprive Newman of his civil rights in violation of 42 U.S.C. § 1985(3) (Count III). Dean Holley, additionally, is named in Counts VII and VIII (defamation and intentional infliction of emotional distress, respectively). In addition to the reasons for dismissal set forth below, dismissal of the individual Howard defendants is particularly warranted here because Newman fails to allege sufficient *facts* that plausibly support a reasonable inference that *any* of these individuals discriminated against him

9

on the basis of race or any other protected characteristic. To the contrary, Newman's factual allegations show only that the individual defendants performed their jobs as administrators at Howard Law. And Newman alleges *no* facts about Dr. Frederick, the President of Howard University, beyond that Newman sent an email to him complaining of race discrimination—and to which Dean Holley, whom Newman had copied, promptly responded. In short, Newman strings together a series of conclusory allegations against the individual defendants, which are plainly insufficient to meet his burden. *Middlebrooks*, 722 F. Supp. 2d at 86.

The Defamation and IIED counts asserted against Dean Holley (and the institutional Howard defendants) should be dismissed for the reasons stated in Sections III and IV, *infra*.

## II.      Plaintiff's Discrimination Claims Fail as to All Howard Defendants.

Newman asserts claims against Howard University and the Law School pursuant to Title VI of the Civil Rights Act, and against all Defendants under 42 U.S.C. § 1981 and the DCHRA, alleging that he was discriminated against on account of his race and (in his DCHRA claim) political affiliation.[10] Compl. ¶¶ 80-121. Title VI prohibits educational institutions from "exclud[ing] from participation in, [] den[ying] the benefits of, or [] subject[ing] to discrimination" any person on the ground of "race, color, or national origin." 42 U.S.C. §§ 2000d, *et seq*. Section 1981 prohibits discrimination on the basis of race in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

---

[10] Newman claims membership in "protected classes based on race sex, age, sexual orientation, gender identity, and political affiliation." Compl. ¶ 115. However, the only personal characteristic referenced in his Complaint is race, along with a conclusory statement that "pressure was exerted on [Newman] to endorse the Democratic Party, liberal ideologies, or factual premises he opposed[.]" *Id*. ¶ 120. However, as Newman alleges no facts regarding his political affiliation relevant to an adverse action within the DCHRA one-year limitations period, Defendants' Motion addresses all discrimination claims as based on Newman's race.

contractual relationship." 42 U.S.C. § 1981(b). The DCHRA largely tracks Title VI, with an expanded list of protected characteristics. *See* D.C. Code § 2-1402.41. Claims under the DCHRA, however, must be asserted within one year of the occurrence of the discriminatory act—which limits Newman's claims to those occurring on or after January 16, 2022. D.C. Code § 2-1403.16.

Newman's discrimination claims use similar pleading standards, and may be analyzed together. *See Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 124 (D.D.C. 2014) (explaining that Title VI and Section 1981 claims are analyzed "under the same standards" and then disposing of all discrimination claims); *Stafford v. George Washington Univ.*, 2019 WL 2373332, at *17 (D.D.C. June 6, 2019) ("To adequately plead a discrete discrimination claim under either the DCHRA or Title VI, a plaintiff must plausibly allege that a particular adverse action was motivated by racial animus."); *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002) ("The standard for establishing an 'intent to discriminate on the basis of race' is identical in the Title VI and § 1981 contexts."); *Ke v. Drexel Univ.*, 2015 WL 5316492, at *11 (E.D. Pa. Sept. 4, 2015) ("Although [Title VI and Sec. 1981] guarantee different rights, the same analysis applies to both statutes … the Court will discuss these claims concurrently.").

Newman alleges that he has been discriminated against on the basis of his race in three ways: (1) disparate treatment based on his race; (2) failure to remedy a hostile educational environment; and (3) retaliation for protected conduct. All three claims fail because Newman has not alleged facts that, if true, show that he was treated differently from similarly situated students because of his race; that Howard was deliberately indifferent to a severe and pervasive racial harassment against Newman; or that Defendants took adverse action against Newman for participating in a protected activity.

To the contrary, Newman's allegations admit that the University took disciplinary action against Newman for reasons *other than* his race—namely, his repeated misuse of the school email and listserv systems after being told repeatedly to stop—unlike the non-Caucasian students he alleges also violated the policy. Newman's allegations also admit that, rather than ignoring Newman's claims of discrimination, Howard took action to address Newman's claims when he brought them to school administrators. And Newman's allegations demonstrate that the disciplinary process against him was initiated because of his mass email to students suggesting that a classmate had died from the Covid-19 vaccine, not in retaliation for his claims of discrimination a year prior. Dismissal of Newman's Title VI claims is therefore appropriate. *See Stafford*, 2019 WL 2373332, at *10 (dismissing certain Title VI claims where plaintiff "failed to plead facts that plausibly suggest" actions by school resulted from intentional discrimination); *Joseph v. Boise State Univ.*, 998 F. Supp. 2d 928, 944 (D. Idaho 2014) (dismissing Title VI claim where "plaintiff fails to allege any evidence to indicate racial bias motivated a defendant's action and the allegations made support a finding that alleged bias was not racial in nature"). Finally, Newman's DCHRA & § 1981 claims fail with his Title VI claims because his allegations do not plausibly support that he suffered adverse action based on his race or any other protected characteristic, or in retaliation for his discrimination complaints.

A.    **Plaintiff's disparate treatment claim fails.**

In order to state a viable claim for disparate treatment, a plaintiff must allege sufficient facts to plausibly show (1) that he is a member of a protected group; (2) that he suffered an adverse action; and (3) "that all of the relevant aspects of [his] situation were nearly identical to those of the other [students] who did not suffer similar adverse [] actions." *Harris v. Mayorkas*, 2022 WL 3452316, at *5 (D.D.C. Aug. 18, 2022) (internal quotation omitted); *see also Stafford*, 2019 WL 2373332, at *8 (Plaintiff must allege "that he suffered some sufficiently adverse action, and …

12

that the adverse action was taken because of his race."). Newman here alleges his race as his protected characteristic. But while expulsion is an adverse action, Newman does not allege that he was expelled because of his race, or that any similarly-situated non-White students were treated differently. He thus has failed to plausibly allege that Howard treated him differently *because of* his race. His disparate treatment claim therefore should be dismissed. *See id.* at *10 (granting motion to dismiss where plaintiff "failed to plead facts that plausibly suggest" that adverse actions, including removal from tennis team, were "because he was black").

    1.    <u>The only adverse action Plaintiff alleges is his expulsion.</u>

Newman alleges multiple instances where he felt slighted or humiliated, including that he was: (1) permanently banned from the University listserv and denied participation by his classmates in GroupMe chat groups; (2) subjected to disciplinary proceedings and expelled for alleged "disruptions" and "harassment"; and (3) subjected to "public condemnation and humiliation" at a Town Hall meeting. *See* Compl. ¶¶ 82-91. However, only the expulsion carries sufficiently materially adverse consequences as to cause "tangible harm" and give rise to a disparate treatment claim under Title VI.

In *Hajjar-Nejad*, a medical student brought an action challenging his dismissal from the George Washington School of Medicine, alleging a number of adverse actions, including a statement by one Dean that he "did not want Plaintiff to become a surgeon." 37 F. Supp. 3d at 129. The Court held that such actions were not adverse because none of them "significantly changed [plaintiff's] status as a student or materially altered the terms, conditions, or privileges he enjoyed as a student." *Id.* Statements that cause no "tangible harm," but only "humiliation, anger and embarrassment" are not adverse actions sufficient to make out a claim of disparate treatment. *Id.*

Thus, Newman's complaints of "public condemnation and humiliation," like those in *Hajjar-Nejad*, are "[p]urely subjective injuries," caused no "tangible harm," and therefore are not

"adverse actions." *Id.* (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002)). And, Plaintiff's complaint of being "permanently banned" from the school listserv in January 2021 is belied by his own use of the listserv a year later, in January 2022, *Compare* Compl. ¶ 50 *with id.* ¶ 47; while loss of access to a listserv—or removal from a GroupMe chat—does not "materially alter[] the terms, conditions, or privileges [Plaintiff] enjoyed as a student." *Hajjar–Nejad*, 37 F. Supp. 3d at 129. Newman continued as a student in good standing after each of these alleged events.

