# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL R. NEWMAN, )
)
Plaintiff, )                 Civil Action No. 1:23-cv-00436-TNM
v. )
)
HOWARD UNIVERSITY SCHOOL )       **OPPOSITION TO DEFENDANTS'**
OF LAW, *et al.* )               **MOTION TO DISMISS**
)
Defendants )

I, Michael R. Newman, Plaintiff in the above case, submit this Opposition to Defendants' Motion to Dismiss. This opposition serves to introduce additional detail, rebut Defendants' assertions, and present compelling arguments that support the continuation of this legal action.

The crux of this case lies in my claims of racial discrimination and breach of contract. I have provided substantial evidence that demonstrates discriminatory actions and practices on the part of the Defendants. These actions have caused immense emotional distress and exerted a profound and detrimental impact on my personal life and the hope of ever entering the legal profession. I have also provided substantial evidence of the existence of contract and Defendants' breach.

It is crucial that this Court allow me an opportunity to present a full presentation of evidence and arguments in a fair and impartial setting. To that end, I present the following compelling array of evidence and supporting arguments for the Court's and Defendants' examination.

RECEIVED
MAY 2 5 2023
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**On Discrimination**

In October 2020, in a nearly hour-long conversation, Dean of Admissions Reginald McGahee told me comments I had made in a GroupMe chat were "wrong," "dangerous," "reckless[]," and "insensitive"; students were right to be offended by them and owed me no explanation as to why; I owed everyone an apology; I had "replicat[ed] a system of subjugation and marginalization"; I had caused students "wounds," "hurts," and "trauma"; and I should "accept the mistake" I had made and "think[] about what [I'm] going to say before [I] say it."[1]

McGahee could not articulate what exactly about my comments fit these descriptions other than that, in his opinion, my comment that I "part[ed] with the black community" was tantamount to declaring all black people think alike and hold exactly the same views. Though I failed to comprehend this equation, the Dean succeeded in persuading me that with time I may come to understand why my comments had been deemed offensive. He also asked me how I might go about trying to reconcile with classmates:

McGahee: Okay, so what do you recommend, or what do you think you should do to make amends, if at all?

M. Newman: [...] I received an email this morning from Maurice, the president, and I think *the email went out to the entire class*. I'm not sure. But I think that it gives me an opportunity to *respond to his email* and kind of, after I've reflected on the things that you've said, *to write an email* which kind of speaks to what people have been waiting to hear and haven't been able—and I haven't been able to give. I wish that the students knew!

---

[1] I recovered the audio recording of this conversation only after filing my Original Complaint. My Amended Complaint will reflect the corrections and added detail the recovery permits.

McGahee: I do think that it might be helpful to you, to the degree that you're comfortable sharing that information, sharing some version of this information with your classmates to let them know that you are an ally to them. Not that you're just here to take from the environment, but you're also here to give to the environment. I think it's very admirable of you…. And if they [classmates] don't know that, they can't give you credit for some of the good things that you're trying to do that no one is aware of. Ex. 1, at 34:21.

McGahee: I think, you know, I don't know how you feel about what you plan to do, but I think you would gain some emotional capital if you told a little bit more of who you are and shared who Ray is versus trying to absorb who everyone else is. … So I think if you are committed to this community, if you do want to be a part of it in some way, then *you should share part of who you are so that they can understand where you're coming from* so that when they hear these comments, they don't assume animosity. *Id.*, at 39:12.

M. Newman: So, was my suggestion, does that sound like a reasonable way to go about this, *responding to Maurice's email*?

McGahee: If you feel comfortable responding I don't have [*inaudible*]. If you don't address it, then it's just going to fester. *Id.*, at 50:41. [Italics throughout added for emphasis.]

    In January 2021, after I carried out this plan, Holley then seized the same letter, which she calls a "manifesto," as the impetus for discriminatory acts discussed below. The contents of the letter may have differed from what either McGahee or I had envisioned in October, but the distribution of it was one McGahee had *authorized*. As to the views I expressed, a Howard Law professor affirmed for me my understanding as it had evolved by January:

M. Newman: Initially, I made a couple of comments that I thought were innocent, and then there was a great deal of fallout, and I was told that my comments were hurtful and offensive. And I reflected very deeply for a long time, and I listened to what people told me, and I didn't understand. And I had one long conversation with an administrator, and I was honest and said, I still don't understand what's hurtful or offensive. But I was listening, and I was trying to understand, and I thought I eventually would. Over the weeks, I thought more and more about it, and I came to a conclusion that was very different than what I thought it would be, that what I said was never hurtful or offensive, but that some students expect me, as a Caucasian, to walk on eggshells. And there are certain things that are forbidden for me to talk about or say. And there are certain opinions I should never voice.

Professor: I concur in your assessment that there is a segment of the … community, not just in the student body, but in the faculty as well, that on a variety of topics … there are some who believe *that if you're not black, there are certain ideas that you simply cannot hold or certainly cannot express*. […] [T]here's always been a segment of the Howard community that feels that way on a range of issues, *that white people basically should be seen and not heard*. It's kind of funny because you would think that a predominantly black school would be very sensitive to not *squelching and basically treating minorities poorly*, but that obviously isn't always the case. […] I am well aware that there's a segment of the Howard community that feels that way, and a vocal one at that.

Newman: [T]he conclusion I've drawn is that there are two schools of thought. I think you kind of hit on that. One is that a vision for Howard is to create a kind of oasis away from racism where … all people, students and faculty, are treated without regard to their race. But then there's the other school of thought that Howard can be a different sort of oasis where we

can have the same sort of racial discrimination other schools have, but with blacks the dominant race and other races being marginalized. And I feel like that that was what I was up against. And I'm still up against. …

Professor: [Y]ou have accurately described the two different philosophies with regard to what's present on campus.

