## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL NEWMAN**, <br><br> Plaintiff, <br><br> v. <br><br> **HOWARD UNIVERSITY SCHOOL OF LAW**, *et al.*, <br><br> Defendants. | Case No. 1:23-cv-0436 (TNM) |

## <u>MEMORANDUM ORDER</u>

Howard University School of Law expelled Michael Newman.  It claims that it did so because he repeatedly sent disruptive emails to his classmates against school policy.  Newman tells a different story.  He claims that his expulsion was the culmination of two years of racist vitriol and abuse that he suffered at the hands of Howard students and administrators.  So Newman sued, bringing claims under local and federal antidiscrimination law.  And he also raised various claims under D.C. tort and contract law.  Howard now moves to dismiss Newman's Complaint.  The Court will do so, but only in part.

In short, the Court dismisses most of Newman's antidiscrimination claims for failure to adequately plead the existence of a material adverse action caused by his race.  And it will dismiss most of his contract-based claims for want of a binding contract.  Last, it will dismiss most of his remaining tort claims.  That said, several of Newman's claims survive: all those directed against unnamed third parties, and several adequately pleaded claims directed against Howard and its employees.

### I.

Plaintiff Michael R. Newman is a former student of Howard University School of Law,

Class of 2023.[1]  Compl. ¶¶ 9–10, ECF No. 1-2 pp. 5–54.  Howard is a historically black college

or university, or HBCU for short.[2]  Newman, a white male, enrolled there to "learn the thoughts

and experiences of people of color."  *Id*. ¶ 14.  Although most Howard students are black,

Newman was not the only white law student during his time there.  Jan. 28, 2021, Zoom Conf.

Tr. (Jan. 28 Tr.) at 4:74–75, ECF No. 21-1 pp. 40–79; Town Hall Tr. at 21, ECF No. 21-1 pp.

80–114.

Newman enrolled at Howard, in part, because of a scholarship it offered him.  Compl.

¶ 9.  Newman's scholarship agreement entailed the school covering roughly $26,000 of his

tuition during his first year of study.  Howard Univ. Merit Scholarship Pol'y (Scholarship

Agreement) at 2, ECF No. 21-1 pp. 174–75.  To maintain the scholarship, Newman had to rank

in the top half of his law school class.  *Id*.  Failure to do so would result in his scholarship being

suspended with an opportunity for later reinstatement.  *Id*.  Or, if Newman's performance

dropped low enough, the scholarship agreement could be terminated altogether.  *Id*.  With this

offer in hand, Newman enrolled at Howard.  Compl. ¶ 9.

Newman's experience at Howard was turbulent from the start.  Shortly after starting law

school, Newman attended a symposium with his classmates.  At the symposium, a black speaker

stated that "if Biden and Harris won the White House, they would usher in a 'golden age of

environmental justice.'"  Compl. ¶ 12.  In response, Newman posted in a group chat with his

classmates, "Where I part with the black community is where they believe government solves

problems, I only see it causing problems."  *Id*.  He likewise asked whether "black voters didn't

---

[1] Because the Court is deciding a motion to dismiss, it assumes the truth of the nonconclusory
factual allegations in Newman's Complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[2] Throughout this Order, the Court refers to Howard University and its law school
interchangeably as "Howard."  When the distinction between the two is relevant, the Court will
specify which it is referring to.

2

question turning to government for solutions" and whether black individuals "reliably voting for the same party . . . disincentivized both parties from responding to the needs of black communities." *Id*. These messages began what would ultimately devolve into a years-long conflict between Newman and his classmates and university administrators.

Newman's classmates reacted negatively to his post. One classmate called him "way outta pocket" and said that he hoped a professor would "drag[] [Newman] for filth." Compl. ¶ 13. Another removed Newman from a class-wide group chat. *Id*. And students met to discuss "next steps" in response to his comments. *Id*. ¶ 15. When Newman's classmates announced that meeting, one of his professors "replied jokingly, 'Whoever it is, I'll kill him!'", referring to Newman. *Id*.

Just after New Year's, Newman sent his classmates a letter, attempting to explain himself. Compl. ¶ 18. The letter came in four parts, titled, in order, "The Reactions," "My Comments," "My Background," and "Perpetuating Racial Aggression." *See* Newman Letter, ECF No. 13-2. The last section, Newman distributed to his classmates through a Howard email listserv. Compl. ¶ 22. He followed that email with another, sending his classmates a link to a documentary titled *Uncle Tom*. *Id*. ¶ 18. This again sparked strong reactions from Newman's classmates. Many referred to his letter as a "manifesto," *id*. ¶ 20, and two administrators separately contacted Newman to inform him that his use of the listserv violated university policy. *Id*. ¶¶ 22–23. Dean Danielle Holley told Newman "I request that you no longer send any emails to the Class of 2023 email list or any other law school email list." *Id*. ¶ 23.

Newman contacted the university president, Wayne Frederick, to complain about his treatment and alleged that he was facing racial discrimination. Compl. ¶ 21. Frederick never responded to Newman's email. But minutes after Newman sent it, Holley contacted him and

asked him to meet with law school administrators.  *Id*.  Newman recorded the meeting—as he did many other meetings during this saga.  In that meeting, Holley acknowledged that she had been forwarded Newman's email to Frederick.  Jan. 28 Tr. at 1:2–4.

Holley remarked in the meeting that Newman had caused "an incredible disruption to the Howard Law community."  Jan. 28 Tr. at 1:7–8.  Holley noted that although Howard is a private institution, and therefore Newman "do[es]n't have any First Amendment rights in the Howard community," it is still "an institution that believes very much[] . . . in freedom of expression." *Id*. at 2:36–40.  But she informed Newman that she believed his comments over the past semester had been "a huge distraction" to the rest of the students, and asked that he "confine [him]self . . . to attending class, reading for class, studying, [and] doing [his] academic kind of success work" because "[w]e can't have a disruption to the academic environment."  *Id*. at 2:41–3:48.

Holley also noted that Newman had "made very serious claims that the law school ha[d] engaged in racial discrimination."  Jan. 28 Tr. at 3:51–52.  She acknowledged that "[t]hose claims have now been forwarded to the EEOC office of the university and will be investigated." *Id*. at 3:52–53.  Still, she pressed Newman to admit that it would not be racial discrimination for his classmates or professors to disagree with the ideas he expressed.  *Id*. at 3:53–54.

At the meeting, Holley also addressed Newman's use of the school's email listservs.  She told him, "[y]ou are not welcome, and I have told you now officially by email, to ever use a [*sic*] official class email list to do anything."  Jan. 28 Tr. at 6:109–11.  As she put it, "those email lists are for official use of administration, staff, faculty, and for student events that are approved by use of the law school."  *Id*. at 6:114–7:116.

Last, Holley suggested that the law school "does not seem to be a very good fit for you." Jan. 28 Tr. at 7:136.  She noted that, "if you want to continue with us, . . . you're free to do that

as long as you're in good academic standing and you have not violated any of the university rules." *Id*. at 8:142–44. "But . . . this law school doesn't seem to be a good fit for you." *Id*. at 8:146–47. Thus, she told Newman, "you may want to think about . . . your options after this semester to continue your legal education." *Id*. at 8:152–53.

