## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**MICHAEL NEWMAN**,

               Plaintiff,

               v.

**HOWARD UNIVERSITY SCHOOL OF LAW**, *et al.*,

               Defendants.

Case No. 1:23-cv-0436 (TNM)

---

## MEMORANDUM ORDER

Michael Newman is a white former student of Howard University School of Law.  He alleges that, during his brief time there, Howard administrators created an intolerable racially hostile environment and, eventually, ousted him.[1]  So he sued them for racial discrimination, breach of contract, and defamation.  In a previous order, the Court dismissed several of his claims.  Newman now moves to amend his Complaint, and Howard opposes the motion.  For the reasons below, the Court grants Newman's motion in part.  But when amendment would be futile, the Court denies the motion.

### I.

The Court assumes the truth of these following facts, which come from Newman's Amended Complaint.  *Shear v. Nat'l Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C. Cir. 1979).

Howard is an HBCU, or historically black college or university.  *Newman v. Howard Univ. Sch. of L.*, --- F. Supp. 3d ---, 2024 WL 450245, at *1 (D.D.C. 2024).  Newman is a 50-

---

[1] Throughout this opinion, the Court uses "Howard" to refer to the University and Law School collectively.  When the distinction between the two is relevant, the Court will specify to which it is referring.

year-old white man who was formerly enrolled as a law student there.  Amended Complaint

(Amend. Compl.) ¶¶ 1, 11, ECF No. 50-1.

Newman's saga began in November 2019, when he applied to the Howard University

School of Law.  Amend. Compl. ¶ 9.  Although Newman is not black, he "was drawn to

Howard" because of "the predominance of nonwhite students" and because he "desire[d] to

surround himself and his children with people from other backgrounds, races, religions, and

word views."  *Id*. ¶ 13 (cleaned up).  For instance, Newman had previously lived in Hawaii and,

while he was there, "enrolled his daughter into a Hawaiian language immersion school."  *Id*.

¶ 63.  When he enrolled at Howard, Newman "planned to move his family to Columbia Heights

so they could be immersed in the African-American and Latino communities."  *Id*. ¶ 64.  And he

decided on "a black elementary school" for his children for the same reason.  *Id*.

In December 2019, Howard offered Newman a place in its law school.  Amend. Compl.

¶ 14.  As an added incentive, it offered him a scholarship of $26,250, renewable annually,

provided certain conditions were met.  *Id*. ¶¶ 14, 230.  He had to rank in "the top half of his class

each year," for his scholarship to be renewed.  *Id*. ¶ 230.  Based on these offers, Newman

enrolled at Howard.  *Id*. ¶ 14.

Students in Newman's matriculating class used various social-media platforms to

communicate.  Newman joined two "web-based chat rooms" hosted on GroupMe, a mobile

phone application.  Amend. Compl. ¶ 15.  One of these group chats was "inclusive of the entire

class," but another was "exclusive to [Newman's section]."  *Id*.  Each of these group chats was

organized by Newman's classmates, not Howard.  *Id*.  Separately, Newman also used a law

school-organized Facebook page to communicate with his peers.  *Id*. ¶ 16.

In October 2020, Howard hosted a symposium that proved to be the spark in this powder keg.  Amend. Compl. ¶ 18.  At the symposium, "an African-American speaker claimed that if Biden and Harris won the White House[,] they would usher in a 'golden age of environmental justice.'"  *Id*.  Newman responded by posting in his section-only GroupMe.  *Id*.  He said, "Where I part with the black community is where they believe government solves problems, I only see it causing problems."  *Id*.  He then asked whether "black voters didn't question turning to government for solutions" and whether "reliably voting for the same party every election disincentivized both parties from responding to the needs of black communities."  *Id*.

This did not go over well.  Newman's peers responded with an uproar.  Students complained to Newman, to school administrators, and to professors.  Amend. Compl. ¶ 19.  Students (and some administrators) claimed that Newman's comments were racist or, at best, insensitive.  *Id*. ¶¶ 20–22.  In one instance, a member of the Howard Law student government interrupted a class to ask students to meet and "discuss next steps" in response to Newman's comments.  *Id*. ¶ 19 (cleaned up).

Newman met with a Howard administrator, who encouraged him to "make amends."  Amend. Compl. ¶ 23.  Newman suggested that he email his law school class explaining himself, and the administrator agreed.  *Id*.  The administrator encouraged Newman to share his background with his peers "so that when they hear these comments, they don't assume animosity."  *Id*. ¶ 25.  Newman agreed.

Meanwhile, the hostility spilled over into Newman's classes.  During a legal research class, Newman's professor "introduced a discussion of 'cultural competency' and discrimination."  Amend. Compl. ¶ 30.  She "invited Newman to share experiences from his own background," but he declined, saying that he would rather listen to his classmates.  *Id*.  At least

six students then complained, one after another, about Newman. *Id*. They charged that he lacked cultural competency and that his comments made them "anxious" and "impede[d] [their] ability to work." *Id*. ¶¶ 30–32. After that episode, the professor immediately changed her grading system. *Id*. ¶ 33. She introduced a subjective component into students' grades and allowed the students to "grade one another," thus potentially incorporating their biases into a student's grade. *Id*.

Over the rest of Newman's first semester, his classmates shunned him. Amend. Compl. ¶ 36. This caused him mental and emotional distress. As a result, he did poorly on his first-semester final exams. *Id*. ¶ 37. Newman's test scores that semester sat "among the lowest in the class, with two D's and a C." *Id*. But he would not discover this until much later.

At the start of the next semester, Newman's property law professor required his students to read *The Racial Contract* by Charles Mills. Amend. Compl. ¶ 40. As Newman tells it, that book had "no discernible relationship to property law." *Id*. ¶ 41. Instead, its core thesis was that "all civilization is built upon a universal unspoken contract among whites having as its chief aim the subjugation and exploitation of all non-white peoples of the world." *Id*. ¶ 40. Newman's property professor and classmates elaborated on this theme, detailing "the evils of the white race, and in particular, white men." *Id*. ¶¶ 42–44.

