**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **MICHAEL NEWMAN**, <br><br> Plaintiff, <br><br> v. <br><br> **HOWARD UNIVERSITY SCHOOL OF LAW**, *et al.*, <br><br> Defendants. | Case No. 1:23-cv-00436 (TNM) |

## <u>MEMORANDUM ORDER</u>

Plaintiff Michael Newman is a former Howard University Law School student. He has sued the law school, the university, and various university officials on several grounds, most of which center around allegations of race discrimination. Following partial dismissal, one round of amendment, and discovery, Newman again seeks to amend his Complaint. The Court denies this request. Newman may not continue to repackage the same facts into different theories of relief and hope for a new outcome. The dramatic revisions Newman posits would unduly prejudice Defendants at this stage of the case. More, permitting another do-over would be futile. The Court declines to jam the wheels of progress once more.

### I.

The Court aims for brevity on background, given it has spun Newman's tale at least twice already. *See Newman v. Howard Univ. Sch. of L.*, 715 F. Supp. 3d 86, 97–101 (D.D.C. 2024) (*Newman I*); *Newman v. Howard Univ. Sch. of L.*, 2024 WL 4227723, at *1 (D.D.C. Sept. 18, 2024) (*Newman II*). The Court assumes the truth of the facts below, which come from the proposed Second Amended Complaint ("SAC"). In short, Newman is a white man who matriculated at Howard Law School—an historically black college or university, or HBCU—in

the fall of 2020.  SAC, ECF No. 81-1, ¶ 14.  He was drawn to the law school in part because of his desire "to support and lift up racial minorities."  SAC ¶ 21.  Newman enrolled in Howard with a scholarship that covered a significant chunk of his tuition, provided he ranked in the top half of his law school class.  SAC ¶¶ 14, 237.

But Howard would not be the utopia Newman envisioned.  He quickly earned the ire of his classmates by sending an inflammatory message in a class-wide group chat.  SAC ¶ 18 ("Where I part with the black community is where they believe government solves problems, I only see it causing problems.").  At the urging of professors, a student removed Newman from the chat, and the chat members continued to disparage Newman.  SAC ¶¶ 73, 96, 169.

Facing ostracism, Newman tried to explain himself by sending a four-part letter to his classmates.  SAC ¶¶ 39, 56–69.  He sent the final installment over a Howard email listserv.[1] SAC ¶ 47.  This portion was particularly controversial.  Newman stressed his belief that black and white Americans were "so similar to one another that there ceased to be any meaningful distinction between the two."  SAC ¶ 66.  He claimed "[w]e are all the Southern plantation owners, and we are all the women and men they enslaved."  SAC ¶ 66.  He added that "to whatever extent blacks have been victims of discrimination, they will tend to perpetuate the same discrimination."  SAC ¶ 66.  He also blasted the listserv with a link to a documentary entitled *Uncle Tom*.  SAC ¶ 47.

The communications were not received as Newman had hoped.  Students responded with vitriol.  SAC ¶¶ 54–55.  Various administrators contacted Newman to inform him that his use of

---

[1] Though Newman himself does not submit his letter, he refers to it extensively it in his SAC, so it is incorporated therein.  *See Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992) (finding documents incorporated into complaint where it is "replete with references to them").

the listserv violated university policy and the law school Code of Conduct.  SAC ¶ 48.  Dean Danielle Holley explicitly asked Newman to refrain from using the email list again.  SAC ¶ 48.

Early on, Newman spoke with the university's EEO coordinator to discuss the racial discrimination he was facing.  SAC ¶ 38.  The coordinator suggested he file a formal complaint against a particular student leading the charge against Newman.  SAC ¶ 38.  Newman was reluctant to take this route and exacerbate tensions with his classmates, so he declined to file the complaint then.  SAC ¶ 38.  But the animosity towards Newman continued to fester.  SAC ¶¶ 39–54.  Ultimately, Newman decided to take formal action.  Newman contacted the university president, Wayne Frederick, to allege he was facing racial discrimination.  SAC ¶ 70.  Newman was then invited to a meeting with Holley.  SAC ¶ 70.  Holley told Newman he had caused serious disruptions to the law school community through his incendiary communications.  SAC ¶ 74.  Still, she acknowledged his allegations of racial discrimination and informed Newman his claims had been forwarded to the university's EEOC office.  SAC ¶ 75.

A few days later, Holley hosted a regularly scheduled virtual town hall for Howard Law students.  SAC ¶ 77.  Many attendees came with the express purpose of discussing Newman. SAC ¶ 77.  Newman was not allowed to speak for several hours, as his classmates aired their grievances with him.  SAC ¶ 83, 86.  He finally was given a few minutes to give his side of the story.  SAC ¶ 87.

Newman's first year did not end well.  He had finished in the bottom half of his class. SAC ¶ 93.  Howard ultimately revoked his scholarship based on that performance.  SAC ¶ 93.

During his 2L year, Newman filed a formal complaint of racial discrimination based on his exclusion from the student-run group chat.  SAC ¶ 97.  The university employed an outside

attorney to probe the complaint.  SAC ¶ 97.  After a long investigation, the attorney concluded that Newman's allegations could not be substantiated.  SAC ¶ 97.

