**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| MICHAEL NEWMAN,<br><br>        Plaintiff,<br><br>        v.<br><br>HOWARD UNIVERSITY SCHOOL OF<br>LAW, *et al.*,<br><br>        Defendants. |

Case No. 1:23-cv-00436 (TNM)

**MEMORANDUM ORDER**

Three years after he enrolled at Howard University School of Law, Michael Newman found himself in court—though not as a budding lawyer.  Howard expelled Newman before his final year.  Before that, Newman lost his scholarship, drew backlash from his peers, and feuded with administrators.

Newman now proceeds pro se in this case against his alma mater and several of its administrators (collectively, "Howard").  His claims have dwindled during the years this case has progressed.  As things stand, Newman presses several contract breach claims (related to his lost scholarship), claims for racial interference with a contract under 42 U.S.C. § 1981 (again, related to his scholarship), and a handful of defamation claims.  Howard now seeks summary judgment. The Court grants that motion as to all but two of Newman's defamation claims.

**I.**

Readers interested in the convoluted history of this case should consult prior decisions.[1]

---

[1]  The whopping 162 docket entries in this case attest to its demands.  Those entries include three proposed complaints, two motions to dismiss, and a litany of miscellaneous requests.  To process those motions, the Court held five hearings and issued 138 pages of written orders.

*See Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86 (D.D.C. 2024) ("*Newman I*");

*Newman v. Howard Univ. Sch. of Law*, No. 1:23-CV-0436 (TNM), 2024 WL 4227723 (D.D.C.

Sept. 18, 2024) ("*Newman II*"); *Newman v. Howard Univ. Sch. of Law*, No. 1:23-CV-00436

(TNM), 2025 WL 1411093 (D.D.C. May 15, 2025) ("*Newman III*").  But this is the first time the

Court writes with the fruits of discovery before it.  So the Court begins with the facts, before

turning to an abbreviated history.

**A.**

Michael Newman is a former Howard University School of Law student.  *See* Pl.'s Resp.

to Defs.' Stmt. Mat. Facts ("Pl.'s Resp. DSMF") ¶ 3, ECF No. 135-10.  Howard is an HBCU, or

historically black college or university.[2]  *See id.* ¶ 1.  Newman, who is white, chose Howard in

part because of his "dedication to justice and racial understanding."  Defs.' Resp. to Pl.'s Stmt.

Mat. Facts ("Defs.' Resp. PSMF") ¶ 2, ECF No. 158-1.  Howard also attracted him with an

academic scholarship.  *Id.* ¶ 6.  Newman earned $26,000 towards his first year's tuition.  *Id.*; *see*

Pl.'s Ex. 76 ("Scholarship Agreement"), ECF No. 140-6.  The scholarship would renew for

Newman's second year if his "first-year class rank [was] within the top fifty percent (50.00%) of

the class."  Scholarship Agreement at 3.  If Newman's first-year rank dipped below that

threshold, he would lose the scholarship (absent a few exceptions not relevant here).  *Id.*  With

this tuition coverage, Newman enrolled at Howard Law in 2020.

Class began online because of COVID, so Newman stayed at his Hawaii home.  Pl.'s

Resp. DSMF ¶ 15.  He tried to virtually connect with his peers.  On the class Facebook page, he

shared his "strong desire to make lasting friendships at Howard" and noted that he "prefer[s]

---

[2]  Throughout this Order, the Court's references to "Howard" include Howard University, Howard University School of Law, and the school officials Newman sues.  When the distinction between Defendants is relevant, the Court specifies.

engaging people through political debate" and "philosophical discussion."  Pl.'s Ex. 82 at 2, ECF No. 141-2.  Regular current event updates from Newman followed.  *See, e.g.*, *id.* at 3–13.

Other students engaged at first, but things took a turn in October 2020.  That month, an activist delivered a speech about environmental justice.  *See* Defs.' Resp. PSMF ¶ 106.  Newman disagreed with what he heard and decided to share his thoughts with some classmates.  He took to GroupMe, writing, "Where I part with the black community is where they believe government solves problems, I only see it causing problems."  Pl.'s Ex. 8 at 3, ECF No. 135-7.[3]  Recipients were offended and told Newman as much.  *See* Pl.'s Resp. DSMF ¶ 63; Defs.' Ex. 28 at 2, ECF No. 116-27 (Newman's email to a professor reflecting on the situation).  Peers pressured Newman to retract his statements and he came to feel that he was no longer "one of the group."  Defs.' Ex. 28 at 2.

On top of these social problems, Newman had trouble adjusting to law school classes.  Above all, he "struggl[ed] excessively" with Legal Research, Reasoning & Writing.  Defs.' Ex. 20 at 3, ECF No. 116-20 (Newman's October 1, 2020, email to a professor).  Newman disliked the professor teaching his class.  *See id.* at 2; Pl.'s Ex. 114 at 3, ECF No. 144-3.  He also lost track of assignments.  *See* Pl.'s Resp. DSMF ¶ 41; Defs.' Ex. 19 at 3, ECF No. 116-19 (Newman's September 25, 2020, email to the research librarian about missing assignments); Defs.' Ex. 20 at 2 (Newman's October 1, 2020, email reporting that he "missed a second deadline in LRRW").  In the end, after administrators rebuffed his request to transfer professors, Newman dropped the class.  Pl.'s Resp. DSMF ¶¶ 45–47; *see* Defs.' Ex. 22 at 3, ECF No. 116-22

---

[3]  The parties disagree about the makeup of this GroupMe.  Howard says it included the full Howard Law Class of 2023.  *See* Pl.'s Resp. DSMF ¶ 62.  Newman maintains that he addressed a smaller group—his "section" in law school speak.  *See* Pl.'s Ex. 8 at 3, ECF No. 135-7 (showing a screenshot of the message at issue in a group called "HUSL Section 2").  The dispute is immaterial, but the Court assumes Newman is right for now.

(email from Associate Dean Mariela Olivares to Newman).

Abandoning legal writing did not solve all Newman's problems. In November, he told a professor that he had been "castigated, condemned, forcibly silenced, and effectively ostracized." Defs.' Ex. 32 at 4, ECF No. 116-31. He described this treatment as "racial discrimination." *Id.* And he asked the professor to understand that these circumstances made him reluctant to speak in class. *Id.* Concerned about Newman's charge, the professor referred Newman to University resources. *Id.* at 3. Newman ultimately connected with a representative of the University's Equal Employment Opportunity ("EEO") office. Pl.'s Resp. DSMF ¶ 68; *see* Defs.' Ex. 33 at 2, ECF No. 116-32. Though Newman spoke with her twice, he declined to file a formal discrimination complaint against any classmate. Pl.'s Resp. DSMF ¶ 69. He also decided against filing a grievance under the Student Code of Conduct. *See* Defs.' Ex. 11 at 2, ECF No. 116-11. At this point, the semester was nearly over. Newman finished with poor grades—two Ds and a C. Pl.'s Resp. DSMF ¶¶ 25, 52; *see* Defs.' Ex. 2 ("Newman Transcript") at 2, ECF No. 117-1.