In short, the only "adverse action" alleged by Newman is his expulsion following the adjudication of the disciplinary charges against him. However, as demonstrated below, his own allegations not only fail to show that such action was taken because of his race, but *refute* that conclusory assertion.

> 2.   Plaintiff does not allege facts to support that similarly situated non-White students were not expelled.

Newman claims that he was disciplined and expelled because of his race, and that similarly-situated non-White students were treated differently. The facts pled in his Complaint, however, do not support this allegation, but rather refute it, and so dismissal is warranted. *See Joseph*, 998 F. Supp. 2d at 944 ("A motion to dismiss a Title VI claim is appropriate where … the allegations made support a finding that alleged bias was not racial in nature.").

When assessing Newman's allegations regarding his expulsion, the Court should bear in mind the general mandate that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Furthermore, "bare and conclusory" allegations based on a plaintiff's "[s]ubjective belief" that he was discriminated against based on his race cannot sustain a Title VI intentional discrimination claim at the Rule 12 stage. *Mandawala v. Ne. Baptist Hosp., Counts 1, 2, & 11*, 16

F.4th 1144, 1151 (5th Cir. 2021) (dismissing Title VI claim where plaintiff alleged that he was given a poor grade, and thus failed the program, because he was black and an instructor preferred white students).

Newman's only specific, factual allegation in support of his assertion that Howard Law intentionally discriminated against him by treating him differently than non-White students is that "African-American students who signed an open letter and disseminated it via listserv were not reprimanded." Compl. ¶ 82.[11] But Newman was not penalized in any way for his response to that open letter. According to the Complaint, Dean Holley's response to Newman's school-wide email addressing the open letter was an email to him that stated simply: "Mr. Newman, This is an unauthorized use of the law school's email system and the class listservs. Please refrain from using these mediums of communication." *Id.* ¶ 48. Newman does not allege that Dean Holley threatened him with any consequences as a result of his email, or that she initiated disciplinary action on that basis.[12]

Rather, Newman admits that Dean Holley brought disciplinary charges *only* after Newman sent yet *another* mass email speculatively linking a fellow student's death to the Covid vaccine. *Id*. ¶¶ 51-52. Newman also admits in his Complaint that, by that point, he had been warned at least twice not to send mass emails to his fellow students. *Id*. ¶¶ 24, 48. Thus, Newman's own allegations admit that he was subjected to discipline based *not* on his race, but because—after being repeatedly told not to use Howard's system to send mass emails that did not address law

[11] Newman also alleges that Howard students who "seized control of the Blackburn Community Center" were "not expelled." Compl. ¶ 87. However, these students engaged in entirely different behavior from Newman's and were facially not similarly situated.

[12] Even assuming that Dean Holley did not send a similar email to the student that sent the open letter, Newman suffered no more of an adverse action for his response to the open letter sent by Black students than they did for sending it: none.

school business—he sent an email to his fellow law students linking their classmate's death to the Covid-19 vaccine. *See id.* ¶ 52. Newman does not allege that any non-White student had been told repeatedly not to use the University's email system as he did, did it anyway, and was *not* disciplined and expelled, as he was.[13] Newman's disparate treatment claim thus fails on its face. *See Harris*, 2022 WL 3452316, at *6 (dismissing Title VII disparate treatment claim where complaint failed to allege sufficient facts to demonstrate that similarly situated coworkers were treated differently); *Doe v. Trs. of Univ. of Penn.*, 270 F. Supp. 3d 799, 830 (E.D. Pa. 2017) (dismissing Title VI disparate treatment claim where "in spite of the Complaint's conclusory allegation that Plaintiff was treated differently in the disciplinary proceedings due to his race, the Complaint alleges no facts that actually support such an inference").

## B.     Plaintiff's hostile environment claim fails.

Educational institutions may be liable under Title VI if they are "deliberately indifferent" to acts of harassment by students that "give rise to a hostile educational environment." *Stafford v. George Washington Univ.*, 578 F. Supp. 3d 25, 36 (D.D.C.), *overruled on other grounds by* 56 F.4th 50 (D.C. Cir. 2022), *petition for cert. filed* (Mar. 27, 2023); *Davis*, 526 U.S. at 643 (stating same standard for Title IX sexual harassment claims). To state such a claim, Newman must allege facts that plausibly show that Howard "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive[,] that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Stafford*, 578 F. Supp. 3d at 36 (internal quotation omitted); *see also Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015).

---

[13] Newman also does not allege that any other student—Black or White—sent unsolicited emails to students linking their classmate's death to the Covid vaccine to further their own agenda.

An education institution is "'deliberately indifferent' to acts of … harassment only where [their] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 410 (quoting *Davis*, 526 U.S. at 648). This is a high bar, and "imposes liability only when a school's own deliberate indifference effectively 'caused the discrimination.'" *Prasad v. George Washington Univ.*, 390 F. Supp. 3d 1, 25 (D.D.C. 2019) (quoting *Davis*, 526 U.S. at 642-43).

Newman alleges that fellow students made racist remarks about him after he had sent group chat and email messages that were perceived to be racially insensitive. *E.g.*, Compl. ¶¶ 13, 19, 24, 32, 33, 34, 37, 38. But "[s]chools are not required to 'purg[e] their schools of actionable peer harassment'" in order to avoid a Title VI violation. *Prasad*, 390 F. Supp. 3d at 25 (quoting *Davis*, 526 U.S. at 648). Rather, so long as a University takes responsive action, such as by investigating claims of discriminatory harassment, a hostile environment claim will not lie. In *Mandel v. Board of Trustees of California State University*, for example, plaintiffs alleged that there was a "pervasively hostile environment at SFSU for Jewish and Israeli students." 2018 WL 5458739, at *7 (N.D. Cal. Oct. 29, 2018). They alleged fellow students made "verbal threats against 'Zionists' and against Israel," and that "not once have incidents of harassment or the fear of Jewish students been taken seriously." *Id.* The court dismissed plaintiffs' Title VI hostile environment claims, finding that, even if the alleged incidents of harassment were sufficiently severe and pervasive, the plaintiffs did not adequately allege the University was deliberately indifferent to the harassment because the University "investigated" the incidents reported and plaintiffs did "not allege there were unreasonable delays or inadequate efforts in those investigations." *Id.* at *23. "Instead, plaintiffs complain[ed] about the outcome of those investigations, in particular that no students or student groups were disciplined." *Id.*

As in *Mandel*, Newman admits that Howard acted in response to his allegations of harassment. First, Newman admits that Howard administrators repeatedly met with him to discuss his comments and the student body's response to them. *See, e.g.*, Compl. ¶¶ 16 (phone conversation with McGahee); 21 (meeting with Dean Holley); 41 (meeting with McGahee and Dean Holley); 49 (meeting with Dean Holley). Furthermore, Plaintiff's four-part email "Manifesto" to the student body (cited repeatedly in his Complaint and thus incorporated therein) states that, toward the end of Newman's first semester, Howard's Title IX office reached out to Newman offering to investigate his claims of harassment, but Newman declined to make a complaint. Ex. 1, at 3, 6.

And, when Newman "formally complained" that Dean Holley discriminated against him by "failing to mitigate" the racial discrimination he allegedly endured as a White student at Howard Law, and by refusing to share information regarding a student's death, he concedes that Howard had a third party "attorney" undertake an "investigation," which included meetings with Newman and several administrators. Compl. ¶ 45.[14] Newman disagrees with the result of this investigation—which found no "racial discrimination in violation of federal or local laws," *id.*— but that is not sufficient basis for his hostile environment claim to proceed. *See Mandel*, 2018 WL 5458739, at *23. Newman thus has not—and cannot—support a claim that Howard was "deliberately indifferent" to claimed race-based harassment; to the contrary, his allegations admit that Howard administrators repeatedly acted to investigate and address Newman's complaints.