From conversation with Howard Law professor, January 2021.[2] [Italics added for emphasis.]

Federal Regulation 34 C.F.R. § 100.3 states that under Title VI any university receiving federal funds is forbidden "on the ground of race … [to] [p]rovide any service … to an individual which is different, *or is provided in a different manner*, from that provided to others under the program." [Italics added.] Requiring a minority-race student to self-censor or express approval of majoritarian viewpoints while allowing majority-black students relative liberty to speak freely violates Title VI because it results in a different service for the minority student or one provided in a different manner.

Majority black students regularly employed epithets, made sweeping judgments about Caucasians, or voiced hostility toward me with explicit references to my race and other protected characteristics. Administrators not only saw firsthand examples of race-based hostile language and epithets but were informed by me on multiple occasions. Exhibit 2 depicts the example I shared with Frederick and Holley in January 2021 in which a black classmate derided me, mocked me with racial epithets, asked me to self-censor, and impugned my character all the while centering his criticisms around my race and his perception that Caucasians can have neither valid contributions to offer discussion of racial dynamics in the U.S. nor any right to

---

[2] To protect the professor's anonymity, I will ask the Court to allow me to submit the complete transcript under seal.

draw inspiration from or comment on the legacy of Martin Luther King.[3] Following that exchange, another classmate weighed in, declaring that my comments confirmed to her the sweeping condemnations of the Caucasian race she had read in Charles Mills' *The Racial Contract*, a reading assigned to us by our Property Law professor. *See* Ex. 2.

Holley immediately asked to meet with me and then berated *me* for 19 minutes for *my* "incredible disruption to the Howard Law community," Ex. 3 ¶¶ 7-8, a "video that [I] put into the GroupMe and statements that were made [by me] in the GroupMe," *Id.* ¶¶ 14-15, my tweet of Gordon, my "emails to the President of the University and other people [protesting racial discrimination], *so now there's University time being taken dealing with all these matters*," *Id.* ¶¶ 30-31 [emphasis added]; reminded me that "[I] don't have any First Amendment rights in the Howard community," *Id.* ¶¶ 37-38; and insisted that I "confine [my]self hopefully to attending class, reading for class, [and] studying." *Id.* ¶¶ 46-47. Holley denied the University owed any responsibility for racial discrimination regarding "disputes … with fellow students." *Id.* ¶ 61. When she eventually allowed me to speak, I began:

> Newman: Well, you've said a lot, and it sounds like you had, the primary purpose of calling this meeting was to dress me down like that—.
>
> Holley: Absolutely it is, and I want to get that message across…. *Id.* ¶¶ 170-172.
>
> Newman: Ok, well, I just, in my point of view, a dialogue would have been more conducive to fostering a solution to the controversy that has erupted. You're showing, you're admitting that you really just called me to this meeting to dress me down, and I—.

---

[3] To the student, for a white person to quote Martin Luther King is to "bastardiz[e]" him. Ex. 2 ¶ 26. Holley expressed the same sentiment at my second hearing: "I think you know that this is deeply offensive, to compare yourself to Martin Luther King and to other civil rights workers"; "you went way over the line!"

Holley: I did! I absolutely did! *Id.* ¶¶ 200-203.

In their Motion to Dismiss, Defendants characterize this meeting as: "Newman admits that Howard *acted in response* to his allegations of harassment." Mot. Dismiss, at 18 [emphasis added]. To be sure, "Dean Holley … promptly responded"(!), *Id.*, at 10—not by addressing my legitimate concerns, but by recommending to classmates they exclude me from chat forums and excommunicate me; conspiring with students to dredge up material she could use against me in a disciplinary action; reprimanding me severely, revoking certain email privileges, and pressuring me to transfer to another school; hosting a Town Hall in which she (a) invited students to excoriate me for two hours while muting my microphone, cutting my camera, and closing the chat, (b) actively suppressed the meaning of my tweet about Gordon, stoking greater hatred and unrest, and (c) repeatedly gave classmates detailed instructions on how to file a disciplinary complaint against me; manipulating my class rank in such a way as to deprive me of my scholarship; and inducing University administrators to pursue spurious Student Code of Conduct ("Code") charges to expel me. Defendants took no action to cure a known hostile environment and in fact did much to provoke it. *See* Ex. 4, Town Hall, January 28, 2021.

During our meeting, Holley repeatedly referenced as a "point of contention" a video I shared in GroupMe that prompted the altercation of Exhibit 2. Ex. 3 ¶ 411. In the video[4], Georgia Howe discusses her reasons for leaving the Democratic Party, including changes in her thinking about racial dynamics in the U.S. She at no time denigrates any racial group and only delivers commentary on prevailing assumptions about race and other political hot-button issues.

---

[4] https://www.youtube.com/watch?v=flp7gKg5G4E&pp=ygUWZ2VvcmdpYSBob3dlIGJyZWFrYXdheQ%3D%3D

Just prior to my post, a black classmate shared a video[5] in which podcasters played a humiliating mock game show titled, "Guess What Race She Is!," poked fun at the Asian name of *Howard Magazine*'s new editor-in-chief, argued that only blacks should be hired to that position, and exclaimed, "I went to a historically black college just to get away … from white people!"