A few days later, Holley hosted a "regularly scheduled" virtual town hall for Howard law students. Compl. ¶ 28. She described that week's town hall as being about "what's been happening in our community around some things that have been happening in the first year class." Town Hall Tr. at 1. Although Holley said that she could not discuss specific students because of federal educational privacy laws, *id*. at 2, students evidently recognized that she was referring to Newman, *e.g.*, *id*. at 24. Over the course of the meeting, students expressed frustration with both Newman and the administration's response to him. *Id*. at 13–16. Holley encouraged students to file formal complaints if they felt a classmate was being disruptive or harassing. *See id*. at 4, 6, 7, 10, 11.

Newman tried to participate in the event by "raising" his virtual "hand." Town Hall Tr. at 24. But Holley refused to let him. Compl. ¶ 35. Indeed, at one point, Holley disabled a text messaging function in the virtual meeting room after Newman repeatedly attempted to use it to communicate with his peers. Town Hall Tr. at 24; *see also* Compl. ¶ 35. For nearly two hours, Holley obstructed Newman's participation in a discussion that was primarily about him. *See* Town Hall Tr. at 30. Newman was not able to speak until several peers demanded that he explain himself. *Id*. at 24–28. Once Newman was allowed to participate, he held the floor for roughly seven minutes, justifying his actions to his classmates. *Id*. at 30–32. Shortly after he finished speaking, Holley ended the meeting.

Even beyond this, Newman's first year at Howard did not go well. His classmates

referred to him with a slew of racial epithets.  These included "mayo king" (or "king mayo"), Compl. ¶ 28; "the White Panther," *id*. ¶ 37, based on a popular Marvel character, the Black Panther; "keebler [*sic*] cookie," *id*. ¶ 38; and "snow possum," *id*.  After his first year of law school, Newman found himself in the bottom half of his class, jeopardizing his scholarship.  *Id.* ¶ 41; Scholarship Agreement at 2.

In the fall of 2021, at the start of his 2L year, Newman "filed a formal complaint of racial discrimination with the University," based on his exclusion from a student-run group chat. Compl. ¶¶ 44–45.  The university hired an outside attorney to investigate his complaint.  *Id*. ¶ 45. But after an investigation that included interviews with Newman, the investigator concluded that his claims of discrimination could not be substantiated.  *Id*.

In January 2022, halfway through the school year, he again ran afoul of the school's email policies.  In late January, a group of students sent an open letter to Holley over the school listserv, protesting the school's return to mandatory in-person instruction.  Compl. ¶ 46.  Holley responded positively using the same listserv.  *Id*.  Soon after, Newman also tried to discuss the COVID pandemic using that listserv.  *Id*.  He sent a message thanking his classmates for "voic[ing] their views openly" and criticizing the school's "often opaque and autocratic policies."  *Id*. ¶ 47.  But unlike the other students, Newman was admonished by Holley.  *Id*. ¶ 48.

Wanting to continue his discussion of COVID-related matters, but seeking to avoid the listserv, Newman sent an email from his private email account.  Compl. ¶ 51.  He blind carbon copied "a number of students," so they would all receive the same email.  *Id*.  In this email, he "shared a link to a news report" about a Howard classmate who had recently died.  *Id*.  The news report stated that "she had died from pulmonary embolism (PE), a condition scientifically linked to mRNA vaccines," like those for COVID.  *Id*.

At this point, Holley emailed Newman stating that he had "continued to violate the University's email policy," by sending mass emails that his classmates described as "disgusting" and "disturbing." Compl. ¶ 52. She therefore suspended his Howard email address and blocked his private email address from the law school's network. *Id*. Holley also informed Newman that she would "bring student code of conduct charges" against him. *Id*.

Holley and Newman filed administrative charges against one another on January 31. Compl. ¶ 53. Holley complained that Newman had continually harassed his classmates and disturbed the law school's learning environment. *Id*. Newman, for his part, alleged that Holley had misused university procedure in an effort to "intimidate [him] from expressing information and views she disfavors" and to "control what information or opinions are shared among classmates." *Id*.

Lawan Lanier-Smith, Director of Student Conduct & Community Standards, reviewed the complaint against Newman. Compl. ¶ 55. She convened a panel to hold a hearing on Newman's alleged misconduct. *See id*. ¶¶ 62–63. The only witness at the hearing was Holley, whose testimony consisted of "numerous false claims, some having no clear relevance to her complaint." *Id*. ¶ 59. After Holley finished testifying, Lanier-Smith asked her a single question—not related to any material fact in dispute—and denied Newman an opportunity to cross-examine or otherwise question her. *Id*. ¶¶ 57, 60. She then provided Newman only 15 minutes to respond to Holley's charges and present his own case. *Id*. ¶ 61.

Several weeks later, the panel declared Newman "responsible" without explanation. Compl. ¶ 64. "The Notice consisted solely of boilerplate with Newman's name and the word 'Responsible' pasted in." *Id*. Newman appealed this decision, and the university vacated the panel's decision on the ground that Lanier-Smith had improperly denied Newman an opportunity

to cross-examine Holley. *Id*. ¶¶ 69, 71. The university then reassembled the same panel, and Newman sat for another hearing. *Id*. ¶ 71. The panel again found him responsible and recommended expulsion; this time the university obliged. *Id*. ¶¶ 77–79.

Newman now alleges various violations of state and federal law sounding in contract, antidiscrimination law, and tort. Howard has since moved to dismiss on behalf of itself and its officers. And Newman, in turn, has filed a bevy of motions—to expedite, and for leave to file surreplies. The parties' motions are ripe for decision.

## II.

Howard moves to dismiss Newman's Complaint under Federal Rule of Civil Procedure 12(b)(6). Mot. to Dismiss (MTD), ECF No. 13.[3] So the Court assumes the truth of all nonconclusory facts alleged in Newman's Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It then asks whether those facts "state a claim to relief that is plausible on its face." *Id*. In other words, the Court asks whether those facts allow it to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

Newman's status as a pro se litigant entitles him to special solicitude. Complaints from pro se plaintiffs are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Thus, "[c]ourts must construe pro se filings liberally." *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999). And the Court is careful to ensure that meritorious claims are not defeated by inartful pleading. *See Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007). Similarly, the Court must "consider supplemental

---

[3] Howard moves to dismiss only those claims directed against it and its officers. *See* MTD at 2 n.1. The Court therefore does not consider any claims directed solely against the unnamed third parties.

material filed by a pro se litigant" alongside the Complaint itself to "clarify the precise claims being urged." *Id*. But, ultimately, the Complaint must still satisfy *Iqbal*'s pleading standards. *See Crisafi v. Holland*, 655 F.2d 1305, 1308 (D.C. Cir. 1981).

Howard includes voluminous supplementary materials as evidence in its motion. *See* ECF Nos. 13-3 through 13-10. The Court generally declines to consider these materials. When considering a motion to dismiss, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." Fed. R. Civ. P. 12(d). It would be inappropriate to convert this motion to one for summary judgment at this stage, when Newman has multiple claims on which he is entitled to discovery. So the Court exercises its authority under Rule 12(d) to exclude Howard's extra-pleading materials.