At about this time, Newman distributed the apology letter he had discussed with an administrator. Amend. Compl. ¶ 47. That letter was divided in four parts, the first three of which he distributed over GroupMe and the last of which he sent over the school's email listserv. *Id*.

Newman's letter was long. The first three parts generally expressed affection for his classmates, calling them his "extended family," and asking them to "reopen [their] hearts" to

him.  Amend. Compl. ¶ 56.  He discussed his own sympathy for causes to "promote[] racial justice" and "end . . . mass incarceration and qualified immunity," among other things.  *Id*.  But he still reprinted his earlier comment about "part[ing] with the black community."  *Id*. ¶ 58.  This time, though, he placed that quote alongside one from Malcolm X, which he claimed expressed a similar sentiment.  *Id*.  Newman also shared that he rejected the concept of "race" as an "imaginary social construct with no basis in science."  *Id*. ¶ 62 (brackets omitted).

In the last portion of his letter, Newman shared that he believed black and white Americans were "so similar to one another that there ceased to be any meaningful distinction between the two."  Amend. Compl. ¶ 66 (cleaned up).  He told his classmates that "the different races had intermingled so fully and for so long" that they "could collectively consider themselves inheritors of all their forebears."  *Id*. (cleaned up).  As an illustration, he said that "[w]e are all the living embodiment of Thomas Jefferson, of Harriet Tubman, of Red Cloud.  We are all the Southern plantation owners, and we are all the men and women they enslaved."  *Id*.  Newman then added that "to whatever extent blacks have been victims of discrimination, they will tend to perpetuate the same discrimination."  *Id*. (cleaned up).

After Newman sent out his letter, Reginald McGahee, the Dean of Admissions, emailed all students "asking them to refrain from use of the listserv except for 'official approved law school business and organizational use.'"  Amend. Compl. ¶¶ 4, 48.  Danielle Holley, Dean of the Law School, piled on, emailing Newman directly to chastise him.  *Id*. ¶¶ 4, 48.  Still, though, Newman reviewed the school's official policy documents and noted that they contained no formal policy on listserv use.  *Id*. ¶ 48.  Indeed, they were "silent on use of listservs."  *Id*.

Meanwhile, other students also used the school listserv.  For instance, a black student sent "six unauthorized emails to the entire class" over the listserv.  Amend. Compl. ¶ 29.  Those

emails were sometimes school-related, but often not. First, that student sent a school-wide email calling Newman's remarks "insensitive" and "offensive." *Id*. ¶ 27. Later, he sent another email telling his classmates that they had "a divine purpose" and wishing them "(REAL, GENUINE, AUTHENTIC, AGAPE) L.O.V.E." *Id*. ¶ 28. He later sent another such message, telling students that he was "[s]ending every student L.O.V.E. because the world is yours to inherit." *Id*. He also sent emails encouraging Howard to change its "Covid policy and transition toward in-person study," and repeatedly encouraging classmates to "stock up on food, non-perishables, and defensive mechanisms" in the wake of January 6. *Id*. Finally, he sent an email thanking Newman for sharing a documentary with the class. *Id*.

Whatever good wishes Newman offered his classmates were not reciprocated. They lambasted his letter on Twitter. They called Newman racist, said he was "ruining [their] educational experience," and accused him of being a neo-Nazi. Amend. Compl. ¶ 54. Students also said that they would "read him," which is slang for "to harshly criticize" him.[2] They also demanded to know "who was on the admissions board and what spirit forced them to admit this white man to our school." *Id*. And students endorsed the idea of "cyber bully[ing]" Newman and exclaimed "Bring back bullying." *Id*. Various students used racial epithets to attack

---

[2] *See Read for Filth*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=read+for+filth [https://perma.cc/K4YV-XCTE] (last visited July 31, 2024). Newman also alleges that his classmates threatened violence against him because they asked "when y'all are ready to choose violence" and said "[s]ometimes [it] is okay to wake up and choose violence." Amend. Compl. ¶ 54. But "wake up and choose violence" is also a well-known meme among people Newman's classmates' age and refers to when one acts "particularly mean-spirited or chaotic" or "heavily roasts another, seemingly without provocation." *Wake Up And Choose Violence*, Know Your Meme, https://knowyourmeme.com/memes/wake-up-and-choose-violence [https://perma.cc/GJW4-PZ3X] (last visited July 31, 2024); *see also Choose Violence*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Choose%20violence [https://perma.cc/7YMQ-QKZL] (last visited July 31, 2024) ("When someone hits a nerve, usually by stating facts that are true, one can say they have 'chosen violence.'").

Newman.  They called him "Mayo King," "mayo monster," "[s]now possum," "Keebler cookie elf man," and "pale man."  *Id*. ¶¶ 54–55.

Newman sought help from Howard administrators but was dissatisfied with their response.  He contacted Howard President Wayne Frederick to report that he was being discriminated against.  Amend. Compl. ¶ 70.  Frederick forwarded Newman's email to Holley. *Id*.  And although Holley arranged a virtual meeting with Newman, she did not use it to address his concerns; instead, she "repeatedly chastised" and berated Newman for the "incredible disruption" he had caused.  *Id*. ¶¶ 70–72.  Shortly after Newman met with Holley, he learned that his first-semester grades were in the bottom half of his class.  *Id*. ¶ 76.  This jeopardized his scholarship, which required that he remain in the top half.  *Id*.

In late January 2021, Holley held a regularly scheduled Zoom town hall for Howard Law students.  Amend. Compl. ¶ 77.  But this town hall was unusual.  Holley declared at the start that it was "very clear to her what the topic of the night's discussion needed to be."  *Id*. ¶ 78. Students immediately understood the town hall to be about Newman.  *Id*. ¶¶ 77–78.  Then ensued roughly two hours of group criticism of Newman from Holley and his classmates.  *Id*. ¶¶ 79–87. Throughout the time, as his classmates heaped scorn on him, Newman was prevented from responding—Holley refused to activate his microphone so he could speak, and she disabled the meeting's text-messaging function after Newman tried to respond to his peers.  *Id*. ¶ 86.  Finally, after two hours, Holley let Newman speak.  *Id*. ¶ 87.  But it did not help things.  His classmates simply continued to dismiss his comments and direct racial epithets toward him.  *Id*. ¶ 89.