Newman continued to communicate with his classmates en masse.  At the beginning of the spring semester, a group of students sent an open letter to Holley over the listserv protesting the school's return to in-person instruction amid the pandemic.  SAC ¶ 98.  Newman followed suit, sending a letter over the listserv to tack on criticism of the administration.  SAC ¶ 99.  Holley again reprimanded Newman for violating the listserv policy.  SAC ¶ 99.  When Newman developed fears that a classmate's death had resulted from the COVID vaccine, he felt he needed to share that information with his fellow students.  SAC ¶¶ 104–05.  Avoiding the formal listserv, Newman sent a mass email to hundreds of students intimating their classmates' cause of death.  SAC ¶ 106.  Holley did not appreciate the loophole.  She informed him she had violated her orders by sending unauthorized emails to the student body.  SAC ¶ 107.  She suspended his law school email address, blocked his personal email from the school's systems, and filed an administrative complaint against Newman.  SAC ¶¶ 112–14.

The complaint was adjudicated by the director of Howard University's Office of Student Conduct and Community Standards, Lawan Lanier-Smith.  SAC ¶ 115.  Holley testified extensively and made "numerous false claims."  SAC ¶ 121.  Newman was denied the opportunity to cross-examine Holley or the authors of hearsay evidence introduced by her.  *Id.* Newman was given only 15 minutes to defend himself.  SAC ¶ 123.  The panel concluded Newman was "Reponsible" and recommended expulsion.  SAC ¶¶ 120, 126.  Newman appealed, and this appeal was granted on the grounds that Newman was refused the opportunity to cross-examine witnesses and that expulsion may be a disproportionate sanction.  SAC ¶ 131.

Newman sat for a second disciplinary hearing before the same panel. SAC ¶ 134. Again, the panel found him responsible and recommended expulsion. SAC ¶ 153. Newman appealed, but this appeal was denied. SAC ¶ 154.

He then came to this Court. He brought claims under local and federal antidiscrimination law. *Newman I*, 715 F. Supp. 3d at 97. He also raised several claims under tort and contract law. *Id.* The Court dismissed most of Newman's claims. *Id.* Newman then moved to amend his Complaint. *Newman II*, 2024 WL 4227723, at *1. For many claims, the Court concluded that amendment would be futile and denied the motion to that extent. *Id.* at *14. But it permitted his claims of racial discrimination in contracting under 42 U.S.C. § 1981, his contract claims based on a breach of his scholarship agreement, and three defamation claims to go forward. *Id.*

The parties engaged in tortured discovery. *See* Discovery Conference Tr., ECF No. 80, 46:2–9 ("Folks, I've got to tell you, literally in my seven years as a judge, I have never done this, kind of sat down and gone through line by line, request by request, for documents and what have you."). Shortly after the close of discovery, Newman again moved to amend his Complaint.[2]

---

[2] Three days after replying in support of the instant motion, ECF No. 85, Newman filed a Motion for Leave to File a Supplemental Memorandum, ECF No. 86. The supplemental memorandum purportedly supports Newman's Motion for Leave to File the SAC. The Court denies Newman permission to file the supplemental memorandum. To start, he chose to move to amend knowing that productions were forthcoming. *See* Discovery Conference Tr. 41:12–16. More, all the "new evidence" he references in the supplemental memorandum was available at the time he filed his second motion to amend or by the time the briefing on that motion was complete. *See* Mot. Leave File Suppl. Memo. at 1 (noting EEO report was disclosed on September 18, 2024); Mot. File SAC (filed October 18, 2024); Opp'n Mot. Leave File, ECF No. 89, at 2 (noting Defendants made final production on November 1, 2024); Reply in Supp. Mot. File SAC (filed December 6, 2024). So the supplemental memorandum is improper. *See Neville v. Burrows*, 2024 WL 578986, at *6 (D.D.C. Feb. 13, 2024), *aff'd sub nom. Neville v. Lucas*, 2025 WL 1122199 (D.C. Cir. Apr. 16, 2025) (denying leave to file supplemental memorandum where plaintiffs failed to show evidence was newly discovered and noting that a sur-reply "is an inappropriate vehicle to raise such new allegations."). More, the Court finds the factual allegations irrelevant to the resolution of the pending motion. And Defendants would be prejudiced by its incorporation, as they already filed an extensive opposition to the current motion. *Cf. Glass v. Lahood*, 786 F. Supp. 2d 189, 231 (D.D.C. 2011), *aff'd*, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011) (noting "surreplies are generally disfavored" and that district courts should consider whether the filing "would be helpful to the resolution of the pending motion" and whether the other party "would be unduly prejudiced were leave to be granted.").

Second Mot. Amend, ECF No. 81.  Defendants oppose this motion.  Opp'n, ECF No. 84.  The

motion is ripe for review.[3]

## II.

Federal Rule of Civil Procedure 15 governs amendment of a plaintiff's complaint.  In

general, a plaintiff may amend his complaint with leave of court "when justice so requires."  Fed.

R. Civ. P. 15(a)(2).  This is a "liberal standard," and leave to amend should be "freely give[n]."

*Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996); Fed. R. Civ. P. 15(a)(2).  But a

court may deny leave to amend there has been "undue delay, bad faith or dilatory motive on the

part of the movant, [or] repeated failure to cure deficiencies by amendments previously

allowed."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Likewise, amendment should be denied

where it would cause "undue prejudice to the opposing party" or be "futil[e]."  *Id.*  Amendment

is futile where the updated complaint would not survive a motion to dismiss, meaning it lacks

"sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 630 (D.C. Cir. 2020) (quoting *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009)).