During winter break, Newman resolved to explain himself to his peers. *See* Defs.' Ex. 34 at 2, ECF No. 116-33 (EEO Coordinator's December 2020 email noting Newman's intention). In early January, Newman sent a letter in three parts (later joined by a fourth) through GroupMe. *See* Pl.'s Resp. DSMF ¶ 72; Defs.' Exs. 37–39, ECF Nos. 116-36–116-38. Among other things, those mass letters defended his October statements and offered some thoughts on racial identity. *See generally* Defs.' Exs. 37–39. They did not go over well. Several students complained. *See, e.g.*, Defs.' Ex. 40 at 2, ECF No. 116-39. Others kicked Newman out of the class GroupMe. *See* Defs.' Ex. 41 at 2, ECF No. 116-40. For his part, Newman asked administrators to "facilitate open dialogue" with professionals. Pl.'s Resp. DSMF ¶ 69 (quoting Pl.'s Ex. 124, ECF No. 145-

4).  That never happened.

Things reached a boiling point in late January 2021.  Dissatisfied with the Law School's response, Newman complained about his peers' treatment to Howard University President Wayne Frederick.  Defs.' Ex. 41 at 2.  Frederick forwarded Newman's email to the Dean of Howard Law, Danielle Holley, who arranged a meeting with Newman.  Pl.'s Resp. DSMF ¶ 78.  On the same day, Newman emailed a link to the documentary, *Uncle Tom*, to the Class of 2023.  *Id.* ¶ 79; *see* Defs.' Ex. 43 at 2, ECF No. 116-42.  Newman wrote that his classmates could benefit from hearing the "alternative perspectives" the film provided with its focus on conservative black Americans.  Defs.' Ex. 43 at 2; Pl.'s Resp. DSMF ¶ 80.  Later that night, Newman took to the listserv to send the fourth and final part of his letter series, titled "Perpetuating Racial Aggression."  *See* Pl.'s Resp. DSMF ¶ 84; Defs.' Exs. 45 & 46, ECF Nos. 116-44 & 116-45.  Soon after, a law school administrator's email reminded all students that class listservs were "restricted to official approved law school business and organizational use."  Pl.'s Resp. DSMF ¶ 85; Defs.' Ex. 47, ECF No. 116-46.  Holley also emailed Newman personally twice that night to ask him to stop using school mailing lists.  *See* Pl.'s Resp. DSMF ¶¶ 86, 87; Defs.' Exs. No. 42 & 48, ECF Nos. 116-41, 116-47.

Fallout continued for the rest of the month.  Newman met with Dean Holley and Dean of Admissions and Student Affairs Reginald McGahee on January 28.  *See* Pl.'s Ex. 81, ECF No. 141-1 (Newman's self-prepared transcript of the Zoom meeting).  During the meeting, Holley suggested that Newman transfer to another school.  *Id.* at 8.  Three days later, Holley led a virtual town hall that focused on Newman.  *See* Pl.'s Resp. DSMF ¶ 90.  Holley framed the meeting as a discussion about "what's been happening in our community . . . in the first year class."  Pl.'s Ex.

46 ("Town Hall Tr.") at 2, ECF No. 137-6.[4]  Student speakers understood the focus.  Many took direct aim at Newman.  *Id.* at 25–30.  They demanded, for example, that Newman formally apologize for his actions.  *Id.* at 31.  With those grievances aired, Holley gave Newman a few minutes to share his side.  *Id.* at 30, 32–33.

Newman's social standing never improved, but his grades did.  He sought help from professors and put his classmates' hostility aside.  Pl.'s Resp. DSMF ¶¶ 96, 98.  His spring semester grades reflected that effort.  Newman Transcript at 2.  That performance, though, was not enough.  At the end of the year, Newman found himself ranked in the bottom half of his class by GPA.  *See* Pl.'s Resp. DSMF ¶ 101.  And so he lost his scholarship.  *Id.* ¶ 102.

Still, Newman returned for his second year.  After an uneventful fall, he found himself in conflict again with Holley.  Tensions reignited early in the spring when Newman requested a meeting with Holley after he learned that another Howard Law student died suddenly.  *Id.* ¶¶ 104–05.  At that meeting, Newman asked Holley about the student's cause of death.  *Id.* ¶ 105; *see generally* Pl.'s Ex. 39, ECF No. 136-19 (Newman's self-prepared transcript of the meeting).  Holley found the request "highly inappropriate" and refused to answer.  Pl.'s Ex. 39 at 2.

Newman found the answer on his own.  An article reported that the student died from a pulmonary embolism.  *See* Defs.' Ex. 1 ("Newman Dep.") at 243:3–13, ECF No. 116-4.  He also came across research suggesting that COVID vaccines could increase the risk of that condition.  *Id.* at 243:14–244:6.  Newman shared all of this research with more than 200 classmates in an

---

[4]  Newman produced several secretly recorded Zoom conversations with Howard personnel. Howard had some recordings transcribed and certified, and Newman offered his own transcriptions of others.  Howard Mot. for Summ. J. ("Howard Mot.") at 20 n.5, ECF No. 116. The Court follows the parties' lead and relies on this evidence for now.

email in late January 2022.  Pl.'s Resp. DSMF ¶ 107; Defs.' Ex. 60 at 2, ECF No. 116-59; *see* Defs.' Ex. 61 at 2, ECF No. 116-60 (estimating the number of recipients).  His email also encouraged the University to delay its COVID booster shot deadline to afford "students more time for inquiry into the potential risks of the Covid vaccine."  Defs.' Ex. 60 at 2.  Several students upset by the email forwarded it to Holley.  Pl.'s Resp. DSMF ¶ 112; Defs.' Ex. 62 ("Holley Compl.") at 13–17, ECF No. 116-61.  Hours later, Holley told Newman she planned to "bring student conduct charges" because of his "continue[d] violat[ions of] the University's email policy."  Defs.' Ex. 63 at 2, ECF No. 116-62.

Dean Holley followed through.  Her complaint accused Newman of two Student Code of Conduct violations: "unauthorized and abusive use of the University's email system" and "continual harassment of member [sic] of the Howard Law community, and disturbance of the learning environment."  Holley Compl. at 2.  She attached emails from students complaining about Newman's mass emails and GroupMe messages.  *Id.* at 4–17.

University officials reviewed the complaint and set a hearing.  Pl.'s Resp. DSMF ¶¶ 126, 128.  At the initial hearing in April 2022, Newman was barred from questioning the only witness against him—Dean Holley.  *Id.* ¶ 129.  He successfully appealed the resulting decision.  *See id.* ¶ 133.  The University ruled that he had a right to cross-examine witnesses.  Defs.' Ex. 73 at 2, ECF No. 116-72; Pl.'s Resp. DSMF ¶ 134.  On remand, the same panel reconvened in July 2022 and allowed Newman to question the Dean.  Pl.'s Resp. DSMF ¶ 135; *see* Defs.' Ex. 52, ECF No. 116-51.

In the end, the panel again found Newman responsible for "harassment" and "disruptive conduct" and recommended expulsion.  *See* Defs.' Ex. 69 at 6, ECF No. 116-68.  This time the University agreed.  Pl.'s Resp. DSMF ¶ 165.  And so, Newman's time at Howard ended.  Defs.'

Ex. 74 at 2–3, ECF No. 116-73 (letter to Newman reporting the decision).