### C. Plaintiff's retaliation claim fails.

To meet state a claim for discriminatory retaliation, a plaintiff must allege that: (1) he engaged in protected activity; (2) he was subjected to adverse action; and (3) there existed a causal

---

[14] Although Dean Holley is an administrator of the Howard University School of Law, as a non-student, she is not subject to the rules of the Student Code of Conduct.

link between the adverse action and the protected activity. *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 84 (D.D.C. 2003) (citing *Jones v. WMATA*, 205 F.3d 428, 433 (D.C. Cir. 2000)).

Newman alleges three activities that could be considered protected activity. First, Newman sent an email to President Frederick "request[ing] assistance from Howard administration to address racial discrimination." Compl. ¶ 21. Notably, this is the only activity that Plaintiff actually identifies as "protected activity." *Id*. ¶¶ 95-96. Second, Newman submitted two discrimination complaints, one against the University regarding his exclusion from GroupMe, and one against Dean Holley after the initiation of his own disciplinary proceeding. *Id*. ¶¶ 45, 53. Newman does not, however, allege facts that can be construed as showing that Howard took adverse action against Newman because of those activities.

Newman first asserts that comments made by Dean Holley constituted "retaliation" for his email to Dr. Frederick. *Id*. ¶ 95. It is unclear how that could be the case. Newman alleges that Dean Holley said she thought "Howard Law was a poor choice for him" and suggested he transfer; mentioned "numerous complaints" other students had made about Newman; recommended that he "confine his activities to classroom study;" and discouraged him from attending an upcoming Town Hall. *Id*. ¶ 95.[15] Even assuming the truth of these allegations, these statements do not constitute adverse action. Howard did not suspend Newman or restrict his privileges. At worst, Newman describes an unpleasant meeting. This is insufficient. *See Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) ("Actionable retaliation claims are limited to those where an employer causes '*material* adversity,' not 'trivial harms.'") (quoting *Burlington N. & Santa Fe Ry. Co. v.*

---

[15] Plaintiff also cryptically alleges that Dean Holley "assign[ed] him an official subordinate status" (Compl. ¶ 95), but alleges no specific facts to support this conclusory assertion, which is insufficient to show material adversity sufficient to give rise to a retaliation claim.

*White*, 548 U.S. 53, 68 (2006)). This conversation with Dean Holley did not, according to Newman's own allegations, "dissuade[] [him] from making or supporting a charge of discrimination." *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Indeed, Newman alleges that, a year after this meeting with Dean Holley, he filed a formal discrimination complaint. Compl. ¶ 45. He also alleges Howard responded to his complaint by hiring an outside attorney to investigate Newman's claims. *Id.* That can hardly be considered retaliatory action. And Newman's admission that Howard voluntarily investigated his discrimination claims undermines any suggestion that the disciplinary proceeding, a year after his email to President Frederick, was in retaliation for those claims. *See* Ex. 8. Newman has essentially "pled himself out of court by alleging facts that render success on the merits [of his Title VI retaliation claim] impossible." *Chandamuri*, 274 F. Supp. 2d at 85 (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000)).

Regarding Newman's second formal complaint of discrimination, he alleges this complaint was made *after* Dean Holley initiated a disciplinary action against him. Compl. ¶ 53. Howard's initiation of a disciplinary process against Newman logically cannot constitute retaliation for a discrimination complaint raised by Newman *after that event*. *See Chandamuri*, 274 F. Supp. 2d at 84-85 (dismissing retaliation claim where timing of the alleged retaliation in relation to the protected activity "precludes a finding that there was a causal connection between the two").

Far from retaliating, Howard appropriately responded to Newman's complaints of discrimination. Newman has failed to allege facts plausibly showing a "causal link" between his disciplinary proceeding (the only adverse action against him) and his own discrimination complaints. *Id.* His Title VI retaliation claim therefore fails.

### D.        Plaintiff's § 1981 and DCHRA claims fail with his Title VI claims.

Newman's § 1981 and DCHRA claims fail with his Title VI claims because he has not alleged facts showing that Howard took action adverse to Newman because of or motivated by his race (or, for purposes of the DCHRA, any other protected category).

Under the Supreme Court's decision in *Comcast Corp. v. National Association of African American-Owned Media*, to state a viable Section 1981 claim a plaintiff must plausibly allege—at the pleading stage—that he was discriminated against because of his race; *i.e.*, "but for" causation. 140 S. Ct. 1009, 1014-19 (2020) ("[A] plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred."). Similarly, to establish a DCHRA claim, a plaintiff must show he "'was subject to an adverse action motivated by [] discrimination.'" *Stafford*, 2019 WL 2373332, at *6 (quoting *Carter-Frost v. D.C.*, 305 F. Supp. 3d 60, 67 (D.D.C. 2018)).

As discussed in Section 1.A, the only "adverse action" Newman alleges is his disciplinary proceeding and resulting expulsion, and he was charged with violations of the Code of Conduct and expelled—not because of his race—but because, after repeatedly being told not to use Howard's email system to send mass messages, he sent an email to his classmates suggesting that a student had died as a result of the Covid-19 vaccine. Compl. ¶ 52. He has asserted no facts that plausibly allege that "but for [his] race," he would not have been disciplined. *Comcast*, 140 S. Ct. at 1019. Indeed, despite his allegations of discrimination over the span of two years, Newman faced disciplinary action only after he sent an email to his classmates usurping a student's untimely death for his own agenda regarding the Covid vaccine. His allegations are insufficient to show that the disciplinary action was "motivated by" Newman's race as opposed to his own actions immediately preceding the initiation of the proceeding: his decision to send yet another mass email

to his classmates. Newman's § 1981 and race-based DCHRA claims therefore fail for the same

reasons as his Title VI claims, as they are unsupported by, and indeed contrary to, the facts alleged

in his Complaint.

Finally, Newman's § 1981 claim fails because he has not alleged facts that, if true, show

that Howard breached a contract between Newman and the school—let alone for racially

discriminatory reasons. As discussed *infra,* Section VI, Newman has not alleged facts that, if true,

show that he entered into a contract with Howard that the University then breached. Newman's §

1981 claim therefore fails with his contract claims, even if it does not fail with his Title VI claim.

*See Stafford*, 2019 WL 237332, at \*18 (analyzing § 1981 and contract claims together and

dismissing both because plaintiff had not sufficiently alleged he was party to a contract the

University breached when it dismissed him from the tennis team).

## III.    Plaintiff's § 1985(3) Claim Fails.

42 U.S.C. § 1985(3) "created a cause of action with four elements: (1) a conspiracy; (2) for

the purpose of depriving, either directly or indirectly, any person or class of persons of the equal

protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either

injured in his person or property or deprived of any right or privilege of a citizen of the United

States." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 96 (D.D.C. 2019). To allege a conspiracy,

a plaintiff must allege facts sufficient to make it plausible "that the defendants manifested the

specific intent to agree to participate in a concerted effort to deprive someone of their civil rights

based on a racially discriminatory motive." *Morgan v. D.C.*, 550 F. Supp. 465, 470 (D.D.C. 1982)

(citing *United States v. Bailey*, 444 U.S. 394, 405 (1980); *Griffin v. Breckenridge*, 403 U.S. 88,

102 n.10 (1971)). Where the "alleged § 1985(3) conspirators are private actors, the plaintiff must

demonstrate that the conspiracy was aimed at rights constitutionally protected against private

impairment." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993)).

Newman cannot state a § 1985(3) claim, *first*, because he does not allege that Defendants sought to restrict rights protected against private impairment under that provision. The Supreme Court has held that violations of Title VII (which is similar in key respects to Title VI[16]) "cannot be the basis for a cause of action under § 1985(3)." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979). At least two circuit courts similarly have held that § 1981 cannot serve as the basis for an action under § 1985(3). *See Jimenez*, 596 F.3d at 1312 ("The only rights the Supreme Court has expressly declared enforceable against private conspirators under § 1985(3) are the right to interstate travel and the right against involuntary servitude."); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 806 (3d Cir. 2001) (holding same). This Court should follow these precedents and dismiss Newman's § 1985(3) claim because neither Title VI nor § 1981 provides a basis for a § 1985(3) claim against non-governmental actors.