McGahee and Holley repeatedly interrupted my attempts to discuss the classmate's video, disavowing control over or responsibility for any content posted to GroupMe. In fact, Holley exerted substantial control, asked students to scrutinize material I posted and report to her, induced them to remove me from the forum, and "dress[ed] me down" for contributions I made there. As Defendants wish to emphasize, "GroupMe chat platforms [are] set up, and … administered, by … classmates—not the University." Mot. Dismiss, at 3. Holley's statements at the Town Hall in fact reflect substantial control over the platform, asserting that the Student Code of Conduct applied to conduct in GroupMe chat forums. Ex. 4, at 12:43-13:49. And even as she disavowed responsibility for black classmates' GroupMe posts she engaged their assistance to scrutinize and police mine. Defendants claim Holley's immediate responses did not constitute adverse actions, but her testimony at both hearings referred to material I had posted in GroupMe, which she represented as "materials that [students] found racially offensive." Further, her threat to file a complaint against me a year later was based in part on her revocation of email privileges at that January 2021 meeting. *See* Ex. 5 ¶¶ 271-278.

Throughout the Deans' 90-minute call with me January 28, 2021, both pressured me to silence myself, giving me a choice for my three years of law school: "don't have any extracurricular conversations with other students," Ex. 3 ¶ 188, or "find a law school that is

---

[5] https://www.youtube.com/watch?v=lXHkibaIi6A&ab_channel=BreakfastClubPower105.1FM

maybe a better fit for you," *Id.* ¶ 167. Throughout the two-hour Town Hall of January 31, 2021, students repeatedly expressed their insistence that I self-censor, one student capping off the evening by saying, "[W]hat we're really asking you as black and brown people, as your fellow JD peers, is instead of offering up what you think we need to hear, is instead what you can hear from us." Ex. 4, at 2:03:21. Students and administrators alike pressured me to "be seen and not heard." *Supra.*

Defendants' Motion to Dismiss recounts to the Court procedural steps taken to adjudicate Holley's complaint against me and, much as Evers in denying my appeal, Ex. 6, at 1, n.1, extrapolates from the mere exercise of those procedural steps a just adjudication or due process. Mot. Dismiss, at 1, 43. Yet neither hearing was meaningful, and the Court owes the University no deference in a disciplinary expulsion case, certainly not to the point of ignoring decisions lacking rational bases and motivated by racial animus. Defendants manipulated both hearings, appeals, and the overall process extrajudicially so as to obtain Holley's desired result. Similarly, Howard's "outside attorney" enjoys a longstanding relationship with Howard University, and whether his "investigation" ended six months after it began I cannot say, but he accomplished nothing during that time but to amass any evidence he could to defend Howard in the event of litigation. Mot. Dismiss, at 20, 8.

Cursory analysis of the University's basic procedural steps reveals administrators' unconcern even for the specific conduct Holley sought to prosecute or specific provisions of the Code she alleged it violated. Lanier-Smith's Notice of Hearing dated March 21, 2022, charged, "1. SECTION VI: #6 – DISRUPTIVE CONDUCT," and "2. SECTION VI: #12 – HARASSMENT" [of the Code].  Holley's complaint charged, rather, "23. Use of Electronic Communication" and "12. Harassment." At the first hearing Lanier-Smith ignored Holley's

"Electronic Communication" charge and again charged disruptive conduct and harassment. Holley's testimony then mentioned "disruptive" only once but referenced listservs 13 times. The second hearing repeated all these same inconsistencies, Lanier-Smith again charging disruptive conduct, *not* use of electronic communication. At my first meeting with Lanier-Smith on February 25, 2022, she had told me the "bulk" of Holley's disciplinary action against me was "the inappropriate use of the listserv," while Defendants' Motion to Dismiss avers my expulsion was based *solely* on the open letter from my private email asking Holley to postpone a vaccine deadline. Mot. Dismiss, at 15-16. Moreover, while Holley's testimony had focused primarily on events of 2020 and 2021, and Bright emphasized the impact of Holley's (false) claim I continued using listservs in 2021 after I was asked to stop, Evers, by contrast, declared my expulsion based solely on events of 2022. Ex. 6, at 2.

Thus, administrators failed to coordinate among themselves even what they were charging me with, and all everyone was really sure about was that I was guilty of whatever it was. Such scant attention for controlling facts and issues, together with the hellbent manner in which Defendants pursued my expulsion, makes sense if the disciplinary process was a sham throughout and is not explainable by any theory Defendants have put forth. And administrators' willing collusion to prosecute a sham trial against a Caucasian student accused of "disruption" an email allegedly caused, while pardoning actual disruptions caused by black Howard University students who took control of the Blackburn Student Center for over a month in defiance of administrators' repeated demands to depart, constitutes disparate treatment. Likewise, black Howard Law students sparked a small uproar by hosting a football game for "real men only" and were not disciplined. Or, if "unauthorized use of listserv" was the charge, Defendants similarly absolved numerous other students', faculty's, and staff's repeated unauthorized uses of listservs.

Further, Dean McGahee *authorized* distribution of my letter, presumably over a listserv. Or, if an email sent from my private Gmail account was the charge, no one to date has alleged any policy or code prohibited doing so. By any calculation, my expulsion defies legitimate explanation.

Much as administrators' reckless miscarriage of justice is explainable by racial animus, McGahee's, Holley's, and students' exaggerated reactions to my most innocuous statements, absent a showing the statements were objectively offensive, is explainable by racially discriminatory treatment—a campus culture of "squelching and basically treating minorities poorly." *Supra.* McGahee's, Holley's, and classmates' concurrent indifference to overtly racist remarks black students made about whites renders a finding of racial discrimination irrefutable.