There is, however, one exception. The full text of Newman's four-part letter was submitted by Howard, not Newman. But Newman references that letter extensively throughout his Complaint. The text of the letter has thus been incorporated into his Complaint and can be considered without converting the motion to one for summary judgment. *See Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992) (finding documents incorporated into complaint where it is "replete with references to them").

## III.

Now on to the substance of Newman's claims. Newman first raises several claims sounding in contract. Then, he raises several statutory race-discrimination claims. And finally, he offers a handful of miscellaneous claims. The Court addresses each in turn.

## A.

Start with Newman's contract-based claims. These include breach of contract (Counts V & X), Compl. ¶¶ 122–31, 164–65; breach of the implied duty of good faith and fair dealing

(Count VI), *id.* ¶¶ 132–43; and promissory estoppel (Count XI), *id.* ¶¶ 166–68.

A claim for breach of contract requires the plaintiff to show (1) the existence of a valid contract between the parties, (2) a duty arising out of that contract, (3) a breach of that duty, and (4) resulting monetary loss. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  To show the existence of a valid contract in the first place, the plaintiff must point to a meeting of the minds between the parties on all material terms, along with an intent by the parties to be bound. *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005).  Ordinarily, this reduces to the rule that a contract requires "an offer and an acceptance, and consideration," *Bullard v. Curry-Cloonan*, 367 A.2d 127, 131 (D.C. 1976), or a bargained-for exchange, *see Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1003 (D.C. 2008).

A unilateral contract is one where a promisor agrees to do something in exchange for the performance of some specified act. *King v. Indus. Bank of Wash.*, 474 A.2d 151, 156 (D.C. 1984).  Usually, "[s]o long as that act remains unperformed, the promisor is not bound." *Id.*  But there is an exception.  "[I]f a promisor is himself the cause of the failure of performance, . . . he cannot take advantage of the failure." *In re Estate of Drake*, 4 A.3d 450, 454 (D.C. 2010).  In other words, if the promisee's failure to perform is "fairly attributable to the promisor's own conduct," then the promisor must still carry through on his end of the bargain, despite the promisee's nonperformance. *Id.*  This exception is known as the "prevention doctrine."

More, "all contracts contain an implied duty of good faith and fair dealing." *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).  This "means that neither party shall do anything which will have the effect of destroying or impairing the right of the other party to receive the fruits of the contract." *Id.* (cleaned up).  At a minimum, the duty requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."

10

*Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)).  A party can breach that duty by, among other things, "evad[ing] the spirit of the contract, willfully render[ing] imperfect performance, or interfer[ing] with performance by the other party."  *Paul*, 754 A.2d at 310.

And to raise a promissory estoppel claim under D.C. law, a plaintiff must allege facts showing (1) the existence of "a promise," that (2) "the promise . . . reasonably induc[ed] reliance upon it," and that (3) the reliance on the promise was "to the detriment of the promisee."  *Simard v. Resol. Tr. Co.*, 639 A.2d 540, 557 (D.C. 1994).

### 1.

Newman raises two breach of contract claims, in Counts V and X.  Compl. ¶¶ 122–31, 164–65.[4]  His first breach of contract claim fails.  A claim for breach of contract must allege the existence of a valid contract.  *Tsintolas Realty*, 984 A.2d at 187.  That requires a meeting of the minds between the parties on all material terms of the contract, along with an intent to be bound by those terms.  *Kramer Assocs.*, 888 A.2d at 251.  But there is no contract here.

Newman alleges that some combination of Howard's Non-Discrimination Policy and Student Code of Conduct constituted a binding contract.  Compl. ¶¶ 125–26.  He also points to Howard's Code of Ethical Conduct.  Opp'n to MTD (Opp'n) at 17, ECF No. 21.  None of these documents qualifies.

Newman presents only a brief excerpt of the Non-Discrimination Policy, but that excerpt shows no evidence of an intent by the parties to be bound.  As Newman puts it, the Non-

---

[4] Newman's second breach of contract claim is framed as a claim under the prevention doctrine.  Compl. p. 47.  But recall that the prevention doctrine is a defense to nonperformance, *not* a cause of action.  So the Court recharacterizes Newman's claim as one for breach of contract, raising the prevention doctrine in his defense.

Discrimination Policy says that Howard will "*strive*[]" to eliminate discrimination and that it will not "tolerate discrimination or harassment against any person."  Compl. ¶ 125 (emphasis added).  The use of "strive" is precatory, not promissory.  It describes Howard's goals for campus culture but does not create an enforceable obligation *vis-à-vis* Newman.  *See Kramer Assocs.*, 888 A.2d at 251.  More, none of the rest of the Non-Discrimination Policy contains any language creating a reciprocal obligation for Newman, meaning that any promise by Howard would lack consideration.  *Eastbanc*, 940 A.2d at 1003.  So the Non-Discrimination Policy cannot serve as the basis for Newman's contract claim.

Newman presents full copies of the Student Code of Conduct and Code of Ethical Conduct, but neither fits the bill either.  Newman argues that the Code of Conduct constitutes a binding contract because it promises students various procedural and substantive rights in exchange for their compliance with the Code of Conduct's terms.  Compl. ¶ 126.  Again, not so.

The Code of Conduct is not a bargained-for "exchange of promises."  *Eastbanc*, 940 A.2d at 1003.  No portion of the Code of Conduct indicates that the rights it describes are contingent upon or in exchange for compliance with the rules.  Rather, the Code of Conduct identifies various rights that students have and lists them alongside students' obligations.  Howard Univ. Student Code of Conduct (Code of Conduct) at 3–5, ECF No. 21-1 pp. 182–84.  But nothing in the Code of Conduct suggests that these rights and obligations are reciprocally contingent.

That is especially clear given bedrock rules of contract law.  In an ordinary contract, if one party materially breaches the contract, the other party is excused from future compliance.  Restatement (Second) of Contracts § 237 (1981).  But no one thinks that is true here.  No party contends that a Howard student's right "to be free from intimidation and retaliation by University

employees" or "to be informed of . . . pending charges" or "face [his] accuser(s) and have the opportunity to cross-examine them," Code of Conduct at 4, dissolves when he violates the Code of Conduct.  In fact, many of these rights only make sense on the assumption that he *has* violated the Code of Conduct—or at least been credibly accused of having done so.  And if that is true, then the Code of Conduct is *not* an enforceable contract.

That conclusion is buttressed by the fact that many of the rights and obligations are simply restatements of rights and obligations that already exist.  For instance, Howard pledges to comply with the terms of the Family Educational Rights and Privacy Act of 1974.  Code of Conduct at 4.  And it demands that students "observe the laws of local, state, and federal governments."  *Id*. at 5.  But "a promise to perform a preexisting obligation . . . is not sufficient consideration" to support a contract.  *Murray v. Lichtman*, 339 F.2d 749, 752 n.5 (D.C. Cir. 1964).  So the most natural reading of the Code of Conduct is that it spells out existing rights and obligations held by the school and students and then lists a series of rules students must observe to continue attending.  It is not, as Newman contends, a contract between school and student.