Some months elapsed without issue, until the start of Newman's second semester.  Then, he noticed that an administrative hold had been placed on his student account.  Amend. Compl. ¶ 93.  He spoke with the admissions dean and learned that, because his exam scores placed him

in the lower half of his class, his scholarship had been revoked.  *Id*.  Soon after, Howard held a

meeting for second-year students to discuss their academic performance.  *Id*. ¶ 95.  When

Newman sought to explain that he perceived his poor performance to be due to a hostile

educational environment, all the other students—along with a Howard administrator—stood up

and walked out.  *Id*.

In the latter half of the fall semester, Newman filed a formal complaint with the Howard

administration, alleging racial discrimination.  Amend. Compl. ¶ 97.  The school hired an outside

attorney to investigate, and Newman met with that attorney.  *Id*.  Newman "told the attorney-

investigator that racial discrimination at Howard Law was pervasive and oppressive," but the

attorney concluded that his claims "could not be substantiated."  *Id*.

In late January 2022, Newman's classmates circulated an email over the school listserv.

Amend. Compl. ¶ 98.  That email criticized the school's return to in-person education because

the authors perceived the COVID pandemic still to be ongoing.  *Id*.  Despite having previously

been warned not to use the school listserv, Newman replied to all.  *Id*. ¶ 99.  Holley immediately

scolded him.  She informed him that his email was "an unauthorized use of the law school's

email system" and asked him to "refrain from using" the listserv.  *Id*.

Newman and Holley met again.  This time, Newman asked Holley about a recently

deceased Howard student.  Amend. Compl. ¶ 100.  "Newman asked Holley the cause of death,"

and Holley refused to answer directly.  *Id*.  But she denied that the student had committed

suicide, or that her death was related to either COVID or the COVID vaccine.  *Id*.  Newman later

learned from a "local news station" that the classmate had died of a pulmonary embolism, *id*.

¶ 104, a condition in which blood clots travel to the lungs, blocking blood flow and (thus)

oxygen intake.  Newman connected the dots:  He read an "peer-reviewed scientific paper that

linked a rise in cases of [pulmonary embolisms] to the introduction of mRNA Covid vaccines." *Id*. ¶ 105.  So he "set about to warn classmates of the potential risks" of these vaccines.  *Id*.

Newman sent his classmates emails using his email account's blind carbon copy (bcc) function.  Amend. Compl. ¶ 106.  He "warn[ed] them of the study linking mRNA vaccines to the cause of their classmate's death."  *Id*.  Minutes later, Holley emailed Newman.  *Id*. ¶ 107.  She informed him that he had violated her orders by again sending "unauthorized emails to the law school student body."  *Id*.  She also relayed that his classmates had characterized his email as "disgusting" and "disturbing."  *Id*. ¶ 109.  Holley thus informed Newman that she would be "having [his] Howard email address suspended and [his] gmail blocked from the law school system."  *Id*. ¶ 112.  She also informed him that she would be bringing an administrative complaint against him in the coming days.  *Id*.

Holley filed her complaint in short order.  She accused him of "continual harassment of member[s] of the Howard Law community, and disturbance of the learning environment at the School of Law."  Amend. Compl. ¶ 114.  Newman returned fire.  He filed an administrative complaint of his own, in which he accused Holley of threatening him, discriminating against him, and creating a hostile educational environment.  *Id*.  Newman's complaint was never adjudicated.

Howard appointed another administrator, Lawan Lanier-Smith, to oversee Newman's disciplinary hearing.  Amend. Compl. ¶ 115.  Lanier-Smith required Newman to respond to Newman's claims, but she set the deadline more than three weeks before she provided him a copy of Holley's complaint.  *Id*. ¶ 116.  Because of the delays in producing the complaint, Lawan-Smith's superiors intervened and delayed the hearing.  *Id*.  Then during the hearing, Lawan-Smith allowed Holley to speak without permitting Newman to cross-examine her.  *Id*.

¶ 119.  Throughout the hearing, Newman alleges that Holley gave misleading testimony.  *Id.*

¶ 121.  And Lawan-Smith gave him only 15 minutes to respond.  *Id.* ¶ 123.  After the hearing,

the panel found Newman "Responsible" and recommended expulsion.  *Id.* ¶¶ 126, 129.  Newman

appealed.  *Id.* ¶ 127.

Newman's appeal was granted, and a new hearing was scheduled.  Amend. Compl. ¶ 134.

Although Newman asked for a new hearing panel to be assembled, this request was denied.  *Id.*

¶ 145.  Instead, his new hearing occurred before the same panelists as his first.  *Id.*  This time,

Lanier-Smith allowed Newman to cross-examine Holley, but she limited that cross-examination

to 20 minutes.  *Id.* ¶ 148.  Lanier-Smith also prevented Holley from answering several of the

questions Newman asked on cross-examination.  *Id.* ¶ 151.  In the end, the panel again found

Newman responsible and recommended expulsion, *id.* ¶ 153, and this time his appeal was

rejected, *id.* ¶ 154.

Sometime later, Newman brought this lawsuit.  He alleged "various violations of state

and federal law sounding in contract, antidiscrimination law, and tort."  *Newman*, --- F. Supp. 3d

---, 2024 WL 450245, at *4.  After a first round of dispositive motion briefing, the Court

dismissed Newman's Complaint in large part.  *See generally id.*  But it allowed Newman to

move to amend.  Newman has now filed such a motion and attached a proposed Amended

Complaint.  In this new pleading, he alleges that Howard committed racial discrimination in

violation of Title VI of the Civil Rights Act of 1964 and the D.C. Human Rights Act.  Amend.

Compl. ¶¶ 155–227.  He also alleges a violation of 42 U.S.C. § 1981, racial discrimination in

contracting.  *Id.* ¶¶ 228–244.  More, Newman brought a series of claims for breach of contract

and quasi-contract, *id.* ¶¶ 259–312, along with tortious interference with his contractual relations.

*Id.* ¶¶ 329–331.  And last, he brings a fresh set of defamation claims.  *Id.* ¶¶ 313–328.