---

[3] Newman also seeks leave to file a video and audio recording of Lawan Lanier-Smith's August 2, 2024, deposition, as well as the associated transcript.  Mot. File Video Files and Transcripts, ECF No. 88.  He aims to include these files as exhibits to his reply in support of the present motion, ECF No. 85.  Newman argues that "[t]hese materials are necessary for the Court to fully evaluate the witness's testimony, demeanor, and defense counsel's conduct during the deposition."  Mot. File Video Files and Transcripts at 13.  The Court denies the motion.  A witness's credibility is irrelevant to the pending motion to amend.  *Cf. Glass*, 786 F. Supp. 2d at 231 (choice of whether to permit filing of supplemental briefing turns on whether briefing "would be helpful to the resolution of the pending motion."); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 235 (D.D.C. 2022) (denying plaintiff's motion to file supplemental brief and exhibits because a court is limited to the "four corners of the complaint, as well as any documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies" when determining a motion to dismiss.).  Filing the exhibits on the public docket is further inappropriate because they were made by Newman himself—the video recording was taken on his wife's iPhone, and the transcript was typed by Newman.  *See* Opp'n Mot. File, ECF No. 93, at 2, 4.  The federal rules do not permit courts to rely on deposition transcripts or recordings created by parties.  See Fed. R. Civ. P. 28(c), 30(f); *see also Alcorn v. City of Chicago*, 336 F.R.D. 440, 442 (N.D. Ill. 2020).

As before, the Court acknowledges Newman's pro se status.  Because it was drafted by a pro se litigant, the SAC is held to a "less stringent standard[] than formal pleadings drafted by lawyers."  *Holmes v. Kerner*, 404 U.S. 519, 520 (1972).  Still, this does not give pro se plaintiffs license "to ignore the Federal Rules of Civil Procedure."  *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 876 (D.C. Cir. 1993).

## III.

The Court denies Newman's third shot at these claims.  Despite his sustained efforts to find a magic theory to fit his facts, he has repeatedly failed to ameliorate deficiencies identified by the Court.  His rewrite of nearly 100 pages of his Complaint at this stage of the case would unduly prejudice Defendants, who have been forced to submit effectively three motions to dismiss already.  More, his proposed revisions would be futile.  So Newman must proceed with the Complaint he already has.

Because of the sprawling nature of this case, it helps to highlight precisely what Newman seeks to change with his SAC.  First, he seeks to revise his previously dismissed racial discrimination claims based on Title VI and the D.C. Human Rights Act.  SAC ¶¶ 156–222.  Second, he aims to recalibrate his live § 1981 claim to include a breach of good faith and fair dealing, SAC ¶ 235; breach of contract based on statements made by Dean Mariela Olivares, SAC ¶¶ 239, 251; alleged adjustment of grading and ranking schemes, SAC ¶ 267; and deprivation of a J.D. degree, SAC ¶ 277.  Third, he wishes to re-allege his previously dismissed § 1985(3) claimed based on alleged conspiracies to foster a racially hostile environment, strip Newman of his scholarship, and expel him.  SAC ¶ 301.  Fourth, he seeks to change his live breach of contract claim from a breach of the scholarship agreement to a breach of an oral contract based on statements from Olivares that he would not be ranked at the end of his 1L year.

SAC ¶¶ 311–13.  Fifth, he seeks to revise his surviving breach of implied covenant and fair dealing claim to add allegations that Defendants failed to honor Olivares' ranking statement and misled him into believing university policy manuals were binding.  SAC ¶ 351.  And finally, he asks to add an equitable estoppel claim based on the same statement from Olivares and based on statements denying the binding nature of the Code of Conduct.  SAC ¶¶ 298–301.  All these claims—save for the racial discrimination claims—Newman seeks to run against three new defendants: Olivares, former Dean Reginald McGahee, and Professor Alice Thomas.  The Court takes each bucket of revisions in turn.

**A.**

Start with Newman's racial discrimination claims under Title VI of the Civil Rights Act of 1964 and the D.C. Human Rights Act.[4]  This is the third time the Court is seeing some version of these allegations.  *Newman I*, 715 F. Supp. 3d at 107; *Newman II*, 2024 WL 4227723, at *8.  Newman insists that he suffered disparate treatment because he was punished for using the listserv, yet no black students were disciplined when they, too, used the listserv.  SAC ¶ 158.  The Court twice dismissed a similar claim because Newman failed to identify a similarly situated black student, as required for a disparate treatment claim.  *Newman I*, 715 F. Supp. 3d at 107–109; *Newman II*, 2024 WL 4227723, at *8–9.  Newman now insists he has found that comparator through discovery.  He points the Court to a letter emailed by black students over university listservs in January 2021, which he calls the "Demand Letter."  SAC ¶ 157.

The Demand Letter was addressed to the law school's faculty and staff, written by "the students of Howard University School of Law."  Exhibits, ECF No. 81-1, at 117.  Broadly, the authors sought "a comprehensive and effective remedy from the Law School Administration

---

[4] In general, the legal frameworks for Title VI and D.C. Human Rights Act claims are identical. *Esteños v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008).

regarding the egregious lack of transparency and accountability for the actions of Michael 'Ray' Newman." *Id.* The letter detailed Newman's "incessant, contemptuous, and truculent remarks" and his use of the listserv "to pugnaciously antagonize the 1L class." *Id.* at 117–18. The students then chronicled demands, including that Newman be suspended from the listservs; that students be given access to accountability protocols; and that Newman be subject to an administrative hearing and sanctions. *Id.* at 118–19.