**B.**

A few months after his expulsion, Newman filed this lawsuit alleging a bevy of race discrimination claims and a few tort claims. *See* Compl., ECF No. 1-2 at 5–54. Howard removed the case to this Court. *See* Notice of Removal, ECF No. 1. In February 2024, the Court dismissed most of Newman's claims. *See Newman I*, 715 F. Supp. 3d at 116. It then allowed Newman to amend some of his claims. *Newman II*, 2024 WL 4227723, at *14. Another motion to amend followed, which the Court found mostly futile. *Newman III*, 2025 WL 1411093, at *1.

Taken together, these decisions left Newman with three sets of claims. First, a group of contract claims related to his scholarship agreement. *See Newman II*, 2024 WL 4227723, at *12 (citing First Am. Compl. ¶¶ 304, 307, 308, ECF No. 50-1). Second, claims under 42 U.S.C. § 1981 for race-based interference with his scholarship agreement. *See id.* at *9; First Am. Compl. ¶¶ 228–44. Third, three claims for defamation against Dean Holley based on her statements during the 2022 disciplinary hearing. *See Newman II*, 2024 WL 4227723, at *14; First Am. Compl. ¶¶ 317–19. With those claims in play, the parties moved into discovery.

Now, Howard seeks summary judgment. Howard Mot. for Summ. J. ("Howard Mot."), ECF No. 116. Newman opposes but offers little in the way of record cites or legal authority. *See* Newman Resp. ("Opp'n"), ECF No. 135. His response to Howard's statement of material facts is likewise scant on record cites. *See generally* Pl.'s Resp. DSMF, ECF No. 135-10. Newman also submitted his own statement of facts, and that document follows the pattern. *See* Pl.'s Stmt. Facts, ECF No. 147-2. These submissions violate the Local Rules and this Court's Standing Order. *See* LCvR 7(h); Standing Order ¶ 13(B), ECF No. 5. Newman should know from the Court's past warnings that his pro se status does not exempt him from the rules. *See, e.g.*,

*Newman II*, 2024 WL 4227723, at *6; Oct. 14, 2025, Minute Order.  So the Court disregards

Newman's unsupported factual assertions.  *See* Fed. R. Civ. P. 56(e); LCvR 7(h).  With that, the

Court continues to the ripe summary judgment motion.[5]

## II.

Summary judgment is appropriate if Howard shows that "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A factual dispute is material if it could alter the outcome of the suit under the governing

substantive law, and genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Howard

bears the burden of "identifying those portions of the [record] which it believes demonstrate the

absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(cleaned up).  If it does so, the burden shifts to Newman to point to "specific facts showing that

there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (cleaned up).  His evidence "is to

be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But he cannot

"rest upon mere allegation or denials of his pleading."  *Id.* at 248 (cleaned up).

Because Newman sues *pro se*, the Court liberally construes his filings and considers them

all together.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  That leeway, though, does not

extend to the *evidence* required at summary judgment.  *Penkoski v. Bowser*, 548 F. Supp. 3d 12,

---

[5] One other motion requires attention.  Newman seeks leave to file "corrections" to his statement of material facts and a sur-reply.  Mot. for Leave, ECF No. 161-1.  The Court denies Newman's request for leave to file a sur-reply.  He has had ample opportunity to make his case and does not raise truly new issues.  *See Crummey v. Social Sec. Admin.*, 794 F. Supp. 2d 46, 62 (D.D.C. 2011).  As for his "corrections," the Court permits those that correct typographical errors and add missing citations.  *See* Mot. for Leave at 5–12 (¶¶ 44, 47, 54, 63, 104, 107, 110, 167, 175, 178, 181, 219, 220, 226).  The Court accounted for those changes when resolving the summary judgment motion.  It denies the rest of the "corrections"—those that offer new or rewritten factual statements.

20 (D.D.C. 2021). "[C]ourts hold *pro se* plaintiffs to the same evidentiary burdens and presumptions as represented plaintiffs." *Id.* And, of course, Newman must also comply with the Federal Rules of Civil Procedure. *See Oviedo v. WMATA*, 948 F.3d 386, 397 (D.C. Cir. 2020).

### III.

At the outset, the Court has jurisdiction over all of Newman's claims. Jurisdiction over his federal-law claims exists under 28 U.S.C. § 1331. And the Court has supplemental jurisdiction over his state-law claims. *See* 28 U.S.C. § 1367. The Court takes the merits of each set of claims in turn, concluding that Howard is entitled to summary judgment on all but two defamation claims.

### A.

Start with the contract claims. A summary of the limits to these claims recognized in prior orders sets the table. First, the contract claims run against Howard University and Howard Law School. Order on Mot. to Clarify at 1–2, ECF No. 48. Second, Newman's scholarship agreement is the only relevant contract. *Newman I*, 715 F. Supp. 3d at 103–04. "Howard promised to pay Newman $26,000 per year in exchange for his meeting certain eligibility criteria." *Id.* at 104; *see* Scholarship Agreement at 2–3. The relevant requirement here, of course, is that Newman needed to rank "within the top fifty percent" of his class for the scholarship to renew. Scholarship Agreement at 3. Newman did not achieve that rank. *See, e.g.*, Defs.' Ex. 59 at 2, ECF No. 116-58 (email reporting Newman's class rank as "86/148").

This brings up the third limit. Because Newman's own failure to meet the eligibility benchmark would typically excuse Howard's failure to pay up, Newman's viable claims are rooted in his theory that Howard prevented him from upholding his end of the bargain. *See, e.g.*, *Newman I*, 715 F. Supp. 3d at 104–05; *Newman II*, 2024 WL 4227723, at *11 (citing First Am.

Compl. ¶ 279). He can pursue that theory in two ways. The first avenue is a contract defense known as the "prevention doctrine." *See In re Estate of Drake*, 4 A.3d 450, 454 (D.C. 2010) (noting that if a promisee's failure to perform is "fairly attributable to the promisor's own conduct" then the promisor must still uphold his end of the deal). The second avenue is to challenge Howard's actions as a violation of the implied duty of good faith and fair dealing. *See Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000) (explaining that a party breaches the duty of good faith and fair dealing by "evad[ing] the spirit of the contract, willfully render[ing] imperfect performance or "interfer[ing] with the performance by the other party"). Newman invokes both avenues, though the analyses merge.

Within these limits, Newman brings three claims against Howard for interfering with his ability to fulfill the scholarship agreement. He claims that (1) it "adjusted its 'grading and ranking systems' specifically to target him," *Newman II*, 2024 WL 4227723, at *12 (quoting First Am. Compl. ¶ 307); (2) "its agents executed a smear campaign against him," *id.* (quoting First Am. Compl. ¶ 308); and (3) it "supported and failed to correct a racially hostile environment," *id.* (quoting First Am. Compl. ¶ 304). Howard wins summary judgment on each.

**i.**

First up is Newman's theory that Howard manipulated its ranking systems to his disadvantage. *See* First Am. Compl. ¶ 279 (prevention doctrine theory); *id.* ¶ 307 (breach of implied duty of good faith and fair dealing). The evidence does not bear this out.

Instead, it shows that Newman failed to rank in the top half of his class because he struggled academically. Newman's problems began when he matriculated at Howard Law. He had trouble keeping track of deadlines. *See* Pl.'s Resp. DSMF ¶ 41; Defs.' Ex. 19 at 3; Defs.' Ex. 20 at 2. His mind wandered during virtual lectures. Defs.' Ex. 27 at 10:3–11:1, ECF No.