*Second*, even if Newman's § 1981 or Title VI claim could support a § 1985(3) claim, Newman has failed to adequately plead a conspiracy. Newman alleges there were three conspiracies against him—but for two of them he has failed to even identify the Defendants who conspired. Compl. ¶¶ 109, 110. For the one conspiracy for which Newman does identify alleged conspirators, he offers no specific factual allegations supporting his conclusory claim of conspiracy. *Id*. ¶ 111. Newman does not allege when the conspiracy was created, who instigated it, or what Defendants conspired to do beyond his conclusory assertion of an intent to subject him to "discriminatory treatment." *Id*.; *see Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C.

---

[16] *See Hajjar-Nejad*, 37 F. Supp. 3d at 124.

2019) ("A common goal, never discussed explicitly or implicitly among the Defendants, does not constitute an agreement."). Newman does not allege any discussions of an agreement between these five individuals, or identify any specific "act[s] in furtherance of the conspiracy." *Wilson*, 417 F. Supp. 3d at 96; *see also Dantzler v. U.S. Dep't of Just.*, 2021 WL 2809125, at *5 (D.D.C. July 6, 2021) (dismissing where plaintiff failed to "allege facts showing there was an agreement"). Absent such allegations, Newman cannot maintain a claim under 42 U.S.C. § 1985(3).

## IV.    Plaintiff's Defamation Claim Fails.

To assert a defamation claim, a plaintiff must allege the defendant made a false and defamatory statement concerning the plaintiff; the defendant published the statement *without privilege* to a third party; the defendant was at fault in doing so; and the statement was actionable as a matter of law or its publication caused the plaintiff special harm. *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013). Newman's defamation claim fails because he has failed to allege that any statements made about him were false and defamatory, and any statements made during his disciplinary hearing were privileged and cannot serve as the basis for a defamation claim.

### A.    Plaintiff's defamation claim fails because he has not alleged any defendant made false or defamatory statements about him.

Newman's defamation claim against Dean Holley, Howard, and "third parties to be determined through discovery"[17] (Compl. at p.44, Count VII) must be dismissed because Newman does not allege that any Defendant made a false or defamatory statement about him.

---

[17] Defendants to this claim (Howard University, the Law School, and Dean Holley) focus their arguments on the allegedly defamatory statements attributed to them. If the Court dismissed this claim against them, it could theoretically allow Newman to proceed in regard to the unnamed third parties. But Howard Defendants submit that the defamation claim fails in full given the lack of specificity of most of the relevant allegations, and that the allegedly defamatory statements made by "unknown third parties" were, like Dean Holley's statements, non-actionable opinions.

Newman fails to allege an actionable statement because: (1) many of the alleged statements are not sufficiently specific; (2) others were plainly statements of opinion; and (3) Newman's allegations admit that many of the statements were substantially true. Further, the statute of limitations for defamation in the District of Columbia is one year. *See Stith v. Chadbourne & Parke, LLP*, 160 F. Supp. 2d 1, 6 (D.D.C. 2001). Therefore, any of Newman's claims for defamation based on conduct occurring before January of 2022—including those allegedly made at the "Town Hall" in January 2021—must be dismissed as untimely.

*First*, the majority of Newman's allegations do not identify specific allegedly defamatory statements. "In order to plead defamation, a plaintiff should allege specific defamatory comments by 'plead[ing] the time, place, content, speaker, and listener of the alleged defamatory matter.'" *Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011) (quoting *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996)). In *Stovell*, the plaintiff alleged that one defendant, Gloria James, "falsely depict[ed] the character of Defendant Lebron James's actual father." *Id.* The court dismissed the defamation claim based on this allegation because the plaintiff "failed to identify any of the specific statements that Gloria James allegedly made about the character of Lebron James's father." *Id.* Similarly, another court in this district dismissed allegations that the defendant "made comments regarding [plaintiff's] training record" and "caused numerous instances of offensive and harmful statements to be written about her in graffiti" because the plaintiff "fail[ed] to describe the content or substance of the supposed defamatory statements." *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 6 (D.D.C. 2011).

The majority of Newman's allegations lack the specificity required to state a claim for defamation. For example, Newman alleges that Dean Holley "used the entirety of a two-hour Town Hall both to defame Newman and to encourage classmates to do so … Statements included, but

were not limited to, false allegations of racism." Compl. ¶ 145. Newman further alleges that Dean

Holley characterized him as "argumentative", but does not identify her specific statements. *Id.* ¶

147. Newman's failure to identify the specific statements made is fatal to his defamation claim

based on those statements. *See Stovell*, 810 F. Supp. 2d at 248.

    *Second*, the statements Newman does identify were the speaker's opinion, and are thus

nonactionable. *Armstrong*, 80 A.3d at 184. To determine whether a statement is an opinion, courts

> (1) 'examine the allegedly defamatory words in the context of the entire document
> in which they appear'; (2) determine whether the statements 'could be said to imply
> undisclosed defamatory facts'; (3) 'consider whether the allegedly defamatory
> words are susceptible to proof of their truth or falsity'; and (4) 'consider the context
> in which the document containing the allegedly defamatory reference is published.'

*Florio v. Gallaudet Univ.*, --- F. Supp. 3d ---, 2022 WL 2785972, at *6 (D.D.C. July 15, 2022),

appeal filed (No. 22-7117, D.C. Cir.) (quoting *Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204,

1210 (D.C. 1991)).

    As to the first and fourth factors, "[c]ontext is a critical legal concept for determining

whether, as a matter of law, a statement is reasonably capable or susceptible of a defamatory

meaning." *Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001). With respect to the second and third

factors, "'imaginative expression' and 'rhetorical hyperbole' are not actionable in defamation

because they 'cannot reasonably be interpreted as stating actual facts about an individual.'"

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596-97 (D.C. 2000) (quoting *Milkovich v.

Lorain J. Co.*, 497 U.S. 1, 20 (1990)). "[I]f it is plain that a speaker is expressing a subjective view,

an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of

objectively verifiable facts, the statement is not actionable." *Id.* at 597 (quotation omitted).

    Here, Newman alleges that Dean Holley made defamatory statements at a Town Hall—but

these statements were clearly her opinion and nonactionable. Specifically, Newman alleges that

Dean "Holley characterized Newman's writings as 'hurtful,' 'wrong,' 'lies,' 'untruthful,' 'not

based on history,' and 'disturbing in every sense of the word.'" Compl. ¶ 30. And Dean Holley allegedly described Newman as "someone who was 'in our community who [doesn't] share our values.'" *Id*. The context of these statements indicates that they were opinions responding to Newman's own opinions regarding his classmates, Howard School of Law, and the "black community." The Town Hall was held less than a week following Newman's distribution of his four-part "Manifesto," the "writings" giving rise to the discussion about him at the Town Hall. *See id*. ¶¶ 22, 28. In his letter, Newman stated that the "black community … believe[s] government solves problems"; that Howard is "no less likely to discriminate against 'whites' than vice versa at a PWI"; and that Howard is "among the country's most racist law schools." Ex. 1 at 4, 9, 11. This context indicates that the statements made in response by Dean Holley at the Town Hall were plainly her opinion in response to Newman's comments.

With respect to the second factor of the opinion analysis, Dean Holley was responding to Newman's Manifesto to the entire law school community. Newman's allegations do not suggest there were "undisclosed" facts. To the contrary, the audience of law students—who all received Newman's "Manifesto"—was well aware of the basis for the discussion. This factor thus also indicates that the statements are non-actionable opinions.

With respect to the third factor, Dean Holley's statements are not susceptible of either truth or falsity; they are her subjective interpretation of Newman's writings. In particular, the statements that the Manifesto was "hurtful" and "wrong" clearly cannot be true or false. Dean Holley's declaration that Newman does not share the values of the Howard community is similarly incapable of truth or falsity. Dean Holley's statement that Newman's writings were "not based on history" is an analysis of his comparison of Howard and primarily white institutions; it is her "theory, conjecture, or surmise," not the assertion of an objective fact. *Guilford*, 760 A.2d at 597.