In a textbook example of disparate treatment, black classmates were "told repeatedly not to use the University's email system … did it anyway, and [were] *not* disciplined and expelled, as [I] was." Mot. Dismiss, at 16. In January 2021, McGahee emailed all students one warning. Holley sent one email to me only. Following the Town Hall, she sent one email to the student body (and *not* to me). We were all thus equally noticed.[6] Prior to warnings, I emailed an open letter to classmates over a listserv, and black classmates responded over the listserv. A year later, post warnings, black classmates emailed an open letter to Holley over the listserv, and I responded over the listserv. A clearer example of "similarly situated" would be hard to find.

Students have emailed the student body describing pressure they were putting on administrators to stiffen Covid protocols. Multiple students used listservs to solicit support for the Blackburn riot. Students sent emails over listservs for commercial purposes or to advertise parties. January 21, 2022, the Director of Information Technology wrote, "It has come to the

---

[6] A question remains, moreover, why Holley emailed me directly but not the black students who used listservs at the same time and in the same manner (and why she subsequently excluded me from an email to the student body).

attention [sic] that students are using computer equipment in the classrooms to play music and videos. Please be advised it is prohibited to use university equipment for personal use. It is also prohibited to disconnect equipment and connect your personal devices to university's equipment."[7] No students were prosecuted for these violations of the University's Acceptable Use Policy or expelled. After George Floyd's death Howard students who organized a protest that led to riots, looting, and property damage (decidedly disruptive conduct) were neither prosecuted nor expelled. A single individual sent, over School listservs, more than 100 emails, frequently political, favoring or opposing a political party or candidate, violating the Acceptable Use Policy's prohibition of "use of University computing resources … by faculty or staff in connection with political campaign activities in support of or in opposition to individual candidates, political parties, or political action committees…." The Howard University Faculty Senate sent an open letter to Wayne Frederick over a University listserv in the same manner as I discussing Covid protocols, the same topic as the open letter sent over a listserv to which I responded over the listserv January 25, 2022, and one related to my open letter to Holley January 29, 2022, sent from my private email account.

Holley's prosecution of me for alleged "disruptive conduct" also contradicted her open acknowledgement she could not, under the Student Code of Conduct, bring a charge against any student for disruptive conduct and that only a fellow student could do that:

> "But there is nothing in my power that allows me to unilaterally make a decision that someone is disruptive and remove them." Ex. 4, at 19:01.

---

[7] The Director here aptly describes the sort of conduct prohibited by the Policy. Holley's interpretation (whether of the Policy or the Code), by contrast, stretched the plain meaning of the text beyond reasonable limits. Neither my computer nor recipients', nor Google's servers, constituted University equipment.

"When you read the Student Code of Conduct, it says that if you were the person who has been the victim of something that violates the Student Code of Conduct, then you are the person who should report it.[8] Right? So that's all I'm saying, is that every single person in this community is empowered to do that and would need to do that in order to bring a complaint, right? So, I can't bring a complaint on behalf of a student who says that, right? You do need to bring a complaint." Ex. 4, at 36:40-38:56.

At our introductory meeting February 25, 2022, Director of Student Conduct Lanier-Smith had not yet provided me with Holley's formal complaint, thus I did not know what evidence Holley intended to present, what conduct she alleged, what violations of the Code, or what sanctions she sought. Asked when I could expect a copy, Lanier-Smith replied, "I'd give it to you as soon as I could. I try not to keep things like that from students…. I'm not necessarily the type of person that wants to keep anything that I can give to you, or that you are due, from you. I try to do things in a quite timely manner." Ex. 7, at 10:37 *et seq.* On March 4 I emailed her saying, "I would appreciate a copy of the complaint against me at the earliest possible date." She did not respond. March 17 I asked again, and she did not respond. March 21, Lanier-Smith emailed me a "Notice of Hearing," but not Holley's complaint. I wrote back March 22 asking, "When can I expect to receive a copy of the complaint that was filed against me?" March 23, I emailed again asking, "Could I have a copy of the complaint that was filed against me? I understand it may be redacted." Lanier-Smith replied, stating, "You shall have reasonable access to relevant case documents that are maintained in the Office of Student Conduct & Community Standards prior to your hearing on March 31, 2022." March 24, I asked, "Could I have a copy of

---

[8] Holley's claim that she herself was a victim of harassment appears to have been a ploy to circumvent this particular obstacle to her action of expulsion on the same ground.

the complaint by Friday (3/25) so I can have the weekend to prepare a response?" With less than a week till my scheduled hearing, I had as yet no indication Holley sought my expulsion and expected the complaint to entail a warning or probation. Lanier-Smith wrote back on Friday, March 25, to say Holley's complaint would be provided by "Close of Business" on Monday, March 28, three days prior to my hearing. I had a three-hour class scheduled for that evening and others in ensuing days and asked if my hearing could be postponed because "I don't believe two days is a reasonable amount of time to prepare an adequate response."

Three days before my hearing, Lanier-Smith emailed me Holley's 15-page complaint, stating, "I have considered your request for a postponement of your hearing and determined that there is not a compelling reason for a delay. Your hearing remains scheduled for March 31, 2022, at 2:00 p.m." I learned then, for the first time, Holley wanted me expelled. I protested that expulsion "is a lot to have at stake with only two days to prepare." Lanier-Smith replied:

"Per the student code of conduct, requests for a postponement are considered by the Director of Student Conduct & Community Standards and granted only when it is determined that there is a compelling reason for the delay. As explained in my previous email I have determined that there is not a compelling reason for the delay. You were notified of the charges on February 23, 2022, and I met with you on February 25, 2022, and discussed with you the nature of the alleged violations. Furthermore, it is the hearing panel who will recommend final sanctions (if any) after considering information contained within the record from the hearing."