In this respect, the Code of Conduct is more like Title 18 of the United States Code than a contract.  Title 18 lists various rights held by individuals, *e.g.*, 18 U.S.C. § 3161, alongside a series of rules about how they are to behave, *id*. §§ 1–2725.  But no one would describe Title 18 as a contract or even "contract-like."  So too here.  The mere colocation of the rights and obligations is not enough to suggest that they are part of a reciprocal exchange of promises.

Similar reasoning applies to the Code of Ethics.  Like the Code of Conduct, the Code of Ethics does not memorialize a bargained-for exchange between parties but elaborates blanket rules that all members of the Howard community are expected to follow.  *See* Howard Univ. Code of Ethical Conduct (Code of Ethics) at 3, ECF No. 21-1 p. 220 ("[T]his *Code of Ethical*

13

*Conduct* sets forth the common obligations[] . . . to which all members of the Howard University . . . community must adhere."). But because the Code of Ethics does not contemplate *an exchange*, it does not qualify as a contract. Merely listing simultaneous obligations is not enough. Each party's obligation must be the inducement for the other party's obligation. *Cf. Rafferty v. NYNEX Corp.*, 744 F. Supp. 324, 330 (D.D.C. 1990). And that is wholly lacking here. So, because none of the Non-Discrimination Policy, Code of Conduct, and Code of Ethics qualifies as a contract, the Court will dismiss the breach of contract claim as it pertains to each of the three.

Newman brings a final breach of contract claim based on his scholarship agreement. This claim survives. Here, there is a clear contract: Howard promised to pay Newman $26,000 per year in exchange for his meeting certain eligibility criteria. Scholarship Agreement at 1–2. This is classic example of a contract—each party promised to do something, and the promises depended on one another. *See Eastbanc*, 940 A.2d at 1003. And he alleges a breach: Howard refused to pay up. Compl. ¶ 41.

Although that breach was paired with a breach of Newman's own, Compl. ¶ 41, Newman plausibly alleges that his nonperformance of the academic qualification requirements was caused by Howard's misconduct. *Id*. ¶ 165; *see also* Opp'n at 18–19. He alleges that professors adjusted their grading systems to disfavor him, *id*. at 18, that administrators "devised a ranking scheme in such a manner as to ensure [he] fell into the bottom half of the class," *id*. at 19, and that they used subjective participation grades to translate his peers' biases into poor grades, *id*. He has thus plausibly alleged that Defendants' conduct is what prevented his performance, bringing his claims within the ambit of the prevention doctrine. *Estate of Drake*, 4 A.3d at 454. So he states a valid claim for breach of contract.

14

**2.**

Next, consider Newman's claim for breach of the implied duty of good faith and fair dealing. This claim survives too. Because the only valid contract is the scholarship agreement, Newman's claim must relate to the execution of that agreement. A party breaches its duty of good faith and fair dealing when it "impair[s] the right of the other party to receive the fruits of the contract," for example, by "interfer[ing] with performance by the other party." *Paul*, 754 A.2d at 310 (cleaned up). Newman alleges that Howard did just that. In fact, the core of this claim is largely the same as that of his prevention doctrine defense above. *Supra* Part III.A.1. Newman has therefore made out a valid claim on this count.

**3.**

Last, Newman raises a claim for promissory estoppel. This claim must be dismissed. Newman argues that Howard promised him "full availability of his academic merit scholarship renewable for three years." Compl. ¶ 167. But that promise was contingent. In order to be paid under the scholarship agreement, Newman had to meet certain metrics of academic success. Scholarship Agreement at 2. And Newman does not dispute that he failed to do so. More, unlike his breach of contract claim, Newman does not have a defense to justify his nonperformance here. The prevention doctrine is a defense to *breach of contract*. *Estate of Drake*, 4 A.3d at 454. It has nothing to say about the independent claim of promissory estoppel. So Newman's unexcused failure to meet the terms of the Scholarship Agreement means that he cannot recover on a theory of promissory estoppel.

**B.**

Now consider Newman's discrimination claims. He raises four: race discrimination in violation of Title VI of the Civil Rights Act of 1964 (Count I), Compl. ¶¶ 80–99; race

discrimination in violation of the D.C. Human Rights Act (Count IV), *id.* ¶¶ 113–21; conspiracy against rights under 42 U.S.C. § 1985(3) (Count III), *id.* ¶¶ 108–12; and racial discrimination in contracting under 42 U.S.C. § 1981 (Count II), *id.* ¶¶ 108–12.

In general, the legal frameworks for Title VI and D.C. Human Rights Act claims are identical. *Esteños v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008) (D.C. Human Rights Act follows Title VII framework); *Smith v. Barton.*, 914 F.2d 1330, 1336 (9th Cir. 1990) ("[B]ecause of the similarities between Title VI and Title VII, courts frequently have looked to Title VII in determining rights and procedures available under Title VI."). So the Court discusses them together.

Title VI protects individuals from being "excluded from participation in," "denied the benefits of," or "subjected to discrimination under any program or activity receiving Federal financial assistance," on account of race. 42 U.S.C. § 2000d. Those programs and activities include university education. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 224, 276 n.23 (2003). The quintessential Title VI claim is one for disparate treatment—when the plaintiff alleges that he was treated "less favorably than others because of [his] race, color, religion, sex, or national origin." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988).

But plaintiffs can allege Title VI violations in other ways, too. Some circuits—though not yet this one—recognize "hostile educational environment" claims. *See, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015). Those circuits generally apply a "deliberate indifference standard" in assessing such claims, *id.*, to heed Title VI's limitation to only cases of *intentional* discrimination, *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Under the deliberate indifference standard, a plaintiff must show that "(1) the harassment was so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to

educational opportunities," "and that the [school] (2) had actual knowledge, (3) had control over the harasser and the environment in which the harassment occurs, and (4) was deliberately indifferent." *Fennell*, 804 F.3d at 408 (internal quotation marks omitted).

Some circuits also recognize a cause of action under Title VI when a defendant retaliates against the plaintiff for reporting unlawful conduct. *See, e.g.*, *Peters v. Jenney*, 327 F.3d 307, 316–17 (4th Cir. 2003). The D.C. Circuit has not yet done so, and neither have several others. *See Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 n.4 (5th Cir. 2020). Title VI itself contains no statutory language prohibiting retaliation. *Compare* 42 U.S.C. § 2000d (Title VI) (making no mention of retaliation) *with* 42 U.S.C. § 2000e-3(a) (Title VII) (explicitly outlawing retaliation); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). Instead, anti-retaliation rules have been crafted through a combination of regulatory action, 34 C.F.R. § 100.7(e), and judicial lawmaking, *see Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 81 (D.D.C. 2003).

In those circuits recognizing Title VI retaliation claims, such claims have four elements. A plaintiff must allege that (1) he engaged in protected activity, (2) his protected activity was known to the defendant, (3) he endured some adverse action, and (4) there was a causal link between his protected activity and the adverse action. *Chandamuri*, 274 F. Supp. 2d at 84. To be cognizable, the adverse action must be "materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). That is, the adverse action must be something that would "dissuade[] a reasonable [plaintiff] from making or supporting a charge of discrimination." *Id*.

Turning to Newman's last two claims, 42 U.S.C. § 1985(3) creates a cause of action for

certain conspiracies against individuals' civil rights.  To prove a violation of that statute, a

plaintiff must prove (1) the existence of a conspiracy between "two or more persons," 42 U.S.C.