## II.

Federal Rule of Civil Procedure 15 governs amendment of a plaintiff's complaint. In general, a plaintiff may amend his complaint with leave of court "when justice so requires." Fed. R. Civ. P. 15(a)(2). This is a "liberal standard," and leave to amend should be "freely give[n]." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996); Fed. R. Civ. P. 15(a)(2). Still, there are some narrow circumstances under which a court may deny leave to amend: where the motion was unduly delayed or is futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Amendment is futile where the updated complaint would not survive a motion to dismiss, meaning it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 630 (D.C. Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

As before, the Court is mindful of Newman's pro se status and the special solicitude it warrants. *See Amiri v. Nat'l Science Found.*, 664 F. Supp. 3d 1, 10-11 (D.D.C. 2021), *aff'd*, 2022 WL 1279740 (D.C. Cir. Apr. 28, 2022) (per curiam). Even so, he remains bound by the Federal Rules of Civil Procedure. *Id.*

## III.

On the one hand, Newman did not unduly delay bringing forth his new claims. He sought leave to amend in early April, just two months after the Court partially dismissed his Complaint in early February. *Compare* ECF No. 37, *with* ECF No. 50. That brief timespan does not constitute an undue delay. And although Newman likely could have included these allegations in his original Complaint, that does not justify denying leave to amend under Rule 15's liberal standard. *See Foman*, 371 U.S. at 182. Howard's reliance on *Onyewuchi v.*

*Gonzalez,* 267 F.R.D. 417 (D.D.C. 2010), which involved an attempted amendment months after the close of discovery, is thus unavailing.

Still, permitting many of Newman's claims to go forward would be futile. Some have been examined and rejected by the Court already. *See generally Newman*, --- F. Supp. 3d ---, 2024 WL 450245. Others fail for a grab bag of reasons. But some of Newman's claims deserve being heard. To clear up which claims are proceeding to discovery, the Court takes each set in turn. First are a series sounding in antidiscrimination law under Title VI of the Civil Rights Act of 1964, the D.C. Human Rights Act, and 42 U.S.C. § 1981 (Counts I and II).[3] Next are a bevy of breach of contract claims and a claim for tortious interference with contractual relations (Counts V, VI, and IX). And last is a set of claims for defamation (Count VII).

## A.

Start with Newman's race discrimination claims. These are his claims under Title VI and the D.C. Human Rights Act, along with his claims under § 1981. Most of these would be futile for the Court to consider because they fail to state a claim for relief.

## 1.

To start, Newman's disparate impact claims would eventually fail because there is no private right of action under which to bring them. In *Alexander v. Sandoval*, the Supreme Court held that private parties lack a cause of action to contest disparate impact under Title VI. 532 U.S. 275, 293 (2001). Newman seeks to bring his disparate impact claims under Title VI. *E.g.*, Amend. Compl. at 53. He is therefore in the same position as the plaintiff in *Sandoval*. And like that plaintiff, he has no cause of action to advance his claim. His disparate impact claims would

---

[3] Newman originally also brought a claim under 42 U.S.C. § 1985(3). He has since abandoned this claim. Reply at 2.

thus be futile.

His retaliation claims must also be set aside.  To begin with, neither the D.C. Circuit nor the Supreme Court has recognized a retaliation claim under Title VI.  *Newman*, 2024 WL 450245, at \*9.  And the idea that the Title VI encompasses such a claim is dubious as a textual matter.  *See Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.27 (11th Cir. 2003) (noting that Title VI is "silent" on whether it prohibits retaliation); *but see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("[r]etaliation . . . is another form of intentional sex discrimination encompassed by Title IX's private cause of action").  But the Court need not decide this sticky issue now.  Because even if there were a cause of action for Newman's retaliation claim, it would still fail on the facts.

To make out a claim of retaliation, a plaintiff must allege he was punished for engaging in some protected activity.  *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).  "An activity is protected if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment."  *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212 (D.D.C. 2006).  Plus, the communication must assert discrimination on the basis of a protected trait.  *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (noting that, for a retaliation claim, "[w]hile no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition").

Newman alleges the retaliation stemmed from his comments following the symposium, Amend. Compl. ¶¶ 224, 18; his January 2021 letter, *id*. ¶ 225; and his other "January 2021 writings," *id*. ¶ 226.  These communications, while they say many things, never once accused Howard of racial discrimination.  So none of them qualify as protected activities within the reach

of a retaliation claim.  Thus, even supposing that Newman has a cause of action, he has not alleged prohibited retaliation here.

Next consider Newman's hostile educational environment claims.  Like his retaliation claims, neither the Circuit nor the Supreme Court has blessed a private right of action for hostile educational environment claims under Title VI.  But even if Newman has a private right of action for these claims, he has failed to state a claim for relief that is plausible on its face.  So the claim would be futile to add to his Complaint.

Courts that recognize hostile environment claims under Title VI typically apply a "deliberate indifference standard" to them.  *See, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015).  Under that standard, Newman must show that Howard was "deliberately indifferent" to his harassment, meaning Howard's response was "clearly unreasonable in light of the known circumstances."  *Id.* at 410.  Mere negligence is not enough. *Davis*, 526 U.S. at 642.

Newman has failed to show that Howard acted clearly unreasonably under the circumstances.  First, his claims differ little from those already dismissed.  *Newman*, 2024 WL 450245, at *11.  He concedes that administrators directed his complaints to the University's EEO office, which offered him the opportunity to file a formal complaint.  Newman initially declined this offer.  Amend. Compl. ¶¶ 38, 213, 215.  He also admits that, once he did file a formal complaint, the University outsourced the investigation to an independent attorney.  Amend. Compl. ¶ 97.  That attorney concluded that "a finding of racial discrimination in violation of federal or local laws, or University policy, could not be substantiated."  *Id.*  The Court would be hard-pressed to find that Howard was unreasonable by responding to Newman's concerns through two different remedial channels, one of which was autonomous.  Newman may be

14

frustrated with how things played out.  But that does not mean Howard "made no real effort to investigate or end the [alleged] harassment and threats" or "fail[ed] to take any action to remedy the situation."  *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 690 (4th Cir. 2018); *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 701 (4th Cir. 2007).  Accordingly, the hostile educational environment claims are futile.