Newman insists that the Demand Letter finally unlocks his disparate treatment claim. He points out that none of the black authors "were charged with violations of Howard's Student Code of Conduct, denied access to University listservs, or sanctioned in any other way." SAC ¶ 159. This different treatment, according to Newman, "suggests that race was the driving factor behind these adverse actions." SAC ¶ 161.

Newman also points to a black student who "sent six unauthorized emails to the entire class over School listservs, was never reprimanded, and was not sanctioned in any way." SAC ¶¶ 29, 103, 110. Neither one of these comparators avails.

Take first the Demand Letter. As before, "Newman's violations differed in both quantity and quality from those of his classmates." *Newman I*, 715 F. Supp. 3d at 108. He "violated the policy three times," and "even after that, he tried to circumvent the policy by sending a fourth mass email using his private email account's bcc function." *Id.* There is no sign that the senders of the Demand Letter were repeat offenders, like Newman. At risk of repeating the Court's prior opinion verbatim: "This alone sets Newman apart, as it suggests that he was a repeat offender and did not respond to verbal warnings prior to discipline." *Id.*

More, "the content of Newman's emails was materially different from that" of the Demand Letter. *Id.* Newman circulated "controversial emails addressing his personal relations

with other law students" and his charged takes on race relations in the United States.  *Id.*; *see also* Newman Letter, ECF No. 84-6, at 3 ("To whatever extent 'whites' discriminate based on perceived race, 'blacks' can reasonably be expected to do the same, and to whatever extent 'blacks' have been victims of discrimination, they will tend to perpetuate the same discrimination.").  In contrast, the Demand Letter was a group letter to the school administration complaining about Newman's actions.  More, "on top of all of that . . . no other classmate brought comparable baggage with them when they emailed the law school."  *Newman I*, 715 F. Supp. 3d at 108.  The Demand Letter is simply too different from Newman's actions to serve as a comparator.

So too when comparing Newman to the classmate who used the listserv multiple times. For one, there is no evidence that this classmate rebuffed multiple admonishments from the administration to cease sending mass communications.  Newman's intentional evasion of reprimands broadens his offense conduct beyond the mere violation of rules about the listserv. More, Newman's messages were certain to ignite hostilities and inflame passions, especially given his relative unpopularity with the other students.  The same cannot be said for the classmate Newman points to.  For the most part, the classmate's six messages sought to encourage and uplift readers.  *See* SAC ¶ 28 (email telling classmates they had a "divine purpose" and wishing them "(REAL, GENUINE, AUTHENTIC, AGAPE) L.O.V.E.").  The classmate also took aim at the school's policies and procedures, including its approach to the pandemic and to Newman himself.  SAC ¶¶ 27–28.  Newman's unsolicited credo, in contrast, was immediately controversial and completely irrelevant to happenings at the law school. Instead, it stoked an already simmering personal controversy.  Thus Newman has again failed to identify a similarly situated black student.  His disparate treatment claim is thrice futile.

Now, Newman's hostile educational environment claim. This cannot be resurrected. The Court had dismissed these claims because Newman failed to show that Howard was deliberately indifferent to his complaints of racial harassment. *Newman I*, 715 F. Supp. 3d at 109. Plus, it expressed doubt that Title VI could even support an atextual cause of action for a hostile environment. *Id.*; *see also Newman II*, 2024 WL 4227723, at *7. Even so, the Court stressed that Howard "contact[ed] him and offered to mount an investigation into his harassment," an offer he "declined." *Newman I*, 715 F. Supp. 3d at 109. Plus, "when he *did* report race discrimination, Howard hired an independent third party to investigate." *Id.* These steps "were not clearly unreasonable under the circumstances." *Id.*; *see also Newman II*, 2024 WL 4227723, at *7 ("The Court would be hard-pressed to find that Howard was unreasonable by responding to Newman's concerns through two different remedial channels, one of which was autonomous.").

Newman offers one new edit to his hostile environment claim that he claims shows deliberate indifference. In discovery, he found that Holley falsely represented that she forwarded his letter to Frederick to the University's EEO office. SAC ¶ 183. Newman stresses that "[n]ot only was [his] complaint never forwarded to EEO, but Holley's email reply to Frederick reveal [sic] she considered [his] complaint no more than an attempt to cause further disruptions." SAC ¶ 183. And he insists that "Defendants' main concern regarding [his] complaints of racial discrimination was their public image," rather than remediating the harassment. SAC ¶ 197.

Still, this new factual allegation changes nothing. At the time of the meeting with Holley, Newman had had a chance to file an EEO complaint—an opportunity he rejected. SAC ¶ 201. And Newman understood the procedure to file an EEO complaint if he changed his mind. More, it remains true that "the University conducted a separate investigation" into Newman's complaints by retaining an outside investigator. SAC ¶ 201. Thus, again putting aside the

"sticky issue" of whether Title VI supports a cause of action for a hostile educational environment, "Newman has failed to show that Howard acted clearly unreasonably under the circumstances." *Newman II*, 2024 WL 4227723, at *7. Again, "Newman may be frustrated with how things played out." *Id.* But "that does not mean Howard made no real effort to investigate or end the alleged harassment or threats," or "failed to take any action to remedy the situation." *Id.* (cleaned up). The hostile environment claims remain futile.