11

116-26.  These troubles were reflected in his first semester grades—a pair of Ds and a C. Newman Transcript at 2.  That performance, Newman concedes, put him in the bottom five of his section.  Pl.'s Resp. DSMF ¶ 35.  Newman found his footing in the spring.  *See* Newman Transcript at 2.  But even so, that left him with an 82.08 average for his first year.  Pl.'s Resp. DSMF ¶ 19.  That GPA placed him in the bottom half of the class.  Defs.' Ex. 59 at 2; *see* Defs.' Ex. 14 at 63:1–64:9, ECF No. 116-14 (Director of Student Records's description of how grades are translated into class ranks).

In response, Newman offers three arguments that fall short.  *First*, he argues that administrators thwarted him by walking back their promise that he would not be ranked if he dropped legal writing.  *See, e.g.*, Pl.'s Resp. DSMF ¶¶ 6, 33; Opp'n at 5.  The Court twice rejected Newman's reliance on this episode.  *See Newman II*, 2024 WL 4227723, at *11; *Newman III*, 2025 WL 1411093, at *11.  It does not carry the day here either.  To start, administrators repeatedly discouraged Newman from dropping his writing class—and discussed tips for success in class with him.  *See, e.g.*, Pl.'s Ex. 13 at 17–21, ECF No. 135-12; Pl.'s Ex. 3 ("Olivares Email") at 3, ECF No. 135-2.

Newman nevertheless decided to withdraw from the class, and he now tries to hold his own decision against Howard by misconstruing administrators' statements as a promise that he would retain his scholarship.  Associate Dean for Academic Affairs Mariela Olivares told Newman in an email that he "would not be ranked" with his class "at the end of Spring 2021" if he dropped his legal writing class.  Olivares Email at 3.  When Newman approached Dean McGahee about the matter, he deferred to Olivares.  Pl.'s Ex. 13 at 2.  Newman says he took the administrators' messages to mean that his scholarship would be safe until 2L.  *See* Pl.'s Resp. DSMF ¶ 34.  But Oliveras did not promise him that he would keep his scholarship—only that he

would not be ranked.  Olivares Email at 3.  She was wrong about that.  *See* Pl.'s Ex. 5 at 2, ECF

No. 135-4 (Olivares's admission at her deposition that she made a "mistake").  But even if she

had been right, Newman's scholarship would have been on the chopping block.  Recall that

Newman had to rank "in the top fifty percent" at the end of his first year for the scholarship to

renew.  Scholarship Agreement at 3.  An unranked student does not rank "in the top fifty

percent."  *Id.*

More, the evidence calls into question whether Newman really understood Oliveras's

answer as a promise that his scholarship would be safe because he would not be ranked.  His

summary response to Oliveras's email said, "my scholarship will be unaffected by withdrawal

from LRRW."  Olivares Email at 2.  But he equated that concern with his fear that dropping the

class would put him below the scholarship's credit requirements.  *Id.*  Further, after his exchange

with Olivares, Newman told a professor, "I stand to lose my scholarship and possibly be

dismissed from law school if I don't bring up my GPA in the spring."  Defs.' Ex. 58 at 2, ECF

No. 116-57; *see also* Pl.'s Ex. 96 at 14, ECF No. 142-6 ("I got very poor grades in the fall

semester.  I don't think there's a chance of me keeping my scholarship.").  Newman's concern

about his grades during the second half of his first year shows that he feared he could lose the

scholarship because of its ranking requirement.

*Second*, Newman argues that Howard's records reporting his rank in different ways imply

mischief.  Opp'n at 5; *compare* Pl.'s Ex. 36 at 18–21, ECF No. 136-16 (ranking sheet showing

152 students) *with* Defs.' Ex. 59 at 2 (email reporting Newman's rank out of 146 students).  To

be clear, Newman never argues that he actually ranked in the top half of his class.  Instead, he

says that the conflicting records suggest Howard manipulated grades "to make [his] rank appear

deeper into the lower half that it was."  Pl.'s Resp. DSMF ¶ 101.  Newman's exact ranking

*within* the bottom half, though, is irrelevant to whether Howard breached the agreement or its implied duty of good faith and fair dealing. No matter Newman's exact rank, he was not in the top half. *See* Scholarship Agreement at 3. On that central point, there is no doubt.

In any event, Newman's interpretation of the evidence has other problems. He paints Howard's records as "incoherent and unreliable" because they report different numbers of students in his class. Pl.'s Resp. DSMF ¶ 101. But the reports come from two different points. Some are from January 2021 (showing rankings after one semester), *e.g.*, Pl.'s Ex. 36 at 11–14, while others are from June 2021 (showing rankings after two semesters), *e.g.*, *id.* at 18–20. The student total apparently changed as students dropped out. *See id.* at 2–3 (administrators' conversation about removing a student who withdrew). Newman maintains that even the June 2021 ranking sheet differs from the rank he received over email for the same period because the former showed 152 students, while the email put his rank at 82 out of 146. Pl.'s Resp. DSMF ¶ 101. But, again, neither of those documents shows Newman in the top half.

*Third*, Newman speculates that professors and administrators depressed his grades because they disliked him. *See, e.g.*, Opp'n at 5. He points out that administrators asked for his grades in early 2021, around when students complained about his listserv missives. Pl.'s Resp. DSMF ¶ 32. And he says his rank "fulfilled" Dean Holley's suggestion that he "find a law school that is maybe a better fit." PSMF ¶ 183 (quoting Pl.'s Ex. 81 at 9). But no evidence shows that administrators—including Holley—tried to change or otherwise interfere with his grades. Instead, Newman rests on "bald conjecture" about the administrators' motives for making requests within their official purview. *See Newman III*, 2025 WL 1411093, at *8 (rejecting a proposed amended claim that traded on similar speculation).

As for his professors, Newman suspects some of wrongdoing but offers little in the way

14

of evidence.  *See* Newman Dep. at 130:5–131:1 (admitting that he has no evidence that some professors did anything wrong).  In fact, Newman opted not to depose the professors he thinks disliked him.  *See* Reply at 9 n.2, ECF No. 158.  The only evidence Newman has comes from his Property grade, and it does not show what he says.  Pointing to Professor Carlton Waterhouse's scoresheet, he argues that the professor "quietly assigned [him] a '0' for peer review" after he "raised concerns about peer bias."  Opp'n at 5.  In fact, Waterhouse removed the peer review score *at Newman's request*.

In March 2021, Newman wrote to Dean Olivares with concerns about the Property grading system.  Pl.'s Ex. 22 at 2, ECF No. 136-2.  The peer rating component, he feared, invited his classmates to give him low scores because he was unpopular.  *Id.*  So he asked "that this component of the score be removed or [his] individual score bolstered artificially to whatever degree reasonable based on a more objective assessment of [his] contribution."  *Id.*  Newman got what he wanted.  *See* Pl.'s Ex. 21 at 5, ECF No. 136-1.  The "Peer Eval" component on Waterhouse's scoresheet is blacked out for Newman.  *Id. see* Pl.'s Ex. 20 at 3, ECF No. 135-19 (message from the Property teaching assistant to Newman telling him, "Professor Waterhouse instructed me not to include peer evaluations in your grade due to potential bias").  And Newman apparently got a boost to compensate for the excised figure.  Pl.'s Ex. 21 at 5 (showing that Newman's raw score—without a peer evaluation grade—was a "13" and that he received a "B" while another student with a "13.5" raw score received a "D").