Newman also alleges that Dean Holley said that his writings were "untruthful" and contained "lies." This is precisely the sort of "rhetorical hyperbole" that is considered non-actionable opinion. *Id*; *see Florio*, 2022 WL 2785972, at *6 (concluding that University President's statement that fraternity members had become the "face of systemic racism" on campus was non-actionable opinion). Indeed, courts have consistently held that even bald assertions that a person is racist are not actionable. *See Brimelow v. N.Y. Times Co.*, 2020 WL 7405261, at *9 (S.D.N.Y. Dec. 16, 2020) ("characterization of some individuals ... as 'white nationalists' is ... non-actionable opinion commentary"); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (statements that plaintiff was "racist and anti-Semitic" were "non-fact based rhetoric"); *Skidmore v. Gilbert*, 2022 WL 464177, at *9 (N.D. Cal. Feb. 15, 2022) (collecting cases from "multiple courts" holding "that a term like 'racist' ... is not actionable under defamation-type claims"); *Ward v. Zelikovsky*, 643 A.2d 972, 980 (N.J. 1994) ("Most courts that have considered whether allegations of racism … are defamatory have concluded . . . that they are not.").

Newman also complains of allegedly defamatory statements Dean Holley made during his disciplinary hearing. Specifically, Newman alleges that Dean Holley said Newman was "argumentative" during a meeting with her and Dean McGahee and that Newman's "email regarding a deceased classmate" was "defamatory." Compl. ¶¶ 147, 149. Like the comments made during the Town Hall, these were Dean Holley's opinion regarding Newman's conduct and actions, not statements of fact, and did not imply any facts that were not disclosed to the disciplinary panel. "The principle that opinions based on disclosed facts are protected is well established." *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 704 (D. Md. 2000).

*Third*, Newman complains of statements that were substantially true and thus cannot be defamatory. "It is an absolute defense to a defamation claim if the statements are substantially

true." *Carpenter v. King*, 792 F. Supp. 2d 29, 34 (D.D.C. 2011) (quotation omitted). Whether a statement is "substantially true" is a question of law for the court. *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 311-12, 318 (D.C. Cir. 1994). "In determining whether factual statements in an allegedly defamatory communication are substantially true, [courts] discount minor inaccuracies 'so long as the substance, the gist, the sting, of the libelous charge be justified.'" *Armstrong*, 80 A.3d at 183-84 (quoting *Moldea*, 22 F.3d at 318). In other words, "[w]hen the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 243 (2d Cir. 2017) (quotation omitted).

Many of the statements Newman characterizes as defamatory were true or, at a minimum, contained only minor inaccuracies that did not change the "gist" of the statement. For example, Newman alleges that Dean Holley falsely claimed that he "continued using the listserv in 2021 after being asked multiple times to cease." Compl. ¶ 148. However, Newman admits that he was instructed twice in 2021 not to use the Law School's listserv or email system to send messages that were not law school business, *Id.* ¶¶ 24, 48, and also admits that he nonetheless then sent another mass email in January of 2022. *Id.* ¶ 48. At most, Newman alleges that Dean Holley made "minor inaccuracies" in her testimony by confusing January of 2022 with 2021, and courts "discount minor inaccuracies 'so long as the substance, the gist, the sting, of the libelous charge be justified.'" *Armstrong*, 80 A.3d at 183-84 (citation omitted).

Similarly, Newman complains that Dean Holley incorrectly characterized some of his statements during her testimony. *See* Compl. ¶¶ 149-51. But these minor mischaracterizations, even if true, do not change the substantial truth of her statements. *See Armstrong*, 80 A.3d at 183-84. Newman alleges Dean Holley said Newman wrote that his classmate "died from the Covid-19

vaccine" when Newman "only reproduced a news report from the classmate's hometown attributing her death to [pulmonary embolism] and cited scientific reports of a potential link between the vaccine and [pulmonary embolism]." Compl. ¶ 149. Newman alleges Dean Holley claimed Newman "said the difference between black Americans and other Americans was that black Americans wanted the government to solve their problems for them," but Plaintiff actually said "he parted with the black community on the question of whether government solves problems or only creates them." *Id*. ¶ 150. Finally, Newman alleges that Dean Holley claimed he said "African-Americans suffer from hive mind" when Newman only "told a specific group of classmates" that they suffered from hive mind. *Id*. ¶ 151. Thus, Newman's own allegations confirm the substantial truth of Dean Holley's statements; he challenges only minor inaccuracies. *See, e.g.*, *Wood v. AFGE*, 316 F. Supp. 3d 475, 485 (D.D.C. 2018) (claim that someone received a "flood of telephone calls" is substantially true even when there were only five or six such calls). Courts have found that much more serious mistakes than those by Dean Holley here do not change the substantial truth of a statement. *See, e.g.*, *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 58-59 (D.D.C. 2012) (holding that accusations of "violating federal criminal law" were substantially true when the plaintiff had been found civilly liable for "breaching fiduciary duties, legal malpractice, [and] procuring [an agreement] through undue influence and/or coercion").

"When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Tannerite Sports, LLC*, 864 F.3d at 243 (quotation omitted). Dean Holley's statements—which are non-actionable opinions—cannot be found untrue without pressing her words out of their ordinary meaning. Newman's defamation claim against Dean Holley and the institutional Howard Defendants must be dismissed.

**B.     Plaintiff's defamation claim based on Dean Holley's speech at his disciplinary hearing fails because her speech at the hearing was privileged.**

Many of the statements Newman alleges were defamatory were made during his student disciplinary hearing and were thus absolutely privileged.

Statements made during a judicial or quasi-judicial proceeding are protected by an absolute privilege against an action for defamation. *See Park v. Brahmbhatt*, 234 A.3d 1212, 1215 (D.C. 2020). This privilege extends to "quasi-judicial proceedings conducted by administrative bodies." *Mazanderan v. McGranery*, 490 A.2d 180, 181-82 (D.C. 1984). If a quasi-judicial proceeding is "sufficiently similar" to a traditional proceeding, statements made at the proceeding are absolutely privileged. *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 919 (E.D. Va. 2004). The Fourth Circuit has thus reasoned that "arbitration proceedings, like judicial proceedings, 'cannot proceed without evidence and the right of the parties to present argument; it cannot operate in a vacuum,' and thus, to deny immunity to parties offering evidence in an arbitration proceeding 'would be a severe limitation on the utility of arbitration in resolving controversies and would thwart that public policy which encourages arbitration.'" *Id.* (quoting *Corbin v. Wash. Fire & Marine Ins. Co.*, 278 F. Supp. 393, 396-97 (D.S.C.), *aff'd*, 398 F.2d 543 (4th Cir. 1968)). The same is true of University disciplinary proceedings; they cannot proceed if parties and witnesses do not have the "right … to present argument." *Id.* Allowing a defamation claim to proceed based on statements made during such a proceeding would severely undermine their utility, discouraging schools from holding such proceedings and parties and witnesses from participating.

The Second Circuit has identified factors that can "assist in determining whether a proceeding is quasi-judicial." *Khan v. Yale Univ.*, 27 F.4th 805, 820 (2d Cir. 2022) (quotation omitted). These factors include "whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or ... ascertain facts and decide; (3) make binding orders and

31

judgments; (4) affect the personal property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties. *Id.* (quotation omitted). All of these factors apply to University disciplinary proceedings.