I placed calls to Evers and Bright, and with the intervention of one of them and the additional plea that I was desperate at the moment to obtain bone marrow treatment for my ailing sister-in-law, Lanier-Smith agreed to postpone my hearing. The fact that Lanier-Smith withheld Holley's complaint for more than a month after promising to provide it speedily indicates: Either

(1) Holley did not submit her complaint on January 31, but much later, and backdated it to January 31—which would indicate collusion between the parties[9]—or, (2) Lanier-Smith needlessly withheld it until just before my hearing—which would indicate malice. Both to claim the Code forbade me to cross-examine Holley when, as Director of Student Conduct, she knew it guaranteed that right, and to refuse to tell me where she forwarded my complaint against Holley, further evidenced malice.

Lanier-Smith, who had pledged to select panelists "from a pool of qualified and trained administrative staff and faculty members," herself sat with the same two handpicked co-panelists not once, but twice. Her denial of my right to cross-examine Holley cannot have been remedied with a second hearing when the same three individuals oversaw both—and she never permitted me to cross-examine parties whose testimony Holley presented as evidence.

### On the Existence of Contract and Breach

The existence of contract is demonstrable by my signed acknowledgement of scholarship in which the University repeatedly expressed its intent to be bound with such phrases as "shall be awarded," "is credited," "[r]enewal … shall be based," "funds shall be applied," and "shall be renewed in full." Ex. 8, at I.3, I.4, I.6, I.8, III.A.3.

The University's Student Code of Conduct expresses intent to be bound in "Section III: Student Rights, Freedoms, and Responsibilities," in which the Code guarantees a list of "General Rights and Freedoms" and a list of "Procedural Rights and Freedoms." Ex. 91, at 3-4. General rights and freedoms guaranteed by the Code include "freedom of expression, inquiry and assembly"; "the right to organize groups; the right to join associations in support of any cause or

---

[9] If true, the Code's five-day statute of limitations would have expired on any actionable event.

common interest; and the right to peacefully protest"; "the right of fair access to all educational

opportunities and benefits available at the University in an environment that is safe and free from

invidious harassment, discrimination or intimidation"; "a right to privacy in accordance with the

provisions established by [FERPA]"; and "the right and responsibility to report, in good faith and

without fear of retaliation, violations of this Code, the University Code of Ethics and Conduct,

the Title IX Policy and any other policy of the University, to appropriate academic or

administrative officers of the University." *Id.*, at 4.

The Code guarantees a "[s]tudent[] accused of violating this Code" the right "(B) To be

informed of and to have explained, as required, the pending charges. (C) To be free from

intimidation and retaliation by University employees in the resolution of disciplinary matters.

(D) To face accuser(s) and have the opportunity to cross-examine them and any witnesses…. (F)

To have a fair and impartial hearing before an appropriately appointed hearing board, appeal

board, or Administrative Hearing Officer." *Id.*, at 4-5. The Code also guarantees an accused

student "shall have reasonable access to all of the relevant case documents." *Id.*, at 9. The Code

requires that "[t]he Complainant carries the burden of proof to establish that the Accused Student

violated the *Code*." *Id.*, at 10. The Code requires the Administrative Hearing Officer and Hearing

Panel to "conduct[] the hearing in a fair and impartial manner…." *Id.*, at 11.

The Student Code of Conduct was a contract Holley explicitly acknowledged bound her,

the President, and even the Board of Trustees:

"I think that's one of the questions we're confronting right now is what happens when we

are confronted with a situation in which there is not a shared value and that question of, is it

a violation of a Code that is in our government? Or is it a situation where we're going to

disagree and have to determine how to deal with that disagreement outside of the Code of

Conduct? But just to be clear, *there's nothing that empowers me as Dean of the Law School, nothing that empowers President Frederick, nothing that empowers the Board of Trustees to dismiss any student from the law school because we disagree with their views.* Right? There's nothing that empowers me to do that." Ex. 4, at 16:25. [Emphasis added.]

The Code of Ethical Conduct ("CEC") specifies "common obligations, responsibilities and accepted principles of ethical conduct to which all members of the Howard University … community must adhere," including the Board of Trustees … and administrat[ors]." Ex. 92, at 3. Upon "trustees and Senior Administrat[ors]," including President, Vice Presidents, and Deans, the CEC places a *heightened* standard of "special responsibilities." *Id.* The CEC signals the University's intent to be bound to certain "fundamental responsibilities," stating, "To Our Students -- we have the responsibility to provide fair access to all educational opportunities and benefits available at the University in an environment that is free of harassment, discrimination, or intimidation." *Id.* The CEC does not use the word "goal" or "ideal" when describing its "obligations" and "responsibilities" to students.[10]

The CEC binds Administrators to adhere to specific standards of professionalism and integrity, "avoiding any conduct that is an actual or apparent violation of these standards at all times." *Id.* It prohibits "discriminating," "harassing," or "depriving anyone of rights in physical or intellectual property"; and from "deny[ing] a student fair access to educational opportunities and benefits available at the University." *Id.* Distinctions between aspirations and duties are readily apparent. For example, a reasonable person recognizes the text, "[T]he University is

---

[10] "Goal" appears only once: "Members of the University Community shall be objective, independent and impartial and conduct their duties in a manner that assigns first priority to the needs and goals of the University." III(G), at 5. "Mission" appears three times in Section III, but only with regard to the University's cultural diversity, educational experience, and "abiding interest in both domestic and international affairs." *Id.*, at 4.

committed to continuing to produce leaders for America," as aspirational, while the warranty, "Harassment, discrimination, or intimidation of students that deny or impede their right of access to these benefits and opportunities will not be tolerated and will be subject to disciplinary action," communicates a clear and specific obligation. However, even language of an aspirational nature, though it may not specify a concrete, binding promise, must guide interpretation of more-concrete clauses and evaluation of student conduct. For example, where an email sought to alert classmates to a potential health hazard, speak out against racial bigotry, or address other matters of public concern, the Code's proclamation of "appreciation for the tradition of freedom of expression on campus" and "commitment to fostering and tolerating different viewpoints" ought to have guided interpretation of the Code provisions my accuser alleged I violated.