§ 1985(3), that was (2) motivated by "some racial[] . . . animus," *Bray v. Alexandria Women's

Health Clinic*, 506 U.S. 263, 268–69 (1993), (3) that is "'aimed at interfering with rights' that are

'protected against private, as well as official, encroachment,'" *id*. at 268, (4) a concrete "act in

furtherance of the conspiracy," *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 96 (D.D.C.

2019), and (5) resulting injury either in the form of pecuniary harm or deprivation of a right, *id*.

Last, 42 U.S.C. § 1981 provides a cause of action for certain instances of private

discrimination.  42 U.S.C. § 1981(c).  "[A] § 1981 plaintiff first must show that he was deprived

of [a] protected right and then establish causation."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-

Owned Media*, 140 S. Ct. 1009, 1018 (2020).  Those protected rights include the right "to make

and enforce contracts," "to sue," to "be parties" in a lawsuit or "give evidence," and to enjoy "the

full and equal benefit of all laws and proceedings for the security of persons and property."

42 U.S.C. § 1981(a).  Most often, the difficulty is in establishing causation—that is, "that, but for

race, [the plaintiff] would not have suffered the loss of" that right.  *Comcast Corp.*, 140 S. Ct. at

1019.

In all these race-discrimination claims, the plaintiff must show that the harm that befell

him was *because of his race*.  He can do so in either of two ways.  First, a plaintiff may show

causation through direct evidence.  That is, he may submit evidence that "if believed by the trier

of fact, will prove the particular fact in question without reliance upon inference or

presumption."  *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989).  For

example, if a defendant's agent said outright that he was motivated by the plaintiff's race.

But he may also show causation through indirect, or circumstantial, evidence.  *Ayala-

*Gerena v. Bristol Meyers-Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996). When he does so, he must simply plead "a *prima facie* case of purposeful . . . discrimination" under the framework set out by the Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 622 (D.C. Cir. 2023). That is, he must "establish[] that (1) he is a member of a protected class, (2) he suffered an adverse . . . action, and (3) the unfavorable action gives rise to an inference of discrimination."[5] *Id.*

### 1.

Start with Title VI. Newman fails to plausibly allege that he faced disparate treatment by Howard on account of his race. In order to do so, he would need to plead that he was treated differently from similarly situated law students of another race, and that such treatment was *because of* his race. *See Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). He has not done so. In particular, he has failed to allege that he was similarly situated to other students who were treated differently.

Newman claims that both he and other students violated the law school's "listserv policy," but that only he was punished for it. Compl. ¶¶ 22–24, 46–48. That is, he alleges that he was treated differently from other violators of the listserv policy because of his race. But this ignores significant differences between Newman and the other violators of the listserv policy.

To start, Newman's violations differed in both quantity and quality from those of his classmates. First, he admits that he violated the policy three times. Compl. ¶ 83. And even after that, he tried to circumvent the policy by sending a fourth mass email using his private email

---

[5] Howard makes no argument that Newman is subject to the heightened pleading standards for majority plaintiffs outlined in *Parker v. Baltimore & Ohio R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981). *See Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822, 827–28 (6th Cir. 2023) (outlining the rule, its critiques, and the entrenched circuit split *Parker* created). So, the Court treats any argument that Newman is subject to the *Parker* rule as forfeited.

account's bcc function.  *Id.* ¶ 51.  So far as the Court can tell, the other law students violated the

policy once, at most.  *Id.* ¶ 82.  This alone sets Newman apart, as it suggests that he was a repeat

offender and did not respond to verbal warnings prior to discipline.  *Id.*  Even without anything

else, it would be enough to show that he was not similarly situated to the comparator students he

identifies.

Second, the content of Newman's emails was materially different from that of his

classmates.  Newman alleges that his classmates used the listserv to circulate an open letter on a

matter of concern to all Howard students and the administration—the school's return to in-

person education.  Compl. ¶ 46.  Newman, by contrast, used the listserv to circulate controversial

emails addressing his personal relations with other law students.  *Id.* ¶¶ 22, 47.  In one email, he

shared a letter suggesting that marginalized individuals "allow [themselves] to be marginalized,"

stating that "we are all the Southern plantation owners, and we are all the women and men they

enslaved," and calling Howard "among the country's most racist law schools."  Newman Letter

at 11–12.  And in a later email, he suggested that a recently deceased classmate had died from

side effects of COVID mRNA vaccines.  Compl. ¶ 51.

To be sure, this conclusion follows from the fact that the Court has complete copies of

Newman's email but only snippets and quotes of his classmates'.  Had Newman's letter *not* been

incorporated, this outcome may well have been different.  *See LaRoque v. Holder*, 650 F.3d 777,

785 (D.C. Cir. 2011) (requiring courts to accept pleaded facts as true).  But based on the

pleadings as they appear in this case, the Court must conclude that Newman's emails are

substantially and materially different from his classmates'.

These aspects of his violations of the listserv policy illustrate that he was *not* similarly

situated to his classmates.  No classmate is alleged to have repeatedly violated the policy after

being warned to stop.  And no classmate is alleged to have sent as inflammatory of emails as Newman did.  Indeed, Newman's email about his classmate's death, in particular, appears to have caused significant distress among his peers.  *See*, *e.g.*, Jan. 25 Meeting Tr., ECF No. 21-1 pp. 116–27.

But on top of all of that, Newman's emails took place against the backdrop of the prior controversy surrounding his remarks.  And no other classmate brought comparable baggage with them when they emailed the law school.  The Court cannot take the emails in isolation and ignore their context.  Howard's response to Newman's emails was informed by his previous remarks and behavior, and this too set him apart from his classmates.

In sum, Newman was not similarly situated to the other students at Howard.  And because he was not similarly situated, he cannot claim that he endured disparate treatment—the different treatment stemmed from his different conduct, not his race.  *See Willingham v. Gonzales*, 391 F. Supp. 2d 52, 58–59 (D.D.C. 2005).  And even if he points to his removal from the group chat or other students' conduct there, Compl. ¶¶ 88–89, such references are immaterial because the group chat was privately run by students, and the university had no authority over it. So because he has failed to make out a prima facie case of disparate treatment, this claim must be dismissed.  *See Wright*, 68 F.4th at 622.

The Court turns now to Newman's two other Title VI claims.  It will assume that Title VI prohibits the creation of a hostile educational environment and that it prohibits retaliation, even though the D.C. Circuit has recognized no such cause of action.  But even if such causes of action exist, Newman has failed to adequately plead either.

To make out a claim for hostile educational environment, Newman had to plead that Howard was "deliberately indifferent" to his harassment.  *Fennell*, 804 F.3d at 410.  And that, in

turn, requires allegations that Howard's response was "clearly unreasonable in light of the known circumstances," not merely negligent. *Id.*; *see also Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). This high standard ensures that liability exists only where the school's inaction "effectively caused the discrimination." *Id.* at 642–43 (cleaned up).