## 2.

Now consider Newman's remaining race-discrimination claims—these are his claims for disparate treatment under Title VI and his claim under 42 U.S.C. § 1981.

Newman brings disparate treatment claims under both Title VI and the D.C. Human Rights Act.  Amend. Compl. at 53.  These statutes dovetail with one another.  *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *8 (citing *Esteños v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008) and *Smith v. Barton*, 914 F.2d 1330, 1336 (9th Cir. 1990)).  Either way, Newman must allege facts supporting two essential elements:  He must allege facts showing that he was treated differently from other similarly situated students, and that this treatment was because of his race.  *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *8, 10.

Newman may plead causation through either direct or circumstantial evidence.  If he offers allegations of direct evidence of causation (that is, evidence that proves causation without the need for inferences or presumptions, *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)), the analysis is at an end—he has sufficiently alleged causation.  If instead he offers allegations of circumstantial evidence of causation, evidence that requires such inferences, the *McDonnell Douglas* burden shifting standard is triggered.  *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 622 (D.C. Cir. 2023).  At the pleading stage, this requires only that he make out a prima facie case of causation.  *Id*.  That is, that he allege "(1) he is a member of a

protected class, (2) he suffered an adverse . . . action, and (3) the unfavorable action gives rise to an inference of discrimination."[4]  *Id*.

Newman alleges a single adverse action undergirding his disparate treatment claim: his expulsion.  Amend. Compl. ¶ 158.  In support of that claim, he alleges four distinct ways in which he was treated differently from his black classmates.  First, he alleges that he was punished more than black classmates for "'unauthorized' use of listservs," *id*. at 58; second, he alleges he was punished more than black classmates for "'abusive' use of listservs," *id*. at 61; third, he alleges he was punished more than black classmates for "harassment," *id*. at 63; and last, he alleges he was punished more than black classmates for "disturbance of the learning environment," *id*. at 67.

Newman's disparate treatment claim is futile because it does not state a plausible claim for relief.  *See Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012).  The problem is simple.  Newman alleges a single adverse action: his expulsion.  Amend. Compl. ¶ 158.  So he must show that he was treated differently than black classmates regarding the facts underlying *that* decision.  *See Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017).  But he does not do so.  Instead, he alleges disparate treatment with respect to each individual violation that justified his expulsion.  Amend. Compl. ¶¶ 169–76 (disparate treatment in response to unauthorized use of listservs), 179–81 (disparate treatment in response to abusive use of listservs), 184–90 (disparate treatment in response to harassment), 194–210 (disparate treatment in response to disruption of the learning environment).  Newman has no direct evidence of

---

[4] As before, *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *10, n.5, Howard makes no claim that Newman is subject to the heightened pleading standards for majority plaintiffs from *Parker v. Baltimore & Ohio R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981).  The Court therefore again finds any argument based on *Parker* to be forfeited.

discrimination regarding his expulsion decision.  So what he must allege—and what he pointedly

fails to allege—is that there was some similarly situated black classmate who was *not* expelled

for a similar series of violations.  *See Nanko Shipping*, 850 F.3d at 467; *see also Newman*, --- F.

Supp. 3d ---, 2024 WL 450245, at *11.

       And his claims that there was disparate treatment regarding the underlying bases of the

expulsion decision *also* fail.  For instance, Newman points to another student who sent six

unauthorized emails over the Howard listserv, yet he sent only two.  Amend. Compl. ¶ 169.  But

even taking that to be true, the number of emails was not the only consideration justifying

Newman's discipline—the tone and content of the emails also factored in.  *See Newman*, --- F.

Supp. 3d ---, 2024 WL 450254, at *10 ("Newman's violations differed *in both quantity and*

*quality* from those of his classmates." (emphasis added)).  Although Newman baldly asserts that

his and the comparator student's emails were "substantially similar" in content, Amend. Compl.

¶ 170, his allegations do not back that up.  And his "threadbare recitals of the elements of a cause

of action . . . [would] not suffice" to survive dismissal.  *Iqbal*, 556 U.S. at 678.  So they would be

futile to add to his Complaint.

       Newman admits that he sent an open letter to the Howard student body by email, in

which he included various inflammatory statements.  For example, he compared himself to

Malcolm X, Amend. Compl. ¶ 58; said that "his genetic code was likely to resemble that of an

African-American classmate more closely than that of a Caucasian one," *id*. ¶ 62 (cleaned up);

charged that Howard was a racist institution, *id*. ¶ 65; argued that "[w]e are all the Southern

plantation owners, and we are all the women and men they enslaved," *id*. ¶ 66; and remarked that

"to whatever extent 'blacks' have been victims of discrimination, they will tend to perpetuate the

same discrimination," *id*.  Whether or not Newman feels those comments were true or justified,

they were significantly more inflammatory than his classmate's banal comments about students having a "a 'divine purpose' and wishing them '(REAL, GENUINE, AUTHENTIC, AGAPE) L.O.V.E.'" *Id*. ¶ 28.  A reasonable observer would naturally expect Newman's emails to be substantially more disruptive than those wishing "agape love" to classmates.  Even the classmate's emails suggesting students "stock up on food, non-perishables, and defensive mechanisms" after January 6th, *id*., cannot be seen as comparably inflammatory to Newman's.

Likewise, Newman's claim he faced disparate treatment with respect to "disturbance of the learning environment" falls flat.  Amend. Compl. at 67.  Newman does not point to a comparator student who disrupted the learning environment but suffered a lesser sanction.  Instead, he points to "a black Howard University student" who participated in a sit-in at a whites-only lunch counter in Alexandria, Virginia, during the Jim Crow era.  *Id*. ¶ 194.  His essential claim appears to be that this person, too, caused a "disruption or disturbance," but that this disruption was justified.  *Id*. ¶ 195 (cleaned up).  Justified or not, Newman does not appear to contest that he caused a disruption.  And a disparate treatment claim requires that the plaintiff have been treated differently from someone else.  *Nanko Shipping*, 850 F.3d at 467.  Not that he was disciplined for doing something he feels was justified.  So, even if the Court were to take his disparate treatment claims one-by-one, instead of altogether, they would still fail.