The final claim under Title VI and the DCHRA is one for retaliation. Little has changed since the Court dismissed this claim. Again, Newman asserts that he complained of racial discrimination, prompting Defendants to "engage[] in retaliatory actions, including, but not limited to, [Newman's] removal from all GroupMe platforms and subsequent exclusion from listserv access." SAC ¶ 218. He also points to "the public humiliation at the Town Hall" as an example of a retaliatory action. SAC ¶ 221. These allegations cannot be added to the Complaint.

To start, they come too late; the newly asserted adverse actions do not stem from evidence newly acquired during discovery. Instead, they are reformulated allegations based on information that Newman has possessed all along. Given Newman has repeatedly attempted— and failed—to bring a viable retaliation claim, the Court will not permit him to try once more at this stage of the case, especially when he does not bring forth any new proof on the matter. *See Lemus v. Montano*, 2024 WL 3673572, at *4 (D.D.C. Aug. 5, 2024) ("Courts have denied motions for leave to amend when the plaintiff sought to amend after discovery had closed or if the plaintiff knew the evidence included in the amended complaint at the time of the filing of the original complaint.").

But even if the Court were to permit Newman one final audition, he would not get the part. The Court remains dubious that Title VI permits private retaliation claims. *Newman II*, 2024 WL 4227723, at *6. Putting that concern aside, the retaliation allegations are futile. Removal from a student-run GroupMe, even if it is true that a professor encouraged it, is not an example of an adverse action, as it does not "result in some kind of actual change in status." *Newman I*, 715 F. Supp. 3d at 110. The same is true for exclusion from a listserv; Newman has not shown that his removal had some "tangible impact" on his status as a law student. *Cf. Drielak v. McCarthy*, 209 F. Supp. 3d 230, 240 (D.D.C. 2016), *aff'd sub nom. Drielak v. Pruitt*, 890 F.3d 297 (D.C. Cir. 2018) (holding in the Title VII context that "exclusion from meetings— without a more tangible impact on an employee's responsibilities or salary—is not a materially adverse employment action" and collecting cases saying the same.). Finally, as vitriolic as it was, the Town Hall itself was not a materially adverse action. "[P]urely subjective injuries," such as "public humiliation" or "loss of reputation" do not constitute adverse actions. *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006). So it would be futile to amend the retaliation claim.

## B.

Move now to Newman's § 1981 claim. The Court had allowed Newman to bring a claim that Defendants substantially interfered with the benefits of his scholarship agreement. *Newman I*, 715 F. Supp. 3d at 112. Then it permitted Newman to amend the claim to include an allegation that Defendants substantially interfered with his ability to attain a J.D. degree. *Newman II*, 2024 WL 4227723, at * 9 (noting that Defendants did not oppose amendment of the § 1981 claim). Now, Newman seeks to add a new claim for breach of good faith and fair dealing by creating a racially hostile environment. SAC ¶¶ 234–49. He also argues that Olivares contracted with him

to delay ranking him until his second year, and that Defendants substantially interfered with this contract because of his race. SAC ¶¶ 250–66. Finally, he adds factual allegations to bolster his preexisting § 1981 claims. SAC ¶¶ 272–84. For all of these new allegations, he adds three new Defendants: Olivares, McGahee, and Thomas.

Defendants note their opposition is "limited to Newman's attempt to expand the [§ 1981] claim to include three previously not named individuals." Opp'n at 23 n.17. Thus the Court asks whether amendment is improper as to those three Defendants.

Start with Olivares. The § 1981 claim against her would be futile. To begin with, the promise she made to Newman does not amount to a "written modification to the scholarship contract." SAC ¶ 255. Modifications to a contract require "the same elements of consideration as necessary for normal contract formation." *Rinck v. Ass'n of Rsrv. City Bankers*, 676 A.2d 12, 17 (D.C. 1996). Newman does not explain the extra undertakings that he and Olivares made to induce the other to enter into the modification. *See Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1003 (D.C. 2008) ("For a contract to be enforceable, each party must undertake to do something the party otherwise is under no legal obligation to do, or to refrain from doing something the party has a legal right to do.") (cleaned up). So her promise cannot sustain a § 1981 claim. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship' under which the plaintiff has rights.") (cleaned up).

Newman alternatively posits that, in making the promise, Olivares "breached the implied covenant of good faith and fair dealing by persuading Plaintiff to withdraw" from the research class "with the understanding that he would not be ranked until his 2L year." SAC ¶ 256. This decision "to rank Plaintiff prematurely frustrated Plaintiff's reasonable expectations under the

14

contract and deprived him of a fair opportunity to improve his class rank and protect his scholarship."  SAC ¶ 256.

The problem is, Newman does not plausibly allege that Olivares made the misleading promise to Newman because of his race.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).  He could do so either by presenting direct evidence or circumstantial evidence.  *Moini v. Wrighton*, 602 F. Supp. 3d 162, 172 (D.D.C. 2022), *aff'd sub nom. Moini v. Granberg*, 2024 WL 2106214 (D.C. Cir. May 1, 2024).  For the latter, Newman must show that (1) "he is a member of a racial minority"; (2) "his [university] intended to discriminate against him on the basis of race"; and (3) "the discrimination concerned an activity enumerated in § 1981."  *Id.*  Newman has not met the second element here, even assuming he could meet the others.