Otherwise, Newman falls back on his theory that because professors could have broken anonymization they might have "depressed his overall grade."  Opp'n at 5.  Construing his filings generously, Newman at most shows that some professors incorporated subjective points into grades.  *See* Pl.'s Resp. DSMF ¶ 23.  But he does not show that this grading practice led to

artificially deflated grades for him.  For example, though Newman claims that he received the "lowest participation score" in his Property class, the grade sheets show that he received the median grade—a 4 out of 5.  Pl.'s Ex. 21 at 5.  Without evidence to support his claims, Newman's argument boils down to speculation.  And speculation cannot defeat summary judgment.  *Morris v. McCarthy*, 825 F.3d 658, 674 (D.C. Cir. 2016).

### ii.

The next contract claim fails for similar reasons.  This claim theorizes that Howard administrators launched a "smear campaign" against Newman, causing "his professors and their TA's [sic]" to award "him reduced scores in his classes."  First Am. Compl. ¶ 308; *see* Opp'n at 15.  But, as discussed, the record shows that Newman lost his scholarship because of his poor academic performance and includes no evidence that Newman's professors interfered with his grades in the way he alleges.  *See supra* Part III.A.i.  So Newman cannot show that any "smear campaign" had "the effect of destroying or injuring" his right "to receive the fruits of" the scholarship agreement.  *Paul*, 754 A.2d at 310.

Newman protests that "[t]he record contains multiple instances of administrators soliciting, receiving, and circulating unverified student complaints and compilations targeting [him], copying multiple professors."  Opp'n at 15.  As support, he cites evidence that some professors received criticism about him from other students and that they shared the students' emails with administrators.  Pl.'s Ex. 63 at 5, ECF No. 139-3; Pl.'s Ex. 9, ECF No. 135-8.  Aside from repeating his unsupported allegations of grade manipulation, Newman does not explain how any of this inhibited his ability to perform under the scholarship agreement.  *Accord Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 96 (D.D.C. 2004) (dismissing a breach of good faith and fair dealing claim where plaintiff did not allege injury

rights under the contract at issue).  Newman may disagree with what his classmates had to say about him, but a professor's attention to another student's complaint—unaccompanied by any sort of grade-based retribution against Newman—does not show "willful" interference with Newman's scholarship.  *See Paul*, 754 A.2d at 310.

### iii.

Last up for the contract claims is Howard's failure to correct a racially hostile environment.  *See* First Am. Compl. ¶¶ 70–71.  The theory is that Howard did not appropriately address the animosity Newman's peers showed him, thereby interfering with his ability to get top grades.  *See, e.g.*, Opp'n at 12–14.  But, once again, the evidence does not show that Howard's failure to respond to peer-on-peer hostility had "the effect of destroying or injuring" Newman's right "to receive the fruits of" the scholarship agreement.  *Paul*, 754 A.2d at 310.

*Paul v. Howard University* is instructive.  754 A.2d 297 (D.C. 2000).  There, the court rejected the plaintiff's claim that Howard University's denial of her tenure application violated the duty of good faith and fair dealing.  *Id.* at 310–11.  That claim failed because the plaintiff "had no contractual right to receive tenure automatically" and Howard officials "acted within the standards set forth in the handbooks when considering her tenure applications."  *Id.* at 311.

Similar facts present here.  Though Newman apparently forgets, *see* Opp'n at 17, the scholarship agreement did not promise Newman a "welcoming environment" free of hostility from other students, *Newman II*, 2024 WL 4227723, at *11.  And Howard's response to Newman's concerns about his peers' treatment followed set policies.  Professors and administrators who learned about Newman's social ostracization referred him to grievance procedures.  *See, e.g.*, Defs.' Ex. 32 at 3 (Professor Patricia Worthy's referral email); Defs.' Ex. 11 at 2 (Dean McGahee's email inviting Newman to file a grievance for any violations of the

Student Code of Conduct in the GroupMe).  Newman found those procedures unappealing and declined to pursue them during his first year.  *See* Pl.'s Resp. DSMF ¶ 70.  He thought the school should instead "facilitate open dialogue in an educational setting with a trained professional." Pl.'s Ex. 124 at 2, ECF No. 145-4.  Howard's refusal to arrange his preferred remedy does not amount to bad faith.

That is particularly true considering the help Newman got.  Howard Law officials devoted lots of time to helping Newman succeed socially and academically.  Dean McGahee, for example, had a series of long talks with Newman.  *See, e.g.*, Pl.'s Ex. 34, ECF No. 136-14 (Newman's transcript of his conversation with McGahee in mid-October 2020); Pl.'s Ex. 13, ECF No. 135-12 (Newman's transcript of his conversation with McGahee in early October 2020); *cf.* Pl.'s Ex. 9 at 20 (email from a professor agreeing to speak with Newman about the challenges Newman "faced as a Caucasian student at Howard").  More, when Newman did file a complaint (in January 2022 against Dean Holley) the University hired a law firm to investigate. Pl.'s Resp. DSMF ¶ 115.

To be sure, the record is replete with evidence that Newman's peers mocked and excluded him.  *See, e.g.*, *id.* ¶¶ 76, 77.  And Holley responded questionably to that behavior— including by leading the town hall that devolved into a grievance session about Newman.  *See id.* ¶ 91.  But Newman offers no evidence that links those problems to his ability "to receive the fruits of the" scholarship agreement.  *Paul*, 754 A.2d at 310.  So Howard earns summary judgment on the claims.  *See Cambridge Holdings Grp.*, 357 F. Supp. 2d at 96.

**B.**

Howard next seeks summary judgment on Newman's claim under 42 U.S.C. § 1981. Howard Mot. at 30–38.  A § 1981 claim demands evidence that Newman was deprived of a

protected right, and that intentional race discrimination was a but-for cause of that deprivation. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 339 (2020). Newman invokes his right to contract. *See* 42 U.S.C. § 1981(b) (defining the protected right to "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits privileges, terms, and conditions of the contractual relationship"). He claims that Howard Law, Howard University, and five individual administrators interfered with his scholarship by manipulating his grades and stirring up racial hostility. First Am. Compl. ¶¶ 230–39; *see Newman III*, 2025 WL 1411093, at *9 n.5 (permitting certain factual allegations from Newman's proposed Second Amended Complaint to supplement this § 1981 claim). Unsurprisingly then, Newman's § 1981 claim overlaps with his breach-of-contract claims. And, once again, Howard earns summary judgment.[6]

**i.**

At the outset, Newman's § 1981 claim against the individual Howard officials fails because there is no evidence that they affected his scholarship. Along with Dean Holley, the individual Defendants are four Howard University officials: President Wayne Frederick, Vice President of Student Affairs Cynthia Evers, Associate Vice President of Student Affairs Debra Bright, and Director of Student Conduct and Community Standards Lawan Lanier-Smith. *See* First Am. Compl. at 81 (stating § 1981 claims "against all Defendants").[7] Newman "must

---

[6] Newman also alleges that Howard interfered with his "contract with Howard" by "expelling him for racially discriminatory reasons," thereby depriving him of a J.D. First Am. Compl. ¶ 240. The Court has never addressed this claim because Howard previously waived objection to it. *See Newman II*, 2024 WL 4227723, at *9; *Newman III*, 2024 WL 1411093, at *7. Once again, Howard ignores Newman's § 1981 claim relating to his degree and expulsion. *See* Howard Mot. at 30–38. And, once again, the Court follows suit. It will proceed to trial.