While this Court does not appear to have addressed this issue, other courts therefore have concluded that university disciplinary hearings are quasi-judicial proceedings entitled to protection. For example, in *Doe v. Univ. of Dayton*, 2018 WL 1393894, at *1 (S.D. Ohio Mar. 20, 2018), the plaintiff was charged with sexual assault and prosecuted under the student conduct process. The "University's policies and procedures under which the charge against [p]laintiff was processed contained notice, a hearing, and the opportunity to present evidence." *Id.* at *4. The court therefore held that "alleged statements in the University proceeding . . . are absolutely privileged because they were all made to individuals involved in the University's judicial system and were all made in connection with a proceeding within that system." *Id.*

Howard's disciplinary process has all the hallmarks of a quasi-judicial proceeding. Howard's disciplinary process provides students with notice, a hearing, and the opportunity to present evidence. Compl. ¶ 128; *see also* Code § IV.2 (describing process). It guarantees students "a fair and impartial hearing before an appropriately appointed hearing board, appeal board, or Administrative Hearing Officer." Compl. ¶ 126; Code § III.2.F. (same). Newman's experience confirms the quasi-judicial nature of Howard's disciplinary process. Newman was given notice of the charges, Compl. ¶ 53, had a meeting before his first hearing, *id*. ¶ 57, and was given the opportunity to present evidence at the hearing. *id*. ¶ 59. Newman availed himself of the school's appeal process, through which he was given a second hearing. *Id*. ¶¶ 69, 71. At his second hearing, Newman was able to cross-examine the witness against him. *Id*. ¶ 72.

Furthermore, the Code provides that disciplinary processes are "closed," and "only those

persons directly involved … may be present." Code § IV.2.B.10. This further supports the conclusion that statements made regarding the respondent during the hearing are privileged. Dean Holley's statements during Newman's disciplinary hearing thus should be considered privileged, and cannot form the basis for a defamation claim. Newman's defamation claims are based entirely on statements of opinion or privileged statements and must be dismissed.

## V.      Plaintiff's Intentional Infliction of Emotional Distress Claim Fails.

Newman raises an intentional infliction of emotional distress ("IIED") claim against Dean Holley, Howard University, and the Law School. To make out an IIED claim, Newman must allege "(1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress." *Robertson v. D.C.*, 269 A.3d 1022, 1033 (D.C. 2022); *see also Thompson v. Trump*, 590 F. Supp. 3d 46, 121-22 (D.D.C. 2022), *appeal filed* (No. 22-7030, D.C. Cir.) (articulating same test and dismissing IIED claims on motion to dismiss). Newman fails to allege these elements.

*First*, none of the alleged conduct by Dean Holley was "extreme" or "outrageous." To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (quotation omitted). "[N]o liability can be 'imposed for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Id.* (citation omitted). Newman's complaint cannot meet this standard. Newman alleges two instances of behavior by Dean Holley that he claims were "extreme" and "outrageous." Newman first alleges that, during a virtual Town Hall, Dean Holley disabled Newman's microphone; lowered Newman's raised digital hand; and disabled the chat function to prevent him from speaking in his defense. Compl. ¶ 158. Newman

also alleges that Dean Holley "used an administrative charge as a pretext for unlawful discrimination." *Id*. ¶ 159. Neither of these allegations constitute extreme or outrageous conduct.

It was Dean Holley's responsibility, as HUSL Dean, to moderate the virtual Town Hall. Newman is disgruntled with how Dean Holley discharged her duties, but his disapproval does not make her actions "extreme" or "outrageous." As alleged by Newman, many students thought the University should have "already taken corrective action" against him. *Id*. ¶ 33. In light of these feelings, Dean Holley made a reasonable decision to moderate the students' interactions to minimize disruption. Nothing in Newman's complaint would cause a member of the community to exclaim, "outrageous!" *Ortberg*, 64 A.3d at 163. That is particularly true given that Newman admits that, at the end of the Town Hall, Dean Holley gave him eight minutes to speak and present his own views in response to his fellow students' concerns about his behavior. Compl. ¶ 35.

Similarly, Dean Holley's decision to charge Newman with Code of Conduct violations was neither extreme nor outrageous. In fact, the hearing panel concluded that these charges were substantiated. Compl. ¶ 77; Exs. 2 & 3 (disciplinary decisions). As the Supreme Court has admonished, courts should not second-guess the outcome of University disciplinary proceedings. *Davis*, 526 U.S. at 648. That principle cannot be reconciled with allowing an IIED claim to proceed based simply on allegations that such a proceeding was wrongly instituted. Universities must have the ability to discipline their students, and disciplinary proceedings are regular features of campus life in the higher education environment. To allow an IIED claim to proceed on allegations that a disciplinary proceeding was wrongly instituted would have a severe chilling effect on educational institutions' ability to ensure a safe and orderly learning environment.

*Second*, Newman has not alleged that Dean Holley—or any other Defendant—intended to cause him emotional distress. *See Waldon v. Covington*, 415 A.2d 1070, 1078 (D.C. 1980) (no

intent where alleged acts were not "unconscionable or calculated to cause emotional distress and a concomitant risk of physical injury"). A person intends to cause intentionally infliction of emotional distress when they "purposely cause [] a disturbance of another's mental or emotional tranquility of so acute a nature that harmful physical consequences might be not unlikely to result." *Id.* at 1077 (quotation omitted). Here, Newman claims that Dean Holley: (1) conspired with Newman's classmates to have him dismissed from school; (2) subjected him to more than "two hours of public condemnation" during the Town Hall Meeting; (3) fostered a hostile educational environment; and (4) engaged in a general pattern of harassment that would be "intolerable in a civilized community." Compl. ¶ 158. Even crediting these allegations, Newman has not alleged that Dean Holley intended to cause him emotional harm. Without such allegations, Newman's claim cannot proceed.

*Third*, Newman has not alleged that he suffered extreme emotional distress as a result of Defendant's conduct. Under D.C. law, a plaintiff has not suffered "severe emotional distress" unless the defendant's actions "proximately cause the plaintiff emotional distress of so acute a nature that harmful physical consequences might be not unlikely to result." *Kotsch v. D.C.*, 924 A.2d 1040, 1046 (D.C. 2007) (quotation omitted). "Recovery is not allowed merely because conduct causes mental distress." *Ortberg*, 64 A.3d at 164 (quotation omitted). "A person may intentionally inflict some worry and concern, so long as he or she refrain[s] from conduct intended or likely to cause physical illness." *Id.* (quotation omitted) (alteration in original).

Although Newman alleges that "public ostracism, vilification, and humiliation" in his first semester "caused [him] to suffer depression, anxiety, and suicidal thoughts," Compl. ¶ 17, these allegations of distress *pre-date* the conduct he alleges was extreme and outrageous: the Town Hall and the decision to charge Newman with violating the Student Code of Conduct. *Id.* ¶¶ 158, 159.

Therefore, Newman's alleged emotional distress could not have been "proximately cause[d]" by actions he points to as a basis for this claim. *See Kotsch*, 924 A.2d at 1046.

Newman's only other allegation of distress is the conclusory allegation that he has suffered "psychological pain, anger, resentment, depression, anxiety, suicidality, family strife, and public and private embarrassment." Compl. ¶ 160. This is insufficient. Indeed, this court has dismissed IIED claims as too "conclusory" in their allegations of distress where the plaintiff, who asserted an IIED claim based on the events at the Capitol on January 6, 2021, "describe[d] his thoughts and emotions when he … heard rioters pounding on the door and smashing glass to enter, and saw Capitol police draw their weapons," and alleged that he texted his wife, "I love you very much. And our babies." *Thompson*, 590 F. Supp. 3d at 122. Judge Mehta explained that the "court does not minimize the trauma and shock [the plaintiff] felt on January 6th, but his pleading simply does not meet the high bar for" an IIED claim. *Id*. Newman's far more conclusory allegations of distress plainly do not meet the "high bar" for stating a viable IIED claim, and should be dismissed.

## VI.   Plaintiff's Contract Claims Fail.

Newman alleges numerous contract-based claims, including breach of contract, breach of the implied covenant of good faith and fair dealing, application of the prevention doctrine, and promissory estoppel. Each of Newman's contract-based claims fails because he does not allege that Howard ever breached any of its obligations to him, whether explicit or implied.

### A.   Howard did not breach any contractual obligations under the University's Non-Discrimination Policy or the Student Code of Conduct.