## A. Revocation of Scholarship

The School breached a contractual obligation to renew my scholarship by contriving my class rank so as to appear to justify its nonrenewal.

A day after classmates expressed shock and outrage over comments I made, the Legal Reading, Research, and Writing ("LRRW") professor adjusted her grading system so as to invite students to evaluate one another as part of our grade. This change, implemented in response to the controversy my comments ignited, ensured my course grade would be reduced and left me with the choice either to accept a lower grade or withdraw.[11] Because I chose to withdraw, at end of year, administrators could in no way have calculated my grades, my classmates' grades, and

---

[11] Our Property Law professor also invited student peers to evaluate one another as part of our course grade—again ensuring a loss of points due to classmates' antipathy. On my request, that professor omitted the student evaluation portion of my grade, but classmates' grades nevertheless benefited, depreciating my score at least to some degree.

our rank in the same manner. Administrators devised a ranking scheme in such a manner as to ensure I fell into the bottom half of the class. According to the terms of the scholarship contract, "if the student's class rank is in the lower half … then the Merit Scholarship may be renewed if the funds are available." III(A)(4). They then positioned the renewal cutoff above my class rank. Evidence for this can be found in an email sent to me by Mariela Olivares, Dean of Academic Affairs, dated October 28, 2020. In it, she stated, "[S]tudents who have completed the first-year curriculum are ranked as a class. Because you would not have earned the requisite credits and completed the first-year curriculum, you would not be ranked with the group at the end of Spring 2021. If you obtain enough credits to put you in the 2L class in Fall 2021, you would be ranked with that group at the end of Fall 2021." In direct contravention to Olivares' clarification, McGahee and Holley ranked me at the end of the spring 2021 semester, before I had completed the two-semester LRRW course, so as to revoke my scholarship and—they hoped—induce me to transfer to another law school.

Grades at Howard Law were easily manipulable and sometimes reflected animus against me personally or bias against a viewpoint I expressed in an assignment. Participation grades were rife with bias. Property Law included a lab, for which the Teaching Assistant ("TA") assigned me a participation grade lower than a peer who spoke a fraction as much as I, and in spite of my having contributed 69% of a written project produced within a group of four. When questioned, the TA replied, "The class participation portion is subjective."

Indeed, participation scores always are, and a number of professors included such subjective grading in their grading systems. One never knew what "participation score" one had received because at the end of each semester each student was awarded a single, comprehensive numeric grade. Such opacity precluded accountability for errors or bias. And though the grading

system was purported to be anonymous, some professors included, on their "anonymous" final exams, questions almost identical to those posed in prior assignments earlier in the semester, allowing them easily to ascertain a student's identity by sheer similarity of the answers posed to both. Research papers were never anonymous. Because Holley had instructed faculty to police zoom chats and report to her on content I posted, she necessarily prejudiced them against me or exacerbated preexisting prejudices. The combined opacity, duplicity, and deliberate manipulation I have described allowed School administrators to abuse their discretion and revoke my scholarship in breach of contract and the implied warranty of good faith and fair dealing.

In the same conversation excerpted above, a Howard Law professor believed that my LSAT score was the highest in the class, very high above the mean LSAT score, and that "somebody with [my LSAT score] should not be getting those kind of grades, because the LSAT, for all its flaws, is generally able to identify people who should do really well in law school. So there's something going on."[12]

As has been said, Defendants acted in bad faith by fostering the hostile environment that caused psychological symptoms that precluded my adequate performance, most notably in fall 2020. At that time both McGahee and Holley stoked hostility through their communications with students, conveying to them the same condemnatory sentiments regarding me as they conveyed to me directly. My performance in the spring of 2021 and subsequently was also affected by the hostile environment administrators stoked, notably at Holley's Town Hall. A higher grade average in spring 2021 would have improved my chance of falling in the upper half of the class.

**B. Student Code of Conduct**

---

[12] (The professor did not, however, suspect foul play.)

The University breached by prosecuting an inexplicable medley of charges, *supra*, by pursuing a pretextual disciplinary action for discriminatory reasons, and by finding fault without a rational basis. Holley admitted under cross-examination she had supplied the panel with evidence inaccessible to me but denied that constituted secret evidence, because "[t]hese are things that you said," and "I think you should be aware of your own statements," and thus I was denied "reasonable access … to relevant case documents" at both hearings. IV(2)(B)(5), Ex. 91, at 9. Lanier-Smith granted Holley a degree of deference repugnant to a neutral arbiter; on cross-examination allowed Holley to evade questions and harangue at length; apologized to the Dean if I attempted to limit her responses and threatened me with sanctions; put no questions to Holley nor ever required any evidence to support her claims; and disregarded evidence I proffered refuting them. The Code required from her a heightened duty of fairness and impartiality, but she failed to uphold even a minimum standard. IV(2)(B)(12), *Id.*, at 11. She violated § IV(2)(B)(10) of the Code by placing a burden on me to prove my innocence, *Id.*, at 10, and § III(2)(D), cross-exam of witnesses. *Id.*, at 4. Lanier-Smith violated § IV(2)(B)(1) of the Code guaranteeing ten working days' notice for a hearing, *Id.*, at 8, and after Bright or Evers intervened to grant my postponement, rescheduled my hearing to a final exam preparation period. Lanier-Smith's insistence she sit on the panel when asked to recuse herself also appears inconsistent with § IV(2)(C) of the Code, which speaks of a "Hearing Officer or Hearing Panel" as distinct from the Director of Student Conduct & Community Standards. *Id.*, at 11. By their rejection of legitimate bases in both appeals, acceptance of Holley's absurd harassment claim, and complicity with an overtly flawed process, Bright and Evers violated § IV(3)(A)(1): "An appeal request will be granted when an important procedure leading up to or during the original hearing was ignored or so flawed that the hearing was not fair and impartial." *Id.*, at 12.