Newman has failed to allege conduct meeting that deliberate indifference standard. As he admits, Howard sought to address his harassment. His exhibits show that Howard contacted him and offered to mount an investigation into his harassment. Jan. 28 Tr. at 4:82–83, 27:589–600. He declined. Newman Letter at 3. More, he concedes that when he *did* report race discrimination, Howard hired an independent third party to investigate. Compl. ¶ 45. That investigation may not have produced the result he wanted. But Howard's responses were not clearly unreasonable under the circumstances. *Accord Cavalier v. Cath. Univ. of Am.*, 513 F. Supp. 3d 30, 51–53 (D.D.C. 2021) (rejecting deliberate indifference claim where plaintiff alleged "sham hearing" and investigation). So Newman has failed to make out a claim for hostile educational environment, and the Court dismisses that claim.

Nor does Newman's retaliation claim survive. He alleges that he engaged in protected conduct by reporting his harassment to Howard administrators. Compl. ¶ 95. And Howard does not dispute that this was protected. Opp'n at 19. But Newman fails to show that he suffered materially adverse actions as a result of his report.

He identifies several adverse actions he claims stemmed from that email. First, Holley telling him that "this law school doesn't seem to be a good fit for you," and that her "recommendation" and "advice" to Newman "is to find a law school that is maybe a better fit for you," Jan. 28 Tr. at 8:146–47, 9:166–67. Compl. ¶ 95. Second, Holley "assigning him an official subordinate status." *Id.* Third, Holley telling him that "one of the things I want to ask

22

you to do . . . is really to limit the disrupting behavior" by "confin[ing] yourself . . . to attending class, reading for class, studying, doing your academic kind of success work" to avoid "a disruption to the academic environment," Jan. 28 Tr. at 3:45–4:50.  Compl. ¶ 95.  Fourth, Holley "attempting to prevent his participation in a Town Hall devoted to discussing him."  *Id*.  Fifth, the "disciplinary charges" against him.  *Id*. ¶ 96.  Sixth, Holley's "misrepresentations in her testimony."  *Id*.  Seventh, the school "circumventing Code-prescribed processes" during his disciplinary proceedings.  *Id*.  And, finally, his expulsion, *id*. ¶ 96.  None suffices.

First, several of the actions he mentions are not materially adverse.  That is, they would not dissuade a reasonable plaintiff from reporting discrimination.  *White*, 548 U.S. at 68.  Holley encouraging Newman to consider transferring schools and suggesting that he minimize his interactions with other students do not cut it.  Compl. ¶ 95.  These were simply verbal statements of Holley's opinion, unbacked by any exercise of Holley's authority or threat of exercise of that authority.  And precedent confirms verbal confrontations like this one do not qualify as materially adverse actions.

Generally, such actions must result in some kind of actual change in status.  For example, in the employment context, the D.C. Circuit has described a materially adverse action as typically involving "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013).  What links each of these actions is that they "demonstrate an objectively tangible harm."  *Id*.  Other circuits agree.  *See Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002).  Indeed, the Sixth Circuit has held that "contentious oral confrontation[s] involving stern words" or even "harsh words" do not rise to the level of a materially adverse action, even when between an

23

employee and her boss.  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (quoting *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002)) (cleaned up).  The tough—even uncomfortable—conversation Newman had with Holley is analogous to that scenario.

Likewise, having one's "raised hand" lowered on a Zoom town hall is not the kind of consequence likely to dissuade one from reporting discrimination.  To be clear, Newman does not complain about the law school holding a town hall to discuss him in the first place.  Compl. ¶¶ 95–99.  Instead, he only challenges Holley "attempting to prevent his participation there."  *Id.* ¶ 95.  But that is not a materially adverse action.  And that is all the more true because Newman *was* allowed to speak at the town hall, though toward the end.  Town Hall Tr. at 30–32.  More, when he spoke, he talked for over seven minutes, *id.*, longer than any other individual student.  Last, Holley warning Newman "that a Title VI lawsuit would be 'very negative' for his career," *id.* ¶ 98, was not materially adverse action either.  Again, this purely verbal warning—which did not even suggest action from Holley—would not dissuade a reasonable person from reporting discrimination.

The remaining actions—assigning a subordinate status, filing disciplinary charges against Newman, misrepresenting testimony, ignoring hearing procedures, and expulsion—may qualify as materially adverse actions.  But Newman fails to adequately plead causation.

Start with his claim that Holley "assign[ed] him an official subordinate status."  Compl. ¶ 96.  So far as the Court can tell, the only "subordinate status" Newman was assigned was when he was instructed not to keep emailing students using the school listserv.  *Id.* ¶ 82.  But as Newman himself alleges, this was based on his repeated emails to classmates, not his report to the administration.  *Id.*; *see also id.* ¶ 83 (conceding Newman sent three unsanctioned emails).

24

Although Newman alleges that other students were not likewise punished for emailing the listserv, *id*. ¶ 82, he has not adequately pleaded that he was similarly situated to them. *Supra* Part III.B.1.  He has therefore failed to plead causation and this aspect of his claim must likewise be dismissed.  *See Nanko Shipping*, 850 F.3d at 467.

And for each of his other retaliation claims, nothing in his Complaint indicates that they were caused by his report of discrimination, aside from his conclusory say-so.  All he has to rely on in support of causation is the temporal proximity of his protected activity to the adverse actions.  But the temporal proximity is not enough.

Each of these adverse actions occurred one year or more after Newman's email to Frederick.  *Compare* Compl. ¶ 21 *with id*. ¶ 53.  But the Supreme Court has been clear that one year is far too long a time to support an inference of causation.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that protected activity and adverse action must be "very close" in time for temporal proximity alone to be sufficient evidence of causation).  In fact, even a three-month delay between the protected activity and the adverse action may be too long.  *Id*. (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)).  So, in sum, the Court finds that Newman fails to adequately plead retaliation, because he has not alleged that any materially adverse action was caused by his engagement in protected conduct.  The Court therefore dismisses this claim, too.

Recall that the D.C. Human Rights Act is coextensive with Title VI in this context.  So Newman's Human Rights Act claim fares the same as his Title VI claims.  In other words, Newman's Human Rights Act claim must be dismissed, too.

**2.**

Now consider Newman's § 1985(3) claims.  As relevant here, Newman alleges two

conspiracies, one between Holley and unidentified third parties, and one between Holley, Lanier-Smith, Frederick, and other Howard administrators.  Compl. ¶¶ 109, 111–12.

Start with Holley and the unidentified third parties.  Here, Newman has failed to plausibly allege the existence of a conspiracy.  He baldly asserts that "Holley, students, alumni and/or other third parties conspired to sift through Newman's communications in search of a pretext for an action of expulsion."  *Id*. ¶ 109.  But the Court need not accept as true conclusory allegations or legal assertions in a complaint.  *Iqbal*, 556 U.S. at 678.  And a simple allegation of conspiracy fits that bill.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007).  Beyond that conclusory allegation, Newman alleges no facts suggesting the existence of a conspiracy.  So the Court must dismiss his § 1985(3) claim for this conspiracy.

Next, the administrators' conspiracy.  Here, too, Newman fails to adequately allege the existence of a conspiracy.  He again nakedly asserts that "Holley, Lanier-Smith, Evers, and Bright conspired" against him.  Compl. ¶ 111.  But he does not allege when or how that took place.  Nor does he provide any specific facts about what the conspiracy entailed or why mere "lawful parallel conduct" was not more likely responsible for his injuries.  *Twombly*, 550 U.S. at 557.  Since he has alleged no specific facts suggesting the existence of a conspiracy, the Court must dismiss this claim, too.