In any event, as Howard notes, Newman's disparate treatment claims can be levied only against Howard, not the individual Defendants.  Opp'n at 12 n.3.  Title VI and the D.C. Human Rights Act prohibit discrimination only by *programs and activities*, not individuals.  42 U.S.C. § 2000d; *see also* D.C. Code § 2-1402.41.  Although Howard may be liable for the individual Defendants' conduct, as its agents, those Defendants may not themselves be held liable.  So the claims against the individual Defendants are futile for that reason too.

Last is Newman's § 1981 claim.  The Court need not address this claim at any length. Defendants have not opposed its addition to the Complaint.  Opp'n at 13 n.5.  Although they do not concede its viability, they have agreed to allow it to proceed to discovery.  So the Court treats any as objection to Newman's § 1981 claim at this point to be waived.

**B.**

Next consider Newman's breach of contract and tortious interference claims.

A claim for breach of contract has four elements.  The plaintiff must show "(1) the existence of a valid contract between the parties, (2) a duty arising out of that contract, (3) a breach of that duty, and (4) resulting monetary loss."  *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *5 (citing *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).  To show the existence of a contract in the first place, the plaintiff must plausibly allege a meeting of the minds on all material terms, alongside an intent of the parties to be bound by those terms, generally by alleging an offer and acceptance of a contract, the terms of which are supported by adequate consideration.  *Id*. (citing cases).

Newman brings a separate claim for breach of the implied covenant of good faith and fair dealing.  Amend. Compl. ¶¶ 301–312.  Properly understood, this is another breach of contract claim.  The implied covenant of good faith and fair dealing is an unstated term that "all contracts contain."  *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).  Thus, Newman is really alleging that *his contract* has been breached by noncompliance with the covenant.

In any event, the covenant obligates each contracting party not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Paul*, 754 A.2d at 310 (cleaned up).  Generally, this means that the parties must act with "faithfulness to an agreed common purpose and consistency with the justified

expectations of the other party." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (cleaned up).  A party breaches this duty when he "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party."  *Paul*, 754 A.2d at 310.

Newman also brings a claim for tortious interference with contractual relations.  A tortious interference claim requires Newman to plausibly allege four elements: "(1) the existence of a contract" between him and some third party, "(2) knowledge of the contract" by the defendants; "(3) intentional procurement of a breach of the contract," and "(4) damages resulting from the breach."  *Paul*, 754 A.2d at 309.

## 1.

Start with Newman's breach-of-contract claims.  He alleges he had a contract for "a three-year renewable scholarship, a three-year course of discovery, and opportunity for attainment of a JD degree."  Amend. Compl. ¶ 260.  Howard does not deny that such a contract existed.  Newman alleges a few key terms of that agreement.  Namely, "the award of a scholarship, its terms for annual renewal, the opportunity to complete a full JD academic study program, and the award of a JD degree."  *Id.* ¶ 270.  Under those terms, only some of Newman's contract claims are viable.

First, Newman argues that Howard breached the terms of its contract by expelling him, "thus failing to provide him with a full three years of study and JD degree."  Amend. Compl. ¶ 275.  But Newman never alleges that his contract with Howard entitled him to study there for three years *no matter what*.  In fact, he specifically alleges that his offer of admission came with strings—he had to meet certain conditions for continued enrollment at the law school.  *E.g.*, *id.* ¶ 272.  And if he alleges that Howard extended an irrevocable offer of admission, no matter what

disciplinary problems ensued, that allegation is not plausible.  It beggars belief to claim that a university would lock itself in to hosting a student regardless of his potential misconduct.  In short, Newman has not plausibly alleged that Howard breached a term of his contract by expelling him, without more.

Next, Newman argues that Howard breached the terms of its contract by "fomenting a hostile environment" that caused him psychic harm.  Amend. Compl. ¶ 275.  Here, too, he fails to allege a contractual term supporting his claim.  For instance, he points to no term of his contract with Howard that obligated it to create a welcoming environment for him.  He simply asserts, without explanation, that its creation of a hostile environment breached his contractual rights.  But that is not enough.  *Iqbal*, 556 U.S. at 678.

Newman also argues that Howard breached its contract by revoking his scholarship after his GPA dipped beneath the minimal contractual level.  Amend. Compl. ¶ 279.  As the Court has previously explained, this is a plausible breach of contract claim, based on Newman's ability to invoke the prevention doctrine as a defense to his own non-performance.  *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *7.

More, Newman claims that Howard breached its contract with him by violating various policy documents: the Student Code of Conduct, Non-discrimination Policy, and Code of Ethical Conduct.  Amend. Compl. ¶¶ 282–96.  The Court has already addressed this too.  Those documents were not a component of the contract that Newman formed with Howard.  *See Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *6–7; *see also* Order on Mot. for Reconsideration, ECF No. 48.  Any breach of their terms was therefore not actionable.

Next up is Newman's claim that Howard breached the terms of its implied covenant of good faith and fair dealing with him.  He alleges several instances:  Howard required him to take

21

his final exams at 10:00 a.m. Eastern Time, Amend. Compl. ¶ 303; its administrators "supported and failed to correct a racially hostile environment," *id*. ¶ 304; the administrators adjusted Howard's "grading and ranking systems so as to deprive Newman of his scholarship," *id*. ¶ 307; administrators engaged in a campaign to "sully Newman's reputation at the law school" and thereby lower his performance grades, *id*. ¶ 308; administrators "ranked Newman at the end of his second semester, contrary to School policy, before he had completed a full 1L course load, so as to deprive him of his scholarship," *id*. ¶ 309; and Holley "submitted 'secret evidence' against Newman to the disciplinary panel," *id*. ¶ 310. Some of these may be fruitful for Newman and will be added to his Complaint. But some must fall away.