The closest he gets is pointing to a December 2020 exchange in which "Dean Olivares encouraged Plaintiff's professor to initiate an Academic Code of Conduct investigation against him" after Newman inadvertently skewed his webcam during a remote exam.  SAC ¶ 266.  Newman claims that Olivares's "attempt to escalate a minor, technical mistake into a formal investigation" demonstrates an underlying, race-based intent.  SAC ¶ 266.  But Newman's own exhibits belie his assertions.  *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) ("In deciding a motion to dismiss, a court may . . . consider documents attached to or incorporated in the complaint.") (cleaned up).  Olivares was merely responding to a professor's concern that Newman had been off-screen for nearly two hours during a proctored exam. Exhibits at 140.  Olivares contacted Newman to clear the air and explained the circumstances to the professor.  *Id.*  Only after doing so did she tell the professor to "[p]lease let [her] know" if he would like to "prepare a referral to [her] for an academic code of conduct investigation."  *Id.* at

139.  Nothing in this exchange raises an inference that Olivares was targeting Newman because he was white.  There is no plausible § 1981 claim against Olivares.

The § 1981 claim against McGahee is also futile.  Newman argues that McGahee "failed to take appropriate action to address the discriminatory environment" Newman faced.  SAC ¶ 244.  This lack of action, according to Newman, "directly interfered with Plaintiff's ability to enjoy the benefits of his scholarship."  SAC ¶ 247.  But Newman does not explain which actions McGahee himself failed to take.  Instead, he acknowledges that McGahee sat with Newman for nearly an hour and "attempted to help Newman better understand his classmates' sudden and pronounced hostilities."  SAC ¶ 20.  Neither does Newman plausibly allege that McGahee failed to take remedial action *because of* his race.  His only allusion to racial motive is that McGahee emailed the director of records to "specifically request[] Plaintiff's grades" from his 1L fall.  SAC ¶ 261.  Newman contends that "[t]his request was made during a flurry of communications among administers . . . as they contemplated the best pretext for removing Plaintiff from the law school."  SAC ¶ 261.  But this is just bald conjecture about McGahee's motive for making a request wholly within his job description.  *See Da Costa v. Immigr. Inv. Program Off.*, 643 F. Supp. 3d 1, 16 (D.D.C. 2022), *aff'd*, 80 F.4th 330 (D.C. Cir. 2023) ("Speculation cannot sustain a claim at the motion-to-dismiss stage.").  Without plausible allegations that "but for [his] race," McGahee would not have deprived Newman of "a legally protected right," the § 1981 claim is futile.  *Comcast Corp.*, 589 U.S. at 341.

The same goes for the § 1981 claim against Thomas.  Newman premises it on Thomas "encourag[ing] classmates to isolate Plaintiff from student communication forums like GroupMe, reinforcing a racially hostile atmosphere."  SAC ¶ 242.  But nowhere does Newman plausibly contend that Thomas urged students to remove Newman from the group chat because

16

he was white.  Instead, elsewhere, Newman acknowledges that "the impetus for Plaintiff's removal was based on his comments and writings."  SAC ¶ 169.  Devoid of contentions of "purposeful discrimination," the § 1981 claim against Thomas cannot stand.  *Moini*, 602 F. Supp. 3d at 171.

Had discovery elicited new evidence supporting non-futile claims, the Court would have readily allowed Newman to amend his Complaint, despite the prior amendment.  But the Court declines to append these claims to the Complaint because they largely rest on information that Newman possessed before discovery.  The small exceptions do not provide the necessary legal heft for Newman's proposed claims.  Newman may not turn this case into an endless cycle of what-about-now.  *See Firestone*, 76 F.3d at 1208.  The § 1981 allegations must move forward without the three new parties.[5]

## C.

Turn now to Newman's § 1985(3) claim.  This provision creates a cause of action for race-motivated conspiracies to interfere with a person's civil rights.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268–69 (1993).  Previously, the Court dismissed Newman's attempts to plead conspiracies between Holley and unidentified third parties, and between Holley, Lanier-Smith, Frederick, and other Howard administrators.  *Newman I*, 715 F. Supp. 3d at 111.  The Court stressed that, for both conspiracies, Newman "alleged no specific facts suggesting the existence of a conspiracy" and merely offered "conclusory allegation[s]." *Id.*  So too here.

---

[5] Because Defendants only challenge the addition of the new parties to the § 1981 claims, the factual allegations independent of the legal conclusions about the new parties will be appended to the FAC.  This includes ¶¶ 234–249, 272–276, 277–280, 282–284.

Newman fills pages with "new" allegations, but they fail to rectify his previous shortcomings. He offers up three conspiracies. First, he argues that Defendants "engaged in a conspiracy to create and perpetuate a hostile environment for Plaintiff based on his race." SAC ¶ 285. He claims this conspiracy involved Holley and Thomas "encourag[ing]" students "to exclude Plaintiff from GroupMe;" "[t]he administration's orchestration of the January 31, 2021, Town Hall"; "[o]ngoing solicitations by administrators, including Dean Holley, directed at black students to monitor Plaintiff's activities"; "[c]oordinated communication between administrators, such as Dean McGahee forwarding complaints about Plaintiff to the Director of Student Conduct and the Office of General Counsel"; and "[t]he administration's deliberate failure to investigate Plaintiff's complaints of racial harassment." *Id.* Next, he insists that "Defendants coordinated their efforts to deprive Plaintiff of his scholarship by ranking Plaintiff in May 2021 despite having assured him in writing that he would not be ranked at the end of his 1L year." SAC ¶ 292. Third, Newman claims that "Defendants conspired to deprive Plaintiff of equal protection under the law . . . by orchestrating a series of racially motivated actions that culminated in his expulsion from Howard Law." SAC ¶ 301. As purported evidence of the conspiracies between Defendants, Newman proffers disconnected facts: McGahee emailed another administrator to ask about Newman's grades, SAC ¶ 294; Olivares spoke with a professor when Newman was off-camera during an exam for hours, SAC ¶ 295; Newman was "ranked prematurely," SAC ¶ 296; and Olivares and McGahee reacting to Newman's unauthorized use of the listserv, SAC ¶ 297.