[7] Newman also alleged that Dean McGahee violated § 1981 by interfering with his scholarship, but the Court explained that any such claim would be futile. *See Newman III*, 2025 WL 1411093, at *8. The Court also rejected as futile Newman's proposed § 1981 claims against

demonstrate some affirmative link" to causally connect each individual's actions with his scholarship loss. *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) (cleaned up); *accord Mitchell v. Amtrak*, 407 F. Supp. 2d 213, 227 n.11 (D.D.C. 2005).  The evidence cannot supply that link.

Bright, Evers, and Lanier-Smith are the most removed.  They entered Newman's orbit during his 2022 disciplinary hearing, a year after he lost his scholarship.  *See, e.g.*, Pl.'s Resp. DSMF ¶¶ 131, 133.  Indeed, Newman's criticisms of their actions focus on the expulsion that resulted from the hearing.  Opp'n at 21.  And he points to no evidence that Bright or Evers even knew about knew about his scholarship before he lost it.  *See* Pl.'s Resp. DSMF ¶¶ 169–70.

President Frederick is also an attenuated actor.  Newman offers his January 2021 email to Frederick, faulting Frederick for not referring his racial discrimination complaint to the EEO office.  Opp'n at 21; Pl.'s Resp. DSMF ¶ 169; *see* Pl.'s Ex. 10 at 9, ECF No. 135-9.  But Newman does not explain how Frederick's inaction affected his scholarship.  In fact, Newman had spoken to the EEO office (and decided against filing charges) by the time he emailed Frederick.  *See* Pl.'s Resp. DSMF ¶ 69.  So it is unclear what more Frederick could have done.

The evidence against Dean Holley also comes up short.  Newman theorizes that she interfered with his scholarship by manipulating his grades and stirring up hostility against him. *See* Opp'n at 20.  Again, though, there is no evidence of grade manipulation.  *See supra* Part III.A.i; Reply at 12–13.  And while Holley disliked Newman and sympathized with student complaints about him, *see infra* Part III.C.i, no evidence shows that her feelings manifested in

---

Olivares and Professor Alice Thomas.  *Id.* at *7–9.  Though Newman ignores those prior holdings, *see* Opp'n at 20–21, the Court will not rehash them here.  More, even if the claims were live, they would fail without evidence of intentional racial discrimination.  *See infra* Part III.B.ii.

action affecting his scholarship.  Newman speculates that the January 2021 town hall depressed his grades by distracting him from schoolwork.  *See* Opp'n at 7.  But "a pro se plaintiff, like any other, cannot defeat summary judgment by making mere allegations or denials that are unsupported by affidavits or other competent evidence."  *Bloom v. McHugh*, 828 F. Supp. 2d 43, 53 (D.D.C. 2011).  And the record cuts against Newman's theory.  *See* Pl.'s Resp. DSMF ¶ 98 (admitting that his grades improved in Spring 2021, after the town hall).

In short, without evidence linking the individual Defendants' actions to Newman's scholarship, the § 1981 claim against these Defendants fails.  *See Patterson*, 375 F.3d at 229.

**ii.**

More, this § 1981 claim fails against every Defendant because the evidence does not show that his "race was a but-for cause" of his scholarship loss.  *Comcast Corp.*, 589 U.S. at 333.  This causal showing demands either direct or circumstantial evidence of racial discrimination.  *Moini v. Wrighton*, 602 F. Supp. 3d 162, 172 (D.D.C. 2022), *aff'd sub nom. Moini v. Granberg*, 2024 WL 2106214 (D.C. Cir. May 1, 2024).

"The record contains no direct evidence of discrimination" by Howard—"for example, a statement that itself shows racial . . . bias in the [scholarship] decision."  *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).  Newman reports "abundant" evidence but offers no record cites in support.  Opp'n at 22.  True, Newman's peers hurled racial insults at him.  *See, e.g.*, Pl.'s Ex. 10 at 8 (Newman's transcript of messages with classmates showing that another classmate called him "Mayo king").  But no classmate played a role in terminating Newman's scholarship.

So Newman's evidence is properly considered circumstantial—and it comes up short.  Circumstantial evidence of discrimination triggers the familiar *McDonnell Douglas* framework.

21

*See Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (applying *McDonnell Douglas* to a § 1981 claim); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff typically must present a prima facie case of discrimination before the burden shifts to the defendant.  *See, e.g.*, *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).  In this Circuit, however, when a defendant offers a legitimate, nondiscriminatory reason for its actions, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see Wheeler*, 812 F.3d at 1114.

Howard offers such a justification.  It maintains that Newman lost his scholarship because he did not rank in the top half of his class at the end of his first year.  Howard Mot. at 36–38.  Again, the evidence supports that story.  *See supra* Part III.A.i.  So the Court skips to the third *McDonnell Douglas* step, asking whether Newman "produced enough evidence for a reasonable jury to find that [Howard] intentionally discriminated against [him] on the basis of race." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 92 (D.D.C. 2019); *see Wheeler*, 812 F.3d at 1114.

Newman has not done so.  To be sure, Newman's grievance smorgasbord paints a bleak picture of his time at Howard Law.  But the three categories of evidence he musters do not create a triable issue over racial discrimination.

*First*, Newman criticizes Howard's enforcement of its scholarship policies.  He points out that the school's average scholarship award is lower for white students than any other group.  Opp'n at 5; *see* Pl.'s Resp. DSMF ¶ 8.  This evidence may be relevant if Newman brought a § 1981 claim based on the terms of his award.  *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (acknowledging that § 1981 permits a claim for racial discrimination in contract

formation).  But he did not.  Newman's claim instead turns on alleged interference with the scholarship agreement he signed.  *See* First Am. Compl. ¶ 229; Reply at 16.  Aside from scholarship data, Newman repeats his attacks on Dean Olivares's incorrect statement that he would not be ranked if he dropped his writing class.  Opp'n at 18.  Adding to the problems covered above, *see supra* Part III.A.i, is the fact that Olivares's statement has no discernable relationship to Newman's race.  He does not, for example, argue that any similarly situated non-white student avoided ranking and kept a scholarship he otherwise should have lost.  *See Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 144 (D.C. Cir. 2008) (recognizing differential treatment as a way of showing pretext).

*Second*, and relatedly, Newman argues that he was treated differently than his non-white peers.  A defendant's favorable treatment of a similarly situated individual of a different race can show pretext.  *See Royall*, 548 F.3d at 144.  But it requires a "nearly identical" comparator.  *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (cleaned up).  Though Newman complains he received worse treatment than his peers in many ways, he does not point to a particular peer for comparison.  For example, Newman stresses that the Law School denied his request for an exam time accommodation to adjust for his Hawaii time zone, though it made exceptions for other reasons.  Opp'n at 18–19; *see* Pl.'s Ex. 5 at 5:06.  But no other student requested or received the location-based accommodation Newman wanted.  *See* Pl.'s Resp. DSMF ¶ 14.  His complaints about the discipline he received for sending unsolicited listserv messages have the same problem.  *See* Opp'n at 19.