Newman alleges that Howard University and Howard Law breached contractual obligations to him under the University's Non-Discrimination Policy and the Student Code of Conduct. To state a breach of contract claim, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4)

damages caused by breach." *Richter*, 2019 WL 481643, at *2 (citing *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). Newman has not alleged facts meeting these elements. Specifically, he does not allege facts indicating that the University Policy and Code of Conduct documents he relies on as the bases for his claim were contractual in nature. Even if they were, Newman does not allege specific facts showing that Howard breached specific obligations set forth in those documents.

        1.    <u>Howard's Code of Conduct and Policy do not set forth contractual obligations owed by the University or School of Law to Plaintiff.</u>

While the relationship between a university and a student "can be contractual in nature," Newman bears the burden to "allege sufficient facts to demonstrate ... the terms of the contract." *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012) (quoting *Manago v. D.C.*, 934 A.2d 925, 927 (D.C. 2007) (alteration in original)). "Whether 'a given section of [a student handbook] also becomes part of the contractual obligations between the students and the university … depend[s] upon general principles of contract construction.'" *Id.* (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977).

In *Mosby-Nickens*, the court held that the plaintiff could not "meet her burden of proving that the Graduate School Rules and Regulations constitutes a binding contract between her and Howard University." 864 F. Supp. 2d at 99. The plaintiff in that case could not "point to any language in the document that demonstrates Howard's intent to be bound by its terms," and she did not "direct the Court to any other indication, such as signatures of the parties, that would demonstrate such intent." *Id.* The court concluded that the "Graduate School Rules and Regulations" were "intended as a means for the university to communicate its expectations regarding academic conduct to its students. It does not appear that the university intended to bind itself to the handbook's provisions." *Id.*; *see also Richter*, 2019 WL 481643, at *3 (same

conclusion with respect to Catholic University's Academic Rules); *Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016) (reaching the same conclusion with respect to the University of the District of Columbia's Honor Code). Indeed, as the court observed in *Mosby-Nickens*, "many courts … have been reluctant to construe university handbooks as binding, unchangeable contracts." 864 F. Supp. 2d at 98.

Here, as in the cases discussed above, Newman has not alleged facts showing that Howard intended to be bound by either the Non-Discrimination Policy[18] or the Student Code of Conduct, the two documents on which Newman bases his contract claim. *See* Compl. ¶¶ 125-26. To the contrary, while Newman alleges that the Code "binds students," he does not allege that it binds the University. *See id.* ¶ 126. Newman's allegations establish that the Code "refers only to what the student must do." *Shinabargar*, 164 F. Supp. 3d at 29. Newman does not "direct the Court to any other indication, such as signatures of the parties, that would demonstrate such intent" to bind the University. *Mosby-Nickens*, 864 F. Supp. 2d at 99.[19]

Because Newman's allegations do not indicate that the student Code of Conduct and Non-Discrimination Policy were intended to bind Howard as part of a contract between the University and its students, Newman's breach of contract claim fails at the outset.

---

[18] Howard University's Non-Discrimination Policy is available at https://secretary.howard.edu/sites/secretary.howard.edu/files/2021-06/Non-Discrimination_Policy_and_Procedures.pdf (last visited on Apr. 10, 2023).

[19] Newman points to the signed letter he received offering him placement in the J.D. program and a scholarship, and Newman's initials thereon "assent[ing] to matriculation and the terms of his scholarship." Compl. ¶ 123. But, even if that allegation were sufficient to establish that there was a general contractual relationship between Howard and Newman, it does not suggest that the Code of Conduct and Non-Discrimination Policy were part of that contract.

2.      <u>Plaintiff does not allege facts that, if true, show that Howard violated specific duties in the Code of Conduct or Non-Discrimination Policy.</u>

Even if the Code of Conduct and Non-Discrimination Policy were considered contractual in nature, Newman has not alleged—and cannot allege—that Howard violated the specific terms of those documents. Newman alleges that Howard breached its contractual obligations to him in two ways. *First*, Newman alleges that Howard breached general obligations related to non-discrimination and free expression. Compl. ¶¶ 125-26. Newman alleges the Non-Discrimination policy "commits [the University] to strive[] to maintain an environment in which all members of the University community are" free from discrimination and rewarded solely on the basis of their ability. *Id.* ¶ 125. Similarly, Newman alleges the Code of Conduct guarantees a number of abstract rights, including the freedom of "expression, inquiry and assembly" and "an environment that is safe and free from invidious harassment." *Id.* ¶ 126. He further alleges that Howard breached its obligations under those provisions by "censoring or silencing him, vilifying him for legitimate public speech, making an odious spectacle of him, willfully fostering a climate of hostility and intimidation, predicating academic success in part on willingness to espouse the School's favored views, narratives, and political agenda, and wrongfully expelling him." *Id.* ¶¶ 125, 127.

But even if the Code of Conduct and Non-Discrimination Policy were viewed as "contractual," Newman has failed to articulate a *specific obligation* thereunder that Howard violated, which is fatal to his claims. "Not all terms in a student handbook are enforceable contractual obligations …, and courts will only enforce terms that are specific and concrete." *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012), *aff'd* 570 F. App'x 66 (2d Cir. 2014) (quotation omitted). "Language in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable." *Id.* (quoting *Ullmo ex. rel. Ullmo v. Gilmour Acad.*, 273 F.3d

671, 676-77 (6th Cir. 2001)). "[A] breach of contract claim will not arise from the failure to fulfill a statement of goals or ideals." *Ullmo*, 273 F.3d at 677. Newman has not identified anything more than "goals or ideals" in the Non-Discrimination Policy; his claim must be dismissed.

*Second*, Newman alleges that Howard failed to follow its own procedures in adjudicating the Code of Conduct complaint against him. Specifically, he accuses Defendants of denying his rights: "(i) to cross-examine Holley, initially, and other accusers throughout; (ii) timely to examine evidence used against him; (iii) to avail himself of the Code's five-day limitation of actions; (iv) to receive adequate notice of hearing; (v) to enjoy a presumption of innocence; and (vi) to place the burden of proof on the complainant." Compl. ¶ 128. These allegations are insufficient.

To begin, Newman does not identify the provisions of the Code of Conduct that Howard allegedly violated. *Id*. ¶ 126. Without pointing to specific obligations under the Code, Newman cannot state a claim for breach of contract. *See Richter*, 2019 WL 481643, at *4 ("Nothing in the Amended Complaint suggests that [the defendant] agreed to guarantee plaintiff" the contractual rights the plaintiff claims). Newman's breach of contract claim fails for this reason alone, insofar as it is based on alleged violations of the disciplinary process as set forth in the Code. *See id*.

In any event, Newman's own allegations fail to show that Howard violated Newman's rights guaranteed by the Code—and in fact show the University met those alleged obligations. *First*, Newman admits Howard allowed him to cross-examine Dean Holley, granting his appeal specifically to give him that opportunity. Compl. ¶¶ 69, 72. *Second*, Newman alleges that he had an "initial meeting" with the Director of the Office of Student Conduct on February 25, 2022, two months before his initial hearing. *Id*. ¶¶ 55, 58. He accordingly had adequate notice regarding the disciplinary proceeding. *Next*, Newman has not alleged any specific facts substantiating his claims that he did not enjoy a presumption of innocence or the hearing panel applied an inappropriate

40

burden of proof. *Finally*, Newman's own allegations state that Dean Holley brought charges against him two days after he sent his email to classmates regarding the death of a fellow student, well within the five-day limitations period Newman alleges. *Id.* ¶¶ 52-53.

Because Newman has not alleged specific facts that show Howard breached identifiable provisions of a contract it entered into with Newman, his breach of contract claim fails.

### B.    Plaintiff's claim for violation of implied warranty of good faith and fair dealing fails because Defendants did not act "arbitrarily or capriciously."