Holley's obfuscation on a particular matter carries over into Defendants' Motion to
Dismiss and will be carefully addressed here. Prior to January 29, 2022, Holley had warned me
only against "unauthorized"[13] use of School *listservs*. In January 2021 I discontinued any use of
listservs immediately when asked, and though classmates used them without repercussion, I
avoided sending over listservs entirely until an open letter to Holley was shared in January 2022,
and to this I responded.[14] Holley took no action against classmates but reproved me once again.
Yet even as she reprimanded me she suggested the idea of sending emails using "bcc or cc"
functions, and that is how I sent my open letter of January 29, 2022, from my private Gmail
account. Holley then emailed me saying, "I warned you on Wednesday not to send any more
*unauthorized emails* to the law school student body." [Emphasis added.] All Holley's
admonitions regarding emails had pertained to a purported listserv policy, and on January 25 she
had outright endorsed emails to individual email addresses. Exhibit 9 ¶¶ 129-130. But,
responding to my January 29, 2022, email using "bcc," Holley suddenly pivoted to claiming she
had warned me against sending any email to classmates by any means unless I had her
authorization. She had never said that, and no Howard University policy grants a dean such
broad authority. The Court should beware attempts by Defendants to obfuscate these two distinct
acts, emailing over School listservs versus emailing "bcc" to individual addresses, particularly
from a private email account. Mot. Dismiss, at 15 ("mass emails"); at 16 ("told repeatedly not to
use the University email system"). On page 21, Defendants assert: "[H]e was charged with
violations of the Code of Conduct and expelled … because, after repeatedly being told not to use

---

[13] She did not clarify what she meant by the word "authorized" until January 25, 2022. Ex. 9 ¶ 258 *et seq.* Her
clarification then seemed to suggest Dean McGahee had "authorized" my emails of January 2021.

[14] Her claim at Ex. 9 ¶¶ 114-116, is refuted by email timestamps. She stated she would provide evidence to back up
her claim. *Id.* at ¶ 290-291. Throughout the disciplinary processes she continually claimed I had continued to violate
the School "listserv policy" after asked to stop but never produced such a policy and never showed evidence I had
continued to send emails over listservs after asked to stop. I attempted to show hearing panelists evidence
vindicating me, but they never indicated any recognition of this evidence.

Howard's email system to send mass messages, he sent an email to his classmates suggesting that a student had died as a result of the Covid-19 vaccine." *Id.* My email about the Covid-19 vaccine was sent, not through "Howard's email system," but from my private Gmail account.

Defendants appear to assert my expulsion was based solely on my email regarding the Covid vaccine, and they assert I was charged with violations of the Code, but the Code nowhere prohibits a student from emailing classmates from a private email account. And, I was never asked to refrain from emailing from my private account—quite the opposite. Defendants therefore seem to concede my expulsion lacked a legitimate basis. But, for further clarification, Holley announced *before* my email about the Covid vaccine she already intended to file charges against me. Ex. 9 ¶¶ 222-223, ¶¶ 229-230, ¶ 269.[15][16]

### C. Howard Code of Ethical Conduct

Neither the attorney nor any other person ever discussed with me the substance of my complaint against Holley or scrutinized her campaign to remove me from Howard Law. Lanier-Smith even refused to tell me where she had forwarded my complaint, and there is no indication any action was ever taken on its behalf.

The "outside" attorney informed me up front that the University was a longstanding client at his firm, and I did not object. I understood that universities' internal investigators ordinarily undertake to protect universities' interests first and foremost, and I expected no less from their attorney. But if Defendants attempt to represent that attorney to this Court as impartial and without a vested interest in the outcome of his "investigation," that is simply disingenuous

---

[15] Defendants were informed of this. Ex. 10, at 56-57.
[16] Apparently in response to this lawsuit, the School has added a "mass email policy" to its website: "Students who violate these rules *will have their mass email privileges revoked* [not be expelled]." [Emphasis added.]

and false. Also, the attorney's personal ideological bias was evident throughout our discussions, one example being his incredulity I had not apologized to the class for my tweet of Gordon. As explained before, my tweet was intended to support Americans of color who suffered police brutality. Holley knew my intent and suppressed that knowledge from students while they denigrated me, refused to correct their misunderstanding, and disabled my microphone and chat so as to prevent my explaining. This was a tweet I posted to my private account with no intention of sharing with classmates. The "investigator" knew all this and more, yet still felt I owed the School an apology and not the other way around.

The following is an example of his quickness to promote an ideology during our interviews.

NEWMAN: [F]or a Caucasian student at Howard Law to make a comment concerning the black community is tabu.

MCCORMACK: And in your experience, is it unusual for a particular group within our society to express that kind of a tabu? I mean, isn't that the old I can criticize my family, but you can't?

NEWMAN: Well, what you're saying kind of reinforces the understanding that I have at Howard Law that I'm not a part of the family because my skin is white.

MCCORMACK: But isn't—don't we all bring multiple identities?