### 3.

The Court turns now to Newman's final race-discrimination claim under § 1981.  Newman identifies interference with his contractual rights as the basis for this claim.  Compl. ¶ 111.  Recall that the only contract here is Newman's scholarship agreement.  *Supra* Part III.A.1.  So the question is whether Defendants interfered with his "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b), on

account of his race.  He has plausibly alleged that they did.

Newman's scholarship agreement required him to maintain a certain level of academic achievement.  Scholarship Agreement at 2.  Newman alleges that Howard faculty manipulated his grades to interfere with his ability to maintain his scholarship.  Opp'n at 18–19.  For instance, he alleges that they altered grading systems the day after he spoke out, *id*. at 18, and used subjective "participation grading" to give him undeservedly low scores, *id*. at 19.  If true, that would be a substantial interference with Newman's ability to enjoy the benefits of his contract.  And he likewise plausibly pleads that the faculty did so because of his race, or because of his race alongside his comments.  *Id*. at 18–19.  So, in sum, Newman has made out a plausible claim under § 1981.

## C.

Finally, consider Newman's remaining, miscellaneous claims: defamation (Count VII), Compl. ¶¶ 144–55, and intentional infliction of emotional distress (Count VIII), *id*. ¶¶ 145–160.

Under D.C. law, a claim for defamation has four elements.  First, that "the defendant made a false and defamatory statement concerning the plaintiff."  *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005).  A defamatory remark is one that "tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community," and that "make[s] the plaintiff appear odious, infamous, or ridiculous."  *Howard Univ. v. Best*, 484 A.2d 958, 988–89 (D.C. 1984) (cleaned up).  Second, that the defendant "published the statement without privilege to a third party."  *Oparaugo*, 884 A.2d at 76.  Third, that "the defendant's fault in publishing the statement amounted to at least negligence."  *Id*.  And fourth, that "either the statement was actionable as a matter of law . . . or that its publication caused the plaintiff special harm."  *Id*.

More, the District recognizes a "substantial truth" defense to defamation claims. *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013).  Under this defense, a statement false only because of "[s]light inaccuracies of expression" is not actionable.  *See Liberty Lobby Inc., v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988).  Instead, courts "discount minor inaccuracies so long as the substance, the gist, the sting, of the libelous charge can be justified." *Armstrong*, 80 A.3d at 1183.

And to mount a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant has engaged in "extreme or outrageous conduct" which "intentionally or recklessly" caused "severe emotional distress to another."  *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997).  To be "extreme or outrageous," the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Id*.  This is, no doubt, a high bar.  And many categories of conduct do not qualify as a matter of law.  *See Best*, 484 A.2d at 986.

## 1.

Start with the defamation claims.  The statute of limitations for defamation claims is one year.  D.C. Code § 12-301(a)(4).  So Newman can only bring his defamation claim for statements made after January 16, 2022.  Compl. p. 50.  That bars him from suing based on the January 2021 town hall, *id*. ¶ 28, and generally limits him to the allegedly defamatory statements made in connection with his disciplinary proceeding.  Those statements include the following:

- "Holley's testimony that Newman was argumentative with her and McGahee," *id*. ¶ 147;
- Holley's testimony that "Newman continued using the listserv in 2021 after being asked multiple times to cease," *id*. ¶ 148;
- Holley's description of Newman's email about his classmate's death as "defamatory," *id*. ¶ 149;

- Holley's statement that "Newman had written [the classmate] died from the Covid-19 vaccine," *id*.;
- Holley's statement that "Newman said the difference between black Americans and other Americans was that black Americans wanted the government to solve their problems for them," *id*. ¶ 150;
- Holley's claim that Newman said "African-Americans suffer from hive mind," *id*. ¶ 151.

At the start, Howard claims that these statements—all of which took place in the disciplinary proceeding—are privileged and therefore not actionable. MTD at 31–33. Not so. The District recognizes an absolute privilege for statements made in connection with a judicial proceeding. *Mazanderan v. McGranery*, 490 A.2d 180, 181 (D.C. 1984). And that privilege extends to quasi-judicial administrative proceedings conducted by government bodies. *Id*. at 181–82. But the District has *not* extended that privilege to proceedings before a private party, except where that proceeding is linked to the judicial process, such as an arbitration proceeding. *See Sturdivant v. Seaboard Serv. Sys., Ltd.*, 459 A.2d 1058, 1060 (D.C. 1983).

One potential exception to that rule, not applicable here, is where "judicial scrutiny" of certain conduct is unavailable, such that an "internal adjudicatory apparatus" is the "only redress for adverse . . . action." *Park v. Brahmbhatt*, 234 A.3d 1212, 1217 (D.C. 2020) (addressing international organization not subject to employment discrimination law). But that is not the case here. Because the disciplinary proceeding was neither conducted by a governmental body nor closely intertwined with the judicial process, the absolute privilege does not apply.

But that is not the end of the matter. Even where statements are not absolutely privileged, they may be covered by a qualified privilege. *Smith v. District of Columbia*, 399 A.2d 213, 220–21 (D.C. 1979). That qualified privilege is generally available in the context of private disciplinary proceedings, *id*., and ensures that a private disciplinary "inquiry may contain an accusation of criminal activity" without the accuser "subjecting himself to liability for

defamation." *Id*. at 221.  Since the statements here were made in the context of such a private disciplinary proceeding, they get the qualified privilege.  And that means that they are "not actionable without a showing of excessive publication or express malice." *Id*.  Because the proceeding was limited to those present, the question here is limited to whether the statements were made with express malice.

Newman has plausibly alleged that they were.  Newman's Complaint details Holley's mounting frustration with him over the course of his time at Howard.  Compl. ¶¶ 23, 25–26, 52–53, 59.  By the time of the disciplinary hearings, she appeared to be very negatively predisposed toward him.  *Id*.  It is plausible, given the facts alleged, that discovery would produce evidence showing that she acted with express malice toward him.  *Iqbal*, 556 U.S. at 678.  And that is all that is needed at this stage.  *Id*.

The question then is whether these statements were actionable.  Most were not.  For starters, several statements were either true or substantially true.  No liability attaches to such statements.  *See Ford Motor Credit Co. v. Holland*, 367 A.2d 1311, 1313 n.1 (D.C. 1977) (actual truth); *Armstrong*, 80 A.3d at 1183 (substantial truth).

First, Holley's statement that "Newman continued using the listserv in 2021 after being asked multiple times to cease," Compl. ¶ 148, was substantially true.  He first sent two emails over the listserv in January 2021, one circulating his letter to the student body and one providing a link to the documentary *Uncle Tom*, and was promptly asked to cease by two administrators. *Id*. ¶¶ 22–23.  He still sent another email over the listserv in January 2022.  *Id*. ¶ 47.  Any falsity in Holley's statement pertained only to the year she identified.  That is precisely the kind of "minor inaccurac[y]" that cannot give rise to a defamation claim.  *Armstrong*, 80 A.3d at 1183. And, in the alternative, her misstatement of the year would not be injurious to Newman and

therefore could not support a defamation claim. *Best*, 484 A.2d at 988–89.