Start with the exams. Howard held all exams "at 10 a.m. EST," which was "4:00 a.m. or 5:00 a.m. Hawaii time." Amend. Compl. ¶ 238. Newman claims this prevented him from adequately preparing for his exams because he got "almost no sleep" beforehand. *Id*. ¶ 303. This claim is in vain. To whatever extent the time difference inhibited Newman's performance, that problem was of his own making. Newman voluntarily remained in Hawaii while Howard was offering remote education, and he voluntarily elected to wake up two hours before each exam. *Id*. Newman has not alleged that any term of the contract required Howard to offer special accommodations for students who chose to live in a different time zone. Nor does failing to offer these special accommodations violate the spirit of the contract or interfere with Newman's performance under it. *Paul*, 754 A.2d at 310.

Next, the early-ranking claim. Newman claims that Howard breached its duty of good faith and fair dealing by ranking him after only two semesters of coursework. Amend. Compl. ¶ 309. But that is just what his scholarship agreement required. Scholarship Agreement at 147,

ECF No. 21-1.[5]  That agreement provided that Newman would be ranked "[u]pon completion of student's first year (fall and spring semesters) of course work."  *Id*.  That is, after two semesters.  Howard's compliance with the terms of its contract cannot breach the same contract.

Now the secret evidence claim.  Newman alleges that Holley "depriv[ed] him of any hope of defending himself against her accusations" and thereby breached the implied covenant.  Amend. Compl. ¶ 310.  This claim is unavailing.  To state a viable claim, Newman must allege that Holley's conduct interfered with Newman's performance under the contract.  *See Paul*, 754 A.2d at 310.  But Newman never explains what term of the contract Holley's "secret evidence" prevented him from fulfilling.  To be sure, offering such evidence may be unfair.  But Newman never adequately alleges that it was a breach of contract.

Last up are three feasible claims.  Newman alleges that Howard "supported and failed to correct a racially hostile environment," that it adjusted its "grading and ranking systems" specifically to target him, and that its agents executed a smear campaign against him.  Amend. Compl. ¶¶ 304, 307, 308.  Given the early stage of proceedings and Newman's pro se status, he plausibly alleges facts in support of each.  *See e.g.*, *id*. ¶¶ 70–71 (alleging Howard allowed a racially hostile educational environment to develop and failed to correct such environment), ¶ 33 (alleging Howard professor changed grading system to target Newman); ¶¶ 78–89 (alleging Howard officer used Town Hall to gin up opposition to Newman).  The claims are entitled to discovery.  *Paul*, 754 A.2d at 310.

Now that Newman's contract claims are settled, he raises two last quasi-contractual claims.  First, he advances a claim for equitable estoppel.  To bring such a claim he must allege

---

[5] Newman included his scholarship agreement in his filings relating to his original Complaint. Still the Court may still consider it in assessing his Amended Complaint. *See Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam,* 406 F. Supp. 3d 72, 79 n.4 (D.D.C. 2019).

facts showing "a false representation or concealment of material fact" that was "made with actual or constructive knowledge of the true facts" and intending to induce another party to rely on it. *Cassidy v. Owen*, 533 A.2d 253, 255 (D.C. 1987).  More, he must allege facts showing that he lacked knowledge and "the means of knowledge" to determine the falsity of the other party's statement, and that he relied on that statement to his detriment.  *Id.*

The problem is that Newman never divulges Howard's "false representation or concealment of material fact."  *Cassidy*, 533 A.2d at 255.  He says Howard "knowingly engaged in misleading behavior that induced Newman to rely on the belief that the University's manuals were binding."  Amend. Compl. ¶ 297.  But not once does he say what that misleading behavior was.  And a "formulaic recitation of the elements of a cause of action will not do" to push his claim through to discovery.  *Iqbal*, 556 U.S. at 678.  More, even if there is some fact somewhere in Newman's 115 pages of allegations that would support this claim, the Court will not search for it.  "[J]udges are not like pigs, hunting for truffles buried in the record."  *Murthy v. Missouri*, 144 S. Ct. 1972, 1991 n.7 (2024) (cleaned up).

Next is a separate unjust enrichment claim.  This claim likewise is fruitless.  An unjust enrichment claim is unavailable when the parties' relationship is governed by a contract.  *Shaffer v. George Washington Univ.*, 27 F.4th 754, 768 (D.C. Cir. 2022).  Newman's enrollment at Howard, the terms of his attendance there, and the terms of his expulsion were all dictated by his contract with Howard.  Thus, he cannot mount a separate unjust enrichment claim to hold Howard liable for breach of its terms.  *Id.*

## 2.

Now consider Newman's claim for tortious interference with contractual relations, which he asserts against "all Defendants."  Amend. Compl. ¶¶ 329–331.  The Court will not permit this

24

claim to go forward—Newman has identified no Defendant against whom this claim could lie.

A party cannot tortiously interfere with its own contract. *Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988). Nor can the employees of one party to a contract do so—when they act in their capacity as employees, they act as the agents of that party and therefore represent the party itself. *Paul*, 754 A.2d at 309. For those reasons, Newman's tortious interference claim fails. Howard itself is one party to the relevant contract. Amend. Compl. ¶ 260. And all the other Defendants are Howard employees. *Id*. ¶ 4. They thus cannot tortiously interfere in Howard's contract. *Paul*, 754 A.2d at 309. The Court will not consider this claim. Newman— after two bites at the apple—has identified no Defendant against whom it could lie.

## C.

Last is Newman's defamation claim. Recall again what a defamation claim requires. In essence, it requires Newman to plausibly allege that a Defendant made false and defamatory statement about him, without privilege, to a third party and that the statement was made at least negligently and caused Newman special harm. *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005).

Two elements are critical here: falsity and defamatory character. The falsity element includes a "substantial truth" defense. *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013). Under that defense, Newman cannot mount a claim if the Defendant's statement is false only because of "[s]light inaccuracies of expression." *Liberty Lobby Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988). The question for falsity is whether "the substance, the gist, the sting, of the libelous charge can be justified." *Armstrong*, 80 A.3d at 183. And to be defamatory, the statement must be one that "tends to injure plaintiff in his trade, profession or community standing" and that makes him "appear odious, infamous, or ridiculous." *Howard Univ. v. Best*, 484 A.2d 958, 988–89 (D.C. 1984) (cleaned up).