The problem is, Newman does not offer any specific contentions to make it plausible "that the defendants manifested the specific intent to agree to participate in a concerted effort to deprive [him] of [his] civil rights." *Morgan v. District of Columbia*, 550 F. Supp. 465, 470

(D.D.C. 1982). He offers no allegations about "when or how such an agreement was brokered," nor does he "allege the existence of any events, conversations, or documents indicating that there was ever an agreement or meeting of the minds between any of the defendants." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010). On the contrary, "he presents unbuttressed hypotheses about scheming and concealing." *Lovett v. United States*, 2024 WL 4286054, at *9 (D.D.C. Sept. 25, 2024). But this will not suffice; "[t]he mere repetition of a conclusory statement that a conspiracy exists and that all the alleged events occurred as a result of the conspiracy are insufficient as a matter of law." *Bush v. Butler*, 521 F. Supp. 2d 63, 69 (D.D.C. 2007). The § 1985(3) claim is futile.

## D.

Next up are Newman's contract claims. Newman has rewritten these allegations, even deleting the assertions that the Court had found sufficient to state a claim. Before, the Court acknowledged that Newman stated a plausible breach of contract claim by arguing that Howard breached the terms of Newman's scholarship agreement "by revoking his scholarship after his GPA dipped beneath the minimal contractual level." *Newman II*, 2024 WL 4227723, at *11. The plausibility of this claim derived from "Newman's ability to invoke the prevention doctrine as a defense to his own non-performance." *Id.* The Court also permitted various iterations of a claim that Howard breached the terms of its implied covenant of good faith and fair dealing to go forward: that Howard "supported and failed to correct a racially hostile environment"; that it "adjusted its grading and ranking systems specifically to target him"; and "that its agents executed a smear campaign against him." *Id.* at *12.

Oddly, Newman seeks to eliminate most of these viable claims. SAC at 95. Now, for his breach of contract claim, he simply argues that Olivares formed a contract with Newman when

she told him that he would not be ranked at the end of his 1L year if he withdrew from his legal research course.  SAC ¶ 311.  He contends that, by ranking him anyway, Defendants breached this contract.  SAC ¶ 312.

But as the Court already explained, this claim is futile.  *See supra* Section III.B.  Olivares did not form a contract with Newman when she erroneously assured him that he would not be ranked at the end of his 1L year.  There was no give-and-take between them when they had this discussion—indeed, Olivares received nothing from Newman at all.  Because the conversation did "not contemplate *an exchange*, it does not qualify as a contract.  Merely listing simultaneous obligations is not enough.  Each party's obligation must be the inducement for the other party's obligation."  *Newman I*, 715 F. Supp. 3d at 104.  Thus the Court will not permit amendment to the existing breach of contract claim.[6]

Newman also reworks his allegations that Defendants breached their implied covenant of good faith and fair dealing.  SAC ¶¶ 303–64.  First, he supplements his live claim that the covenant was breached by the creation and fostering of a racially hostile environment.  SAC ¶¶ 345–50.  This allegation is also edited to include three new defendants: Olivares, McGahee, and Thomas.  The Court will allow the reformulated facts to supplement Newman's live breach of good faith and fair dealing claim, as written in his FAC.  But the Court will not allow the new Defendants to be added.  To start, there are no allegations against Olivares for this claim, so bringing it against her would be futile.  As for McGahee and Thomas, these new allegations are untimely.  In the District, a three-year statute of limitations applies to breaches of the implied covenant of good faith and fair dealing.  *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308,

---

[6] Defendants argue that the breach of contract claims from the FAC may be dismissed in full because Newman has abandoned them.  Opp'n at 39.  The Court declines to take that step here.  This case is confusing enough.  The Court intends to retain the entire FAC.  If Newman wants to voluntarily dismiss his existing breach of contract claims, he can file a stipulation of dismissal.  Otherwise, the Court proceeds on the FAC as written.

321 (D.C. 2008) (citing D.C. Code § 12–301(7)).  The time begins to tick when the contract is breached.  *Id.*

As to McGahee and Thomas, Newman claims that "[b]eginning in the fall of 2020," McGahee "affirmed baseless student complaints that Plaintiff had made 'racially offensive' and 'culturally insensitive' remarks."  SAC ¶ 345.  More, "McGahee's initial instruction for Plaintiff to address his peers through the School listserv only intensified hostilities."  SAC ¶ 345; *see also* SAC ¶ 20 (noting this conversation occurred in the fall of 2020).  These actions were only "compounded by Holley's and Thomas's encouragement to remove Plaintiff from GroupMe platforms."  SAC ¶ 345; *see also* SAC ¶ 169 (noting this happened on January 14, 2021).  Because none of the challenged conduct happened after October 18, 2021,[7] the claims that McGahee and Thomas breached the implied covenant of good faith and fair dealing by fomenting a racially hostile environment are time-barred.