*Third*, Newman protests that a direct comparator is unnecessary because he has other evidence of the racially charged climate he encountered at Howard Law.  *See id.*  True, pretext can be shown in many ways.  But Newman's remaining evidence also comes up short.  He

23

begins broadly, taking issue with the racial focus of materials he read for class. *See id.* at 13, 19. That evidence has limited value. *See Moini*, 602 F. Supp. 3d at 180–81 (declining to consider evidence of a "racist climate on campus" in favor of "available specific evidence directly relevant to the particular plaintiff" (citing *Williams v. Boorstin*, 663 F.3d 109, 115 n.38 (D.C. Cir. 1980)). Otherwise, Newman criticizes his peers' conduct, pointing to insults in GroupMe messages and statements during the town hall. Opp'n at 19–20. But, again, Newman has not connected any of this peer behavior to his scholarship.

In the end, Howard shows that Newman lost his scholarship because he failed to rank in the top half of the class at the end of his first year. And the evidence shows that he failed to do that because he struggled academically. Newman counters with a convincing story that Howard Law School was far from a pleasant environment for him. But the evidence falls short where it matters most for a § 1981 claim. It does not permit a jury to find that intentional racial discrimination played a role in his scholarship loss. *See Brady*, 520 F.3d at 494.

### C.

Last, consider Newman's defamation claims against Dean Holley. Those claims turn on three statements made during Newman's 2022 disciplinary hearing. First, "Holley accused Newman of 'harassment' against her and against the students." First Am. Compl. ¶ 319. Second, "Holley called Newman's email regarding a deceased classmate 'defamatory' and repeatedly characterized Newman's general conduct as 'defamatory.'" *Id.* ¶ 317. And third, "Holley accused Newman of saying African-Americans suffer from hive mind." *Id.* ¶ 318.

To prevail on these claims, Newman must show that Holley made a "false and defamatory statement about him, without privilege, to a third party and that the statement was made at least negligently and caused Newman special harm." *Newman II*, 2024 WL 4227723, at

24

*13 (citing *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).  Each alleged defamatory statement occurred in a University disciplinary proceeding, so Holley is entitled to a qualified privilege.  *See Newman I*, 715 F. Supp. 3d at 113.  Overcoming that privilege requires Newman to show that Holley's statements "were made with express malice."  *Id.*  The Court begins by finding that Newman clears the malice hurdle, before turning to the remaining claim elements.  In the end, Newman's first defamation claim is not actionable, but the rest are.

**i.**

"Malice, in the context of a qualified privilege, is the equivalent of bad faith.  It is the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011) (citation omitted).  To determine whether there is a triable issue of malice, the Court "looks to the primary motive by which the defendant is apparently inspired."  *Id.* (citation omitted).  Under that test, "the mere existence of ill will" does not establish malice if the speaker made the statement for a proper purpose.  *Id.* at 926.  But, ultimately, "[w]hether a person acts with malice is ordinarily a question of fact for the jury."  *Id.* (citation omitted).

A jury could find that Dean Holley made the three statements with malice.  Her dislike of and frustration with Newman is apparent as early as January 2021—a year before she filed the complaint against him.  *See* Opp'n at 17, 20, 28–29.  In January 2021, Holley led the town hall that devolved into a grievance fest about Newman.  *See generally* Town Hall Tr., ECF No. 137-6.  And though she did not identify Newman by name herself at the meeting, she endorsed students' complaints about Newman.  *See, e.g.*, *id.* at 15 ("You came to an HBCU to be free of this kind of activity.").

25

A few days earlier, Holley told Newman that Howard "does not seem to be a very good fit for you." Pl.'s Ex. 81 at 8; *see id.* ("[M]y opinion is that this—you did not choose the right space for your legal education."). And, in the same meeting she complained that she "spent 25%" of her time in the "last three weeks" addressing Newman and his behavior. *Id.* at 10. By January 2022, Holley still saw Newman as "a disturbance." Pl.'s Ex. 39 at 13, ECF No. 136-19. She told him as much in a meeting days before filing charges against him. *Id.*

Holley seeks refuge in the principle that actual malice does not exist even if the speaker "feels resentment and indignation towards the plaintiff" so long as the "primary purpose" of the speech is to "further the interest which is entitled to protection." *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 50–51 (D.D.C. 2010), *aff'd*, 758 F.3d 265 (D.C. Cir. 2014) (cleaned up). She claims that she made the statements to further her protected interest of representing other students' complaints about Newman's actions. Howard Mot. at 39; *see* Defs.' Ex. 52 at 36:22–24 (Holley's testimony about the purpose of her statement).

But construing the facts in the light most favorable to Newman, the record suggests Holley may have had ulterior motives. There is no evidence that a student filed a formal complaint against Newman. *See* Defs.' Ex. 52 at 10:14–19 (Holley's testimony at the disciplinary hearing that one student "wanted to" file a complaint but "as far as I know she didn't do that"). And Holley *herself* told students a year before that "a student must file" a complaint about another student's Code of Conduct violation. Town Hall Tr. at 6 ("[I]f [a student] violate[s] the Student Code of Conduct, I don't have the power to do anything about that myself. That is something that a student must file a complaint about."); *see id.* at 12 ("If you have a complaint, you must file a complaint with the Office of Student Affairs . . . I think the Code is very clear on who should file the complaint. It should be the student who is directly impacted.").

26

So her decision—after a year of frustration with Newman—to bring charges on behalf of unnamed student victims who opted not to file their own complaints is at least open to question. This evidence, combined with Holley's past treatment of Newman, could permit a jury to find that Holley made the statements because of her ill will for Newman.

**ii.**

Now turn to the statements themselves. Dean Holley argues that each statement was neither injurious nor false.

Start with the injury requirement. Holley's argument that "there is no evidence the three statements at issue were injurious to [Newman's] reputation" can be quickly put to rest. Howard Mot. at 52. Holley protests that the disciplinary panel's report "did not rely on [her] characterization of Newman's conduct as a basis for Newman's disciplinary decision." *Id.* True, the report did not explicitly quote her statements. *See generally* Defs.' Ex. 69, ECF No. 116-68. But as Newman points out, Holley made the allegedly defamatory statements in the proceeding that led to the expulsion report. *See* Pl.'s Resp. DSMF ¶ 164. And the report states that it is based on "the documents and statements provided by Dean Holley-Walker and any cross examination of her." Defs.' Ex. 69 at 5. From this, a jury could find the statements injurious.

Now for the next question: Were Holley's statements false? *See* Howard Mot. at 40–52. "The question for falsity is whether 'the substance, the gist, the sting, of the libelous charge can be justified.'" *Newman II*, 2024 WL 4227723, at \*13 (quoting *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013)). Under District law, a statement is not considered "false" if it contains only "[s]light inaccuracies of expression." *See Liberty Lobby Inc., v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988). Further, "a statement of opinion is actionable only if it has an explicit or implicit factual foundation and is therefore objectively verifiable." *Guilford Transp.*

27

*Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000).

First up is Holley's statement that Newman committed harassment. *See* Defs.' Ex. 52 at 35:15–36:20; First Am. Compl. ¶ 319. She earns summary judgment on this claim because the statement was substantially true. *See Liberty Lobby*, 838 F.2d at 1291. She charged Newman with "harassment," which the Howard Student Code of Conduct defines as "engaging in verbal, electronic, visual, written or physical behavior directed at an individual or group that, in the view of a reasonable person, is likely to provoke or otherwise result in a negative or injurious response . . ." Pl.'s Ex. 69 at 7.