In addition to a breach of contract, Newman alleges that Howard violated its implied covenant of good faith and fair dealing implicit in his contract with Howard. However, "the absence of a contract alone is sufficient to defeat [an] implied covenant claim," and so Newman "once again stumbles out of the starting block." *Richter*, 2019 WL 481643, at *5 (quotation omitted). As explained *supra*, Newman alleges breaches of the Code of Conduct and Non-Discrimination Policy, which are not contractual. Dismissal at the Rule 12 stage is therefore warranted for both his contract and good faith and fair dealing claims. *See id.*

Even if the general student conduct and policy documents on which Newman relies were actionable contracts, Newman's claim would still fail. To successfully allege a breach of implied warranty of good faith and fair dealing, a plaintiff must "allege either bad faith or conduct that is arbitrary and capricious." *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013); *see also Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (defining "bad faith" as actions that evade the "spirit of the bargain" and an "abuse of a power"). "To survive a motion to dismiss for breach of the implied covenant, a plaintiff must allege facts to show that defendant 'has taken steps, or refused to take steps, which ultimately had the effect of destroying or injuring the right … to receive the fruits of [his] contract.'" *Richter*, 2019 WL 481643, at *4 (quoting *Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46, 57 (D.D.C. 2010)).

Newman asserts that Howard (1) prevented him from succeeding academically, and (2) was biased in adjudicating the disciplinary charges brought against him. Compl. ¶¶ 133-42. Neither of these conclusory assertions are supported by specific alleged facts. Newman does not allege any steps Howard took, or refused to take, that "had the effect of destroying or injuring" his rights as a student. And Newman certainly does not allege any arbitrary or capricious conduct by Howard.

*First*, far from sabotaging Newman's academic performance, Newman admits in the Complaint that Howard offered him assistance. *Id.* ¶¶ 43, 133. Howard attempted to assist Newman in obtaining mental health counseling, but was unable to do so because Newman resided in Hawai'i. *Id.* Newman's conclusory assertion that Howard "trivializ[ed]" his report of racial discrimination, *id*. ¶ 133, is belied by Plaintiff's admission that Howard's Title IX office reached out to Plaintiff regarding his reports of harassment, Ex. 1 at 3, and that when Plaintiff filed a formal complaint Howard contracted with a neutral third party to undertake an "investigation." Compl. ¶ 45. These allegations demonstrate that the university did not take the sort of "arbitrary or capricious" actions required to show that an institution acted in "bad faith," and thereby violate an implied warranty of good faith and fair dealing. *See Bain v. Howard Univ.*, 968 F. Supp. 2d 294, 298-99 (D.D.C. 2013); *see also Richter*, 2019 WL 481643, at *5.

Newman's conclusory assertion that Howard violated an implied covenant of good faith and fair dealing by "predicat[ing] his grades in part on his acceptance of a marginalized status or political ideologies favored by the School," Compl. ¶ 133, is also not based on any specific alleged facts. Newman alleges that a professor "hinted" that his performance in a class discussion could have a negative impact on his participation grade. *Id*. ¶ 119. But he does not allege facts showing that his poor grades were the result of arbitrary and unfair action by the School of Law or its professors. Speculation and innuendo are insufficient to maintain a good-faith-and-fair-dealing

claim. *See Richter*, 2019 WL 481643, at *5 (dismissing claim on Rule 12 motion because allegations "are far from enough to show that CUA acted arbitrarily, or in bad faith … there is no factual basis from which to conclude that any [] Law professor acted improperly).

*Second*, Newman alleges no facts to support his conclusory assertion of bias in the disciplinary proceeding. Newman was provided a hearing where he was able to present evidence. Compl. ¶¶ 58, 61. At his second hearing, Newman was able to cross-examine the witness against him. *Id*. ¶ 72. Newman's allegations of a biased panel are unsupported by any factual allegations. In fact, the facts show the opposite. Newman's first appeal was *granted* by Howard because he was denied his right to cross-examine the witness against him. *Id*. ¶¶ 69, 71. Newman points to no specific actions taken by Howard, during the hearing or after, that were arbitrary or capricious.

Thus, even if Newman had alleged facts establishing that there was an enforceable contract between him and the University (which he did not), his allegations are insufficient to state a claim for violation of the implied covenant of good faith and fair dealing.

### C.     Plaintiff's prevention doctrine claim fails.

Under the prevention doctrine, "a contracting party whose unjustified action prevents the other party from performing may not claim that the other party has not performed and that party is, in fact, breaching the contract." *E.g.*, *Collins v. Pension Benefit Guar. Corp.*, 881 F.3d 69, 73 (D.C. Cir. 2018). Application requires that the non-occurrence of an agreed-upon action be "fairly attributable to the promisor's own conduct." *E.g.*, *In re Est. of Drake*, 4 A.3d 450, 454 (D.C. 2010).

The prevention doctrine has no application here. Even if the student/university relationship is viewed as quasi-contractual for some purposes, Howard's extension of a scholarship to Newman, contingent upon him maintaining a certain level of performance, is not a contract. *Cf. Sibley v. St. Albans Sch.*, 134 A.3d 789, 806 (D.C. 2016) (finding no contractual agreement based on letter stating intent to cover a certain percentage of school fees).

43

Furthermore, Newman has not alleged facts indicating that his failure to maintain the academic standing required to keep his scholarship was "fairly attributable" to the Law School's conduct. Newman's Complaint identified his first semester grades as the reason he was unable to retain his merit scholarship. Compl. ¶ 27. But the Complaint is wholly devoid of any allegations of conduct by Howard *during Plaintiff's first semester* that could have prevented him from succeeding academically. *See id*. ¶¶ 10-17. The closest Newman comes is his allegation that he sought counseling through the University, but Howard was unable to provide counseling because the school did not have the necessary licensing exemption. *Id*. ¶ 17. An alleged failure to provided additional support does not equate to affirmative "action [that] prevents the [student] from performing" to the standards required by a scholarship, *Collins*, 881 F.3d at 73. Thus, the prevention doctrine does not apply and Newman's claim must be dismissed.

### D.    Plaintiff's promissory estoppel claim fails.

Newman claims that promissory estoppel prevented Howard from rescinding his academic merit scholarship. Compl. ¶ 167. Because Newman does not allege that Howard promised that it would not rescind his scholarship—and in fact alleges that Howard made the scholarship explicitly contingent on maintaining a certain academic standing—this claim fails.

The District of Columbia defines promissory estoppel as: "(1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment." *Myers v. Alutiiq Int'l Sols., LLC*, 811 F. Supp. 2d 261, 272 (D.D.C. 2011). Newman's allegations do not establish that Howard made a promise on which Newman reasonably relied to his detriment. *First*, Newman admits that his merit scholarship was expressly contingent on remaining in the top half of the class. Compl. ¶ 27. Newman also admits that he failed to do so. *Id*. ¶¶ 27, 41. Thus, Newman's own allegations show that, far from breaching a promise, the School of Law acted pursuant to the terms and conditions of Newman's scholarship. *Second*, Newman

44

alleges Howard "*failed* to notify him" that he did not have high enough grades to maintain his scholarship, *id*. ¶ 167 (emphasis added)—but he does not allege that Howard ever promised to notify him, prior to terminating his scholarship, that his grades were insufficient. Thus, Newman has not alleged facts that state a promissory estoppel claim.

## **CONCLUSION**

Newman's allegations are insufficient to sustain his claims, and in fact disprove them. The Complaint should be dismissed in full—and with prejudice. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (dismissal with prejudice is warranted when the plaintiff cannot plead "facts consistent with the challenged pleading" that could "possibly cure the deficiency" in his complaint) (quotation omitted).

Dated: April 11, 2023

Respectfully submitted

/s/ Amanda Shafer Berman
Laurel Pyke Malson
Amanda Shafer Berman (#497860)
Kyle Lyons-Burke (#1655452)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 688-3451
Fax: (202) 628-5116
aberman@crowell.com

*Counsel for Defendants Howard University School of Law, Howard University, Danielle Holley, Wayne A.I. Frederick, Cynthia Evers, Debra Bright, and Lawan Lanier-Smith*

45

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2023, the foregoing was served upon Plaintiff via

e-mail and FedEx delivery.


/s/ Amanda Shafer Berman
Amanda Shafer Berman