NEWMAN: I think everyone identifies with some kind of externality in some way to some extent. But the lesson that I've learned in my year and a half at Howard Law is that, is how extremely damaging it is for people to identify themselves according to their skin color.

MCCORMACK: Well, I guess we'll avoid it.

He also thought it offensive of me to suggest a white male could ever "suffer[] from the same type of discrimination as [blacks] experience day to day."

## My Defamation Claims against Holley

### A. Holley's statements against me at the Town Hall.

Holley's statements to an audience of my peers at the Town Hall are actionable as defamation. Some participants had not read any of my writings, and none of the participants could know whether they had read all of them. Therefore, Holley's statements necessarily carried implications of undisclosed facts, *i.e.*, comments I might have made that were unknown to some or all of the participants. In addition, Holley did not preface statements with "in my opinion" but presented her characterizations of my commentaries as unquestionable. Her comment that "people will say things … that are lies" is of a factual character, similar to the claim against the petitioner in *Milkovich v. Loraine Journal Co.*, 497 U.S. 1, 8 ("Milkovich and Scott lied"). As the transcript shows, Holley's disclaimers, veneered over a discussion about me, that she was not "talking specifically about any one student," were no more than perfunctory. By describing a hypothetical bogeyman as having made "racist, homophobic, sexist, transphobic" comments when I was the topic of discussion, she ascribed those labels to me. Holley's authority over the participants of the Town Hall includes but is not limited to influence she could exert on their budding careers.[17] Calling a Caucasian man "racist" to a group of 300 majority black students at an HBCU is the most damning and indelible impression a Dean could impart on her young students—and this in conjunction with assigned readings and class discussions emphasizing

---

[17] The same must be recalled in regard to her inducement of students to scour my publications in search of defamatory material. One student's discovery and redistribution of my tweet of Gordon must be seen in this light.

supposed evils of the Caucasian race and attributing most of American society's ills to Caucasians.

One indication of the damage Holley's Town Hall caused can be found in a student's diatribe against me a year later. In a rage, the student yelled, "So just do me a favor. Don't say [our deceased classmate's] name one more time. Don't fix your Twitter fingers to type her name one more time. That's all I ask." I had posted nothing to Twitter about the deceased classmate. What was lingering in that angry student's mind was my tweet of Gordon. The eight minutes I was allowed to speak after two hours of denunciation could in no way undo the harm caused.

More must be said on this subject, but time does not permit. As below, I ask the Court grant a hearing for parties to present oral arguments and additional time for written briefs.

**Holley's statements against me at the disciplinary hearings.** Holley's statements against me at the disciplinary hearings mixed factual together with opinion claims. The "gist" of her statements was that I had violated the Student Code of Conduct, and central to this allegation was her claim I continued to violate a rule after being asked to stop: "Despite my warning, he continued to do that, and eventually what I did as a solution, because he wouldn't stop…."

Asked at the second hearing, "Haven't you also told me I was free to send emails to classmates from my private email address?" Holley replied,

"For school purposes, things that are warranted. So that's exactly what I told you. I said, you asked me, if I'm blocked from the university system, how can I communicate with my classmates? And I said, you are welcome to send emails to your classmates about things that they want to receive from you. And I gave you a specific example, the one that I just gave to the committee. The specific example was you're working on a class project with your

classmates. You need to get in touch with them, but you don't have access to your law school email. Please feel free to use your private email for that. And instead, what you did is use it to say that one of your classmates died due to vaccination. That is totally outside of university policy and absolutely disturbing to their education…."

Every word of that answer was made up. Our entire exchange on the subject is found in Exhibit 5. At no time during that 36-minute conversation did she say anything resembling what she claimed to the hearing panel. She only suggested to me I was free to email students individually using the "bcc and cc" email functions. She never said "for school purposes," never said "things that are warranted," never said "things that [students] want to receive," and never gave a "specific example." These were all spun out of whole cloth for no conceivable purpose other than to prejudice the hearing panelists against me and secure my expulsion.

Holley was not a privileged witness at the hearings both because she acted out of malice and because she wielded substantial control over the hearing panel. Her familiarity with Lanier-Smith is explainable in part by Holley's admission she "worked" as a "prosecutor" within the University's disciplinary system and therefore must have gotten to know Lanier-Smith personally. Ex. 4, at 23:16. Holley's confidence, in January 2021, she was "sure the EEOC [University Title IX office] will make the same finding" as herself, Ex. 3, at 68-69, combined with the numerous red flags throughout the disciplinary process, allow for a strong inference of collusion among Howard University's administrative offices.


Finally, for Defendants to accuse me of a vaccine "agenda" is the height of irony. Mot. Dismiss, at 16, 21. The University sent dozens of emails to students about Covid vaccines, not just urging them to undergo vaccination, but demanding it. The University contacted individual

students believed to be "out of compliance with the University's COVID-19 vaccination policy" and threatened to "de-register[] [them] from [their] classes *soon*." [Emphasis added.] The University asked students to submit proof of vaccine status by emailing or uploading photocopies of their vaccination cards. An August 12, 2021, email recommended "the single-dose Johnson & Johnson vaccine" by name. The University tracked and reported the percentage of registered students and employees submitting vaccination cards, encouraged "all students and employees to submit the required documentation as soon as possible," cited data reassuring students of the vaccines' safety and effectiveness, and claimed that "nearly all COVID-19 deaths in the United States [were] now among unvaccinated individuals." The University provided free vaccines and set up vaccine clinics on campus: "[N]o appointments necessary."

I sent one email. Defendants should explain and defend their use of the word "agenda."

Michael A. Newman