Second, Holley's statement that "Newman had written [that a classmate] died from the Covid-19 vaccine," Compl. ¶ 149, was substantially true. Newman alleges that he sent an "open letter calling on Holley to delay a pending vaccine booster deadline" and discouraging students from getting a COVID vaccine booster. *Id*. ¶ 51. And he alleges that his email "shared a link to a news report" regarding a recently deceased classmate, in which she was described as having died from "pulmonary embolism (PE), a condition scientifically linked to mRNA vaccines," like those for COVID. *Id*.

Newman's argument about this statement is purely semantic. It is true enough that he did not say outright, based on these allegations, that his classmate died from the COVID vaccine. But the inescapable inference from his statements, taken together, is that he believes she did. He encouraged students to refrain from obtaining a vaccine booster, and, as a justification, pointed to a dead classmate who died of a condition linked to that vaccine. Compl. ¶ 51. This is, at best, suggestive of precisely what Holley alleged—that Newman believed the COVID vaccine killed his classmate. And he cannot manufacture a defamation claim by relying on innuendo to hide the import of his statement.

Next, Holley's statement that "Newman said the difference between black Americans and other Americans was that black Americans wanted the government to solve their problems for them," Compl. ¶ 150, was substantially true. Newman alleges that he said that "the black community" "believe[s] government solves problems" while he "only see[s] it causing problems." *Id*. ¶ 12. He also admits to asking whether "black voters didn't question turning to government for solutions." *Id*.

To be sure, this is a closer case. Holley's articulation of Newman's statement was

inartful.  But her statement still tried to capture "the gist" of Newman's own remark.  *Armstrong*, 80 A.3d at 1183.  The clear thrust of Newman's statements is that he thinks African Americans are uncritical of government assistance or involvement and, indeed, that they ought to be more critical than they are.  That is the same essential point conveyed by Holley's paraphrasing, which was therefore substantially true.

Another statement was protected opinion:  Holley's description of Newman as "argumentative with her and McGahee."  Compl. ¶ 147.  That is a statement of opinion, not an actionable statement of fact.  It represents Holley's subjective assessment of Newman's manner in her interaction with him.  So it neither implies a provably false fact nor relies on a stated fact that is provably false.  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000).  Because the statement represents Holley's subjective assessment of the situation, it is not "objectively verifiable," and therefore not actionable.  *Id.*, *see also Fairbanks v. Roller*, 314 F. Supp. 3d 85, 91-92 (D.D.C. 2018) (laying out test for opinion statements and noting in close calls, courts should err on the side of nonactionability).

This leaves two potentially actionable statements by Holley: first, her description of Newman's email about his classmate's death as "defamatory," Compl. ¶ 149, and second, her claim that Newman said "African-Americans suffer from hive mind," *id*. ¶ 151.

Her description of Newman's email as "defamatory" implies certain underlying and objectively verifiable facts.  Namely, that his email's factual claims were false and that they were injurious to some individual.  *Supra* Part II.C.  The statement is therefore not protected opinion. *Guilford Transp. Indus.*, 760 A.2d at 597.  Nor is it necessarily true.  Based solely on the allegations in Newman's Complaint, it is far from clear that his email could be accurately described as defamatory.  Perhaps this conclusion will change over the course of this case.  At a

later stage, the parties will be able to admit into evidence the actual text of the email and thus dispute its truth, as well as its injurious character.  But at this point, based solely on Newman's allegations, Holley's statement was not protected.

Nor was Holley's statement that Newman said "African-Americans suffer from hive mind" protected.  This statement appears to be false.  Based on Newman's Complaint, he said only that "a specific group of classmates[,] . . . not African-Americans generally, suffered from hive mind."  Compl. ¶ 151.  Holley's assertion was not an opinion because it was an objectively verifiable statement of fact about what Newman said.  Nor was her statement substantially true because it changed the core meaning of Newman's statement from a critique of specific classmates to a commentary on African-Americans as a group.

The Court therefore dismisses all of Newman's defamation claims except those pertaining to Holley's description of Newman's email about his classmate's death as "defamatory" and Holley's claim that Newman said "African-Americans suffer from hive mind."

## 2.

Finally, Newman brings a claim for intentional infliction of emotional distress.  The bar to recover under on a claim is high.  Newman must plausibly allege conduct by Howard that is "utterly intolerable in a civilized society."  *Kerrigan*, 705 A.3d at 629.  He has not done so.

Newman specifically points to Holley's conduct at the town hall and during his administrative proceedings to justify this claim.  Compl. ¶¶ 158–59.  But even assuming these facts are true, and that this experience was deeply hurtful to Newman, it does not constitute intentional infliction of emotional distress.  *Kerrigan*, 705 A.3d at 624, 628 (finding no intentional infliction of emotional distress where employer "targeted [an employee] for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim

of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him").  The facts Newman alleges are significantly less egregious than those in *Kerrigan*.  Having his participation in the school meeting about him obstructed does not rise to the level of the manufactured allegations of sexual misconduct in *Kerrigan*.  So, just like Kerrigan, Newman fails to state a claim for intentional infliction of emotional distress.  *Accord Robinson v. Howard Univ.,* 335 F. Supp. 3d 13, 30–31 (D.D.C. 2018) (finding no IIED claim for professor who claimed he was victim of mishandled and unfair internal investigation).

Nor does Newman plausibly allege that any of this conduct was undertaken with the goal of causing him emotional distress, rather than simply having such distress be an unfortunate byproduct.  *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980) ("[T]he intent to 'purposely cause . . . a disturbance of another's mental or emotional tranquility . . .' is an essential prerequisite to liability.").  So Newman has failed to plausibly allege facts supporting two elements of this claim, and the claim must therefore be dismissed.

## IV.

To recap where things stand:  All of Newman's claims against unidentified third parties remain live.  As for his claims against Howard and its employees, most have been dismissed. Each of his Title VI, D.C. Human Rights Act, conspiracy against rights, intentional infliction of emotional distress, and promissory estoppel claims against Howard and its employees are dismissed in full.  And his breach of contract claim is dismissed, except as to the scholarship agreement, while his defamation claim is dismissed except as to the "defamatory" and "hive mind" comments.  Last, Newman's § 1981 and breach of implied covenant of good faith and fair dealing claims against Howard and its employees survive in full.

Accordingly, the Court **ORDERS** that the Motion to Dismiss, ECF No. 13, is

**GRANTED** only for the claims and Defendants mentioned above.  The Court **FURTHER**

**ORDERS** that the Motion for Hearing, ECF No. 22, is **DENIED AS MOOT**.  The Motion for

Acknowledgment of Misrepresentations, ECF No. 23, is construed as a motion to supplement

Plaintiff's Opposition, and is **DENIED AS MOOT**.[6]  The Motion for Leave to Amend the

Motion for Acknowledgment of Misrepresentations, ECF Nos. 29 & 30, is **DENIED AS**

**MOOT**.

      **SO ORDERED**.


Dated: February 6, 2024                            _____

                                                 TREVOR N. McFADDEN, U.S.D.J.

---

[6] In the alternative, the motion is **DENIED** for failure to consult opposing counsel before filing. *See* L. Civ. R. 7(m).