Newman alleged that Dean Holley made the following statements, which he asserts were defamatory:

1. "Holley claimed Newman had written that the deceased classmate 'died because of the university's COVID policy, because the university required vaccination, and that her obituary actually proved that she died from that." Amend. Compl. ¶ 315 (cleaned up).
2. Holley "falsely asserted to hearing panelists Newman continued using the listserv in 2021 after being asked multiple times to cease." Amend. Compl. ¶ 316.
3. "Holley called Newman's email regarding a deceased classmate 'defamatory' and repeatedly characterized Newman's general conduct as 'defamatory.'" Amend. Compl. ¶ 317.
4. "Holley accused Newman of saying African-Americans suffer from hive mind." Amend. Compl. ¶ 318.
5. "Holley accused Newman of 'harassment' against her and against students." Amend. Compl. ¶ 319.
6. "Holley characterized Newman's October 2020 comments as 'disturbing.'" Amend. Compl. ¶ 320.
7. Holley told the disciplinary committee that Newman "sent a mass email to the student body that was an open letter to [her].  This was not authorized by any member of the law school administration." Amend. Compl. ¶ 321.
8. Holley told the disciplinary committee that Newman was authorized only to send emails "[f]or school purposes, things that are warranted." Amend. Compl. ¶ 322.
9. "Holley told the hearing panel that for any student to express a personal opinion on a professor's [web] page violated Howard University policy." Amend. Compl. ¶ 323.
10. "Holley claimed to the hearing panel that some of the students at Howard Law may be children." Amend. Compl. ¶ 324.
11. "In her Exhibits to the disciplinary committee, Holley claimed Newman had 'deprived a fellow student and their family of their privacy.'" Amend. Compl. ¶ 325 (brackets omitted).

The bulk of these claims are futile.  Defamation law is not a general-purpose right to sue when people tell lies.  But that is precisely how Newman seeks to use it.  For several statements, even assuming they are false, they are not defamatory.  For instance, consider statements seven through ten.  None of these make Newman "appear odious, infamous, or ridiculous." *Best*, 484 A.2d at 989.  No reasonable person, hearing that minors attend Howard, Amend. Compl. ¶ 324, would understand that statement to reflect at all on Newman's character.  Nor would one understand a claim that Newman sent unauthorized mass emails when he was not permitted to,

*id.* ¶¶ 321–22, or posted unauthorized private opinions, *id.* ¶ 323, as reflecting on Newman's character.  A reasonable observer would certainly not view these statements as making Newman "appear odious, infamous, or ridiculous."  *Best*, 484 A.2d at 989.  These statements are therefore simply not actionable.

A couple statements—numbers one and two—are not actionable because they were substantially true.  *Armstrong*, 80 A.3d at 183.  First, Newman challenges Holley's claim that he said his classmate "died because of the university's COVID policy," which required vaccination.  Amend. Compl. ¶¶ 315, 322.  As the Court previously noted, this claim is "purely semantic." *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *16.  Although Newman may not have expressly said that COVID vaccinations caused his classmate's death, that was "the inescapable inference from his statements."  *Id.*  Newman admits that, shortly after a classmate died, he emailed several students "warning them of [a] study linking mRNA vaccines to the cause of their classmate's death."  Amend. Compl. ¶ 106; *see also id.* at 45 n.3 (alluding to same).  In context, a reasonable observer would understand that as generally implying that the COVID vaccine was responsible for her death.  Just as in Newman's prior Complaint, this claim may not go forward because it is substantially true.

Similarly, Newman points to Holley's claim that he sent multiple unauthorized mass emails in 2021.  He points out that he did not actually send more unauthorized mass emails until 2022.  Amend. Compl. ¶ 316.  For the same reasons the Court already explained, this statement was substantially true and not actionable.  *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *16.

Two more of Holley's comments were protected opinion.  Her description of his remarks as "disturbing" and her statement that he had "deprived a fellow student and her family of their privacy."  Amend. Compl. ¶¶ 320, 325.  For a statement to be actionable, it must be provably

false or rely on an underlying fact that is itself provably false. *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000). Neither of these statements qualifies. Holley's claim that Newman's comments were "disturbing" was subjective. Because it simply reflects her "subjective assessment" of his comments, "it is not objectively verifiable, and therefore not actionable." *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *17 (cleaned up).

The same is true of her remark that Newman "deprived a fellow student and her family of their privacy." Amend. Compl. ¶ 325. This, too, is not objectively verifiable. It represents Holley's subjective assessment of the consequences of Newman's remarks. *See Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *17. Reasonable minds could differ on the extent to which Newman's public remarks intruded on the deceased student's privacy interests. But if that is true, then there is no objectively verifiable fact that Holley misrepresented. And because of that, her comment was not actionable. *See Guilford Transp. Indus.*, 760 A.2d at 597; *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 91–92 (D.D.C. 2018) (clarifying that courts should err on the side of the defendant in assessing close calls for whether a statement is opinion).

Still, the Court will consider three of Newman's defamation claims. The Court already explained that his claim about Holley calling his comments defamatory and his claim that Holley accused him of saying that "African-Americans suffer from hive mind" were actionable. *Newman*, --- F. Supp. 3d ---, 2024 WL 450245, at *17. And for similar reasons, his new claim that Holley accused him of harassment is too. It also implies certain verifiable underlying facts about Newman's conduct. *Id*.

## IV.

To recap where things stand: All Newman's race-discrimination claims are futile and will not be appended to the Complaint, except his claims under 42 U.S.C. § 1981. His contract

28

claims survive in part, but only for certain alleged breaches of contract.  His quasi-contract claims will not be considered.  Likewise, his tortious interference with contract claim is futile and will not be included.  But three of his defamation claims survive.

Accordingly, the Court **ORDERS** that the Motion for Leave to Amend, ECF No. 50, is **GRANTED IN PART** and **DENIED IN PART**, as described above.  Howard's Opposition, ECF No. 51, is **GRANTED IN PART** and **DENIED IN PART**, as described above.

**SO ORDERED**.


Dated: September18, 2024                         _____
                                                                      TREVOR N. McFADDEN, U.S.D.J.