Newman offers another theory as to why Defendants breached the implied covenant of good faith and fair dealing:  by "failing to honor Dean Olivares's October 2020 commitment, in which she informed Plaintiff that if he dropped his [legal research] course he would not be ranked until his 2L year."  SAC ¶ 351.  In acting contrary to this representation, Newman claims "Defendants deprived Plaintiff of the fair opportunity to improve his academic standing, knowing that this ranking would directly impact the renewal of his scholarship."  SAC ¶ 352. This will not be added to the FAC.  For one, it stems from information Newman has long possessed, and he may not invoke it now to repackage a claim Defendants have already prepared to adjudicate.  To permit him to do so would unduly prejudice them.  At any rate, the claim is futile.  As against Olivares, it is untimely; it stems from a comment she made in October 2020.

---

[7] Newman filed the present motion on October 18, 2024.

SAC ¶ 351.  As against all Defendants, it is futile.  Newman "has not alleged a set of facts under which" a decision to rank him at the end of his 1L year "would injure or destroy [his rights]" under his *scholarship agreement*, the only viable contract here.  *Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 96 (D.D.C. 2004).  Again, Olivares neither modified the scholarship agreement nor formed a new contract with Newman.  The scholarship agreement itself provided that Newman would be ranked after two semesters.  *Newman II*, 2024 WL 4227723, at *11.  Defendants' "compliance with the terms of its contract cannot breach the same contract."  *Id.*

And finally, Newman asserts that Defendants breached the implied covenant of good faith and fair dealing by "knowingly creat[ing] and reinforc[ing] the impression that the University's manuals, particularly the Code of Conduct, were binding and governed both student behavior and the University's obligations to students."  SAC ¶ 355.  But he claims this impression was misguided, insisting that "[w]hile the University relied heavily on the Code to justify actions against Plaintiff, this reliance was selective and inconsistent with broader application."  SAC ¶ 363.  According to Newman, Defendants "used the Code as a pretext to justify disciplinary actions against Plaintiff, further reinforcing the claim that the Defendants violated the implied covenant of good faith and fair dealing."  SAC ¶ 364.

These allegations cannot support Newman's contract claim.  Good faith performance "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate standards of decency, fairness or reasonableness." *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (quoting *Restatement (Second) Of*

*Contracts* § 205 cmt. a (1981)). And fair dealing "involves reasonable rather than arbitrary or capricious action." *Id.*

Newman cannot plausibly say that Defendants failed to carry out his scholarship agreement with good faith and fair dealing by invoking the Student Code of Conduct to penalize his behavior. Newman knew that the Code of Conduct applied to him. SAC ¶ 80 (fall 2020 conversation where Holley "stated that when a student violates a rule she first warns the individual, then on subsequent occasions responds as outlined in the Student Code of Conduct."); SAC ¶ 357 ("On January 26, 2021, Dean McGahee sent an email to all law students, informing them that the Code of Conduct applied to all Howard Law students."); SAC ¶ 358 (Dean Holley "reassured Plaintiff that he could lodge a formal complaint if he believed a violation of the [Code of Conduct] had occurred."). Howard did not engage in "subterfuges and evasions" by then using the Code of Conduct in his disciplinary hearings. *Allworth.*, 890 A.2d at 202. Nor does he identify another student who engaged in similar repeated violations of the Code who was not subject to the Code's disciplinary processes. Thus Newman's claim here is fruitless.

### E.

Turn to Newman's final revision. He seeks to re-allege a new version of his previously dismissed equitable estoppel claim. *Newman I*, 715 F. Supp. 3d at 105. He claims that Defendants "induced Plaintiff to reasonably rely on the promise that his class ranking would be postponed until he completed the requisite credits during his 2L year." SAC ¶ 298. He insists that "[a]s a direct result of this reliance, Plaintiff was improperly ranked at the end of his 1L year, causing him to lose his scholarship." SAC ¶ 300. But equitable estoppel requires an allegation that "the promise relied on the promise to his or her detriment." *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 193 (D.D.C. 2016). Newman does not plausibly claim

as much here.  He does not posit that had he remained in the research class, his GPA would have been high enough for him at the end of his 1L year for him to retain his scholarship.  So he has not plausibly alleged that reliance on Olivares's statement was to his detriment.

Newman further contends that "Defendants should be equitably estopped from denying the binding nature of the Code of Conduct."  SAC ¶ 301.  According to Newman, "Defendants created a reasonable belief that the Code governed not only student behavior but also the University's obligations toward its students."  SAC ¶ 301.  But beyond conclusory assertions, Newman does not identify how his understanding that he and the University were mutually bound by the Code fomented detrimental reliance.  He does not specify any actions he took relying on that understanding.  Nor does he explain how those actions harmed him.  He has failed to state a plausible claim for equitable estoppel.

## IV.

For all these reasons, it is **ORDERED** that Plaintiff's [81] Motion for Leave to File the Second Amended Complaint is **DENIED**; and it is further

**ORDERED** that Plaintiff's [86] Motion for Leave to File a Supplemental Memorandum is **DENIED**; and it is further

**ORDERED** that Plaintiff's [88] Mot. File Video Files and Transcripts is **DENIED.**

**SO ORDERED.**


Dated: May 15, 2025                                    _____
                                                                    TREVOR N. McFADDEN, U.S.D.J.