The record bears that charge out. Many students complained that they felt harassed by Newman's unsolicited emails. Newman himself recognized that some of his peers likely did not want his messages. Newman Dep. at 193:9–18. The most important one was the email discussing the deceased Howard student as part of a pitch for delayed vaccine deadlines. *See* Defs.' Ex. 60 at 2, ECF No. 116-59 (Newman's email). Students described that email as "deeply disturbing," an "exploitation" of the student's death, and "emotionally violating." Pl.'s Ex. 108 at 2, 3, 5, ECF No. 143-8. Holley also found the "message completely disgusting and disturbing." *Id.* at 1. Newman maintains that his classmates were merely disagreeing with his views. *See* Opp'n at 36. Maybe so. But his classmates' repeated negative reactions to his messages support Holley's charge that he engaged in "harassment" as defined by the Code. *See* Pl.'s Ex. 69 at 7. In other words, the "substance" of her charge is justified. *Armstrong*, 80 A.3d at 183. So Holley wins summary judgment.

Second is Holley's characterization of Newman's email about the deceased student as "defamatory." Defs.' Ex. 52 at 14:24–15:2, 35:7, 35:23–25; *see* First Am. Compl. ¶ 317. She first frames the statement as a non-actionable opinion. Howard Mot. at 42–43. The Court

28

rejected this argument years ago. *Newman I*, 715 F. Supp. 3d at 115. Nothing in the record changes that holding. Holley now frames her use of "defamatory" as a personal gripe made "in colloquial terms," rather than a legal charge. Defs.' Ex. 77 ¶ 13, ECF No. 116-76. But throughout the disciplinary process Holley used her position as Law School Dean to bolster her complaint. *See, e.g.*, Defs.' Ex. 52 at 35:10–11; Holley Compl. at 3. That context suggests she meant "defamatory" in its legal sense. *See Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C. 1991) (directing courts to consider the context of a statement when determining whether it is opinion). Whether that charge is true turns on genuinely disputed "objectively verifiable" facts. *Guilford Transp. Indus.*, 760 A.2d at 597; *see* Howard Mot. at 42.

As for falsity, the analysis for this statement turns on the same elements Newman himself needs to prove for his claim that Holley defamed *him*. Holley focuses on falsity, arguing that Newman's statement was truly defamatory. *See* Howard Mot. at 47–49. In doing so, she recasts her description of Newman's email as "defamatory" against *her*. *See id.* at 47; Reply at 27. In other words, that she lied "about a student's cause of death." Reply at 27. But the context of Holley's statement shows that she accused Newman of defaming the deceased student—not herself. *See* Holley Compl. at 2 (describing Newman's email as making a "false allegation that a recently deceased member of the Howard Law Class of 2022, [redacted] died due to receiving the COVID-19 vaccine and booster"). And Holley's briefing pays little attention to whether Newman defamed the student. She does not, for example, explain how Newman's speculation about the student's cause of death made the student appear "odious, infamous, or ridiculous." *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984). So summary judgment is inappropriate.

Now on to Newman's last defamation claim. It is based on Holley's statement, "You said that black people have hive mind." Defs.' Ex. 52 at 13:14–15; *see* First Am. Compl. ¶ 318.

This claim also survives.  Again, the statement was not framed as Holley's opinion.  *See Newman I*, 715 F. Supp. 3d at 115.  Holley was not, for example, offering an abstract "charge[] of racism."  *Florio v. Gallaudet Univ.*, 119 F.4th 67, 77 (D.C. Cir. 2024) (cleaned up).  Her full statement was:  "You said that black people have hive mind.  You said that black people believe that the government should solve -- *and that's actually in the chat*."  Defs.' Ex. 52 at 30:14–17 (emphasis added).  Those are not words "expressing a subjective view, an interpretation, a theory, conjecture, or surmise."  *Guilford Transp. Indus.*, 760 A.2d at 597.  She was "claiming to be in possession of objectively verifiable statements."  *Id.*  So the statement is an actionable factual assertion.

And a jury could find that it was a false one.  It is undisputed that Newman wrote in a GroupMe, "I *don't* know what I'm doing.  What I'm *trying* to do is share with you a viewpoint that you won't hear anywhere else because you all suffer badly from hive mind."  Defs.' Ex. 29 at 2, ECF No. 116-28.

Sufficient evidence supports Newman's argument that this statement referred to a few classmates, not all African Americans.  *See* Opp'n at 33–34.  To start, he posted it in the "Howard University School of Law Class of 23."  Defs.' Ex. 29 at 2.  And he wrote it in response to another student's question, "I'm just wondering why are u here? (as we seem to bother you so much)."  *Id.*  Newman's message itself also suggests a focused critique.  He says, "Your professors do not challenge you to question your assumptions" and "I still love all of you even though you so completely despise me."  *Id.*  From this a jury could conclude that he did not accuse African Americans generally of suffering from "hive mind."

Holley's counter that Newman made comments about the "black community" "mere minutes earlier" is mistaken.  Howard Mot. at 50.  Newman's "hive mind" comment came in

January 2021. *See* Pl.'s Ex. 80 at 2–3, ECF No. 116-79 (email from student complaining about the comment in January 2021); Pl.'s Resp. DSMF ¶ 63. That was months, not minutes, after his October 2020 statement, "Where I part with the black community is where they believe government solves problems." Howard Mot. at 50 (emphasis omitted); *see* Pl.'s Resp. DSMF ¶ 62. And though Holley is correct that at least one student interpreted Newman's comment as an accusation against "the class (and the Black community more generally)," Pl.'s Ex. 80 at 3, that evidence is best sent to the jury to be considered against Newman's contrary proffer.

## IV.

In the end, Howard wins summary judgment on the contract breach claims, the § 1981 claim based on interference with Newman's scholarship agreement, and the defamation claim against Holley for her "harassment" accusation. Two of Newman's defamation claims—based on Holley's description of his email as "defamatory" and her statement that he said African Americans suffer from "hive mind"—resist summary judgment. And because Howard does not address Newman's allegations that Defendants substantially interfered with his ability to obtain a J.D. degree, that § 1981 claim also continues. *See* First Am. Compl. ¶ 240–44.

Accordingly, it is:

**ORDERED** that the Motion for Summary Judgment, ECF No. 116, is **GRANTED IN PART** as to Newman's breach-of-contract claims, his § 1981 claim based on Defendants' interference with his scholarship, and his defamation claim against Holley based on her accusation that Newman committed harassment. The Motion is **DENIED IN PART** as to Newman's remaining two defamation claims. *See* First. Am. Compl. ¶¶ 317, 318. It is further

**ORDERED** that the Motion for Leave, ECF No. 161, is **GRANTED IN PART** as to Newman's request to amend paragraphs 44, 47, 54, 63, 104, 107, 110, 167, 175, 178, 181, 219,

31

220, and 226 of his Statement of Material Facts, and **DENIED IN PART** as to his proposed sur-reply and all other requested amendments.

      **SO ORDERED**.


Dated: March 25, 2026                                                      TREVOR N. McFADDEN, U.S.D.J.